**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| Wikimedia Foundation, *et al.*, | ) | |
| *Plaintiffs*, | ) | |
| | ) | Civil Action |
| v. | ) | |
| | ) | No. 1:15-cv-00662-TSE |
| | ) | |
| National Security Agency, *et al.*, | ) | |
| *Defendants*. | ) | |
| | ) | |
| | ) | |
| | ) | |

---

**BRIEF OF *AMICI CURIAE* AMERICAN BOOKSELLERS ASSOCIATION, AMERICAN
LIBRARY ASSOCIATION, ASSOCIATION OF RESEARCH LIBRARIES, FREEDOM
TO READ FOUNDATION, AND INTERNATIONAL FEDERATION OF LIBRARY
ASSOCIATIONS AND INSTITUTIONS IN SUPPORT OF PLAINTIFFS' OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS**

---

Andrew Crocker*
Mark Rumold
David Greene
ELECTRONIC FRONTIER
FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone:  (415) 436-9333
Facsimile:   (415) 436-9993
andrew@eff.org

*Pro hac vice* pending

Jan I. Berlage
GOHN HANKEY STICHEL &
BERLAGE LLP
201 N. Charles Street, Suite 2101
Baltimore, MD 21201
Telephone:  410-752-1261
Facsimile:   410-752-2519
JBerlage@ghsllp.com

*Counsel for Amici Curiae*

**TABLE OF CONTENTS**

INTRODUCTION AND STATEMENTS OF INTEREST OF AMICI...........................................1

ARGUMENT ..................................................................................................................................3

    I.       THE FIRST AMENDMENT PROTECTS THE RIGHTS TO RECEIVE
           INFORMATION, TO DISTRIBUTE EXPRESSIVE INFORMATION, AND
           TO ASSOCIATE WITH OTHERS WITHOUT GOVERNMENT
           INTERFERENCE, AND *AMICI* TAKE PAINS TO PROTECT THESE
           RIGHTS ...................................................................................................................3

    II.     IN LIGHT OF THESE SIGNIFICANT FIRST AMENDMENT INTERESTS,
           COURTS HAVE RECOGNIZED LIBRARIES' AND BOOKSELLERS'
           STANDING TO PROTECT THE RIGHTS OF THEIR PATRONS AND
           HAVE IMPOSED HEIGHTENED STANDARDS ON GOVERNMENT
           ATTEMPTS TO ENCROACH ON THOSE RIGHTS ..........................................8

         A.     Because Government Scrutiny Deters Readers from Asserting Their
                Constitutional Rights, Libraries and Booksellers Have Standing to Raise
                These Rights on Behalf of Their Patrons......................................................8

         B.     Courts Are Wary of Government Attempts to Force Disclosure of
                Readers' Records and Often Impose Heightened Requirements for This
                Disclosure ..................................................................................................10

    III.    THE NSA'S UPSTREAM SURVEILLANCE PROGRAM INFLICTS A
           FIRST AMENDMENT INJURY ON LIBRARIES, BOOKSELLERS, AND
           THEIR PATRONS................................................................................................12

         A.     Many Interactions Between Libraries and Booksellers and Patrons That
                Were Once Carried Out in Person at Physical Locations Now Occur
                Through the Internet ..................................................................................13

         B.     The Upstream Surveillance Program Alleged By Plaintiffs Infringes
                upon the First Amendment-Protected Interactions that Occur Between
                Libraries and Booksellers and Their Patrons Online ................................15

CONCLUSION.............................................................................................................................17

# TABLE OF AUTHORITIES

## Federal Cases

*Am. Immigration Lawyers Ass'n v. Reno*,
    199 F.3d 1352 (D.C. Cir. 2000) ........................................................................................ 10

*Amazon.com LLC v. Lay*,
    758 F. Supp. 2d 1154 (W.D.W. 2010) ............................................................................. 12

*Ashcroft v. Free Speech Coal.*,
    535 U.S. 234 (2002) .............................................................................................................. 3

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
    457 U.S. 853 (1982) .............................................................................................................. 5

*Cooksey v. Futrell*,
    721 F.3d 226 (4th Cir. 2013) ............................................................................................ 10

*Denver Area Educational Telecomms. Consortium, Inc. v. FCC*,
    518 U.S. 727 (1996) .............................................................................................................. 8

*Doe v. Gonzales*,
    386 F. Supp. 2d 66 (D. Conn. 2005) .................................................................................. 7

*Eisenstadt v. Baird,*
    405 U.S. 438 (1972) .............................................................................................................. 9

*In re Grand Jury Subpoena to Amazon.com Dated August 7, 2006*,
    246 F.R.D. 570 (W.D. Wis. 2007) ..................................................................... 7, 11, 16

*In re Grand Jury Subpoena to Kramerbooks & Afterwords*,
    26 Med. L. Rptr. 1599 (D.D.C. 1998) ..................................................................... *passim*

