# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| WIKIMEDIA FOUNDATION, *et al.*     : | |
|                        : | |
|           Plaintiffs,     : | |
|                        : | Civil Action No. 1:15-cv-662-TSE |
|         v.     : | |
|                        : | |
| NATIONAL SECURITY     : | |
| AGENCY/CENTRAL SECURITY     : | |
| SERVICE, *et al.*     : | |
|                        : | |
|           Defendant. | |

---

## BRIEF OF *AMICI CURIAE* FIRST AMENDMENT LEGAL SCHOLARS

---

MARGOT E. KAMINSKI[*]
Assistant Professor of Law
Moritz College of Law
The Ohio State University
55 W. 12th Ave.
Columbus, Ohio 43210
T:  (614) 292-2092
kaminski.217@osu.edu

EMILY L. LEVENSON (#28670)
JOSHUA R. TREEM (#00037)

BROWN, GOLDSTEIN & LEVY, LLP

120 E. Baltimore Street, Suite 1700
Baltimore, Maryland 21202
T:  (410) 962-1030
F:  (410) 385-0869
elevenson@browngold.com
jtreem@browngold.com

*Counsel for Amici Curiae First Amendment
  Legal Scholars*

---

[*] Not admitted in this jurisdiction; motion for admission *pro hac vice* pending. This brief has been prepared and joined by individuals affiliated with various law schools, but it does not purport to present any school's institutional views.

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... ii

STATEMENT OF AMICI INTEREST ............................................................................1

ARGUMENT ....................................................................................................................2

A.    Surveillance Can Cause Injury-in-Fact Under the First Amendment. ..................3

       1.    Surveillance Can Violate Recognized First Amendment Rights. ...........4

             a.    The First Amendment Protects Anonymous Speech. ..................4

             b.    The First Amendment Protects the Right to Privacy in One's
                   Associations. ...............................................................................7

             c.    The First Amendment Protects the Right to Receive Information in
                   Private. ........................................................................................8

       2.    "Chilling Effects" are a Recognized Form of First-Amendment Injury..................9

B.    First Amendment Standing is Distinctive and Permissive................................10

       1.    Threshold Standing Requirements are More Liberally Interpreted in the First
             Amendment Context. ......................................................................11

             a.    Third Parties Can Have Standing Under the First Amendment.................11

             b.    Anticipated Injuries Can Suffice to Create Standing Under the First
                   Amendment......................................................................12

             c.    Facial Challenges are More Favored Under the First Amendment. ..........13

       2.    *Laird* and *Clapper* Do Not Overturn Permissive First Amendment Standing
             Doctrine...........................................................................................14

             a.    *Laird v. Tatum* Addressed Otherwise-Legal Surveillance in Public,
                   and General Rather than Specific Allegations of Chilling Effects. ..........14

             b.    *Clapper v. Amnesty International* Addressed a Facial Challenge
                   Where Plaintiffs Could Not Show the Existence of a Surveillance
                   Program Traceable to the Challenged Statute............................16

CONCLUSION....................................................................................................19

# TABLE OF AUTHORITIES

**Cases**

*[Redacted]*,
    (FISC Nov. 30, 2011)...........................................................................................19

*[Redacted]*,
    (FISC Oct. 3, 2011).............................................................................................19

*[Redacted]*,
    (FISC September [] 2012)...................................................................................19

*Am. Civil Liberties Union v. Clapper*,
    785 F.3d 787 (2d Cir. 2015)..............................................................................18

*Amnesty Int'l USA v. Clapper*,
    638 F.3d 118 (2d Cir. 2011)..............................................................................19

*Benham v. City of Charlotte*,
    635 F. 2d 129 (4th Cir. 2011) ...........................................................................10

*Broadrick v. Oklahoma*,
    413 U.S. 601 (1973)..........................................................................................13

*Clapper v. Amnesty Int'l*,
    133 S. Ct. 1138 (2013)................................................................................*passim*

*Constantine v. Rectors & Visitors of George Mason Univ.*,
    411 F.3d 474 (4th Cir. 2005) ............................................................................10

*Cooksey v. Futrell*,
    721 F.3d 226 (4th Cir. 2013) ...........................................................9, 10, 11, 13

*Donohue v. Duling*,
    465 F.2d 196 (4th Cir. 1972) ............................................................................16

*Enterline v. Pocono Med. Ctr.*,
    751 F. Supp. 2d 782 (M.D. Pa. 2008) ..............................................................12

*In re § 2703(d)*,
    787 F. Supp.2d 430 (E.D. Va. 2011) ..................................................................8

*In re § 2703(d)*,
    830 F.Supp.2d 114 (E.D. Va. 2011) ...................................................................8

*In re Drasin*,
    No. CIV.A. ELH-13-1140, 2013 WL 3866777 (D. Md. July 24, 2013) .....................5, 12

*Laird v. Tatum*,
    408 U.S. 1 (1972) ................................................................ 3, 14, 15

*Lamont v. Postmaster General*,
    381 U.S. 301 (1965) ................................................................ 9

*Lefkoe v. Jos. A. Bank Clothiers, Inc.*,
    577 F.3d 240 (4th Cir. 2009) .................................................. 5

*Marshall v. Stevens People and Friends for Freedom*,
    669 F.2d 171 (4th Cir. 1981) .................................................. 7

*Martin v. Struthers*,
    319 U.S. 141 (1943) ................................................................ 9

*Master Printers of Am. v. Donovan*,
    751 F.2d 700 (4th Cir. 1984) .................................................. 8

*McIntyre v. Ohio Elections Comm'n*,
    514 U.S. 334 (1995) ................................................................ 4

*McVicker v. King*,
    266 F.R.D. 92 (W.D. Pa. 2010) ............................................ 12

