**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

_____

WIKIMEDIA FOUNDATION, *et al.*,  )
)
Plaintiffs,  )
)
v.  )
)
NATIONAL SECURITY AGENCY, *et al.*,  )
)
Defendants.  )
_____)

Civil Action No.

1:15-cv-00662-TSE

**DEFENDANTS' REPLY IN SUPPORT OF MOTION**
**TO DISMISS THE FIRST AMENDED COMPLAINT**

Date:  September 17, 2015

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

JOSEPH H. HUNT
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Branch Director

JAMES J. GILLIGAN
Special Litigation Counsel

RODNEY PATTON
JULIA A. BERMAN
CAROLINE J. ANDERSON
Trial Attorneys

U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W., Room 6102
Washington, D.C.  20044
Phone:   (202) 514-3358
Fax:       (202) 616-8470
E-mail:  james.gilligan@usdoj.gov

Counsel for Defendants

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION ..................................................................................................................1

ARGUMENT .......................................................................................................................2

I.     THE ANALYSIS IN *AMNESTY INTERNATIONAL* CONTROLS THIS CASE ..............2

II.    THE GOVERNMENT'S EXPERT DECLARATIONS ARE PROPERLY BEFORE
THE COURT .........................................................................................................5

III.   PLAINTIFFS DO NOT ADEQUATELY ALLEGE INJURY DUE TO UPSTREAM
INTERCEPTION, COPYING AND REVIEW OF ONLINE COMMUNICATIONS .......7

      A.    Plaintiffs Have Not Plausibly Alleged that the NSA Intercepts,
Copies, and Reviews  for Selectors "Substantially All"
International Online Communications Carried on U.S.
Telecommunications Networks ............................................................7

      B.    Wikimedia's Claims That at Least Some of Its Communications
are Intercepted, Copied, or Reviewed for Selectors, Including
Claims Based on the Volume and Geographic Distribution of
Communications With Its Websites, Rest on Speculation Foreclosed
by *Amnesty International* .........................................................................9

      C.    Wikimedia Alleges No Injury to Itself from the Claimed Interception,
Copying, and Review of Users' Online Communications with Its Websites ........14

            1.    Wikimedia alleges no privacy interest of its own in the online
transmissions associated with user visits to its websites  ..........................14

            2.    Wikimedia has not alleged injury to a protected possessory
interest.....................................................................................................16

            3.    Wikimedia has not alleged a First Amendment injury .............................18

            4.    The transitory interception of online transmissions in which
Wikimedia has no identified legal interest does not alone give
rise to constitutional or prudential standing  ...........................................18

IV.   PLAINTIFFS HAVE NOT PLAUSIBLY ALLEGED RETENTION OF THEIR
COMMUNICATIONS AS PART OF THE UPSTREAM PROCESS ...........................21

**PAGE**

V.    ALLEGATIONS THAT UPSTREAM COLLECTION UNDERMINES PLAINTIFFS' ABILITY  TO CONDUCT THEIR WORK ARE ALSO INSUFFICIENT......................23

CONCLUSION...............................................................................................................................25

## **TABLE OF AUTHORITIES**

**CASES**                                                                                                   **PAGE(S)**

*ACLU v. Clapper*,
   785 F.3d 787 (2d Cir. 2015)....................................................................................... 19

*Allen v. Wright*,
   468 U.S. 737 (1984).................................................................................................... 2

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
   671 F.3d 140 (2d Cir. 2011)....................................................................................... 19

*Ashcroft v. Iqbal*,
   556 U.S. at 681............................................................................................... 7, 8, 18

*Bantam Books, Inc. v. Sullivan*,
   372 U.S. 58 (1963)..................................................................................................... 18

*Bond v. United States*,
   131 S. Ct. 2355 (2011) .............................................................................................. 19

*Clapper v. Amnesty Int'l, USA*,
   133 S. Ct. 1138 (2013)....................................................................................*passim*

*City of Los Angeles v. Patel*,
   135 S. Ct. 2443 (2015) .............................................................................................. 15

*Cooksey v. Futrell*,
   721 F.3d 226 (4th Cir. 2013) .................................................................................... 25

*Cozen O'Connor v. U.S. Dep't of the Treasury*,
   570 F. Supp. 2d 749 (E.D. Pa. 2008) ........................................................................ 9

*David v. Alphin*,
   704 F.3d 327 (4th Cir. 2013) ...................................................................................... 5

*Draughton v. United States*,
   2015 WL 1977675 (D. Kan. May 1, 2015).................................................................. 5

*EPIC v. NSA*,
   678 F.3d 926 (D.C. Cir. 2012) ................................................................................... 9

*Enterline v. Pocono Med. Ctr.*,
   751 F. Supp. 2d 782 (M.D. Pa. 2008).................................................................... 21

**PAGE(S)**

*Havemann v. Colvin,*
    537 F. Appx. 142 (4th Cir. 2013) ........................................................................ 17

*Hearst v. Black,*
    87 F.2d 68 (D.C. Cir. 1936) ................................................................................. 17

*Katz v. United States,*
    389 U.S. 347 (1967) .............................................................................................. 17

*Laird v. Tatum,*
    408 U.S. 1 (1972) ................................................................................................. 25

*LeClair v. Hart,*
    800 F.2d 692 (7th Cir. 1986) .............................................................................. 17

*Lujan v. Defenders of Wildlife,*
    504 U.S. at 563 ............................................................................................... 17, 18

*Mims v. Kemp,*
    516 F.2d 21 (4th Cir. 1975) .................................................................................. 6

*Jewel v. NSA,*
    673 F.3d 902 (9th Cir. 2011) ................................................................................ 2

*Kerns v. United States,*
    585 F.3d 187 (4th Cir. 2009) ............................................................................... 6

*Obama v. Klayman,*
    -- F. 3d --, 2015 WL 5058403 at *8 (D.C. Cir. 2015) .................................... *passim*

*Maryland v. Macon,*
    472 U.S. 463 (1985) ............................................................................................ 17

*Monsanto Co. v. Geerston Seed Farms,*
    561 U.S. 139 (2010) .............................................................................................. 3

*Ostergren v. Cuccinelli,*
    615 F.3d 263 (4th Cir. 2010) ............................................................................. 17

*Raines v. Byrd,*
    521 U.S. 811 (1997) ....................................................................................... 18, 19

*Rakas v. Illinois,*
    439 U.S. 128 (1978) ............................................................................................ 19

**PAGE(S)**

*Rumsfeld v. Forum for Academic & Inst. Rights, Inc.*,
    547 U.S. 47 (2006) ................................................................................... 10

*Susan B. Anthony List v. Driehaus*,
    134 S. Ct. 2334 (2014) ................................................................................ 3

*United States v. Gant*,
    112 F.3d 239 (6th Cir. 1997) ................................................................... 17

*United States v. England*,
    971 F.2d 419 (9th Cir. 1992) ................................................................... 17

*United States v. Jefferson*,
    571 F. Supp. 2d 696  (E.D. Va. 2008) .................................................... 17

*United States v. Schofield*,
    80 F. Appx. 798 (3d Cir. 2003) ............................................................... 17

*United States v. Va Lerie*,
    424 F.3d 694 (8th Cir. 2005) ................................................................... 17

*United States ex rel. Vuyyuru v. Jadhav*,
    555 F.3d 337 (4th Cir. 2009) ..................................................................... 6

*United States v. U.S. Dist. Ct.*,
    (Keith), 407 U.S. 297 (1972) .................................................................. 16

*Wilson v. CIA*,
    586 F.3d 171 (2d Cir. 2009) ..................................................................... 9

**STATUTES**

50 U.S.C. § 1801 ........................................................................................... 11

50 U.S.C. § 1881a ......................................................................................... 11

## INTRODUCTION

To support their standing arguments, Plaintiffs shun clarity of analysis, and urge this Court to do the same.  First they dismiss *Amnesty International*, the standing precedent that bears most directly on this case and sets the terms of analysis the Court must follow.  Next they ask the Court to disregard expert testimony that sheds light on the speculative nature of their standing claims, and that rebuts, in particular, the premises underlying their assertion that the NSA almost certainly intercepts their online communications during Upstream collection.  Plaintiffs also obscure distinctions that are critical to evaluating their claims of injury.  They overlook the difference between (1) communications in which they arguably have protected privacy and other interests, but which are not allegedly so numerous and geographically widespread that their interception by the NSA is virtually certain, and (2) Wikimedia's alleged annual one trillion online "communications," the data transmissions between its public websites and ordinary Internet users, in which Wikimedia has articulated no legal interest of its own.  Plaintiffs are also frequently heedless of the difference between the initial stage of Upstream collection—the alleged interception, copying, and selector review of communications transiting the Internet backbone—and the retention for further analysis and use of communications found to contain selectors that the NSA has lawfully targeted.