*John Doe, Inc. v. Mukasey*,
    549 F.3d 861 (2d Cir. 2008) ............................................................................................... 7

*Lamont v. Postmaster Gen. of U.S.*,
    381 U.S. 301 (1965) ................................................................................................... 4, 8, 16

*Lovell v. City of Griffin, Ga.*,
    303 U.S. 444 (1938) .............................................................................................................. 4

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ............................................................................................................ 10

*Martin v. City of Struthers, Ohio,*
    319 U.S. 141 (1943).............................................................................. 4, 5

*McIntyre v. Ohio Elections Comm'n,*
    514 U.S. 334 (1995)................................................................................. 4

*NAACP v. Alabama ex rel. Patterson,*
    357 U.S. 449 (1958)............................................................................. 5, 10

*Secretary of State of Maryland* v. *J. H. Munson Co.,*
    467 U. S. 947 (1984)............................................................................... 10

*Stanford v. Texas,*
    379 U.S. 476 (1965).............................................................................. 16

*Stanley v. Georgia,*
    394 U.S. 557 (1969)......................................................................... 4, 5, 16

*United States v. Playboy Entm't Grp., Inc.,*
    529 U.S. 803 (2000)............................................................................. 3, 4

*United States v. Rumely,*
    345 U.S. 41 (1953)......................................................................... 4, 5, 7, 8

*Virginia v. American Booksellers Association, Inc.,*
    484 U.S. 383 (1988)............................................................................ 9, 10

*Whitney v. California,*
    274 U.S. 357 (1927).............................................................................. 3

*Zurcher v. Stanford Daily,*
    436 U.S. 547 (1978)......................................................................... 11, 16

## State Cases

*Lubin v. Agora, Inc.,*
    882 A.2d 833 (Md. 2005) ................................................................... 9, 11

*Tattered Cover, Inc. v. City of Thornton,*
    44 P.3d 1044 (Colo. 2002) ............................................................... *passim*

## Constitutional Provisions

U.S. Const., amend. I ............................................................................. *passim*

**Other Authorities**

Am. Booksellers Ass'n, *Questions and Answers: Protecting Customer Privacy in Bookstores* .....7

Am. Library Ass'n & Am. Ass'n of Publishers, *The Freedom to Read Statement* (last modified June 30, 2004) ...............................................................................................5, 6

Am. Library Ass'n, *Code of Ethics of the American Library Association* (last adopted Jan. 22, 2008) ..................................................................................................................................6

Am. Library Ass'n, *Interpretation of the Library Bill of Rights* (amended July 1, 2014)..............6

Am. Library Ass'n, *Midwinter Council Minutes*, Am. Library Ass'n Bulletin (1939) ..................6

Am. Library Ass'n, *Policy concerning Confidentiality of Personally Identifiable Information about Library Users* (last amended June 30, 2004) ...........................................................6

Am. Library Ass'n, *Privacy Tool Kit* (last visited Aug. 27, 2015)................................................15

Barbara Genco, *It's Been Geometric! Documenting the Growth and Acceptance of eBooks in America's Urban Public Libraries*, World Library and Information Congress: 75th IFLA General Conference and Council (Jul. 24, 2009)....................................................13

Digital Book World, *New AAP Figures Show Ebook Growth Mostly Flat* (July 10, 2015)..........13

Information Policy Access Center, University of Maryland ("IPAC"), *2011-2012 Public Library Funding and Technology Access Survey: Survey Findings and Results* (June 15, 2012) ......................................................................................................................14

Int'l Fed'n of Library Ass'ns & Insts., *IFLA Statement on Privacy in the Library Environment* (Aug. 14, 2015) ...................................................................................................................6

IPAC, *2013 Digital Inclusion Survey: Survey Findings and Results* (July 21, 2014)...................14

Maryland State Library Res. Ctr., Privacy Policy (last visited Aug. 27, 2015)..............................7

Montgomery Cnty. Pub. Libraries, *Library privacy and confidentiality* (last visited Aug. 27, 2015) .....................................................................................................................................7

School Library Journal, *2014 Survey of Ebook Usage in U.S. Public Libraries* ..........................13

## INTRODUCTION AND STATEMENTS OF INTEREST OF *AMICI*[1]

*Amici* are the leading organizations representing libraries and booksellers in the United States and abroad. They write to draw the Court's attention to the significant First Amendment harm to libraries and booksellers inflicted by the government surveillance program challenged by the plaintiffs. The Supreme Court has repeatedly explained that the freedom to read and receive information is closely bound up with freedom of speech, and that these freedoms are essential to a properly functioning democracy. As holders and distributors of the world's collective knowledge, *amici*'s members play a direct and intimate role in facilitating unfettered intellectual inquiry. Because of this unique relationship to individuals' freedom to read and speak, the Supreme Court has recognized that libraries and booksellers have standing to challenge government actions that burden their and their readers' First Amendment rights. These are rights that courts have consistently recognized and allowed *amici* to protect in the physical world.