*NAACP v. Alabama ex rel. Patterson*,
    357 U.S. 449 (1958) ................................................................ 7

*Obama v. Klayman*,
    2015 WL 5058403 (D.C. Cir. 2015) ...................................... 18

*Peterson v. Nat'l Telecomm. & Info. Admin.*,
    478 F.3d 626 (4th Cir. 2007) .............................................. 4, 12

*Reno v. American Civil Liberties Union*,
    521 U.S. 844 (1997) ................................................................ 5

*Shelton v. Tucker*,
    364 U.S. 479 (1960) ................................................................ 7

*Smith v. Frye*,
    488 F.3d 263 (4th Cir. 2007) ................................................ 10

*Socialist Workers Party v. Attorney General*,
    419 U.S. 1314 (1974) ............................................................ 15

*Stanley v. Georgia*,
    394 U.S. 557 (1969) ................................................................ 9

*Stephens v. Cnty. of Albemarle, VA,*
    524 F.3d 485 (4th Cir. 2008) ......................................................................... 9

*Susan B. Anthony v. Driehaus,*
    134 S. Ct. 2334 (2014) ............................................................................ 13, 19

*Talley v. California,*
    362 U.S. 60 (1960) .......................................................................................... 4

*Taylor v. John Does,*
    No. 4:13-CV-218-F, 2014 WL 1870733 (E.D.N.C. May 8, 2014) ................... 5

*United States v. Cassidy,*
    814 F. Supp. 2d 574 (D. Md. 2011) ................................................................ 6

*United States v. Stevens*,
    559 U.S. 460 (2010)................................................................................. 13, 14

*Watchtower Bible Tract Soc'y of New York v. Vill. of Stratton*,
    536 U.S. 150 (2002) ....................................................................................... 5

## Other Authorities

*About public and protected Tweets*, Twitter (Sept. 3, 2015),
    https://support.twitter.com/articles/14016#......................................................8

Marc Jonathan Blitz, *Constitutional Safeguards for Silent Experiments in Living: Libraries, the Right to Read, and a First Amendment Theory for an Unaccompanied Right to Receive Information*, 74 UMKC L. Rev. 799 (2006) ........................................................... 8

Julie E. Cohen, *A Right to Read Anonymously: a Closer Look at "Copyright Management" in Cyberspace*, 28 Conn. L. Rev 981 (1996) .............................................................. 8

Department of Justice, Computer Crime and Intellectual Property Section Criminal Division, *Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations* 65 (2009) ........................................................................................ 6

Richard H. Fallon, Jr., *As-Applied and Facial Challenges and Third-Party Standing*, 113 Harv. L. Rev. 1321 (2000) ............................................................................................. 11

A.Michael Froomkin, *Flood Control on the Information Ocean: Living with Anonymity, Digital Cash, and Distributed Databases*, 15 J.L. & Com. 395, 429 (1996)..................................... 4, 5

Nathaniel Gleicher, *John Doe Subpoenas: Toward a Consistent Legal Standard*, 118 Yale L. J. 320 (2008) ........................................................................................................... 6

Margot E. Kaminski & Shane Witnov, *The Conforming Effect:  First Amendment Implications of Surveillance Beyond Chilling Speech*, 49 U. Rich. L. Rev. 465 (2015) ........................... 10

Lyrissa B. Lidsky, *Anonymity in Cyberspace: What Can We Learn from John Doe?*, 50 B. C. L. Rev. 1373 (2009) ................................................................................................ 5

Lyrissa B. Lidsky, *Silencing John Doe: Defamation & Discourse in Cyberspace*, 49 Duke L.J. 855 (2000) ...................................................................................................... 9

NSA Director of Civil Liberties and Privacy Office Report: *NSA'S Implementation of Foreign Intelligence Surveillance Act Section 702* (April 16, 2014) ................................... 17

Office of the Inspector General, Department of Justice, *A Review of the Federal Bureau of Investigation's Activities Under Section 702 of the Foreign Intelligence Surveillance Act Amendments Act of 2008 (*Sept. 2012) ............................................................ 17

Neil M. Richards, *Intellectual Privacy*, 87 Tex. L. Rev. 387 (2008)........................................................................................ 3

Neil M. Richards, Intellectual Privacy: Rethinking Civil Liberties in the Digital Age (2015) ...... 3

Neil M. Richards, *The Dangers of Surveillance*, 126 Harv. L. Rev. 1934 (2013) ........................ 3

Lewis Sargentich, *The First Amendment Overbreadth Doctrine*, 83 Harv. L. Rev. 844 (1970).. 12

Katherine J. Strandburg, *Freedom of Association in a Networked World:  First Amendment Regulation of Relational Surveillance*, 49 B.C. L. Rev. 741 (2008) ........................................ 7

Katherine J. Strandburg, *Membership Lists, Metadata, and Freedom of Association's Specificity Requirement*, 10 I/S: J.L. & Pol'y for Info. Soc'y 327 (2014) ................................................ 7

**STATEMENT OF AMICI INTEREST**

*Amici Curiae* are professors who write in First Amendment law. They teach and publish books and articles on the First Amendment, and their expertise can aid the Court in the resolution of this case. Specifically, *amici* focus this brief on the injury-in-fact element of standing in First Amendment challenges to privacy violations. *Amici*'s employment and titles are listed below for identification purposes only.

- **Marc J. Blitz** is the Alan Joseph Bennett Professor of Law at Oklahoma City University School of Law. His scholarship focuses on First Amendment freedom of speech protection, Fourth Amendment rights against unreasonable search and seizure, and the implications of emerging technologies for each of these areas of the law.