Only on these terms can Plaintiffs fashion arguments to support their standing.  This Court, however, in seeking to discern its jurisdiction to address the far-reaching issues that Plaintiffs submit for decision in this case, must follow the standing analysis applied in *Amnesty International*.  And when applying that analysis, the Court should bear firmly in mind the distinctions among the Plaintiffs, and the respective volume and character of their alleged online communications.  On those terms it becomes apparent that Plaintiffs have not alleged a non-speculative injury, traceable to Upstream surveillance, that supports their standing to sue.

## ARGUMENT

## I.  THE ANALYSIS IN *AMNESTY INTERNATIONAL* CONTROLS THIS CASE.

The standing inquiry, while not "a mechanical exercise," may "be answered chiefly by comparing the allegations of the particular complaint to those made in prior standing cases." *Allen v. Wright*, 468 U.S. 737, 751–52 (1984).  Yet Plaintiffs ask the Court to disregard the single case in the Supreme Court's standing jurisprudence that most closely resembles this one, *Clapper v. Amnesty Int'l, USA*, 133 S. Ct. 1138 (2013).  *See* Govt. Br. at 31–34, 41–42 (enumerating similarities of claims here to *Amnesty International*).  With little explanation, Plaintiffs urge this Court to dispense altogether with the legal standards that the Supreme Court applied in that case.  Pls.' Opp. at 30–33.

Although Plaintiffs contend they may base their standing on a "substantial risk" of injury, *id.* at 33, the Court in *Amnesty International* was emphatic:  "we have repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,'" 133 S. Ct. at 1147.  Plaintiffs do not so much as mention this legal standard.  *See generally* Pls.' Opp.  Instead, they argue "the [G]overnment is wrong to contend that *Amnesty* established a new, higher standing threshold."  *Id.* at 33.  But the Government has made no such argument, nor is there novelty in requiring an "especially rigorous" standing inquiry when the matter before the Court "would force [it] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional."  *Amnesty Int'l*, 133 S. Ct. at 1147 (observing that the Court has "often found a lack of standing in cases in which the Judiciary has been requested to review actions of the political branches in the fields of intelligence gathering and foreign affairs").[1]

---

[1] *Jewel v. NSA*, 673 F.3d 902 (9th Cir. 2011), does not support a contrary result.  Pls.' Opp. at 26.  The issue in *Jewel* was not whether the plaintiffs' injury was adequately pled, but whether it was a "generalized grievance" (and as such insufficient under Article III).  673 F.3d at 905, 907.  *Jewel* was also decided before the Supreme Court's decision in *Amnesty International,* and relied on the Second Circuit decision that was overturned in that case.  *Id.* at 911.

Ignoring the standing threshold applied in *Amnesty International*, Plaintiffs argue that application of a "substantial risk" standard of injury is supported by *Monsanto Co. v. Geerston Seed Farms*, 561 U.S. 139 (2010) and *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334 (2014).  Pls.' Opp. at 33.  But neither case addressed the standing of litigants to mount a challenge to a foreign intelligence program.[2]  Moreover, the Supreme Court added that, even if a "substantial risk" standard *were* applicable, the plaintiffs in *Amnesty International* still "[fell] short . . . in light of the attenuated chain of inferences necessary to find harm [in that case]." 133 S. Ct. at 1150 n.5.  The same is true here.

Plaintiffs attempt to distinguish this case from *Amnesty International* by pointing to public disclosures regarding Upstream surveillance, but identify no facts that move them any closer to establishing that they have standing to bring their claims.  Plaintiffs first note that Upstream surveillance " came to public attention only after *Amnesty* was decided."  Pls.' Opp. at 31.  But, of course, *Amnesty International* teaches that a plaintiff seeking to challenge a foreign intelligence program must establish an injury that is fairly traceable to the challenged program, *id.* at 1148–50; a showing that the program exists does not address the question of whether Plaintiffs have suffered injury because of it.

Plaintiffs also attempt to distinguish *Amnesty International* based on the reported number of targets subject to FAA surveillance, arguing that, when the Supreme Court rendered that decision, "nothing was known about how many targets there were."  Pls.' Opp. at 30.  But Plaintiffs point to no evidence that the Court's reasoning depended in any way on the volume of communications that the challenged intelligence program collected.  *See id.*  Indeed, the dissent

---

[2]  Indeed, *Amnesty International* specifically distinguished *Monsanto* as "inapposite" because that case, addressing the deregulation of a genetically modified crop, hinged on such "concrete evidence" as the locations of crops and the known flight-range of pollinators, rather than "conjecture about possible governmental actions."  *See* 133 S. Ct. at 1153–54.  *Susan B. Anthony List*, decided after *Amnesty*, involved a challenge to a law criminalizing false statements about candidates during political campaigns.  *See* 134 S. Ct. at 2338.

cited the volume of communications collected by the NSA in support of its conclusion that

plaintiffs' communications had very likely been monitored.  *See* 133 S. Ct. at 1157-59 (Breyer,

J., dissenting) (emphasizing the NSA's "legendary" technological capabilities, and media reports

that NSA systems "intercept and store 1.7 billion e-mails, telephone calls and other types of

communications").  There is no reason to think it would have changed the outcome if the Court

had known that the challenged program had tens of thousands of targets, Pls.' Opp. at 32.

Plaintiffs also argue this case is "dramatically different" because, although the Supreme

Court in *Amnesty International* assumed that the statute was being used to intercept only targets'

communications, it has now been disclosed that the Government "is copying and reviewing the

communications *of essentially everyone* in order to find communications to, from, and *about* . . .

[its] targets."  Pls.' Opp. at 30-32.  But there has been no such disclosure.  The scope of

Upstream surveillance remains classified, and the assertion that it includes the communication

"of essentially everyone" is sheer speculation.  *See* Gov't Br. at 16–20.

Moreover, Plaintiffs fundamentally misconstrue "about" collection.  Pls.' Opp. at 31.[3]

Such collection does not include communications "about" the NSA's targets, but, rather,

communications whose message text contains "the *selector* of a targeted person (such as that

person's email address)."  PCLOB Report at 7 (emphasis added).  Selectors cannot be key words

or targets' names; they must be specific communications facility identifiers.  *Id.* at 32–33, 36.[4]

---

[3] Plaintiffs contend the Government should have disclosed the existence of "about" collection to the Supreme Court in *Amnesty International*.  Pls.' Opp. at 31.  But *Amnesty International* itself dismissed the suggestion that the Government had any affirmative duty to disclose classified details of its intelligence-gathering activities, explaining "it is [plaintiffs'] burden to prove their standing by pointing to specific facts . . . not the Government's burden to disprove standing by revealing details of its surveillance priorities."  133 S. Ct. at 1149 n.4.

[4] A hypothetical example illustrates the difference:  if Osama bin Laden were a target and his email address a "selector," communications including Osama bin Laden's email address in their text would be included in "about" collection; communications discussing Osama bin Laden—but not listing his email address—would be excluded.