This case implicates those rights in the digital world. Upstream, the government surveillance program challenged by the plaintiffs here, peers into the online interactions between millions of readers and libraries and booksellers operating on the Internet. Like the named plaintiffs, the First Amendment rights of *amici* and their readers are harmed by Upstream collection. *Amici* therefore respectfully agree with the plaintiffs that they have standing to pursue their claims.

The American Booksellers Association ("ABA"), through its division, the American Booksellers for Free Expression, is the bookseller's voice in the fight against censorship. One of

---

[1] No one, except for undersigned counsel, has authored this brief in whole or in part or contributed money toward the preparation of this brief. Plaintiffs consent to the filing of this brief. Counsel for the defendants state that they "take no position regarding the filing of an amicus brief on the issue of standing in support of the plaintiffs in this case."

ABA's missions is to inform and educate booksellers, other members of the book industry, and the public about the dangers of censorship and to promote and protect the free expression of ideas, particularly freedom in the choice of reading materials. ABA is a not-for-profit trade association comprised of more than 1,600 locally owned and operated independent bookstores nationwide.

Established in 1876 and with more than 55,000 current members, the American Library Association ("ALA") is the oldest and largest library association in the world providing advocacy, information, and resources to librarians and library users. It actively defends the right of tens, if not hundreds, of millions of library users to read, seek information, and speak freely as guaranteed by the First Amendment.

The Association of Research Libraries ("ARL") is a non-profit association of 124 research libraries in North America. ARL's members include university libraries, public libraries, and government and national libraries. ARL influences the changing environment of scholarly communication and the public policies that affect research libraries and the diverse communities they serve. Protecting intellectual freedom is of central importance for libraries and the patrons they serve.

The Freedom to Read Foundation ("FTRF") is an organization established by the American Library Association to promote and defend First Amendment rights, foster libraries as institutions that fulfill the promise of the First Amendment, support the right of libraries to include in their collections and make available to the public any work they may legally acquire, and establish legal precedent for the freedom to read of all citizens.

The International Federation of Library Associations and Institutions ("IFLA") is the leading international body representing the interests of library and information services and their

users. It is the global voice of the library and information profession. Founded in 1927, IFLA represents over 750,000 library and information professionals in over 150 countries. IFLA's Freedom of Access to Information and Freedom of Expression (FAIFE) Committee defends user privacy and promotes intellectual freedom in all aspects, directly or indirectly, related to libraries and librarianship. It believes that intellectual freedom is the right of every individual to both hold and express opinions and to seek and receive information; intellectual freedom is the basis of democracy; and intellectual freedom is the core of the library concept.

## ARGUMENT

I.    **THE FIRST AMENDMENT PROTECTS THE RIGHTS TO RECEIVE INFORMATION, TO DISTRIBUTE EXPRESSIVE INFORMATION, AND TO ASSOCIATE WITH OTHERS WITHOUT GOVERNMENT INTERFERENCE, AND *AMICI* TAKE PAINS TO PROTECT THESE RIGHTS.**

The First Amendment's familiar protections for freedom of speech and press encompass the rights to distribute information, to receive information, and to freely and privately associate.

"The right to think is the beginning of freedom, and speech must be protected from the government because speech is the beginning of thought." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002). It is through speech that "our personalities are formed and expressed" and "our convictions and beliefs are influenced, expressed, and tested" so that we can "bring those beliefs to bear on Government and on society." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 817 (2000). Free expression is indispensible to nurturing fully engaged members of a democracy and to "the discovery and spread of political truth" for a free, pluralistic, and transparent society. *Whitney v. California*, 274 U.S. 357, 375 (1927) (Brandeis, J., concurring).

To realize the full potential of free expression, the Supreme Court has recognized the necessity of certain corollary rights—the right to distribute and receive information and to associate.

The Court has repeatedly affirmed the right to distribute information—by entitling publishers to sell anonymously, pamphleteers to distribute, and cable operators to transmit. *See United States v. Rumely*, 345 U.S. 41 (1953); *Lovell v. City of Griffin, Ga.*, 303 U.S. 444 (1938); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995); *Playboy Entm't.*, 529 U.S. 803.

Freedom to disseminate information is futile, though, if others cannot receive this information. Indeed, "[i]t would be a barren marketplace of ideas that had only sellers and no buyers." *Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301, 308 (1965) (Brennan, J., concurring). The Supreme Court has accordingly established, without equivocation, that "[t]he right of freedom of speech and press . . . necessarily protects the right to receive it." *Martin v. City of Struthers, Ohio*, 319 U.S. 141, 143 (1943), and that "[t]he dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them." *Lamont*, 381 U.S. at 308 (Brennan, J., concurring). *See also Playboy Entm't*, 529 U.S. at 817 (noting First Amendment right to "seek out or reject certain ideas or influences without Government interference or control").