- **A. Michael Froomkin** is the Laurie Silvers & Mitchell Rubenstein Distinguished Professor of Law at University of Miami School of Law. He has written extensively on the First Amendment right to anonymity online.

- **David A. Goldberger** is a Professor Emeritus of Law at The Ohio State University Michael E. Moritz School of Law. He writes on free speech, and has twice argued before the Supreme Court, including in *McIntyre v. Ohio Elections Commission*, which invalidated an Ohio statute prohibiting distribution of anonymous campaign literature. 514 U.S. 334 (1995).

- **James Grimmelmann** is a Professor of Law and Director of the Intellectual Property Program at the University of Maryland, and a Visiting Professor at the University of Maryland Institute for Advanced Computer Studies.

- **Margot E. Kaminski** is an Assistant Professor of Law at The Ohio State University Michael E. Moritz College of Law. Her scholarship focuses on emerging technologies and the relationship between privacy and speech rights.

- **Lyrissa Barnett Lidsky** is a Professor & the Associate Dean of International Programs at the University of Florida's Levin College of Law. She has co-authored a First Amendment casebook, and her scholarship on anonymous speech has been widely cited by state and federal appellate courts, and the Supreme Court of Canada.

- **Toni M. Massaro** is the Regents' Professor, Milton O. Riepe Chair in Constitutional Law, and Dean Emerita at the University of Arizona's James E. Rogers College of Law. She has authored dozens of law review articles on constitutional law, and currently teaches the First Amendment.

- **Neil M. Richards** is a Professor of Law at Washington University Law. His work explores the complex relationships between free speech and privacy in cyberspace, and has been published in *Harvard Law Review*, *Columbia Law Review*, *California Law Review*, *Virginia Law Review*, and *Georgetown Law Journal*.

- **Katherine Jo Strandburg** is the Alfred B. Engelberg Professor of Law at New York University Law School. She is an expert in innovation policy and information privacy law. Her recent scholarship addresses the implications of "big data" for freedom of association.

## ARGUMENT

First Amendment standing analysis is uniquely permissive. The United States Supreme Court, the Fourth Circuit, and numerous other courts have recognized that standing is more permissive when First Amendment harms are alleged because First Amendment challenges are necessary for the very functioning of our democracy. Courts routinely allow third-parties to assert First Amendment harms on behalf of others, and recognize that measures chilling protected expression give rise to First Amendment injury-in-fact.

To understand how First Amendment standing applies here, in a case asserting privacy

violations, it is important to first survey the First Amendment injuries that can be triggered by privacy harms. *See* part A. *Amici* then outline the ways in which courts, including the Fourth Circuit, have relaxed the requirements of standing in the First Amendment context. *See* part B. Finally, *amici* caution that, given the generally permissive nature of First Amendment standing, the court should exhibit care in extending the holdings of *Laird v. Tatum* and *Clapper v. Amnesty International* beyond their limited procedural and factual contexts. In *Laird*, the Supreme Court addressed surveillance conducted in public, and general rather than specific allegations of chilling effects. *Laird v. Tatum*, 408 U.S. 1 (1972). In *Clapper v. Amnesty International*, the Supreme Court addressed a facial challenge where plaintiffs could not show the existence of a surveillance program traceable to the challenged statute. *Clapper v. Amnesty Int'l*, 133 S. Ct. 1138 (2013). *See* part C. As scholars of the First Amendment, a*mici* counsel this court to avoid potential conflicts with, and unintended consequences for, broader First Amendment case law.

**A.      Surveillance Can Cause Injury-in-Fact Under the First Amendment.**

Surveillance can give rise to First Amendment injuries that confer standing on plaintiffs. *See generally* Neil M. Richards, *Intellectual Privacy*, 87 Tex. L. Rev. 387 (2008); Neil M. Richards, Intellectual Privacy: Rethinking Civil Liberties in the Digital Age (2015). There are two categories of First Amendment injuries caused by privacy violations: (1) violations of recognized First Amendment rights, such as the right to anonymous speech, the right to associational privacy, and the right to receive information; and (2) responsive speech-suppression by the plaintiff, also known as the "chilling effect." Commenters have noted of First Amendment privacy harms: "[s]urveillance menaces intellectual privacy and increases the risk of blackmail, coercion, and discrimination; accordingly, we must recognize surveillance as a harm in constitutional standing doctrine." Neil M. Richards, *The Dangers of Surveillance*, 126 Harv. L. Rev. 1934, 1936 (2013).

1.      **Surveillance Can Violate Recognized First Amendment Rights.**

Courts around the country have recognized three First Amendment rights related to privacy: (1) the right to speak anonymously; (2) the right to associational privacy; and (3) the right to receive information, including the right to receive information in private. A violation of any of these rights can constitute injury-in-fact.

a.      **The First Amendment Protects Anonymous Speech.**

Revealing an anonymous speaker's identity or prohibiting anonymous speech constitutes a recognized First Amendment injury. The Supreme Court has for over fifty years recognized that the First Amendment protects the right to speak anonymously. *Talley v. California*, 362 U.S. 60 (1960); *see also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995). Anonymity "protect[s] unpopular individuals from retaliation—and their ideas from suppression—at the hand of an intolerant society." *McIntyre*, 514 U.S. at 357. Commentators have recognized that the Court has long been "highly solicitous of the need of dissidents . . . to speak anonymously when they have a credible fear of retaliation for what they say." A. Michael Froomkin, *Flood Control on the Information Ocean: Living with Anonymity, Digital Cash, and Distributed Databases*, 15 J.L. & Com. 395, 429 (1996); *see also Peterson v. Nat'l Telecomm. & Info. Admin.*, 478 F.3d 626, 632 (4th Cir. 2007) (acknowledging that protection of anonymity should be strongest "where it serves as a catalyst for speech" because revelation of speakers' identities "discourages proponents of controversial viewpoints from speaking"). In fact, the Court has recognized that the long tradition of anonymous pamphleteering in the United States has been essential to the development of our democracy. *Talley*, 362 U.S. at 64; *see also McIntyre*, 514 U.S. at 360.