Properly understood, "about" collection does nothing to shorten the "speculative chain of possibilities" described in *Amnesty International*, 133 S. Ct. at 1150.  Just as it is speculation whether Plaintiffs communicate with individuals who are targets of Upstream surveillance, it is speculation whether Plaintiffs ever send or receive communications including selectors associated with the NSA's targets.  In sum, nothing in the public disclosures that Plaintiffs cite meaningfully distinguishes the allegations here from those rejected by *Amnesty International*.[5]

## II.   THE GOVERNMENT'S EXPERT DECLARATIONS ARE PROPERLY BEFORE THE COURT.

Plaintiffs next urge the Court to disregard the Lee and Salzberg declarations that the Government has submitted in support of its motion to dismiss.  They maintain the Court should shut its eyes to the light shed on their allegations by this expert testimony, *see* Gov't Br. at 18 & n.8, 23 & n.11, on the asserted ground that the Government "is challenging the facial plausibility, rather than the truthfulness, of Plaintiffs' [jurisdictional] allegations."  Pls.' Opp. at 15.

But that is not the case.  Because nothing precludes the Government from combining into one motion its facial and factual challenges to Plaintiffs' jurisdictional allegations, *see, e.g.*, *Draughton v. United States*, 2015 WL 1977675, at *2 (D. Kan. May 1, 2015), the Government has challenged the plausibility of some of those allegations,[6] *see, e.g.*, Gov't Br. at 40-47, and the factual accuracy of others.  *See, e.g.*, *id.* at 20-32.  The declarations and the accompanying exhibits are thus, contrary to Plaintiffs' contention, Pls.' Opp. at 16, properly before the Court.

---

[5] That the Court rejected the plaintiffs' allegations in *Amnesty International* on a motion for summary judgment, *see* Pls.' Opp. at 32–33, should not lead to a different result here; in holding that summary judgment against the plaintiffs was appropriate, the Court determined as a matter of law that the plaintiffs' assertions—despite the additional detail submitted in that case, *see* Gov't Br. at 42 n.30 (describing declarations supporting the plaintiffs' claims)—"were inadequate even to preserve the *question* of standing as a 'genuine issue.'" *Obama v. Klayman*, 2015 WL 5058403, at *8 (D.C. Cir. Aug. 28, 2015) (Williams, J.).  The same is true here.

[6] Plaintiffs are wrong, at least in this Circuit, when they suggest that "[i]t is an open question whether *Iqbal's* plausibility requirement applies to a motion to dismiss under Rule 12(b)(1)," Pls.' Opp. at 14 n.8.  *See David v. Alphin*, 704 F.3d 327, 333 (4th Cir. 2013).

*See United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347-48 (4th Cir. 2009); *see also*

Gov't Br. at 19 n.9.

Plaintiffs misconstrue both the purpose and the substance of the Lee and Salzberg

declarations in asserting that they have not been submitted to demonstrate "that Plaintiffs'

allegations are false."  Pls.' Opp. at 15.  To the contrary, the Government relies on these

declarations to rebut (among others) one of Plaintiffs' *key* jurisdictional allegations:  that it is

"virtually certain" the NSA has intercepted, copied, and reviewed for selectors at least some of

Plaintiffs' "communications," based on their "sheer volume" and "geographic distribution," and

the putative technical necessity and incentive for the NSA to intercept, copy, and review all

communications traversing a given Internet backbone link.  Am. Compl. ¶¶ 58, 60-67; *see* Gov't

Br. at 3, 24-27 (relying on Lee declaration to show volume of Plaintiffs' communications is

"merely a drop in the torrent" of all Internet communications); *id.* at 3-4, 29-32 (relying on Lee

declaration to show Plaintiffs' key "assumptions about Internet technology" are "erroneous"); *id.*

at 3, 21-24, 27-29 (relying on Salzberg declaration to refute alleged statistical certainty of

interception as "unsupported" and "contradicted by Plaintiffs' allegations").  The Court may

resolve this factual dispute concerning jurisdiction without converting the Government's Rule

12(b)(1) motion to one for summary judgment.  *Mims v. Kemp*, 516 F.2d 21, 23 (4th Cir. 1975).[7]

Alternatively, Plaintiffs contend they are "entitled to make their own factual showing" by

"present[ing] declarations and, if necessary, seek[ing] jurisdictional discovery [to] establish[]

their standing to sue."  Pls.' Opp. at 16 & n.11.  But that time has come and gone.  When the

Government moved to dismiss the Complaint, Plaintiffs amended it rather than respond to the

---

[7]  Plaintiffs suggest the Court should resolve any factual dispute under Rule 56, rather than Rule 12, because the "jurisdictional and merits questions" are "plainly" "intertwined."  Pls.' Opp. at 15 n.9.  But, unlike a case in which a jurisdictional fact is "also an element" of the plaintiff's cause of action, *see Kerns v. United States*, 585 F.3d 187, 194 (4th Cir. 2009), it is not "plain[]" here why jurisdiction and the merits are "inextricably intertwined," *id.* at 193.

Government's jurisdictional arguments.  *See* ECF No. 72.  Now, confronting both a facial and

factual attack on their retooled jurisdictional allegations, Plaintiffs still want to keep their powder

dry, even while their expert waits in the wings, *see* Pls.' Opp. at 16 n.11.  Plaintiffs should not be

permitted to postpone the Court's reckoning of their standing in this manner.

**III.   PLAINTIFFS DO NOT ADEQUATELY ALLEGE INJURY DUE TO UPSTREAM INTERCEPTION, COPYING, AND REVIEW OF  ONLINE COMMUNICATIONS.**

**A.   Plaintiffs Have Not Plausibly Alleged that the NSA Intercepts, Copies, and Reviews for Selectors "Substantially All" International Online Communications Carried on U.S. Telecommunications Networks.**

Plaintiffs purport to identify "factual matter" in the Amended Complaint to plausibly

support their "bare assertion," *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009), that the NSA

intercepts, copies, and reviews "substantially all international [online] communications"

transiting the United States, *e.g.*, Am. Compl. ¶ 56.  Pls.' Opp. at 17-21.  But the attempt fails.

Plaintiffs first rely on "technical factors" that they claim "enable the [NSA] to copy and

review substantially all international [online] communications," together with supposed

"strategic imperatives" that motivate it to do so.  Pls.' Opp. at 17-18.  The first of these factors is

the "limited" number of international Internet "chokepoints," *id.* at 17, citing Am. Compl. ¶¶ 46,

60.  But the putatively "limited" number of these chokepoints (Plaintiffs allege there are 49) does

not imply that the NSA intercepts communications at all of them (or that it would have to

intercept all communications passing through any "chokepoints" at which it did conduct

Upstream collection, Gov't Br. at 30).  The second factor is that NSA surveillance devices,

where installed, allegedly "permit[ ] the [NSA] 'to examine the contents of all transmissions

passing through [them].'"  Pls.' Opp. at 18, quoting Am. Compl. ¶ 62.  But that allegation does

not imply that the NSA intercepts all international online communications carried in the United

States, merely that its surveillance equipment is capable of examining all those communications

that it actually does intercept.  Taken together, the third and fourth factors, *id.*, citing Am.

Compl. ¶¶ 62-64, add up to an allegation that, as a technical matter, the NSA "must copy" all communications on "every backbone link that [it] monitors" to "reliably" obtain the communications it has targeted.  Even if that were accurate, *but see* Gov't Br. at 30-31; *infra* at 10-12, it would indicate only that the NSA intercepts all communications at the "link[s] that [it] monitors," Am. Compl. ¶ 64, not that it monitors communications at all backbone links.