The Court has mandated tolerance for the consumption of even the most contentious of ideas. "If the First Amendment means anything, it means that a State has no business telling a man . . . what books he may read or what films he may watch." *Stanley v. Georgia*, 394 U.S. 557, 565 (1969). This freedom from government interference forbids the government from discovering people's interest in specific information. State knowledge of sensitive associations and intellectual inquiry is "almost certain" to deter the "uninhibited, robust, and wide-open

debate and discussion" contemplated by the Constitution. *Lamont*, 381 U.S. at 307 (holding unconstitutional a requirement that readers affirmatively request to receive communist political mail). The Supreme Court has similarly recognized the right to associate privately for the purpose of expressive activity. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958).

These rights to distribute, receive, and associate protect library and bookseller records from government inquiry. Libraries are the "principal loc[i]" of these First Amendment freedoms. *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 868 (1982). And, accordingly, the First Amendment affords "the right to be free from state inquiry into the contents of [one's] library." *Stanley*, 394 U.S. at 565. With bookstores, "[o]nce the government can demand of a publisher the names of the purchasers of his publications . . . [f]ear of criticism goes with every person into the bookstall." *Rumely*, 345 U.S. at 57 (Douglas, J., concurring); *see also Tattered Cover, Inc. v. City of Thornton*, 44 P.3d 1044 (Colo. 2002). The protection for private and anonymous perusal, discovery, and enlightenment within libraries and bookstores is sacrosanct; it is comparable to the Constitution's strict protection for the sanctity of the home. *Rumely*, 345 U.S. at 58 (1953) (Douglas, J., concurring) ("If [a person] can be required to disclose what she read . . . , fear will take the place of freedom in the libraries, bookstores, and homes of the land."). Indeed, it is "vital to the preservation of a free society." *Martin*, 319 U.S. at 146–47.

Because, as these cases indicate, the "freedom to read is essential to our democracy,"[2] it is no surprise that protecting the privacy of patrons is central to libraries and booksellers' missions. As key venues for the consumption of ideas, libraries and booksellers have a duty to

---

[2] Am. Library Ass'n & Am. Ass'n of Publishers, *The Freedom to Read Statement* (last modified June 30, 2004), http://www.ala.org/advocacy/intfreedom/statementspols/freedomreadstatement.

safeguard the diffusion and receipt of information. *Amicus* the American Library Association's ("ALA") Freedom to Read Statement proclaims, "It is the responsibility of publishers and librarians, as guardians of the people's freedom to read, to contest encroachments upon that freedom," in particular by government intrusion.[3]

Libraries and booksellers have long undertaken the duty to protect patron records. In its first Code of Ethics adopted in 1939, the ALA enshrined the "librarian's obligation to treat as confidential any private information obtained through contact with library patrons"[4]—a tenet that remains in place today.[5] Other foundational documents adopted by ALA on behalf of its 55,000 members underscore the need to safeguard reader privacy. These include the Library Bill of Rights, which declares "a right to be free from any unreasonable intrusion into or surveillance of [users'] lawful library use,"[6] and the Policy Concerning Confidentiality of Personally Identifiable Information, which "reaffirms [the ALA's] opposition to any use of governmental prerogatives that . . . discourages [people] from exercising the right of free expression."[7] Meanwhile, *amicus* the International Federation of Library Associations and Institutions ("IFLA") has drawn on the Universal Declaration on Human Rights to establish global norms for libraries' protection of

---

[3] *Id.*

[4] Am. Library Ass'n, *Midwinter Council Minutes*, Am. Library Ass'n Bulletin 33 no. 2 (1939): 128–129, *available at* http://www.ala.org/advocacy/sites/ala.org.advocacy/files/content/proethics/codeofethics/coehistory/1939code.pdf.

[5] Am. Library Ass'n, *Code of Ethics of the American Library Association* (last adopted Jan. 22, 2008), http://www.ala.org/advocacy/proethics/codeofethics/codeethics.

[6] Am. Library Ass'n, *Interpretation of the Library Bill of Rights* (amended July 1, 2014), http://www.ala.org/advocacy/intfreedom/librarybill/interpretations/privacy.