Like all First Amendment rights, the right to speak anonymously applies to online speech. *Reno v. American Civil Liberties Union*, 521 U.S. 844, 870 (1997); *Taylor v. John Does*

*1-10*, No. 4:13-CV-218-F, 2014 WL 1870733, at *2 (E.D.N.C. May 8, 2014) ("The First Amendment protects anonymous speech, including anonymous speech on the internet."). As in the tangible world, however, the right to anonymity online is not absolute. *See, e.g.*, *Watchtower Bible Tract Soc'y of New York v. Vill. of Stratton*, 536 U.S. 150, 168 (2002); *Lefkoe v. Jos. A. Bank Clothiers, Inc.*, 577 F.3d 240, 248 (4th Cir. 2009). Courts around the country have devised a variety of tests for when identifying information about an anonymous online speaker can be revealed. These tests balance the right to anonymous speech against other important interests. *See, e.g.*, *Taylor*, 2014 WL 1870733, at *2; *see also* Lyrissa B. Lidsky, *Anonymity in Cyberspace: What Can We Learn from John Doe?*, 50 B.C. L. Rev. 1373, 1377-1379 (2009) (discussing the balancing tests devised by courts to address anonymous speech online). For example, some courts require that a plaintiff set forth a *prima facie* claim and take steps to notify the anonymous posters of the unmasking action before the court will consider revealing the identity of an anonymous online speaker. *See, e.g.*, *In re Drasin*, No. CIV.A. ELH-13-1140, 2013 WL 3866777, at *3 (D. Md. July 24, 2013) (citing *Indep. Newspapers, Inc. v. Brodie*, 407 Md. 415, 456 (2009)). The Fourth Circuit has not yet decided what procedural hurdles are appropriate for protecting anonymous online speakers. *See Taylor*, 2014 WL 1870733, at *2. But it has recognized that anonymous speech deserves First Amendment protection.

In the Fourth Circuit, an individual's right to anonymity, even in the less protective commercial speech context, can be overcome only by "a substantial governmental interest in disclosure so long as disclosure advances that interest and goes no further than reasonably necessary." *Lefkoe,* 577 F.3d at 249. Political speech and noncommercial speech likely will receive higher constitutional protection. Froomkin, 15 J.L. & Com. at 428 ("Political speech receives the highest constitutional protection because it 'occupies the core of the protection

afforded by the First Amendment;' other types of speech, notably 'commercial speech,' sometimes receive a reduced level of First Amendment protection") (citations omitted). Lower courts in the Fourth Circuit have also recognized protection of anonymous speech. *See, e.g.*, *United States v. Cassidy*, 814 F. Supp. 2d 574, 583, 587 (D. Md. 2011) (applying strict scrutiny and holding federal interstate stalking statute unconstitutional as applied to an anonymous online speaker because "the Government's Indictment here is directed squarely at protected speech: anonymous, uncomfortable Internet speech").

Both websites and anonymous online speakers can assert anonymous speech claims. Websites often bring First Amendment claims on behalf of their users in response to subpoenas seeking to unmask users' identities. The First Amendment injury contemplated in these cases is the unmasking of the anonymous user's identity through the revelation of the user's IP address. The website challenges the subpoena that seeks the user's IP address, prompting courts to protect the anonymous speech right. *See* Nathaniel Gleicher, *John Doe Subpoenas: Toward a Consistent Legal Standard*, 118 Yale L. J. 320, 328 (2008) ("Uncovering [a user's] identity often requires two steps. First, the plaintiff must subpoena the website…for the Internet protocol (IP) address of the user who made the online comments.").

While an IP address is not a name, it points directly to the user's underlying identity. Unmasking IP addresses thus implicates the anonymity right. *Id.* at 328 (explaining how an IP address is used to obtain "the address, telephone number, and other contact information associated with the account of the computer whose IP address" was obtained). *See also* Department of Justice, Computer Crime and Intellectual Property Section Criminal Division, *Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations* 65 (2009) (explaining how an IP address may be used to obtain a "user's name, street address,

and other identifying information."). *Amici* further discuss the ability of websites to assert third-party standing on behalf of their users in part B.1.a, below.

> **b. The First Amendment Protects the Right to Privacy in One's Associations.**

Privacy harms can also violate freedom of association. *See generally* Katherine J. Strandburg, *Freedom of Association in a Networked World:  First Amendment Regulation of Relational Surveillance*, 49 B.C. L. Rev. 741 (2008); Katherine J. Strandburg, *Membership Lists, Metadata, and Freedom of Association's Specificity Requirement*, 10 I/S: J.L. & Pol'y for Info. Soc'y 327 (2014). Privacy can be necessary for freedom of association, especially for those espousing minority or dissident viewpoints. The Supreme Court has long held that disclosure of membership lists can constitute First Amendment injury. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 465 (1958) (recognizing that the "[i]nviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs"); *Shelton v. Tucker*, 364 U.S. 479, 490 (1960) (striking down as overbroad a statute requiring teachers to list the organizations to which they had belonged as a condition of employment, reasoning that "[t]he statute's comprehensive interference with associational freedom goes far beyond what might be justified").