Fundamentally, however, these allegations would be deficient even if viewed as consistent with a claim that the NSA intercepts all international online communications transiting the U.S.: "mere[ ] consisten[cy] . . . stops short of the line [of] plausibility" that a plaintiff must cross at the pleading stage to establish its standing.  *Iqbal*, 556 U.S. at 678.  Moreover, Plaintiffs' contentions about the NSA's technical abilities and strategic incentives, Pls.' Opp. at 17, echo the dissenting Justices' observations in *Amnesty International* about the Government's "capacity" and "motivat[ion]" to collect the type of communications in which the plaintiffs there engaged, 133 S. Ct. at 1157-59, which the majority did not consider sufficient to demonstrate the plaintiffs' standing.  *See also* Gov't Br. at 32-33.  Thus, as the D.C. Circuit observed in *Klayman*, under *Amnesty International* a claim that surveillance must be comprehensive to effectively achieve objectives that the Government is presumably motivated to attain is an insufficient basis on which to find standing, given the "various competing interests that may constrain" the Government's efforts.  2015 WL 5058403, at *6-7 (Williams, J.); *id.* at *9-10 (Sentelle, J.).[8]

Plaintiffs next rely on a statement in a *New York Times* article (Exh. 1, hereto) that the NSA intercepts "apparently most e-mails and other text-based communications that cross the [U.S.] border."  Pls.' Opp. at 18, citing Am. Compl. ¶ 69; *see* Exh. 1 at 3.  Contrary to Plaintiffs' insinuations, *id.* at 18, 21, the quoted remark was not the statement of a knowledgeable

---

[8] Plaintiffs' reference to the officially reported number of NSA targets of "FAA surveillance" in 2014, and speculation about the extent to which the NSA devotes available resources to acquiring their communications, Pls.' Opp. at 21, is insufficient for the same reason.

Government official, but supposition by the journalist who wrote the article, without basis in the facts reported.  Media speculation adds nothing to the Plaintiffs' own.[9]  Plaintiffs also rely on two so-called "NSA documents" published in the press, one a purported "NSA slide," the other not identified at all.  *Id*. at 19;  Am. Compl. ¶¶ 68-69.  Even if they were genuine,[10] these documents respectively indicate, at most, that the NSA conducts surveillance at seven, or "many," international Internet "chokepoints," not all of them.

Plaintiffs' conclusory allegation that the NSA intercepts, copies, and reviews for selectors substantially all international online communications transiting U.S. telecommunications networks is unsupported by any factual matter in the Amended Complaint that raises it above the speculative level, and it is therefore insufficient as a matter of pleading, and the irreducible requirements of Article III, to establish Plaintiffs' standing.

**B.    Wikimedia's Claims That at Least Some of Its Communications are Intercepted, Copied, or Reviewed for Selectors, Including Claims Based on the Volume and Geographic Distribution of Communications with Its Websites, Rest on Speculation Foreclosed by *Amnesty International*.**

Plaintiffs do not contest (although they do not acknowledge) that the overwhelming majority of the one trillion annual online communications in which they claim to "collectively" engage are the alleged one trillion online transmissions of information in which Wikimedia alone engages, mostly through users' visits to its websites.  *See* Govt. Br. at 21–24.  Wikimedia's co-

---

[9]  Plaintiffs also cite an assertion in the *New York Times* article, attributed to unnamed "[c]omputer scientists," that "it would be difficult to systematically search the contents of the communications without first gathering nearly all cross-border text-based data."  Pls' Opp. at 18, quoting Exh. 1 at 3.  Again, that conclusion is based on speculation about the "systematic" nature of the NSA's objectives and the resources it can devote to achieving them, *Klayman*, 2015 WL 5058403, at *6-7, *9-10, and has been rebutted by expert testimony, Lee Decl. ¶¶ 11-13.

[10]  The Government has neither confirmed nor denied the authenticity of these documents and does not do so here.  Courts do not consider alleged national-security information leaked to the public to be a matter of public knowledge unless its authenticity has been officially acknowledged by authorized Government personnel.  *Cozen O'Connor v. U.S. Dep't of Treasury*, 570 F. Supp. 2d 749, 788 (E.D. Pa. 2008); *see also EPIC v. NSA*, 678 F.3d 926, 933 n.5 (D.C. Cir. 2012); *Wilson v. CIA*, 586 F.3d 171, 186-87 (2d Cir. 2009).

Plaintiffs remain silent as to the volume of their communications or their geographic distribution, *see* Pls.' Opp. at 22–23, and, thus, it is undisputed that the Amended Complaint furnishes no basis on which any of these eight other plaintiffs can maintain that their communications are so numerous and widespread as to render their interception by the NSA "virtually certain." *Id.* [11]

 Upon inspection, even the allegation that the NSA is almost certainly intercepting, copying, and reviewing Wikimedia's communications, *see* Am. Compl. ¶ 67, dissolves into unsupported statistical claims and suppositions about how Upstream surveillance "must" operate. *See* Govt. Br. at 20–34.  Wikimedia has adduced no specific facts, *see* Pls.' Opp. at 22–30, to elevate this allegation beyond "mere[] speculat[ion] and . . . assumptions" that cannot support Article III standing under *Amnesty International*.  133 S. Ct. at 1148.

 *Amnesty International* held that even a "very strong likelihood" that the NSA would "intercept at least some of the plaintiffs' communications," *id.* at 1159 (Breyer, J., dissenting)— based on the Government's "strong motives" and "capacity" to collect those communications, *id.*—was no substitute for a showing "that [the plaintiffs'] communications had been monitored under [the challenged program]." *Id.* at 1148; *see also* Govt. Br. at 32–34.  In *Klayman*, the D.C. Circuit applied this principle and held that the plaintiffs' standing to challenge NSA bulk collection of telephone records from communications service providers could not be grounded in "their assertion that NSA's collection must be comprehensive in order for the program to be most effective."  2015 WL 5058403, at *7 (Williams, J.); *see also id.* at *10 (Sentelle, J.).  Yet this is precisely the substance of Wikimedia's refrain that "Upstream surveillance could achieve the government's stated goals only if" the program functioned as they surmise.  Pls.' Opp. at 22.

---

[11] Plaintiffs' observation that the Court need not consider whether the other plaintiffs have standing if Wikimedia has standing, *id.* at 35 n.20, goes only to whether the Court would have jurisdiction to adjudicate the case, *Rumsfeld v. Forum for Academic & Inst. Rights, Inc.*, 547 U.S. 47, 54 n. 2 (2006), not whether the other eight Plaintiffs can hitch their standing wagon to Wikimedia with the hopes of riding to the merits.

Wikimedia relies on the "stated goals" of Upstream surveillance in every facet of its argument that at least some of the transmissions between users and its websites "must be" intercepted, copied, and reviewed as part of the program. It cites the "stated goals" of the program as support for its allegations regarding:

- the volume of Upstream collection; *id.* at 22 (Upstream "could achieve [its] stated goals only if it entailed the copying and review of a large percentage of international text-based traffic); *id.* at 28 (Upstream "could not accomplish its stated goals if the NSA were intercepting such a vanishingly small proportion of internet communications.");

- the geographic distribution of the sites at which Upstream collection occurs; *id.* at 25 ("If the [G]overnment's aim is to 'comprehensively' and 'reliably' obtain communications to, from, and about targets scattered around the world, it must conduct Upstream surveillance at many different backbone chokepoints."); and,

- the scope of Upstream collection at any site where it occurs; *id*. at 23 (To reliably obtain targeted communications "the [G]overnment must be copying and reviewing all of the international text-based communications that travel across the circuits that it monitors."); *id.* at 30 ("Because the NSA is seeking to review the contents of immense quantities of internet communications, its ability to reliably identify those to, from, and about its targets would be significantly impaired if it were not copying and reassembling all the international text-based traffic transiting a given internet backbone circuit.").