[7] Am. Library Ass'n, *Policy concerning Confidentiality of Personally Identifiable Information about Library Users* (last amended June 30, 2004), http://www.ala.org/advocacy/intfreedom/statementspols/otherpolicies/policyconcerning (internal quotations omitted).

patron privacy.[8] Local libraries, including branches throughout Maryland, make the same promise to protect the consumption of ideas from the specter of unwarranted state scrutiny.[9] Booksellers are no different: *Amicus* the American Booksellers Association ("ABA") explains that "protecting the customer's privacy is one of a bookseller's primary responsibilities."[10]

Such commitments are not lip service. Libraries and booksellers have repeatedly asserted their and their users' First Amendment rights in court—as *amici*, interveners, and litigants. For more than fifty years, they have taken part in cases to quash subpoenas, invalidate search warrants, or speak as *amici* to contest state attempts to monitor and unmask patrons engaged in expressive activity. *See, e.g.*, *Rumely*, 345 U.S. at 42 (bookseller resisting a House committee's document requests); *In re Grand Jury Subpoena to Kramerbooks & Afterwords*, 26 Med. L. Rptr. 1599 (D.D.C. 1998) (bookstore bringing motion to quash subpoenas) ("*Subpoena to Kramerbooks*"); *In re Grand Jury Subpoena to Amazon.com Dated August 7, 2006*, 246 F.R.D. 570 (W.D. Wis. 2007) (online bookseller suing for declaratory relief); *Tattered Cover*, 44 P.3d at 1044 (bookstore resisting search warrant for customer's purchase record). In 2005, a library sued to challenge the constitutionality of a National Security Letter aimed at exposing user records, arguing that such searches and seizures chill speech. *Doe v. Gonzales*, 386 F. Supp. 2d 66 (D. Conn. 2005). Libraries and booksellers, including *amici* ALA, ABA and the Freedom to Read

---

[8] *See* Int'l Fed'n of Library Ass'ns & Insts., *IFLA Statement on Privacy in the Library Environment* (Aug. 14, 2015), *available at* http://www.ifla.org/files/assets/hq/news/documents/ifla-statement-on-privacy-in-the-library-environment.pdf.

[9] *See, e.g.*, Maryland State Library Res. Ctr., Privacy Policy (last visited Aug. 27, 2015), http://www.slrc.info/about/Default.aspx?id=81998; Montgomery Cnty. Pub. Libraries, *Library privacy and confidentiality* (last visited Aug. 27, 2015), http://www.montgomerycountymd.gov/library/policies/privacy.html.

[10] Am. Booksellers Ass'n, *Questions and Answers: Protecting Customer Privacy in Bookstores* (last visited Aug. 27, 2015), http://www.bookweb.org/sites/default/files/diy/protectingcustomerprivacy120114_0.pdf.

Foundation ("FTRF"), later filed amicus briefs in support of a similar challenge. *See John Doe, Inc. v. Mukasey*, 549 F.3d 861, 865 (2d Cir. 2008).

II. **IN LIGHT OF THESE SIGNIFICANT FIRST AMENDMENT INTERESTS, COURTS HAVE RECOGNIZED LIBRARIES' AND BOOKSELLERS' STANDING TO PROTECT THE RIGHTS OF THEIR PATRONS AND HAVE IMPOSED HEIGHTENED STANDARDS ON GOVERNMENT ATTEMPTS TO ENCROACH ON THOSE RIGHTS.**

A. **Because Government Scrutiny Deters Readers from Asserting Their Constitutional Rights, Libraries and Booksellers Have Standing to Raise These Rights on Behalf of Their Patrons.**

Providers of books and reading material such as libraries and booksellers are often uniquely positioned to assert readers' First Amendment rights. Readers change or curtail their reading if they fear government scrutiny of their behavior, especially where the intrusion concerns reading material that is personally embarrassing, politically controversial, or otherwise revealing. *See Rumely*, 345 U.S. at 57-58 (Douglas, J., concurring). For example, the Supreme Court has held that cable subscribers would be deterred from filing written requests for "sex-related" programming out of "fear for their reputations should the operator, advertently or inadvertently, disclose the list of those who wish to watch the 'patently offensive' channel." *Denver Area Educational Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 754 (1996). Similarly, in *Lamont*, the Court explained that a requirement to file a request for communist materials would be "almost certain to have a deterrent effect" because "[p]ublic officials like schoolteachers who have no tenure, might think they would invite disaster if they read what the Federal Government says contains the seeds of treason." 381 U.S. at 307.

The resulting inhibition of expressive activity is not hypothetical: patrons care deeply about their intellectual privacy and avoid situations where they cannot preserve it. In *Subpoena*

*to Kramerbooks*, the D.C. district court found that as a result of a grand jury subpoena for a patron's book purchases, "[m]any customers have informed Kramerbooks personnel that they will no longer shop at the bookstore because they believed Kramerbooks to have turned documents over . . . that reveal a patron's choice of books." 26 Media L. Rep. (BNA) at 1601. Similarly, when the owner of the Tattered Cover bookstore challenged a search warrant for a customer's purchase history, she testified she received an "'enormous amount of feedback' from customers about this case, including over one hundred letters from customers in support of the Tattered Cover's position." *Tattered Cover*, 44 P. 3d at 1050.