The Fourth Circuit has recognized that privacy violations implicate freedom of association. In *Marshall v. Stevens People and Friends for Freedom*, the Fourth Circuit agreed with the Supreme Court that "compelled disclosure of affiliation with groups engaged in advocacy may constitute an effective restraint on freedom of association." 669 F.2d 171, 176 (4th Cir. 1981). The court required the government to show a "'substantial relation'" between the governmental interest and the information required to be disclosed". *Id.* at 177 (quoting *Buckley v. Valeo*, 424 U.S. 1, 64-65 (1976)). In a later case, the Fourth Circuit assessed association

disclosure requirements under "exacting scrutiny" required by the Supreme Court. *Master Printers of Am. v. Donovan*, 751 F.2d 700, 705 (4th Cir. 1984) ("[T]he government must show that the disclosure and reporting requirements are justified by a compelling government interest, and that the legislation is narrowly tailored to serve that interest.").

Lower courts in the Fourth Circuit have acknowledged that disclosure of online associations or memberships can infringe an individual's First Amendment rights. For example, the District Court for the Eastern District of Virginia has acknowledged that "freedom of association may be hampered by compelled disclosure of" online associations, in a case where the government sought to reveal the identities of members of Twitter. *In re § 2703(d)*, 787 F. Supp. 2d 430, 438 (E.D. Va. 2011); *In re § 2703(d)*, 830 F.Supp.2d 114, 145-146 (E.D. Va. 2011). The court there quickly rejected the freedom of association claims, reasoning that Twitter members "have already made their Twitter posts and associations publicly available," *see In re § 2703(d)*, 787 F. Supp. 2d at 438. On Twitter, unlike email or other private online communication services, a user's posts and list of "followers" are by default available to the general online public. *See About public and protected Tweets*, *available at* https://support.twitter.com/articles/14016#. These cases indicate, however, that district courts in this circuit will contemplate and assess the substance of freedom of association claims concerning the surveillance of online speakers.

### c. The First Amendment Protects the Right to Receive Information in Private.

A necessary corollary of the First Amendment speech right is the right to receive information, which includes the right to receive information in private. *See generally* Julie E. Cohen, *A Right to Read Anonymously: a Closer Look at "Copyright Management" in Cyberspace*, 28 Conn. L. Rev 981 (1996); Marc Jonathan Blitz, *Constitutional Safeguards for*

*Silent Experiments in Living: Libraries, the Right to Read, and a First Amendment Theory for an Unaccompanied Right to Receive Information*, 74 UMKC L. Rev. 799, 799-809 (2006).

The right to receive information in private is explicitly recognized in First Amendment case law. *See, e.g.*, *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (noting that it is "now well established that the Constitution protects the right to receive information and ideas" and recognizing that privacy violations implicate that right). In *Lamont v. Postmaster General*, the Supreme Court held unconstitutional a requirement that mail recipients write in to request communist literature because it would deter individuals from accessing the literature. 381 U.S. 301, 307, 309 (1965). *See also, e.g.*, *Martin v. Struthers*, 319 U.S. 141, 146, 149 (1943) (holding that ban on door-to-door distribution of circulars violated First Amendment right to receive information); *Stanley*, 394 U.S. at 564 (holding same for a ban on possession of obscenity in the privacy of the home).

The Fourth Circuit has recognized that it is "well established" that the First Amendment protects a right to receive information from a willing speaker. A plaintiff can establish standing to bring a right-to-receive claim by showing the existence of a willing speaker. *Stephens v. Cnty. of Albemarle, VA*, 524 F.3d 485, 491-92 (4th Cir. 2008) (citing *Stanley*; *In re Application of Dow Jones & Co.*, 842 F.2d 603, 606–08 (2d Cir. 1988); and *Public Citizen v. Liggett Group, Inc.*, 858 F.2d 775, 787 n.12 (1st Cir. 1988)).

## 2.     "Chilling Effects" are a Recognized Form of First-Amendment Injury.

In addition to recognizing First Amendment privacy rights, courts recognize the chilling effect as a First Amendment injury. *See Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013) ("In First Amendment cases, the injury-in-fact element is commonly satisfied by a sufficient showing of 'self-censorship, which occurs when a claimant is chilled from exercising h[is] right to free expression.'") (quoting *Benham v. City of Charlotte*, 635 F. 2d 129, 135 (4th Cir. 2011)).

The chilling effect occurs when an individual self-censors in response to government action. *Id. See also* Lyrissa B. Lidsky, *Silencing John Doe: Defamation & Discourse in Cyberspace*, 49 Duke L.J. 855, 888 (2000) ("the chilling effect occurs when … law encourages prospective speakers to engage in undue selfcensorship to avoid the negative consequences of speaking"). Individuals often self-censor in response to surveillance; social science suggests that surveillance produces conformist tendencies and muffles the expression of dissident viewpoints. *See generally* Margot E. Kaminski & Shane Witnov, *The Conforming Effect:  First Amendment Implications of Surveillance Beyond Chilling Speech*, 49 U. Rich. L. Rev. 465 (2015).

The Fourth Circuit has established that a chilling effect exists for purposes of determining First Amendment injury-in-fact whenever government action or a defendant's retaliatory conduct "is likely to deter a person of ordinary firmness from the exercise of First Amendment rights." *Benham*, 635 F. 2d at 135 (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005)) (internal quotation marks omitted). A claimant need not show that she stopped all expressive activity to show a chill; she need only show that the chill was objectively reasonable. *Id.* ("[A] claimant need not show [he] ceased those activities altogether to demonstrate an injury in fact."). The existence of a chilling effect thus often conveys standing in First Amendment cases. *See, e.g.*, *Cooksey*, 721 F.3d at 235; *Benham*, 635 F. 2d at 135; *Smith v. Frye*, 488 F.3d 263, 272 (4th Cir. 2007); *Constantine*, 411 F.3d at 500.