But while each of the foregoing might be a reason why "the effectiveness of the program [would] expand[] with its coverage," *Klayman*, 2015 WL 5058403, at *6 (Williams, J.), and why "a reduction in coverage . . . may well . . . diminish [its] effectiveness," *id.*, they do not elevate Wikimedia's claims about how the program "must" function out of the speculative realm.[12]

So too with Wikimedia's arguments based on the travel of information over the Internet in packets. *See* Pls.' Opp. at 29–30. Wikimedia acknowledges that, *as a technical matter*, it is

---

[12] Wikimedia contends that an alleged "NSA slide disclosed by the media," supports its standing. The purported "NSA slide" is headed "Why are we interested in HTTP?," and depicts the logos of several well-known websites, including Wikipedia. Although it makes no reference to Upstream collection or the NSA, Wikimedia interprets this document as "identif[ying] Wikipedia as a target for [surveillance of HTTP communications]." *See* Pls.' Opp. at 26; Am. Compl. ¶ 107. First, the Government neither confirms nor denies whether the document is an "NSA slide." But whatever the true provenance and meaning of this slide, Wikimedia has surely misconstrued it. It simply observes that the "HTTP" protocol is used in "nearly everything a typical user does on the Internet." Moreover, because Wikimedia is a domestic organization located in the U.S., Am. Compl. ¶ 6, it is a "United States person" under FISA and the NSA is barred from targeting it for surveillance under Section 702. *See* 50 U.S.C. §§ 1801(i), 1881a(b).

11

unnecessary to copy the entire stream of data carried on a backbone submarine cable to be reasonably certain of obtaining all of the packets comprising a specific communication, *see id.* at 29 (discussing Lee Decl. ¶ 13), but insists that, "[a]t scale," Upstream surveillance would be more effective if it collected additional streams of information because the NSA would more reliably obtain all of the packets comprising the communications it collects. *See id.* at 29-30. Like the plaintiffs in *Amnesty International*, however, Wikimedia does not ground these assertions about the program's goals in any actual knowledge of its operational objectives, or the resources devoted to Upstream rather than "numerous other methods of conducting surveillance," 133 S. Ct. at 1149, for which the NSA is responsible. *See* Govt. Br. at 31–32. Lacking that foundation, these allegations cannot support Wikimedia's standing.

Wikimedia's curious allegation that the NSA must intercept "all international text-based communications transiting each of the major internet backbone *circuits* it is monitoring," Pls.' Opp. at 29, also lends no support to its claim that the NSA must be intercepting, copying, and reviewing its communications.[13]  If Wikimedia means to suggest that a "major internet backbone circuit" is coextensive with a given submarine cable, Mr. Lee explains that it is not technically necessary to collect all of the information traversing a given submarine cable to collect some fraction of the information that it contains.  *See* Lee Decl. ¶ 13.  If Wikimedia instead means to imply that each submarine cable contains many "major internet backbone circuits," it is unclear how this allegation brings it any closer to establishing "that [its] communications have been monitored under" Upstream surveillance, as *Amnesty International* requires, 133 S. Ct. at 1148.

Nor do Wikimedia's allegations about the volume of its communications, *see* Pls.' Opp. at 22–23, support its standing.  Wikimedia does not contest that the assertedly "staggering"

---

[13]  Without citation, Wikimedia claims that a circuit "may span multiple fibers in a given cable" and "carries an enormous amount of traffic."  *Id.*  But it neither explains what it means by "major internet backbone circuits" nor states how many such circuits a submarine cable may contain.  *See id*.

volume of its communications, *id.* at 22, is a mere drop in the ocean of Internet traffic.  *See* Govt. Br. at 24–27.  As Mr. Lee observed, even compared with email and the website traffic on just the top 50 websites, Wikimedia's page views amount to 0.29% of the total traffic.[14]

Finding no support in raw numbers, Wikimedia reasserts its allegation that the chances are "99.9999999999%" that at least one of its communications is intercepted as part of Upstream surveillance.  Pls.' Opp. at 22.  But Wikimedia does not contest the analysis by Dr. Salzberg showing that this figure is in fact statistically unsupported and even contradicted by Plaintiffs' own allegations.  *Id.* at 27-29.  Wikimedia insists instead that its model shows how unlikely it is that "Upstream surveillance does not touch" its communications, "even accounting for the assumptions embedded in it."  Pls.' Opp. at 27.  Dr. Salzberg's unrefuted point, however, is that Wikimedia *does not* account for the assumptions in the model.  As Dr. Salzberg demonstrates, each assumption on which the model's validity depends is either unsupported or contradicted by the Amended Complaint.  *See* Salzberg Decl. ¶ 6.

Wikimedia audaciously faults Dr. Salzberg for failing to take into account the alleged features of Upstream collection that make it non-random.  Pls.' Opp. at 27-28.  But Dr. Salzberg's point is that it is *Plaintiffs' model* that assumes the interception of communications to be random, contrary to Plaintiffs' own assertions about how Upstream collection operates.  *See* Salzberg Decl. ¶ 19.[15]  Wikimedia asserts that the alleged "combination of properties" making Upstream collection non-random is "precisely what make[s] it virtually certain that

---

[14]  Plaintiffs mistake this number—total email and traffic on the top 50 websites—for the total text-searchable communications on the Internet when they assert that the NSA intercepts .0000295% of text-searchable Internet communications.  *See* Pls.' Opp. at 28, n. 16.  In reality, this comparison overstates the percentage of communications collected because it omits the activity on most of the Internet—approximately *244 million* active websites, *see* Lee Decl. ¶ 32.

[15]  Indeed, as Plaintiffs note, Dr. Salzberg does not have knowledge of the scope or methods involved in Upstream, Pls.' Opp. at 26, 28, and thus the suggestion that he "points out that Upstream surveillance is non-random" misstates the contents of the declaration.  *Id.* at 27.

[Wikimedia's communications] are subject to this surveillance."  Pls.' Opp. at 27-28.  But they offer no evidence or explanation showing that the non-random nature of Upstream collection might render interception of Wikimedia's communications more likely, not less.  *See id.* at 27. The naked assertions in their brief do not in any way bolster their claim.

### C.    Wikimedia Alleges No Injury to Itself from the Claimed Interception, Copying, and Review of Users' Online Communications with Its Websites.

Even if Wikimedia had properly alleged that the NSA intercepts, copies, and reviews online transmissions between its websites and the Internet users who visit them, Wikimedia still would lack standing.  The sole interests allegedly threatened by this claimed activity are the privacy rights of users who visit its websites, whose interests Wikimedia lacks third-party standing to assert.  Gov't Br. at 34-40.  Wikimedia now argues that it has alleged injuries to privacy, possessory, and expressive interests of its own in these communications, Pls.' Opp. at 36-42; alternatively, that the interception of these communications is alone sufficient to endow it with standing, *id.* at 33-35; and, again in the alternative, that it has third-party standing to assert the rights of ordinary Internet users, *id.* at 42-43.  None of these arguments has merit.

### 1.    Wikimedia alleges no privacy interest of its own in the online transmissions associated with user visits to its websites.

In support of its claimed privacy interest in communications allegedly intercepted by the NSA, Wikimedia first points to the online communications of its staff, Pls.' Opp. at 37-38, citing Am. Compl. ¶¶ 102-04, as well as to "communications by user community leaders" who help administer its websites, and online feedback submitted by users.  *Id.* at 38, citing Am. Compl. ¶¶ 90-91, 95-96, 98.  But the Amended Complaint contains no allegations regarding the number or global distribution of these communications (as opposed to the alleged one trillion online transmissions of information occurring each year when users visit Wikimedia websites).  *See* Gov't Br. at 21-22.  Thus, regardless of any protected interest Wikimedia may have in the above

14

communications, the Amended Complaint furnishes no basis for concluding that they are so numerous and widespread that at least some of them must be intercepted by the NSA.