Just as the realization that their libraries and booksellers cannot guarantee their privacy vis-à-vis the government causes readers to refrain from free inquiry, it also deters them from challenging government intrusions into their privacy. Libraries and booksellers are then left to raise the First Amendment on readers' behalf. In light of the crucial role that booksellers and libraries play in the marketplace of ideas and their intimate connection to readers, the Supreme Court has recognized exceptions to traditional prudential standing rules requiring parties to assert their own rights. *Virginia v. American Booksellers Association, Inc.*, 484 U.S. 383, 387, 392-3 (1988); *see also Tattered Cover*, 44 P. 3d at 1051 n.9 (relying on *American Booksellers* for store owner's ability to raise customers' First Amendment rights); *Lubin v. Agora, Inc.,* 882 A.2d 833, 846 n.11 (Md. 2005) (publisher can raise readers' First Amendment rights). This is "precisely because application of those rules would have an intolerable, inhibitory effect of freedom of speech." *Eisenstadt v. Baird,* 405 U.S. 438, 445 n.5 (1972).

For example, the Court permitted the ABA to raise bookbuyers' First Amendment rights to view protected material deemed "harmful to minors" as part of a challenge to a Virginia law criminalizing display of such material "in a manner whereby juveniles may examine and peruse"

it.[11] *Am. Booksellers*, 484 U.S. at 387, 392-3. The Court explained that "in the First Amendment context, '[l]itigants . . . are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'"[12] *Id.* at 392-93 (quoting *Secretary of State of Maryland* v. *J. H. Munson Co.,* 467 U. S. 947, 956-957 (1984)). "Society as a whole then would be the loser." *Munson*, 467 U.S. at 956; *see also Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013).

> **B.    Courts Are Wary of Government Attempts to Force Disclosure of Readers' Records and Often Impose Heightened Requirements for This Disclosure.**

Confronted by challenges from libraries and booksellers to government demands for patron information, courts have recognized that these investigations risk grave harm to the First Amendment rights of both targets and innocent third parties. "[W]henever law enforcement officials rifle through a bookstore's file cabinets or computer records, the book-buying records of innocent customers will almost inevitably be exposed to governmental observation." *Tattered*

---

[11] The Court also held that the booksellers met the Article III standing requirements for injury-in-fact because they were required to take "costly compliance measures or risk criminal prosecution." 484 U.S. at 392. Similarly, when booksellers receive government search warrants or subpoenas that implicate their and their readers' First Amendment rights, the booksellers satisfy Article III standing requirements. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992) ("little question" that object of government action is injured).

[12] Similarly, courts allow third parties to assert others' First Amendment rights of association or anonymity "when assertion of the right would essentially defeat it." *Am. Immigration Lawyers Ass'n v. Reno*, 199 F.3d 1352, 1363 (D.C. Cir. 2000) (citing *NAACP*, 357 U.S. at 459). Such is the case, for example, when the government seeks to identify readers of a specific book based on their purchase history. *Tattered Cover*, 44 P. 3d at 1053 (allowing bookstore to challenge search warrant for customer's purchasing history because the warrant "intrude[s] upon the First Amendment rights of customers and bookstores because compelled disclosure of book-buying records threatens to destroy the anonymity upon which many customers depend").

*Cover*, 44 P.3d at 1060. As a result, these courts have safeguarded readers from governmental intrusion, even where the government's investigative aim is otherwise legitimate.

In perhaps the best-known case, the Colorado Supreme Court refused to enforce a warrant to search the Tattered Cover bookstore for evidence related to its transaction with a suspect. *Tattered* Cover, 44 P.3d at 1048. The court noted that under the federal Constitution, "when expressive rights are implicated, a search warrant must comply with the particularity requirements of the Fourth Amendment with 'scrupulous exactitude.'" *Id.* at 1055 (quoting *Zurcher v. Stanford Daily,* 436 U.S. 547, 564 (1978)). But, the court found that Colorado's Constitution placed even more stringent requirements on government access to book records, requiring not only a warrant but a prior adversarial hearing and a showing of a compelling need. *Id.* at 1047. *See also Lubin,* 882 A.2d at 846 (quashing subpoena for publisher's records that failed to articulate substantial relationship between records sought and compelling state interest).