## B.      First Amendment Standing is Distinctive and Permissive.

First Amendment claims, including First Amendment privacy claims, are evaluated under First Amendment standing doctrine, which is distinctly permissive towards plaintiffs. *See Cooksey*, 721 F.3d at 229 ("The district court erred . . . in not analyzing [appellant's] claims under the First Amendment standing framework."). This is unsurprising, given the priority free speech receives in American constitutional law. In standing doctrine, as elsewhere, courts put a

thumb on the scale in favor of the First Amendment.

1.  **Threshold Standing Requirements are More Liberally Interpreted in the First Amendment Context.**

The Fourth Circuit has recognized that standing, and especially the injury-in-fact component, is "somewhat relaxed in First Amendment cases." *Id.* at 235. That is because in the face of stringent standing requirements, individuals engaged in protected speech may choose to refrain from speaking rather than challenge a government action, and then "[s]ociety as a whole . . . would be the loser." *Id.* Free speech is so fundamental to our democratic society that we do not want to risk its loss by making legal challenges too difficult. *Id.* (noting that "when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged") (quoting *Secretary of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956 (1984)). This "leniency of First Amendment standing manifests itself most commonly in the doctrine's first element: injury-in-fact." *Id.*

As discussed below, the Supreme Court's recent decision in *Clapper* did not impact this general leniency. Indeed, the Fourth Circuit has reaffirmed after *Clapper* that standing requirements are less rigid in First Amendment cases. *See Cooksey*, 721 F.3d at 235 (noting that First Amendment cases "raise unique standing considerations that tilt dramatically toward a finding of standing") (quoting *Lopez v. Candaele*, 630 F.3d 775, 781 (9th Cir. 2010) (internal quotation marks and citations omitted)).

a.  **Third Parties Can Have Standing Under the First Amendment.**

First Amendment standing doctrine is more permissive with respect to third parties. Courts have held that entities such as newspapers, internet service providers, and website hosts have standing under *jus tertii* to assert the First Amendment rights of their readers and posters.

*See, e.g.*, *McVicker v. King*, 266 F.R.D. 92, 95-96 (W.D. Pa. 2010); *Enterline v. Pocono Med. Ctr.*, 751 F. Supp. 2d 782, 786 (M.D. Pa. 2008). A newspaper has standing to assert the rights of anonymous commentators because those individuals "face practical obstacles to asserting their own First Amendment rights," and the newspaper has a real interest in zealously arguing the issue because of its "desire to maintain the trust of its readers and online commentators." *Enterline*, 751 F. Supp. 2d at 785-86. Moreover, a newspaper can itself display injury-in-fact because revelation of posters' identities could "compromise the vitality of the newspaper's online forums." *Id*. This Court has recognized that a blog administrator can, like a newspaper, assert standing on behalf of anonymous online posters. *See In re Drasin*, 2013 WL 3866777, at *2 n.3 (citing *Enterline*, 751 F. Supp. 2d at 786).

In the First Amendment context, a free speech litigant can often raise the rights of third parties, even when she has no special relationship with those third parties, by using overbreadth doctrine. *See, e.g.*, *Peterson*, 478 F.3d at 633-34 ("The Supreme Court has relaxed standing requirements for overbreadth challenges to allow litigants 'to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'") (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973).

> **b.    Anticipated Injuries Can Suffice to Create Standing Under the First Amendment.**

First Amendment standing doctrine is more permissive with respect to anticipated injuries. Anticipated injuries often suffice for First Amendment standing, especially when the harm alleged is the chilling effect. For example, the Supreme Court recently decided in *Susan B. Anthony v. Driehaus* that a credible threat of enforcement of a statute can suffice for injury-in-

fact, even where plaintiffs did not confirm that their future speech would violate the law. 134 S. Ct. 2334, 2338 (2014). Similarly, the Fourth Circuit has held that the threat of government enforcement combined with an announcement that the plaintiff's blog would continue to be monitored by the government sufficed to show injury-in-fact. *Cooksey*, 721 F.3d at 237 (noting as part of injury-in-fact that plaintiff received "an explicit warning from the State Board that it will continue to monitor the plaintiff's speech in the future").

### c.   Facial Challenges are More Favored Under the First Amendment.

Finally, while the present case is not a facial challenge, how courts treat First Amendment facial challenges again demonstrates the general permissiveness of First Amendment standing doctrine. In free speech cases, courts take the risk of harm to others and the risk of a collective chilling effect on protected expression very seriously. This concern is evidenced by courts' evaluations of First Amendment facial challenges. Facial challenges stem from the notion that, as commenters have noted, "everyone has a personal right, independent of third-party standing, to challenge the enforcement of a constitutionally invalid statute against her." Richard H. Fallon, Jr., *As-Applied and Facial Challenges and Third-Party Standing*, 113 Harv. L. Rev. 1321, 1327 (2000).

Under the First Amendment, facial challenges look to whether overbreadth is "real . . . [and] substantial . . . judged in relation to the statute's plainly legitimate sweep." *Broadrick*, 413 U.S. at 615; *see generally*, Lewis Sargentich, *The First Amendment Overbreadth Doctrine*, 83 Harv. L. Rev. 844 (1970). By contrast, in cases not involving the First Amendment, facial challenges prevail only when there is no constitutional application of a statute. *See, e.g.*, *United States v. Stevens*, 559 U.S. 460, 473 (2010) (noting that "to succeed in a typical facial attack, [a party] would have to establish 'that no set of circumstances exists under which the [measure] would be valid'") (citation omitted).