Wikimedia next contends that even online transmissions between its websites and visiting Internet users "contain many different kinds of sensitive and private information." Pls.' Opp. at 38. None of it, however, is Wikimedia's. The substantive content of the transmissions consists entirely of publicly available information posted on Wikimedia websites. It is not created by Wikimedia but furnished by third parties, and made available to whoever in the world chooses to view or download it. *See* Gov't Br. at 36 & nn.24-25. The additional, allegedly "sensitive and private information" contained in these communications (and Wikimedia's logs thereof), Pls.' Opp. at 38, citing Am. Compl. ¶¶ 90-93, includes information only about users themselves— such as IP addresses, user names and other log-in credentials, *see* Gov't Br. at 37 n.26.[16]

In the end Wikimedia all but acknowledges that it cannot legitimately claim a privacy interest of its own in the information exchanged between users and its public websites. *See* Pls.' Opp. at 38-39.[17] Nevertheless, it argues that maintaining the privacy of that information, so users feel "comfortable" visiting and contributing to its websites, is "essential to its mission." *Id.* This is simply another way of speculating that users may refrain from visiting or contributing to its websites out of their own subjective fears that their communications will be intercepted during the course of Upstream surveillance.[18] That is a proposition for which the Amended Complaint gives no concrete support, even though the Upstream program has been a matter of

---

[16] Defendants have already addressed Wikimedia's assertion that its communications "reveal private information about [its] operations." Pls.' Opp. at 38; *see* Gov't Br. at 38 n.28.

[17] Wikimedia's discussion of *City of Los Angeles v. Patel*, 135 S. Ct. 2443 (2015); *see* Pls.' Opp. at 39, is puzzling. That decision, invalidating an ordinance requiring hotels to submit their guest registries to police inspection on demand, turned on the law's procedural deficiencies, not on the privacy expectations of a hotel operator in a given case. 135 S. Ct. at 2451-56.

[18] Of course, to evade the pervasive surveillance depicted in the Amended Complaint, users would have to refrain from virtually all online activity, not just visits to Wikimedia sites.

public knowledge for over two years, and it is indistinguishable from the assertions of

associational injury that *Amnesty International* rejected as conjectural and not fairly traceable to

the Government's surveillance activities.  133 S. Ct. at 1152 n.7.

Wikimedia also invokes the recognized interest of conversing parties in maintaining the

privacy of what they have chosen to communicate about, even if the information is otherwise

publicly available.  Pls.' Opp. at 39-40, citing *United States v. U.S. Dist. Ct. (Keith)*, 407 U.S.

297, 313 (1972).  But when users view or download information from a Wikimedia website,

Wikimedia neither chooses (nor did it create) the information communicated, nor does it choose

(or even know) to whom it is provided.  Those choices are made exclusively by users, *see* Gov't

Br. at 34-36, and only users can claim a privacy interest in what information they access.[19]

In short, the Amended Complaint contains no allegations that communications

implicating Wikimedia's privacy interests (such as staff communications) are so numerous that

they are almost certainly intercepted by the NSA, or that communications whose "sheer volume"

allegedly renders their interception a near certainty—i.e., data transmissions between Wikimedia

websites and visiting users—contain any matter in which Wikimedia has a privacy interest.

### 2. <u>Wikimedia has not alleged injury to a protected possessory interest.</u>

Wikimedia also claims that alleged NSA interception of online transmissions between

users and its websites interferes with a protected possessory interest, specified in the Amended

Complaint as a "right to control those communications and the information they contain."  Pls.'

Opp. at 36-37; Am. Compl. ¶¶ 70, 103.  This claim adds nothing, however, to Wikimedia's

attempted assertion of a privacy interest.  The right to control information invoked by Wikimedia

---

[19]  As Wikimedia acknowledges, it merely furnishes the technical infrastructure through which information contributed by third parties is made available to users who access it on the Internet.  Gov't Br. at 36; Am. Compl. ¶¶ 79-80, 82.  Thus, Wikimedia's role in the "conversation" is essentially that of a communications service provider, and it no more has a privacy interest in what information is exchanged, or with whom, than a phone company has in the contents of, or the parties to, the conversations carried on its network.

is understood to protect a person's control over the use or dissemination of information concerning his or her person. *Ostergren v. Cuccinelli*, 615 F.3d 263, 283-84 (4th Cir. 2010); *see also Havemann v. Colvin*, 537 F. App'x 142, 147 (4th Cir. 2013); *United States v. Jefferson*, 571 F. Supp. 2d 696, 702-04 (E.D. Va. 2008) (Ellis, J.). As discussed above, Wikimedia identifies no information of a private or proprietary nature—information about itself—that is captured when the NSA allegedly intercepts transmissions between Wikimedia websites and Internet users.

Moreover, even if Wikimedia plausibly alleged a possessory interest in information it exchanges with typical Internet users, to establish standing it must allege an injury to that interest. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 563 (1992). It has not done so. A Fourth Amendment seizure occurs only if "there is some meaningful interference with an individual's possessory interests" in property, *Maryland v. Macon,* 472 U.S. 463, 469 (1985), a standard which "inevitably contemplate[s] excluding *inconsequential interference* with an individual's possessory interests." *United States v. Va Lerie*, 424 F.3d 694, 706 (8th Cir. 2005) (en banc).[20] Wikimedia does not explain how transitory interception of online communications solely for selector review, without delay in their transmission or subsequent retention in Government databases (which occurs only if targeted selectors are detected), causes meaningful interference with any hypothetical possessory interest it has in such communications.[21] Thus, the Amended Complaint does not contain factual matter from which it can plausibly be concluded that

---

[20] *See also United States v. Jefferson*, 566 F.3d 928, 933-34 (9th Cir. 2009); *United States v. Schofield*, 80 F. App'x 798, 802-03 (3d Cir. 2003); *United States v. Gant*, 112 F.3d 239, 240, 242 (6th Cir. 1997); *United States v. England*, 971 F.2d 419, 421 (9th Cir. 1992) (rejecting contention that "any detention of [property] constitutes a fourth amendment seizure").

[21] The cases that Wikimedia cites for the proposition that interception and/or copying of communications alone constitutes a seizure, *see* Pls.' Opp. at 37, involved situations where the government retained the copied communications indefinitely, and used the contents for its own investigative or prosecutorial purposes. *See Katz v. United States*, 389 U.S. 347, 348 (1967); *LeClair v. Hart*, 800 F.2d 692, 693 (7th Cir. 1986); *Hearst v. Black*, 87 F.2d 68, 70-71 (D.C. Cir. 1936); *Jefferson*, 571 F. Supp. 2d at 699-700, 703.

Wikimedia has suffered injury to a possessory interest in communications allegedly intercepted by the NSA. *Iqbal*, 556 U.S. at 678.

### 3.     Wikimedia has not alleged a First Amendment injury.

Wikimedia also claims an expressive and associational interest of its own in users' online exchanges with its websites, a First Amendment right to receive and distribute information confidentially. Pls.' Opp. at 41-42, citing Am. Compl. ¶¶ 89, 98. But it has not pled a non-speculative injury to that interest. *Defenders of Wildlife*, 504 U.S. at 563. Neither the Amended Complaint nor Plaintiffs' opposition asserts that users have in fact refrained from contributing information to or retrieving information from Wikimedia websites because of Upstream collection. *See supra* at 15-16. And, as discussed above, merely assuming that they may do so out of their own fears of Upstream surveillance is insufficient to state a non-speculative injury traceable to the program. *Supra* at 16, citing *Amnesty* Int'l, 133 S. Ct. at 1152 n.7. The precedents cited by Wikimedia, Pls.' Opp. at 41-42, do not support a contrary conclusion.[22]

### 4.     The transitory interception of online transmissions in which Wikimedia has no identified legal interest does not alone give rise to constitutional or prudential standing.