Similarly, federal courts have recognized the considerable risk that subpoenas for reader records pose to readers' First Amendment interests and required a significant showing by the government before allowing disclosure. For example, when federal investigators attempted to use a grand jury subpoena to obtain Monica Lewinsky's reading records from the Kramerbooks bookstore in Washington, D.C., the court held that the First Amendment required the government to "demonstrate a compelling interest in the information sought . . . [and] a sufficient connection between the information sought and the grand jury investigation[.]" *Subpoena to Kramerbooks*, 26 Media L. Rep. at 1601. Similarly, a Wisconsin district court quashed a grand jury subpoena issued as part of an investigation into a "prolific seller of used books on Amazon.com" that sought the identities of 120 third-party book buyers from Amazon.com because of the harm to the buyers' First Amendment interests. *In re Grand Jury Subpoena to*

*Amazon.com Dated August 7, 2006*, 246 F.R.D. at 571-73. The court noted that "it is an unsettling and un-American scenario to envision federal agents nosing through the reading lists of law-abiding citizens while hunting for evidence against somebody else." *Id.* at 573. *See also Amazon.com LLC v. Lay*, 758 F. Supp. 2d 1154, 1172 (W.D.W. 2010) (subpoena to Amazon.com for customers' purchase history as part of tax investigation violated First Amendment).

Each of these courts has required that government investigations that risk revealing individuals' reading history—whether by search warrant or subpoena—require the government to meet an exacting standard. For example, government requests must be narrowly tailored, and the government interest in the information sought must be compelling. *Subpoena to Kramerbooks*, 26 Media L. Rep. at 1601; *Tattered Cover*, 44 P.3d at 1058-59. In addition, because of the risk to core First Amendment values, these courts recognize the importance of pre-enforcement judicial review of governmental demands. *Id.* at 1047.

### III.    THE NSA'S UPSTREAM SURVEILLANCE PROGRAM INFLICTS A FIRST AMENDMENT INJURY ON LIBRARIES, BOOKSELLERS, AND THEIR PATRONS.

Just as libraries and booksellers have standing to challenge law enforcement access to patron records in the physical world so, too, do they have standing to challenge unwarranted access to digital records. Just as government intrusion on the freedom of inquiry causes First Amendment injury in the physical world so, too, does government surveillance cause injury in the digital world. And, just as the plaintiffs in this case, libraries and booksellers and their patrons are injured by the NSA's Upstream surveillance and have standing to challenge it. By sweeping in and searching vast amounts of Internet traffic, upstream surveillance encroaches on the sensitive interactions between libraries and booksellers and their patrons—interactions that, as shown above, these entities have historically taken great pains to protect.

### A. Many Interactions Between Libraries and Booksellers and Patrons That Were Once Carried Out in Person at Physical Locations Now Occur Through the Internet.

As with much of American life, interaction between readers and libraries and booksellers increasingly takes place online. Most obviously, patrons regularly check out and download books from libraries online. In 2013, public libraries had a median of 10,484 ebook titles available to patrons and a median circulation of 13,418.[13] For the largest public libraries (those serving populations of 500,000 or above), those numbers were substantially higher: those libraries had a median collection of 31,250 and a median circulation of 306,670.[14] In one 2009 study, 97.6% of surveyed, public libraries had ebooks and other downloadable digital content in their collections.[15] Indeed, since those libraries began adding downloadable content to the libraries' collections, 87.8% reported an increase in overall library circulation—at least partially attributable to "the dramatic, even geometric growth of eBook use."[16] And of course, the rise in popularity of purchasing books from online marketplaces is well known.[17]

Moreover, a library's online interactions with its patrons are not limited to loaning ebooks. Rather, libraries increasingly serve as vital digital hubs for communities, providing millions of people with access to technologies for education, employment, civic engagement, and

---

[13] School Library Journal, *2014 Survey of Ebook Usage in U.S. Public Libraries* at 40, a*vailable at* https://s3.amazonaws.com/WebVault/ebooks/LJSLJ_EbookUsage_PublicLibraries_2014.pdf

[14] *Id*. at 28, 32.

[15] Barbara Genco, *It's Been Geometric! Documenting the Growth and Acceptance of eBooks in America's Urban Public Libraries*, World Library and Information Congress: 75th IFLA General Conference and Council (Jul. 24, 2009) at 4, *available at* http://conference.ifla.org/past-wlic/2009/212-genco-en.pdf

[16] *Id*. at 15, 17.

[17] In 2013, 21 percent of all trade books sold in the United States were e-books and 59 percent of all books sold were sold online, according to the Association of American Publishers. *See* Digital Book World, *New AAP Figures Show Ebook Growth Mostly Flat* (July 10, 2015), http://www.digitalbookworld.com/2015/new-aap-figures-show-ebook-growth-mostly-flat.

health purposes. "Virtually all public library outlets provide public access to the Internet."[18]

Indeed, in many parts of the country, libraries are often the only source of free public Internet and computer access in a library's service area.[19] Libraries provide a host of Internet-based resources and services to their patrons, including licensed databases, online homework assistance tools, digital reference materials, online instructional courses, audio and video content, and library social networking.[20] In sum:

> Libraries offer a vast array of programs, services, and technologies to patrons, many of which would not have even been conceivable in the not-so-distant past. Libraries offer both formal and informal training for a number of digital technologies to thousands of communities across the country, many of which might otherwise simply forego the ability to either access or effectively utilize digital technology. Libraries are open, connected, and serve as a community-based access point to increasingly digital information and technology that many would not have otherwise.[21]