In *United States v. Stevens*, for example, the defendant successfully challenged as overbroad under the First Amendment a statute criminalizing the creation, sale, or possession of certain depictions of animals, even though he was prosecuted for creating only one type of banned depiction (a video of dogfighting). 559 U.S. at 465, 474. Outside of First Amendment standing doctrine, Stevens' facial challenge would have failed if the government could show a single "circumstance[] . . . under which the [statute] would be valid." *Id.* at 473 (citation omitted). In assessing Stevens' First Amendment overbreadth challenge, the Court evinced concern about the broader chilling effect of the statute on parties not before them.

2. ***Laird* and *Clapper* Do Not Overturn Permissive First Amendment Standing Doctrine.**

As the above analysis shows, courts routinely take a broad view of standing for First Amendment challenges. To the extent this court addresses *Laird* and *Clapper*, it should recognize the narrow context in which both decisions were made. *Laird* addressed surveillance conducted in public, and general rather than specific allegations of chilling effects; *Clapper* addressed a facial challenge where plaintiffs could not show the existence of a surveillance program traceable to the challenged statute. Amici caution this court against extending the holdings of these cases, in light of otherwise permissive First Amendment standing doctrine.

a. ***Laird v. Tatum* Addressed Otherwise-Legal Surveillance in Public, and General Rather than Specific Allegations of Chilling Effects.**

The Supreme Court in *Laird* addressed Army surveillance of *public* activities, conducted by reading the news and attending meetings open to the public. The Court noted that there was in *Laird* "no evidence of illegal or unlawful surveillance activities." *Laird v. Tatum*, 408 U.S. 1, 9 (1972) (quoting *Tatum v. Laird*, 444 F.2d 947, 953 (D.C. Cir. 1971)). Thus, the Court observed, "the information gathered is nothing more than a good newspaper reporter would be able to gather by attendance at public meetings." *Id.* The challengers failed to allege any surveillance on

the part of the Army that was unlawful in itself, alleging instead that a First Amendment chilling effect arose from the collection of publicly available information. *Id.* at 8 (citing the district court's findings).

As Justice Breyer explained in his *Clapper* dissent, wiretapping is different in kind from the public surveillance addressed in *Laird*: "[n]o one here denies that the Government's interception of a private . . . e-mail conversation amounts to an injury that is 'concrete and particularized.'" *Clapper v. Amnesty Int'l*, 133 S. Ct. 1138, 1155 (2013) (Breyer, J., dissenting). *Laird* does not preclude a finding of standing based on First Amendment injury arising from government surveillance of private communications.

The Court in *Laird* also addressed only generalized allegations of chilling effects, rather than specifically alleged chills. Two years after *Laird*, addressing an application for a stay, Justice Marshall characterized *Laird* as standing merely for a need for specific rather than general allegations of a chilling effect. *See Socialist Workers Party v. Attorney General*, 419 U.S. 1314, 1319 (1974) (Marshall, J.) ("In this case, the allegations are much more specific: the applicants have complained that the challenged investigative activity will have the concrete effects of dissuading some YSA delegates from participating actively in the convention and leading to possible loss of employment for those who are identified as being in attendance. Whether the claimed 'chill' is substantial or not is still subject to question . . . [but t]he specificity of the injury claimed . . . is sufficient . . . to satisfy the requirements of Article III."). Justice Marshall characterized *Laird*'s language on whether challengers need to show regulatory action as *dicta* distinguishing other cases, rather than setting a rule. *See id.* at 1318 (characterizing the discussion in *Laird* of regulatory, proscriptive, or compulsory exercises of government power as *dicta* "merely distinguishing earlier cases, not setting out a rule for

determining whether an action is justiciable or not").

The Fourth Circuit has adopted Justice Marshall's reading of *Laird* as requiring specific allegations of injury. In *Donohue v. Duling*, the Fourth Circuit addressed a police department's use of surveillance in public and concluded that it did not cause a First Amendment injury. 465 F.2d 196, 202 (4th Cir. 1972). The Fourth Circuit explained that the surveillance at issue was not only conducted in public, but was not even clandestine. *Id.* at 201. The court cited *Laird* for the holding that there must be "a claim of *specific* present objective harm or a threat of *specific* future harm" to support a justiciable claim for relief. *Id.* at 202 (emphases added). The court noted that the plaintiffs in *Donohue* had offered no testimony of injuries, including none inhibiting their exercise of free speech; no testimony of penalties, loss of employment or reasonably foreseeable threat of such; all of which appear to be injuries the Fourth Circuit would have considered adequate for standing purposes. *Id.* The Fourth Circuit has thus characterized *Laird* as addressing government surveillance conducted in public, and conjectural rather than concrete allegations of harms to third parties whose specific injuries were not presented to the court. *Id* (observing that plaintiffs sought "primarily to vindicate the alleged rights of others, whose actual intimidation or injury is purely conjectural and speculative").

> **b.** ***Clapper v. Amnesty International* Addressed a Facial Challenge Where Plaintiffs Could Not Show the Existence of a Surveillance Program Traceable to the Challenged Statute.**

*Clapper v. Amnesty International* arose under unusual factual and procedural circumstances. 133 S. Ct. 1138 (2013). In *Clapper,* the Court addressed a facial, rather than as-applied, challenge to Section 702 of the FISA Amendments Act, filed on the day the statute was enacted. *Id.* at 1146. The plaintiffs were not able to point to any evidence at all of a surveillance program established by the Government under 702. 133 S. Ct. at 1148 ("Respondents fail to offer any evidence . . . [and] respondents have no actual knowledge . . . [and thus] can only speculate

as to how the Attorney General and the Director of National Intelligence will exercise their discretion in determining which communications to target.") (emphases added). The Court expressed reluctance under those highly speculative circumstances to interfere in the affairs of the political branches in the field of intelligence gathering, especially given the statute's facial requirements that both the Government and the FISA Court (FISC) adhere to the Fourth Amendment. *Id.* at 1150 ("We decline to abandon our usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors… critically, the [FISA] Court must also assess whether the Government's targeting and minimization procedures comport with the Fourth Amendment.").