All else failing, Wikimedia contends that the interception of its websites' mechanized responses to electronic requests for information received from anonymous Internet users, *see* Gov't Br. at 35-37, is sufficient, without more, to provide it "a personal stake in the outcome of the controversy." Pls.' Opp. at 33, 34. But to establish its standing, it is not enough for Wikimedia to allege Government conduct to which it objects, it must also show it has "suffered an invasion of a *legally protected* interest" as a result of that conduct. *Raines v. Byrd*, 521 U.S.

---

[22] For example, *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), involved uncontested findings that the State's designation of certain publications as unfit for sale or display to minors "in fact stopped the circulation of the listed publications" by causing distributors and retailers to cease selling them. *Id.* at 63-64, 68. No such impairment of Wikimedia's asserted right to distribute information has been shown or even alleged here.

811, 819 (1997) (emphasis added).  And, as we have already shown, *supra* at 14-16, Wikimedia

has alleged no such interest and thus cannot show an injury in fact.

The cases Wikimedia cites are not to the contrary.  In *Amidax Trading Grp. v. S.W.I.F.T.

SCRL*, 671 F.3d 140 (2d Cir. 2011), the plaintiff sought to contest the Government's putative

collection of records about its financial transactions from the database of a financial-industry

cooperative.  *Id.* at 143-44.  Finding the allegations of collection too speculative, the Second

Circuit nevertheless observed in dicta that the plaintiff needed "only [to] establish that *its*

information was obtained by the [G]overnment" to establish its standing.  *Id.* at 147 (emphasis

added).  Similarly, *ACLU v. Clapper*, 785 F.3d 787 (2d Cir. 2015), held that the plaintiffs there

had standing to bring a legal challenge to the NSA's bulk telephony metadata program, because

the Government did not contest the plaintiffs' assertion that the NSA had collected provider

records about their telephone calls.  *Id.* at 801; *see id.* at 793-94 (describing the personal

information that can be gleaned from records of individuals' telephone calls).  Wikimedia's

position is not supported by these precedents, because Wikimedia has identified no private or

proprietary information about itself in the "communications" allegedly intercepted by the NSA.

Wikimedia next maintains that considering whether it has a Fourth Amendment interest

in these communications "conflates the standing inquiry with the substantive constitutional one,"

which "the Supreme Court has made clear" is a "distinct question."  Pls.' Opp. at 34, citing

*Rakas v. Illinois*, 439 U.S. 128, 139-40 (1978).  That is not so.  *Rakas*, in fact, made clear it was

concerned with whether a criminal defendant may assert the Fourth Amendment rights of a third

party to suppress evidence against him, 439 U.S. at 138-41, and not "[t]he requirement of Article

III standing," which "ha[s] no bearing upon [a criminal defendant's] capacity to assert defenses"

in a prosecution," *Bond v. United States*, 131 S. Ct. 2355, 2362 (2011).

Wikimedia also "pause[s] to consider" the slippery-slope "implications" of arguments the Government has not made.  Pls.' Opp. at 35.  Wikimedia posits that if it has no standing to challenge the transitory interception of its "internal log[s]" about user visits to its websites, and those users cannot challenge the collection of "third-party business records" about them, then the Government is "actually arguing that this surveillance should not be challengeable at all, by anyone."  Pls.' Opp. at 35.  That is not the upshot of the Government's argument.  Parties who can identify legally protected privacy, possessory, or other interests in online communications that have been intercepted by the Government (such as individual Internet users, for example) may have standing to contest the Government's conduct.  It so happens, however, that Wikimedia has identified no such interests of its own in the communications at issue here.  In any event, the Supreme Court has already addressed and rejected the point that Wikimedia purports to make:  "the assumption that if [plaintiffs] have no standing to sue, no one would have standing, is not a reason to find standing."  *Amnesty Int'l*, 133 S. Ct. at 1154.

What Wikimedia also fails to consider is that even if interception alone—without injury to its own privacy, possessory, or other legally protected interests—could possibly suffice to confer Article III standing, then to maintain this action Wikimedia would have to assert the legal interests of its users in the communications at issue.  But as the Government has already shown, Wikimedia lacks third-party standing to raise claims on its users' behalf.  Gov't Br. at 37-40.

Although Wikimedia initially sought to assert the rights of all its users, *see* Am. Compl. ¶ 111, it now claims only to sue on behalf of two subgroups who visit its websites:  (1) U.S. persons located abroad; and (2) users in the U.S. who are denied content on its webpages that foreign contributors are allegedly unwilling to submit due to fear of Upstream surveillance.  Pls.' Opp. at 42, citing Am. Compl. ¶¶ 85, 110.  But Wikimedia does not allege that U.S. persons abroad who visit its websites are so numerous that communications of theirs with Wikimedia are

almost certainly intercepted; thus no basis appears, even under Wikimedia's theory, to conclude

that they have suffered injuries that a third party may assert.  And Wikimedia's "belie[f]" that

foreigners may be "less willing," Am. Compl. ¶ 110, to contribute to its sites due to fear of

surveillance, thus injuring persons in the U.S. who would view that content, is speculative on its

face and not fairly traceable to the Upstream program.  *Amnesty Int'l*, 133 S. Ct. at 1152 n.7.

Even if the Amended Complaint plausibly alleged an injury to either group of users,

Wikimedia has not met any of the requirements for third-party standing.  *See* Gov't Br. at 37-40.

First, it has not plausibly alleged an Article III injury to itself.  Second, it does not even purport

to assert a close relationship with the users whose interests it seeks to represent—U.S. persons

located abroad, and persons in the U.S. who view foreign-supplied content on its websites.  *See*

Pls.' Opp. at 42, citing Am. Compl. ¶¶ 85, 110.  Rather, Wikimedia claims a close relationship

with a different group of individuals altogether, the volunteers and contributors (not ordinary

Internet users) described in paragraph 83 of the Amended Complaint.  *See id.* at 43.

Finally, Wikimedia has not identified practical obstacles to suit by its typical users.  It

invokes "individuals' interest in preserving their anonymity," Pls.' Opp. at 43, but to file

challenges to Upstream surveillance in their own right the persons in question would have to

reveal only that they use the Internet, which requires no sacrifice of privacy sufficient to confer

standing on third parties.  *See* Gov't Br. at 39.  Wikimedia cites no authority to the contrary.[23]

## IV.  PLAINTIFFS HAVE NOT PLAUSIBLY ALLEGED RETENTION OF THEIR COMMUNICATIONS AS PART OF THE UPSTREAM PROCESS.

Without plausible allegations of interception, Plaintiffs cannot plausibly assert that the

NSA has retained any of their communications, either.  *See* Gov't Br. at 40.  Nevertheless,

___
[23] *Enterline v. Pocono Med. Ctr.*, 751 F. Supp. 2d 782 (M.D. Pa. 2008), on which
Wikimedia principally relies, concerned a newspaper's standing to assert the rights of particular
online commenters whose personal and employment relationships would have been placed at risk
if their identities were revealed.  *Id.* at 785-86.  No comparable privacy interest is involved here.

Plaintiffs argue that the NSA likely retains their communications because they speak with and about individuals and organizations that are likely targets of Upstream collection, resting largely on a recital of allegations in the Amended Complaint.  Pls.' Opp. at 47-48.  Remarkably, Plaintiffs fail to address the Government's point that *Amnesty International* forecloses these very claims as a basis for standing.  *See id.* at 46-50.  Ignoring *Amnesty International* does not change the fact that its reasoning and holding apply directly to the present case.  Although the plaintiffs there argued that their communications likely would be retained "because of the[ir] nature" (what they spoke *about*) and "the identities and geographic locations of the individuals with whom they communicate" (whom they spoke *with*), *see* Gov't Br., Exh. 4 at 14, 23, the Supreme Court held that they lacked standing because they were "merely speculat[ing] and mak[ing] assumptions about whether their communications with their foreign contacts will be acquired." 133 S. Ct. at 1148.  Plaintiffs' allegations here, like those in *Amnesty International*, are insufficient to establish actual retention of their communications.  *Id.* at 1148-50.