The fact that these interactions occur online does not diminish libraries' compelling interest in protecting the privacy of their interactions with patrons. Indeed, the same interests animating the protection of patron records in the physical world applies with equal force to interactions occurring online: patrons' interactions with libraries and booksellers reveal private and sensitive details about an individual's intellectual life. *See* Section I, *supra* at 3-5. As the ALA has observed:

> One cannot exercise the right to read in any format if the possible consequences include damage to one's reputation, ostracism from the community or workplace,

---

[18] Information Policy Access Center, University of Maryland ("IPAC"), *2011-2012 Public Library Funding and Technology Access Survey: Survey Findings and Results* 15 (June 15, 2012), *available at*
 http://ipac.umd.edu/sites/default/files/publications/2012_plftas.pdf.
[19] *Id*. at 16.
[20] *Id.* at 4, 32.
[21] IPAC, *2013 Digital Inclusion Survey: Survey Findings and Results* 19, (July 21, 2014), *available at*
http://digitalinclusion.umd.edu/sites/default/files/uploads/2013DigitalInclusionNationalReport.pdf.

or criminal penalties . . . For libraries to flourish as centers for uninhibited access to information, librarians must stand behind their users' right to privacy and freedom of inquiry. . . Just as people who borrow murder mysteries are unlikely to be murderers, so those seeking information about terrorism are unlikely to be terrorists.[22]

### B. The Upstream Surveillance Program Alleged By Plaintiffs Infringes upon the First Amendment-Protected Interactions that Occur Between Libraries and Booksellers and Their Patrons Online.

A patron's search of a library or bookseller's online collection; the purchase or reserve of physical books, the download of ebooks; and the use of online reference tools—the privacy of all these interactions, and others, are invaded by government surveillance conducted on the Internet's backbone.

The government's upstream surveillance, as alleged by plaintiffs, is accomplished by "connecting surveillance devices to multiple major internet cables, switches, and routers on the internet backbone inside the United States." First Amended Complaint, ¶ 47. Upstream "involves the surveillance of essentially *everyone's* communications . . . . [T]he NSA copies and reviews the communications of millions of innocent people to determine whether they are discussing or reading anything containing the NSA's search terms." *Id*., ¶ 50 (emphasis in original).

Included in the "millions of innocent people" swept within the government's upstream surveillance are libraries, booksellers, and their patrons as they communicate online. Those interactions—the same ones that *amici* have historically gone to great lengths to protect in the physical world—are unceremoniously and systematically

---

[22] Am. Library Ass'n, *Privacy Tool Kit* (last visited Aug. 27, 2015), *available at* http://www.ala.org/advocacy/sites/ala.org.advocacy/files/content/privacyconfidentiality/toolitsp rivacy/Privacy%20Tool%20Kit_January2014.pdf.

searched as they pass through government surveillance devices. These searches are "almost certain" to deter the environment of "uninhibited, robust, and wide-open" inquiry that *amici* work tirelessly to foster. *Lamont*, 381 U.S. at 307. Upstream thus violates the First Amendment "right to be free from state inquiry into the contents of [one's] library," *Stanley*, 394 U.S. at 565—a right which *amici* would have standing to vindicate. *See* Section II.A, *supra* at 8-10.

Finally, as plaintiffs allege, the government's upstream surveillance is conducted without warrants—and, indeed, without any suspicion whatsoever. *See* First Amended Complaint, ¶ 35. Upstream is thus a far cry from the "scrupulous exactitude" the Supreme Court requires. *Zurcher*, 436 U.S. at 564 (citing *Stanford v. Texas*, 379 U.S. 476, 485 (1965)); *see also* Section II.B*, supra* at 10-12. Instead, where online communications between libraries, booksellers, and their patrons are concerned, Upstream resembles the "unsettling and un-American scenario" of "federal agents nosing through the reading lists of law-abiding citizens while hunting for evidence against somebody else." *In re Grand Jury Subpoena to Amazon.com Dated August 7, 2006*, 246 F.R.D. at 573.

## CONCLUSION

For the above reasons, the Court should deny the government's motion to dismiss.


Dated:  September 3, 2015                Respectfully submitted,

                                        By:  /s/ Jan I. Berlage
                                            Jan I. Berlage
                                            GOHN HANKEY STICHEL & BERLAGE LLP
                                            201 N. Charles Street, Suite 2101
                                            Baltimore, MD 21201

                                            Andrew Crocker (*pro hac vice* pending)
                                            Mark Rumold
                                            David Greene
                                            ELECTRONIC FRONTIER
                                            FOUNDATION
                                            815 Eddy Street
                                            San Francisco, CA 94109

                                            *Counsel for Amici Curiae*