This court will need to consider whether *Clapper*, which addressed a facial challenge to a statute in the absence of knowledge of <u>any</u> government surveillance program arising from that statute, applies to an as-applied challenge to the same statute now that the public knows—and the government itself acknowledges—that such programs exist. *See, e.g.,* NSA Director of Civil Liberties and Privacy Office Report: *NSA'S Implementation of Foreign Intelligence Surveillance Act Section 702*, at 5 (April 16, 2014) ("compelled service provider assistance has generally been referred to as Upstream collection"), *available at* http://www.dni.gov/files/documents/0421/702%20Unclassified%20Document.pdf; Office of the Inspector General, Department of Justice, *A Review of the Federal Bureau of Investigation's Activities Under Section 702 of the Foreign Intelligence Surveillance Act Amendments Act of 2008*, at xxvii n.12, 32 n.44, 151 (Sept. 2012) ("Approximately nine percent of the total Internet communications that the NSA acquires under Section 702 are through upstream collection"), *available at* https://oig.justice.gov/reports/2015/o1501.pdf.

Other courts have found that the current level of public knowledge of government

surveillance programs can convey standing. *See, e.g.*, *Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 801 (2d Cir. 2015) ("Appellants in this case have, despite those substantial hurdles, established standing to sue, as the district court correctly held."); *Obama v. Klayman*, 2015 WL 5058403 at *6 (D.C. Cir. 2015) ("[P]laintiffs have nonetheless met the bare requirements of standing.") (Brown, J., concurring).

Changed factual circumstances will impact any attempt to apply the Court's reasoning in *Clapper*. If this Court decides to look to *Clapper* for guidance, it will need to address how the Supreme Court's contingent holding in that case provides guidance to a First Amendment challenge where the length of the Court's five-part "chain of possibilities" has been meaningfully attenuated. *Clapper*'s reasoning relies on a "highly attenuated chain of possibilities" specific to the circumstances of that case. *Amnesty Int'l*, 133 S. Ct. at 1148. The Court enumerated five parts of this chain, which compounded together "do[] not satisfy the requirement that threatened injury must be certainly impending." *Id.* Plaintiffs here, by contrast, have concrete knowledge that the government employs its 702 authority for the challenged surveillance program.

A second core point of uncertainty that the Court emphasized in *Clapper* but is <u>not</u> present here is the position of the FISA Court (FISC) on the constitutionality of any 702 program. The Court in *Clapper* was deeply concerned over speculating about the unknown decisions of independent actors, including the FISC. *Amnesty Int'l*, 133 S. Ct. at 1150 (expressing distaste at speculating over the FISA court's use of its discretion to authorize surveillance: "We decline to abandon our usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors"). Thus the current public knowledge of the FISC's decisions on upstream surveillance traceable to 702 may be a particularly significant disruption of the five-part chain. *See [Redacted]*, (FISC September [] 2012) (regarding NSA

18

measures on handling of domestic communications acquired through "upstream collection"); *[Redacted]*, (FISC Nov. 30, 2011) (approving amended minimization procedures for communications acquired through "upstream collection"); *[Redacted]*, (FISC Oct. 3, 2011) (finding that (1) NSA substantially misrepresented "upstream collection"; (2) current targeting and minimization procedures violated the Fourth Amendment; and (3) current minimization procedures violated the FISA); *all available at* https://epic.org/privacy/surveillance/fisa/fisc/.

One additional and significant procedural wrinkle in looking at *Clapper* is that the parties there waived any distinction between First Amendment standing and Fourth Amendment standing. *See Amnesty Int'l USA v. Clapper*, 638 F.3d 118, 122 (2d Cir. 2011). The parties in that case "agreed that Article III standing should be addressed under a single standard with respect to all of the plaintiffs' claims." *Id.* As a result, the Supreme Court did not contemplate how First and Fourth Amendment standing analysis would diverge in a less speculative case. *Amici* express no view as to Fourth Amendment standing after *Clapper*. We note that as a rule, subsequent Supreme Court case law shows that the Court continues to leniently recognize chilling-effect harms in First Amendment cases. *See, e.g.*, *Susan B. Anthony*, 134 S. Ct. at 2338.

## CONCLUSION

Privacy violations can trigger a variety of First Amendment injuries. The right to speak anonymously, the right to privacy in one's associations, and the right to receive information in private can all be violated by privacy harms. Surveillance can also trigger the well-recognized chilling effect. In general, First Amendment standing to address these harms is permissive. Under First Amendment standing doctrine, there is often more room to address harms against third parties as well as speculative future harms. This is because in the absence of First Amendment challenges, democratic society as a whole is harmed.

*Laird* and *Clapper* do not swallow traditional First Amendment standing doctrine. It is

our hope that this court, armed with a broader view of the doctrinal landscape, will recognize the

crucial import of First Amendment challenges for our self-governing democracy.

Respectfully submitted,

_____/s/_____
JOSHUA R. TREEM #00037
EMILY L. LEVENSON #28670
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore Street, Suite 1700
Baltimore, Maryland 21202
T:  (410) 962-1030
F:  (410) 385-0869
elevenson@browngold.com
jtreem@browngold.com

MARGOT E. KAMINSKI[*]
Assistant Professor of Law
Moritz College of Law
The Ohio State University
55 W. 12th Ave.
Columbus, Ohio 43210
T:  (614) 292-2092
kaminski.217@osu.edu

---

[*] Not admitted in this jurisdiction; motion for admission *pro hac vice* pending. This brief has been prepared and joined by individuals affiliated with various law schools, but it does not purport to present any school's institutional views.