The closest Plaintiffs come to addressing *Amnesty International* is to imply that recent developments somehow negate it:  "[s]ince *Amnesty* was decided, the [G]overnment has officially acknowledged key facts concerning its FAA targets, as well as extensive information about its retention and use of information collected via Upstream" and that "[a]gainst the backdrop" of these developments, Plaintiffs' claims are plausible.  Pls.' Opp. at 49.  This argument is incorrect in at least two respects.  First, the D.C. Circuit confirmed *Amnesty International's* controlling precedential effect on cases of this nature just three weeks ago.  *See Klayman*, 2015 WL 5058403, at *3, *6.  Second, no public disclosures since *Amnesty International* have rendered Plaintiffs' claims that the NSA retains their communications any less speculative.  Indeed, only one of Plaintiffs' claimed disclosures—from a 2011 decision by the FISC—even refers to Upstream collection, specifically :  "In 2011 alone, Upstream

surveillance resulted in the retention of 26.5 million communications." Pls.' Opp. at 49. This statistic is unilluminating, however, as to whether *Plaintiffs*' communications were among the 26.5 million retained (out of the at least tens of trillions carried online annually, *see* Lee Decl. ¶¶ 28, 32), and likewise does not speak to the targeting methods by which communications actually are selected for retention by the NSA. Accordingly, this claimed disclosure does not shed additional light on the plausibility of the alleged retention of Plaintiffs' communications.

Two of Plaintiffs' other claimed disclosures refer only to FAA surveillance generally. *See* Pls.' Opp. at 49. By Plaintiffs' own admission, these statements, addressing the total number of FAA targets and suggesting that FAA surveillance is used "to acquire . . . communications concerning 'counterterrorism,'" *id.*, do not purport to identify specific Upstream targets or selectors or even to address Upstream collection. Because Upstream collection is just one of the programs conducted under the authority of the FAA, *see* Am. Compl. ¶¶ 39-40, such disclosures do not render Plaintiffs' allegations any less hypothetical.

Plaintiffs' claim that it is substantially likely the NSA retains copies of their online communications as part of Upstream collection is in all material respects identical to the claims made and rejected in *Amnesty International*. None of the highly general disclosures pointed to by Plaintiffs transform their speculative claims into an adequate basis for standing.

## V.   ALLEGATIONS THAT UPSTREAM COLLECTION UNDERMINES PLAINTIFFS' ABILITY TO CONDUCT THEIR WORK ARE ALSO INSUFFICIENT.

Plaintiffs' claim that Upstream collection has required them to take burdensome and costly measures, Pls.' Opp. at 44, also does not establish their standing under *Amnesty International*. Contrary to Plaintiffs' suggestion, footnote 5 of *Amnesty International* does not dictate otherwise. There the Court noted that it has "[i]n some instances" found standing "based on a 'substantial risk' that the harm will occur, which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm." 133 S. Ct. at 1150 n.5. The Court concluded in *Amnesty*

*International*, however, that the case before it was not such an instance, given the "attenuated chain of inferences necessary to find harm [t]here," *id.*, and the same conclusion is warranted as to Plaintiffs' indistinguishable arguments regarding Upstream collection.

The measures adopted by NACDL-member Dratel to avoid feared surveillance, such as employing electronic security measures to protect his communications, and traveling abroad to gather information, Pls.' Opp. at 44-45, directly mirror the allegedly burdensome precautions taken by the plaintiffs in *Amnesty International*. *See id.* at 1150; *Amnesty Int'l,* Pls. Mot. for Summ. Judg. at 14 (Gov't Br. Exh. 4) (describing plaintiffs' need to engage in "time-consuming, costly, and sometimes dangerous travel abroad to gather information in person" in order to avoid surveillance).  In rejecting the adoption of such measures as a basis for standing, the Court explained that the plaintiffs could not "manufacture standing merely by inflicting harm on themselves." *Id.* at 1151.  That reasoning applies directly to Plaintiffs' claimed injury here.

Attempting to distinguish the present case, Plaintiffs argue that Mr. Dratel employed these measures because one of his clients (Agron Hasbajrami) was subject to acknowledged FAA surveillance, while the prosecution of another client (Sabirhan Hasanoff) "relied upon officially acknowledged FAA surveillance."  Pls.' Opp. at 44.  As explained previously, the Government did not disclose whether the information at issue in Hasbajrami's case was derived from Upstream or PRISM collection.  *See* Gov't Br. at 46.  Any protective measures taken by Mr. Dratel in that case thus cannot be "fairly trace[d]" to Upstream surveillance.  133 S. Ct. at 1150.  Plaintiffs' allegation regarding Hasanoff is an apparent reference to Congressional testimony regarding FAA-obtained communications involving a Yemen-based extremist and an individual, *other than Hasanoff*, located in the U.S.  *See* Gov't Br. at 47.  The testimony does not suggest that Hasanoff or Mr. Dratel were at any time subject to FAA surveillance.  Any costs Mr.

Dratel incurred to avoid such surveillance are thus attributable to his unsubstantiated fears, and are "insufficient to create standing." *Amnesty Int'l,* 133 S.Ct. at 1152.

Plaintiffs' next argument, that Upstream impairs their protected expressive activities, is likewise unavailing under *Amnesty International* and *Laird v. Tatum*, 408 U.S. 1, 10-14 (1972). Plaintiffs repeat their allegations that because of Upstream collection, some third parties have refused to communicate with them electronically, or curtailed communications with them, thus interfering with Plaintiffs' First Amendment activities.  Pls.' Opp. at 46.  In addition, Plaintiffs argue that "the NSA's surveillance activities compel [them] to self-censor their communications, and in some instances forgo electronic communications altogether."  *Id.*

First, *Amnesty International* dismissed the notion that "third parties might be disinclined to speak with [the plaintiffs] due to a fear of surveillance" as an adequate basis for standing.  133 S. Ct. at 1152 n. 7.  *Amnesty International*'s reasoning applies to Plaintiffs' identical argument here and extends to Plaintiffs' claims regarding self-censorship:  any alleged "chill" on the speech of third parties or Plaintiffs[24] is the result of subjectively held, speculative fears of Upstream surveillance, rather than any knowledge as to the operation of the program.  *See id.* (citing *Laird*, 408, U.S. at 13-14).  Accordingly, purported interference with Plaintiffs' First Amendment rights does "not establish [an] injury that is fairly traceable" to Upstream for purposes of standing.  *Amnesty Int'l*, 133 S.Ct. at 1152, n.7 (citing *Laird*, 408 U.S. at 10-14).

## CONCLUSION

For all the foregoing reasons and those set forth in the Government's opening brief, the Plaintiffs' claims should be dismissed for lack of subject-matter jurisdiction.

---

[24] Plaintiffs' reliance on *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013) is misplaced.  *See* Pls.' Opp at 45.  *Cooksey* involved an individual who self-censored his dietary-advice website after being investigated and threatened with legal action by state officials.  *Id.* at 231, 236.  The objectively based chilling effect held to be sufficient for standing purposes in *Cooksey* bears no resemblance to the subjective fears alleged here, regarding surveillance practices about which Plaintiffs can only speculate.

Dated:  September 17, 2015

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

JOSEPH H. HUNT
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Branch Director

JAMES J. GILLIGAN
Special Litigation Counsel


  _/s/ James J. Gilligan_____
RODNEY PATTON
JULIA A. BERMAN
CAROLINE J. ANDERSON
Trial Attorneys
U.S Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W., Room 6102
Washington, D.C.  20044
Phone: (202) 514-3358
Fax: (202) 616-8470
james.gilligan@usdoj.gov

Counsel for Defendants