1    IN THE UNITED STATES DISTRICT COURT FOR THE
           EASTERN DISTRICT OF VIRGINIA
2               Alexandria Division

3  WIKIMEDIA FOUNDATION, et al,            )
                                           )
4                       Plaintiff,         )
                                           )
5  v.                                      ) CIVIL ACTION
                                           )
6  NSA/CSS                                 ) 1:15-cv-662
                                           )
7                                          )
                                           )
                        Defendants.        )
8  _____)

9                  REPORTER'S TRANSCRIPT

10                   MOTION HEARING

11             Friday, September 25, 2015

12                       ---

13  BEFORE:     THE HONORABLE T.S. ELLIS, III
                Presiding
14
    APPEARANCES:  PATRICK TOOMEY, ESQ.
15                JAMEEL JAFFER, ESQ.
                  ASHLEY GORSKI, ESQ.
16                ALEX ABDO, ESQ
                  DAVID ROCAH, ESQ.
17                DEBORAH JEON, ESQ.
                  American Civil Liberties Union
18                Union Foundation
                  125 Broad Street, 18th Floor
19                New York, NY  10004-2400

20                  For the Plaintiffs

21                       ---

22          MICHAEL A. RODRIQUEZ, RPR/CM/RMR
                 Official Court Reporter
23          USDC, Eastern District of Virginia
                  Alexandria, Virginia
24

25

```
 1                    APPEARANCES (Continued)

 2              RODNEY PATTON, ESQ.
                JAMES GILLIGAN, ESQ.
 3              JULIA BERMAN, ESQ.
                CAROLINE ANDERSON, ESQ.
 4              U.S. Department of Justice
                Civil Division
 5              Room 6102
                20 Massachusetts Avenue N.W.
 6              Washington, DC  20001

 7                 For the Defendant

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE CLERK:  Wikimedia Foundation, et al

2     versus NSA/CSS, et al.

3          Civil case number 1:15-cv-662.

4          THE COURT:  All right.

5          Who is here on behalf of the various

6     plaintiffs in this case?

7          Why don't we begin with the counsel who is,

8     probably, by agreement and designated to take the

9     leading role on this argument on the standing issue, who

10    will that be?

11         ATTORNEY TOOMEY:  That is me, your Honor.

12         Good afternoon.  My name is Patrick Toomey.

13    I am here from ACLU representing the plaintiffs.

14         If you would like me to introduce my

15    colleagues, I can do that.

16         THE COURT:  Yes, you may do so.

17         ATTORNEY TOOMEY:  Also here with me from the

18    ACLU are Jameel Jaffer, Alex Abdo, and Ashley Gorski.

19         ATTORNEY GORSKI:  Good morning, your Honor.

20         ATTORNEY TOOMEY:  And just so your Honor

21    knows, our colleagues from the ACLU, Maryland, Deborah

22    Jeon and David Rocah, who are also -- have appeared in

23    the case are in the galley.

24         THE COURT:  All right.  What about all the

25    other -- good morning to all of you or good afternoon

1    now.

2              What about all the other plaintiffs?

3              ATTORNEY TOOMEY:  We represent all the

4    plaintiffs, your Honor.

5              THE COURT:  All the plaintiffs.

6              ATTORNEY TOOMEY:  Yes.

7              THE COURT:  Okay.  Thank you.

8              Now, for the government?

9              ATTORNEY PATTON:  Good afternoon, your

10   Honor.

11             Rodney Patton.  I represent the NSA and all

12   of the other defendants.  I am from the Department of

13   Justice.

14             Also with me at counsel table is James

15   Gilligan, from the Department of Justice; Julia Berman,

16   from the Department of Justice; and Caroline Anderson,

17   from the Department of Justice.

18             THE COURT:  All right.

19             Good afternoon to all of you.

20             And you are from the Programs Branch?

21             ATTORNEY PATTON:  That is correct, Your

22   Honor.

23             THE COURT:  All right.

24             Let me ask Mr. Toomey.  I just am serious.

25   It has nothing to do with the case.  Do you have a much

1    older relative that was a student in England about

2    40 years ago, 45 years ago?

3              ATTORNEY TOOMEY:  Not that I know of, your

4    Honor.

5              THE COURT:  All right.

6              ATTORNEY TOOMEY:  I was a student briefly

7    there, but I don't think that timeframe.

8              THE COURT:  Well, I knew a student when I

9    was a student there by the name of Dan Toomey, and

10   that's not a relation?

11             ATTORNEY TOOMEY:  I have several relatives

12   name Dan Toomey, but I don't believe any of them were

13   there with you.

14             THE COURT:  All right.

15             Well, having covered my lack of any conflict

16   on that side, let me point out that I think one of the

17   leading lights of the Programs Branch is Ms. Jennifer

18   Ricketts, who was my second group of law clerks some

19   30 years ago.

20             But that doesn't create a conflict, as far

21   as I am concerned, but I disclosed it.  I hope she is

22   doing well.

23             ATTORNEY PATTON:  She is doing very well,

24   your Honor.  Thank you for asking.

25             THE COURT:  In fact, I have had a parade of

1    clerks go through the Programs Branch.  I don't even

2    know how many of them are still even there.  But I think

3    most of them have gone -- passed on that way.

4              I say "passed on" because I am eager to

5    share this.  Recently a story appeared in a publication

6    expressing some disagreement with an opinion I had

7    written.  That's not surprising.

8              But at published a picture of me, purporting

9    to me be with that story.  The picture was of a person I

10   knew, liked, and admired, but it wasn't me.

11             It was a picture of Ed Becker, a judge of

12   the Third Circuit who past away in 2006.

13             Rumors of my passing are greatly exaggerated

14   as Twain said.  But am delighted to be associated with

15   Ed Becker, even in death.  He was a very interesting,

16   remarkable, and very funny man, always.

17             I recall once that he wrote an opinion

18   entirely in verse.  I didn't read it.  But many people

19   did.  Poetry was never one of my loves.

20             All right.  This is a -- you all have

21   filed -- forests have died for what you all have done.

22   It's a very interesting case.

23             Let me hear first from the defendant.  I

24   have some questions to ask you.  You are the movant in

25   this matter.  And, so, it is your burden to persuade me.

1          This -- first of all, I want to thank every

2     one for agreeing this to hear this in Alexandria.  This

3     case was, initially, filed in Maryland; and, for reasons

4     that I have disclosed to you, it was -- couldn't be

5     heard -- well, it could be heard there, but not by a

6     Maryland judge.

7          And when I was asked to take the case, I

8     communicated with counsel, and I am pleased to say that

9     you agreed to have this motion heard here, which is

10    convenient for me, and I hope not too inconvenient for

11    you.

12         Actually, one of your clients, or one of the

13    parties lives close to where I live.  I don't know the

14    man.  But I live near Charlottesville, Virginia.  And I

15    think Rutherford does as well.

16         But, in any event, I appreciate the

17    agreement of counsel to do this here.  And to the extent

18    that we do other things in this case, it will always be

19    here if by agreement.  If not, then we will go to

20    Greenbelt.

21         Any counsel can raise an objection at any

22    time, and I'll go to Greenbelt.  Rather not, but it

23    wouldn't be the first time I had to do something I

24    didn't want to do.

25         Now, let me ask you a couple of initial

1    questions.  First, this is a case that challenges the

2    NSA's gathering of Internet data from communications.

3           It strikes me, in my occasional forays into

4    reading newspapers, other than the sports page, which

5    isn't often, that there have been a lot of these cases

6    around, and I am not so happy about doing over what

7    other people are doing.

8           Now, I am familiar with the D.C. Circuit

9    case, of course, and I am familiar with the Second

10   Circuit case, and with the Clapper case, and the Supreme

11   Court, all of which you all have talked about at great

12   length in your briefs.

13          But aren't there some other cases going on

14   in district courts around the country right now?

15          ATTORNEY PATTON:  Your Honor, as an initial

16   matter, some of the cases that you referenced there

17   dealt with bulk telephony metadata program.

18          THE COURT:  Oh, I know it's not the exact

19   same case.

20          ATTORNEY PATTON:  So, it's not the exact

21   same program; and that is, obviously, very important in

22   terms of standing.

23          THE COURT:  Yes, I understand that.

24          ATTORNEY PATTON:  But there are, in fact --

25          THE COURT:  All right.

1          Let me narrow it down to this.  Are there

2     any ongoing cases involving a challenge to the upstream

3     collection of Internet data by the NSA?

4          ATTORNEY PATTON:  Yes, there are -- there

5     is, your Honor.  At least one in the Northern District

6     of California.  We were counsel in that case, too.

7          The case went to summary judgment on a lot

8     of the same topics, and assumptions, and speculations as

9     are here, and the judge found that there was

10    insufficient evidence to preserve even an issue for

11    trial.

12         As a matter, he dismissed --

13         THE COURT:  Was there a standing dispute in

14    that case?

15         ATTORNEY PATTON:  Yes, there was, your

16    Honor.  It was a standing dispute.

17         THE COURT:  So, it must have gone beyond

18    standing.

19         ATTORNEY PATTON:  The standing and the

20    merits were dealt with at the summary judgment stage.

21    It was a motion for summary judgment -- partial motion

22    for summary judgment by the Jewel plaintiffs on their

23    Fourth Amendment claim.  And the United States, Connor,

24    cross-moved for summary judgment on that.

25         THE COURT:  And who were the plaintiffs in

1    that case.

2                    ATTORNEY PATTON:  The plaintiffs or Jewel

3    was one plaintiff and another particular plaintiff --

4                    THE COURT:  So, these parties were not

5    parties.

6                    ATTORNEY PATTON:  These plaintiff were

7    parties to the case; that's correct.

8                    THE COURT:  They were.

9                    ATTORNEY PATTON:  Yes.  So, they, basically,

10   and much the same way as the plaintiffs in this case

11   said, there has been so much information out there in

12   the public sphere since the Snowden --

13                   THE COURT:  Well, we will get to argument

14   about standing.  I just want to focus now, very sharply,

15   on -- I have asked you the question, are there any other

16   cases that are recent or ongoing, involving a challenge

17   to the NSA's collection upstream of this Internet data.

18                   And you've told me about one in California

19   that went to summary judgment.  Was there a Ninth

20   Circuit appeal?

21                   ATTORNEY PATTEN:  So, there is a Ninth

22   Circuit appeal currently ongoing on that issue, your

23   Honor.  But there is also a motion to dismiss the appeal

24   that is being heard later in October, because it was a

25   Rule 54(b).

1              THE COURT:  All right.

2              And the plaintiffs here were plaintiffs

3    there as well.

4              ATTORNEY PATTON:  No, that's not correct,

5    your Honor.  None of the plaintiff there, to my

6    knowledge, were plaintiffs.

7              THE COURT:  Am sorry.  I thought you said

8    earlier, they were.

9              ATTORNEY PATTON:  No.  They are making the

10   same arguments.

11             THE COURT:  Oh, making the same arguments.

12             ATTORNEY PATTON:  Making the same arguments.

13             THE COURT:  All right.

14             ATTORNEY PATTON:  The plaintiffs here.

15             THE COURT:  All right.

16             Apart from the California case, any other?

17             ATTORNEY PATTON:  I am not aware of any

18   others on the civil side.  Obviously, on the criminal

19   side, there is a Hasbarjrami case that, I think, the

20   ACLU filed an amicus brief on that, in that particular

21   case, challenging both upstream and PRISM.

22             So, but, as far as civil cases are

23   concerned, I am not aware of any other upstream

24   challenge other than this one and the one in the

25   Northern District of California.

1                    THE COURT:  All right.

2                    ATTORNEY PATTON:  And there are other civil

3     actions under Section 702, but those are all PRISM cases

4     challenging a different program.

5                    THE COURT:  All right.

6                    Now, the second question I want to ask you

7     is -- well, no, I'll make it the third, because the

8     second question I am going to ask you is probably going

9     to take longer.

10                   So, I'll ask another question first.  I take

11    it that at some point in time, or points in time, the

12    data collection that the NSA is undertaking that is

13    being challenged in this case went to the FISC -- went

14    to the Foreign Intelligence Surveillance Court, and an

15    order issued.

16                   ATTORNEY PATTON:  That's correct, your

17    Honor.  The process works under Section 702.

18                   THE COURT:  Right.

19                   ATTORNEY PATTON:  The Attorney General and

20    the --

21                   THE COURT:  But there is, usually, an order

22    and an opinion sometimes with it.  Did that occur?  And

23    the reason I know that is that I have had a number of

24    classified information cases here.  We get cases of that

25    sort here, and I have had to consider those orders and

1    those opinions.

2          Most of them have been -- most of them,

3    there only have been two or three -- have been

4    classified.

5          Is there a public order or opinion in --

6    that relates to the data collection practices challenged

7    here?

8          ATTORNEY PATTON:  I don't believe there is

9    an unclassified opinion.

10         THE COURT:  But there would have to be a

11   classified order and/or opinion; is that right?

12         ATTORNEY PATTON:  Certainly a classified

13   order because --

14         THE COURT:  All right.

15         ATTORNEY PATTON:  -- FISC has to approve

16   both the certification coming from the Attorney General

17   and the Director of National Intelligence --

18         THE COURT:  So --

19         ATTORNEY PATTON:  -- plus their targeting

20   procedures and minimization procedures.

21         THE COURT:  So, let me continue for just a

22   moment and ask you, what, if any effect, should the

23   existence of such an order have on the challenge by the

24   plaintiffs in this case?

25         ATTORNEY PATTON:  For purposes of them being

1    able to prove their standing, I don't believe it has

2    any.  For purposes of, if this case goes to the merits,

3    I think it has a significant impact on it because -

4                  THE COURT:  All right.

5                  ATTORNEY PATTON:  -- the FISC has to prove

6    the reasonableness of the program under the Fourth

7    Amendment that's under the statute.  And both the --

8                  THE COURT:  So, it would be akin to

9    something like the existence of a search warrant in a

10   case challenging the legality of the search.

11                 The court would still have to assess whether

12   the search was legal, and defects in the search warrant,

13   or the affidavits, or whatever, would have to be

14   examined.

15                 All right.  Let's go to the third question,

16   which really leads into what's at issue today.  The

17   first two questions I asked really don't have much to do

18   with what's before the court today.

19                 The Clapper case is a case that you rely on

20   quite significantly.  Now, what -- and that was upstream

21   collection data, was it not?

22                 ATTORNEY PATTON:  That was Section 702,

23   which authorizes upstream selection and authorizes

24   PRISM.  But it was a facial challenge brought, in fact,

25   by six of the nine plaintiffs here, a facial challenge

1    to the statute that authorizes this very program.

2                    THE COURT:  Now, what -- and, of course,

3    Clapper held there was no standing in a divided court.

4                    ATTORNEY PATTON:  Well, divided in the sense

5    that it was five, four.  But, yes, the majority ruled

6    that there were no standing for the same reason --

7                    THE COURT:  Yes.

8                    ATTORNEY PATTON:   -- were pending in this

9    case.

10                   THE COURT:  Now, I want to know -- and I am

11   going to ask this of the -- of you, Mr. Toomey.

12                   What is there in this second or amended

13   complaint that is different from or in addition to the

14   facts that were alleged in Clapper?

15                   And I ask that for an obvious reason.  And

16   that is, that if the facts in this case are exactly the

17   same as Clapper, no different from Clapper, then I don't

18   know that I have the authority to reach any different

19   conclusion.

20                   So, I want to know whether, chiefly from

21   you, Mr. Toomey, what is alleged in this case that is

22   different from or in addition to what was alleged in

23   Clapper.

24                   ATTORNEY PATTON:  Your Honor, if I may

25   answer that question as quickly as I possible, because

1      there are, obviously, a lot of things that are alleged.

2               But the bottom line here is that in Clapper

3      the Supreme Court ruled that the plaintiffs in that case

4      could only speculate and make assumptions about who the

5      targets were.

6               Here the same kind of speculations and

7      assumptions have to albeit, by these plaintiffs, as to

8      whether or not their communications were intercepted.

9      So, it's only sightly different, but it's the

10     speculation on the assumptions that's key.

11              And here, whether -- whether anyone that

12     these plaintiffs are talking to is a target, classified.

13     Whether, what the scope of upstream collection is, how

14     it actually operates, classified.

15              So, the only things that the plaintiffs can

16     do, as set aside and throw against the wall, as much

17     information as they can taken from this snippet or that

18     snippet, but the bottom line is, they have to say, you

19     must be collecting this.  It's speculation.  You've got

20     to do it in this way in order to be effective.

21              And the D.C. Circuit through Judge Sentelle

22     and Judge Williams, just last month, looked at albeit

23     the bulk telephony metadata program in that case, and

24     said that's not enough.

25              When you are looking at a program and

1    saying, well, in order to be effective as a bulb

2    telephony metadata, you must be collecting from Verizon

3    wireless.  That's just one piece of speculation.  And I

4    know that we are going to hear from the plaintiff about

5    a chain of speculation in Amnesty and that there is not

6    as long a chain here.  The point is, it's still

7    speculation.

8          And one case of speculation was sufficient

9    for the D.C. Circuit to say, you've not shown standing

10   in that case.  That was one of the cases that your Honor

11   alluded to earlier.

12         And the point is, the plaintiff in that case

13   could not say, following Amnesty, that just because we

14   think the program would be effective, only if you had

15   Verizon wireless, that we can presume that Verizon is

16   part of the program.

17         Here, plaintiffs make the same arguments.

18   We presume it has to be substantially all because,

19   otherwise, how could you do this, or how could you do

20   that?

21         And, of course, the point is how the program

22   operates is classified.  There are very few pieces of

23   information out there in the public.  There is Privacy

24   and Civil Liberties Oversight Board.  There are some

25   FISC opinions.  I recommend 2011 FISC opinion from

1   October 3rd of that year by Judge Bates, which explains

2   a lot about this program.  But what it doesn't explain

3   is the scope of the program, the operational details of

4   how it works.  Those were classified, and they are still

5   classified.

6             So, plaintiffs, they will tell you a lot of

7   things together, and their words would be, they must be

8   doing this.  To be effective, they must do this.  Those

9   are all speculative words.  They are all assumptions

10  that the plaintiff make.

11            So, notwithstanding the pieces of

12  information that have come out, official acknowledgement

13  since the Snowden leaks that occurred, nothing that has

14  come out as an official acknowledgement has indicated in

15  anyway the scope of this program or how it works.

16            The plaintiff are left to speculate.  That's

17  exactly what the Supreme Court said they can't do in

18  order to show standing on page 1148 of the Clapper

19  versus Amnesty opinion.

20            So, we submit this case is not that

21  difficult, notwithstanding the forest that we killed to

22  prove the point to you, is that plaintiffs, two years

23  later, cannot get any further than the -- six of the

24  same plaintiffs did in Clapper versus Amnesty

25  International.

 1              THE COURT:  I take it you would not contest

 2     standing if the plaintiffs adduced an e-mail of theirs

 3     that they got from Snowden saying he got it from NSA.

 4              ATTORNEY PATTON:  That would be very fact

 5     specific, your Honor.  Obviously --

 6              THE COURT:  And then it would be the

 7     credibility of Snowden.

 8              ATTORNEY TOOMEY:  Well, I am certainly not

 9     going to address that.  But what I will address is

10     official acknowledgments, for example --

11              THE COURT:  Well, I think, what my question

12     really was is how in the world does the plaintiff in

13     this situation show standing other than by inference and

14     probabilities?

15              ATTORNEY PATTON:  Well, your Honor, that

16     certainly a problem that the plaintiffs at Amnesty

17     International had.  And, as I alluded earlier, the ACLU

18     on behalf of Mr. Hasbarjrami, he received an official

19     notice, not specific to upstream collection or PRISM,

20     but a 702 notice that the parties have discussed in

21     their papers.  And so they briefed that issue of the

22     legality of Section 702 upstream and PRISM, and so those

23     issues were briefed.

24              If some plaintiff came forward with evidence

25     that they had, in fact, being -- their communications

1    being intercepted, then certainly we would look at that

2    and the facts of that case.

3              THE COURT:  How in the world would they get

4    that evidence?

5              ATTORNEY PATTON:  Well, that's -- that's one

6    of the features of a classified program.  It's not a bug

7    of a classified program that it's hard to prove

8    standing.

9              THE COURT:  Yes.  And you couldn't and

10   shouldn't tell me how they could get that because you

11   would be revealing, if you knew --

12             ATTORNEY PATTON:  Right.

13             THE COURT:  -- classified information.

14             ATTORNEY PATTON:  That's correct.

15             THE COURT:  I am just making the observation

16   that, I am sure, was apparent to the Supreme Court in

17   Clapper that this is a significant, very difficult

18   burden for a plaintiff that they are setting.

19             And in one of -- life is full of ironies.  I

20   believe Justice Breyer was an author of either Iqbal or

21   Twombly.  I don't remember which one.

22             Which one was anti-trust case?

23             ATTORNEY PATTON:  I think they were both

24   anti-trust case.

25             THE COURT:  Well, one of the --

1        ATTORNEY PATTON:   Twombly, I am sorry.

2   Twombly was anti-trust case.

3        THE COURT:   I think Breyer authored Twombly;

4   and, of course, he doesn't -- he is not happy with its

5   application, as the majority put it in this case.   Just

6   an irony that I -- I am increasingly amused by in life.

7   There are lots of them in everyone's lives.

8        I think I understand the parties' arguments.

9   Let's do this.   You'll have the last word.   You are the

10   movant.   But let me ask Mr. Toomey to tell me.   And pay

11   attention to this because this is one of the things that

12   I do want you to respond to.

13        My first question to Mr. Toomey is the

14   obvious one.   What has been alleged in this case that is

15   different from or in addition to what was found to be

16   insufficient in Clapper?

17        ATTORNEY TOOMEY:   Of course, your Honor.

18        There are four reasons.

19        THE COURT:   I am sure that's a question you

20   anticipated.

21        ATTORNEY TOOMEY:   We had an idea you might

22   ask it, your Honor.

23        THE COURT:   All right.

24        ATTORNEY TOOMEY:   There are four basic

25   reasons this case is not foreclosed by Amnesty

1    International, your Honor.

2              And if I can just describe in each briefly

3    and then get into more detail, if you you want to go

4    further.  The first reason is that this surveillance is

5    fundamentally different from the surveillance that was

6    at issue in Clapper.

7              The surveillance at issue in Clapper

8    concerns what the Supreme Court understood to be

9    targeted surveillance, surveillance that was directed at

10   the communications to or from the government's foreign

11   targets.

12             The surveillance that has been disclosed

13   now, and officially acknowledged by the government, is

14   far broader than that.  It involves, in the first

15   instance, this screening, as the government calls it,

16   and as we refer to it, the copying and reviewing of,

17   essentially, everyone's communications, targets and

18   non-targets alike, in search of certain terms that are

19   associated with the government's targets.

20             So, to put it maybe more simply, your Honor,

21   to put in terms of physical mail, for instance.  If the

22   government wanted to collect mail from its -- from just

23   its targets, it could look at the outside of the

24   envelope and say, I'll take this letter and that letter.

25             If the government wanted to find the letters

1    containing the e-mail address or the name of a target,

2    it would have to look at the content of every letter

3    coming through, you know, the postal screening service

4    in order to find the communications that it was looking

5    for.

6              And that's very important to know about what

7    this surveillance entails.  And it was not before the

8    Supreme Court in Clapper, precisely, because, as others

9    have observed since, the government did not inform the

10   Supreme Court that that was how some of the surveillance

11   was being conducted.

12             The second difference, your Honor, is that

13   far, far more is known -- is now known about the

14   surveillance than was known at the time of Clapper.

15             And the PCLOB report makes this point

16   explicitly.  And we, we identified that statement in

17   paragraph 51 of our amended complaint, that at the time

18   Clapper was decided and, in fact, when the statute was

19   passed, no one in the public or the Supreme Court

20   understood the surveillance to operate in this way; that

21   is, to be this broad net looking at the content of all

22   the transiting communications, as opposed to merely

23   being focused on the communications of targets.

24             And we have pointed to numerous other

25   official disclosed -- disclosed documents that showed

1    this.  We don't have the FISC order in the terms that,

2    perhaps, you were asking before that authorizes this

3    surveillance.

4            But we certainly have FISC opinions that you

5    can find on Westlaw, in fact, that describe the

6    surveillance at issue, that describe upstream

7    surveillance.  And one of those opinions is an opinion

8    from Judge Bates from October 2011, where he found

9    certain of the procedures that govern upstream

10   surveillance unconstitutional.

11           And there are other opinions out there that

12   are also touching surveillance that have been released

13   by the government.  So, the record that the court has

14   before if today about how this surveillance operates,

15   the government says everything about how this

16   surveillance operates is classified.  Well, that's not

17   true.

18           The PCLOB report describes in a number of

19   ways how this surveillance operates.

20               THE COURT:  What report?

21               ATTORNEY TOOMEY:  The PCLOB report, your

22   Honor.  That's the Privacy and Civil Liberties Oversight

23   Board report.  It's a 196-page report that evaluates the

24   government's surveillance activities under Section 702.

25               It describes upstream surveillance in

1    significant detail, and many of the key points are

2    identified, both in our briefs, and in our amended

3    complaint.

4         The third difference from Amnesty is that

5    the plaintiff are different, not merely in their name,

6    your Honor, but in terms of how they communicate and the

7    volume and distribution of their communications.

8         We have pointed, specifically, to

9    Wikimedia's communications.  It engages in more than

10   trillion Internet communications, international Internet

11   communications each year with individuals in every

12   country on earth.

13        No -- none of the plaintiffs in Amnesty put

14   that record before the court.  And we've also put before

15   the court a member of NACDL, Mr. Dratel, whose clients

16   received an FAA notice.  In other words, whose client

17   was told that the government used FAA surveillance to

18   intercept --

19        THE COURT:  Say that last again, please.

20        ATTORNEY TOOMEY:  Say which part again, the

21   last part?

22        ATTORNEY TOOMEY:  Mr. Dratel's client

23   received a notice from the government, an official

24   notice, that his communications were intercepted using

25   FAA surveillance.

1               And Mr. Dratel had a second client whose

2       investigation involves a co-defendant, who also

3       government officials have described in testimony using

4       FAA surveillance.

5               THE COURT:  That just shows that those

6       particular communications were gathered.  And for all we

7       know, those persons' clients were designated terrorists

8       overseas, right?

9               ATTORNEY TOOMEY:  The lawyers' clients were

10      individuals here in the U.S.

11              THE COURT:  But were they -- certainly, if

12      they were people they were communicating with were

13      terrorists, that wouldn't be a problem,

14      Constitutionally, would it, if they were communicating

15      overseas and there was a FISC court order that permitted

16      it.

17              ATTORNEY TOOMEY:  Our argument here, your

18      Honor, is that the facts that --

19              THE COURT:  Can you say yes or no and then

20      answer my question, and then go to explain it.  It's

21      frustrating when I ask a question, and I -- this isn't

22      politics.  This isn't -- you are not on the stump.  It's

23      better to give me a direct answer.

24              If the person who received these notices was

25      communicating, or not the person receiving notice, but

1    the client was communicating with someone who was a

2    designated terrorist or something of that sort overseas,

3    then nothing constitutional -- unconstitutional about

4    that if there is a FISC order, is there?

5              ATTORNEY TOOMEY:  We think there is

6    something unconstitutional with that, your Honor.

7    That's not the issue here right now.

8              To be very clear about the type of FISC

9    orders that are involved in Section 702 surveillance,

10   they are not individualized warrants or individualized

11   orders finding probable cause of the same kind, as what

12   we refer to as a traditional FISC order.

13             They are the FISC orders that apply to this

14   surveillance part, general orders authorizing and

15   approving the procedures that the government proposes to

16   follow.

17             The government never identifies through the

18   court its particular targets.  And, in fact, those

19   targets do not need to be designated terrorists at all.

20   They could -- they can be any foreigner located abroad,

21   any person who the government believes has -- is likely

22   to communicate information with foreign intelligence

23   value to it.  It could be journalists.  It could be

24   human rights activists.  It could be academics.  It

25   could be individuals who work at companies abroad.

1          So, I just want to be very careful to

2     distinguish between what -- what the traditional FISC

3     process required, which was and had done an

4     individualized order, and the surveillance at issue here

5     in which the government is able to identify 92,000

6     targets, foreign targets, under a single FISC order.

7          And we do believe that there are grave

8     constitutional problems with the government's ability to

9     do that absent some type of probable cause finding

10    required by the Fourth Amendment.

11         Back to Mr. Dratel, your Honor, because --

12    and the lawyer who has a client who received one of

13    these notices.  Our argument is -- and the Supreme Court

14    made this point in Amnesty itself, the five justices in

15    the majority.

16         The court observed that an attorney whose

17    client was subject to FAA's surveillance would be able

18    to make a stronger evidentiary showing that his

19    communications had been intercepted, than the plaintiffs

20    who are before the court in Amnesty.

21         And the reason that we believe we have made

22    that this type of stronger showing here is because in

23    order to investigate a defense, in order to contact

24    witnesses abroad, when a defendant has received a

25    notice, the defendant's lawyer must reach out to

1   individuals abroad, contact key witnesses, research the

2   allegations in the indictment, and that that lawyer is

3   likely to communicate with or about the same person who

4   was targeted through the FAA surveillance.

5          So, that's why we believe the facts that Mr.

6   Dratel puts before court are very different from the

7   lawyers who were before the court in Amnesty itself.

8          But the third point is more generally that

9   Wikimedia's communications are so widely distributed

10  across the globe and so immense in number that they

11  transit all of the major Internet circuits that the

12  government is monitoring.

13         So, whichever circuits the government is

14  monitoring, our arguments is, the government must be

15  intercepting at least some of plaintiffs' Wikimedia's

16  communications.

17         The fourth point, your Honor, is that the

18  legal standard in this case is different from the legal

19  standards in amnesty.  We are here, of course, on a

20  motion to dismiss.  The government says the legal

21  standard is plausibility.

22         In Amnesty, the parties were before the

23  court on a motion for summary judgment.  And the Supreme

24  Court has emphasized in a number of different places and

25  a number of different ways that what a party is required

1    to put forward at the pleading stage is different than

2    what a party must put forward at the summary judgment

3    stage.

4              So, those are the main four categories in

5    which we think this case is very different from Amnesty.

6    You can also see this in concrete way by comparing the

7    facts of this case to contingencies that Justice Alito

8    identified on page 1148 of the court's opinion.

9              First he said -- you know, he said that the

10   court was considering a set of contingencies that the

11   plaintiff was putting forward.  The first of them was

12   that the government would target the plaintiffs'

13   contacts.

14             Now, the surveillance -- because the

15   surveillance here is different, because it involves

16   examining the content of, essentially, everyone's

17   targets and non-targets communications, the fact that

18   the surveillance implicates plaintiff doesn't depend on

19   whether the government is surveilling plaintiff's

20   individual context.

21             Second, the second contingencies that

22   Justice Alito identified was that government would

23   choose to use FAA surveillance.

24             But, of course, the government has

25   officially disclosed that it is using upstream

1     surveillance; and the PCLOB, the Privacy and Civil

2     Liberties Oversight Board, has described that

3     surveillance, and it has been described in another

4     number of other context by the government.

5              Third, justice Alito said that the

6     plaintiffs in that case could not know whether the FISC

7     had approved the surveillance.  But, of course, here we

8     know that for a fact that the FISC had approved the

9     surveillance.

10             The government just told you that and, of

11    course, it is reflected in the materials that we cited

12    in the paper and in the amended complaint.

13             And, fourth, the Court said that plaintiffs

14    were speculating about whether the surveillance would

15    implicate their communications.

16             But we have put forward facts showing that

17    this surveillance implicates the plaintiffs'

18    communications.  We have alleged first that the

19    government is intercepting, it's copying, and reviewing

20    substantially all international communications,

21    including those of plaintiffs; and second, even if that

22    were not enough, we have alleged facts showing that the

23    government is copying and reviewing at least some of the

24    plaintiffs' trillion or more communications each year.

25             And that showing, I want to emphasize, we

1    are saying to a virtual certainty that the government,

2    in order to carry out upstream surveillance, must be

3    copying and reviewing at least some of the plaintiffs'

4    communications.

5              We say that based on three factual premises,

6    your Honor.  First, the facts that the government,

7    itself, has acknowledged about how upstream surveillance

8    operates.

9              The PCLOB has described -- the Privacy and

10   Civil Liberties Board has described in analyzing

11   precisely this type of surveillance, the use of

12   surveillance devices that examine the content of all

13   communications transiting that device.

14             And it has put forward even more detailed

15   description about how the government's review of the

16   contents of communications requires it to access, not

17   just the communications of targets, but the

18   communications of others.

19             Second, we have appointed to the volume and

20   distribution of plaintiff Wikimedia's communications.

21   The fact that Wikimedia's communications are so numerous

22   and spread across the globe that they transit every

23   major Internet circuit entering and leaving the country.

24             And third, we have pointed to technological

25   requirements of -- for conducting this type of

1    surveillance.  And we have explained those technological

2    requirements and the structure of Internet

3    communications in great detail in our papers.

4                   And those -- those technological

5    requirements are consistent with the analysis of

6    computer experts that are cited in the New York Times

7    article that we also rely upon which says, based on

8    interviews with government officials, review of NSA

9    documents, and conversations and -- conversations with

10   computer scientists that in order to carry out this type

11   of surveillance the government would have to be copying

12   and reassembling, essentially, all the tiny packets that

13   are flowing in the stream of data in order to review and

14   identify the communications of its 92,000 individual

15   targets that are spread across the globe.

16                  And we believe we can make this showing,

17   your Honor, on the basis of information that's in the

18   public record.  But, of course, we have also pointed the

19   court to materials that corroborate plaintiffs' showing

20   on these points that show that the government is

21   conducting the surveillance at many choke points and

22   that it has identified and pointed to plaintiff,

23   Wikimedia's, own communications in connection with

24   upstream surveillance.

25                  THE COURT:  All right.

1          Thank you.

2          ATTORNEY TOOMEY:  Do you have any further

3    questions, your Honor?

4          THE COURT:  No, thank you.

5          You will have the last word.  But I want you

6    to respond, specifically, to what Mr. Toomey has said.

7    He went through -- he counted four.  I counted five

8    differences between -- that he contends exist between

9    this and the information available in Clapper.

10         ATTORNEY PATTON:  Yes, your Honor.  I am

11   happy to walk through them all.  The first one that I

12   wrote down was that the -- what we have here, upstream

13   collection, is "fundamentally different" than Section

14   702 that was at issue in Clapper.

15         First of all Clapper versus Amnesty

16   International involved 702.  702 has upstream and PRISM.

17   What wasn't public at the time was that upstream

18   collection includes to, from, and about with regard to

19   Internet communications.

20         What does "about" mean?  The plaintiffs used

21   this phrase as if talking about Rodney Patton was a

22   target, that if they sent an e-mail with Rodney Patton

23   in it, that that will show up and that's something that

24   would be captured.  That's not correct.

25         "About" relates to the specific

1    communications identifier, such as an e-mail address.

2    So, in the context of an about communications, so the

3    about could appear in the header or appear in the body.

4         If you want to know more about making a

5    bomb, contact following e-mail.  That is an about

6    communication.

7         The most critical point, I think, that the

8    plaintiffs make in their first point is, and they keep

9    repeating it throughout is that we are copying,

10   essentially, everyone's communications, essentially

11   everyone's international communications.

12        That's not well pled under Iqbal at all.

13   That's their conclusion.  Any factual enhancement that

14   they have suggested to support that, doesn't.

15        Mr. Toomey refers to the PCLOB report, for

16   example, and there are plenty of facts about the

17   upstream collection in this program.

18        What there isn't is any discussion about its

19   scope and operational details.  I want to give you one

20   example that they cite to demonstrate that is,

21   essentially, everyone's communications.  That's page

22   111, note 476.

23        "The NSA's upstream collection may require

24   access to a larger body of international communications

25   than those that contained a tasked selector."  May

1    require access to a larger body.  How big, how small is

2    that?  PCLOB doesn't say, nor does the FISC opinion that

3    both the plaintiffs and the defendants have cited and

4    referenced to you today.

5              And that the FISC opinion talks about nine

6    percent of the 702 collection being related to upstream

7    and 91 percent being related to PRISM.  That was in

8    2011.

9              That doesn't tell you anything about the

10   extent and scope of whether, essentially, everyone's

11   communications were copied.  The same is true on the

12   ODNI report.

13             The Office of Director of National

14   Intelligence report, where it referenced there are over

15   92,000 targets for 702.  How many are PRISM?  How many

16   are upstream?  You are left to guess.

17             There is the Charlie Savage article from the

18   New York Times in 2013.  Again, media speculation about

19   the extent.  There is no actual knowledge in there.

20             In fact, the PCLOB report references this

21   particular article on page 119 and with reference to

22   about collection, says that that article misunderstands

23   the more complex reality.

24             And that's the problem with speculation, of

25   course, is that you don't understand what is, actually,

1    going on.  There is reference to their technical

2    capacity.  Of course, under Iqbal, if you have the

3    technical capacity to do something, that doesn't mean

4    you are doing it.  It is, consistency, as Iqbal pointed

5    and Twombly pointed out, is not enough.

6              There are a limited number of choke points

7    they indicated.  49, I think, is the number they used.

8    But that number doesn't mean one thing or another with

9    regard to how much of that the NSA is monitoring.

10             The purported slide that is on paragraph 68,

11   I think, of their complaint, we can neither confirm nor

12   deny its authenticity.  But even if it's correct doesn't

13   support the proposition that they want this court to

14   draw from it.

15             It indicates or purports to indicate that

16   there is coverage on some, but that doesn't mean all.

17   So, the bottom line there is, with regard to it being

18   fundamentally different, it is not.

19             And then far -- their second point, which I

20   have, obviously, touched on here, is that far more is

21   known about it.  I have walked through the PCLOB report

22   and FISC opinion.  And this I could talk a lot about,

23   this next point, but I will spare you all of the

24   details.

25             The plaintiffs are different.  Well, eight

1    out of the nine plaintiffs are not different.  Eight out

2    of the nine plaintiffs are pretty much the same as the

3    plaintiffs in Clapper versus Amnesty International.

4              The one that is different here, they say is,

5    Wikimedia.  Why?  They have a huge volume of

6    communications, they said, distributed throughout the

7    world.

8              These communications, of course, are someone

9    like -- someone from France logging on and looking up a

10   Wikimedia website.  That's a communication here.  They

11   have over a trillion of those, they say.

12             Well --

13             THE COURT:  Their counting of the trillion

14   is subject to some dispute.

15             ATTORNEY PATTON:  It is subject to some

16   dispute.

17             THE COURT:  Put it to one side, because it

18   is a large number, they are counting every little bit.

19             ATTORNEY PATTON:  Well, what they are

20   counting are http requests.  And, as our expert pointed

21   out, http request for a Wikimedia article is a lot fewer

22   than, say, if you are going on FISC, both because http

23   requests would get more, the more complicated the

24   graphics and the adds, and there are no adds on Wiki

25   cites, and there are not as many graphics.

1           So, even that one trillion number is

2      comparing apples to oranges in terms of the website

3      visits that we've looked at and the web page views.

4           So, if you look at Wiki's web page views,

5      though, and you compare just that for all the Wiki cites

6      that they have -- I think it was 255 billion per year,

7      it actually amounts to, when you combine just the

8      e-mails that traverse the world, and the top 50

9      websites -- top 50 out of 244 million active websites

10     out there.  It's still 0.29 percent.

11          So, the terms of volume, the numbers seem

12     staggering until you put it in context.  They didn't put

13     it in context, and we have done that here.

14          Plaintiffs talked about Mr. Dratel and Mr.

15     Dratel's clients.  Mr. Dratel's clients received a

16     notice of Section 702 surveillance, that their case

17     involved that.

18          What they didn't get was, is it an upstream

19     case.  So, he has to speculate, well, was it an upstream

20     surveillance?  Was it a PRISM surveillance?  They are

21     not told.

22          So, what they do in those criminal cases is

23     they brief the legality of both.  But that's fine for

24     them to do in a criminal case.  But here they need to

25     show something more than just a mere possibility --

1    could have been that, could have been this.  You decide.

2    That's the mere possibility under Iqbal standards.

3            Again, when talking about this, he -- the

4    plaintiffs indicated that there is a virtual certainty

5    that we must be intercepting, and those are those

6    speculative words.

7            Once you are here you, must be doing

8    something.  They must be doing this to make it

9    effective.  That's the words of speculation from page

10   1140 of the Clapper versus Amnesty International that

11   says, "Assumptions and speculations are not enough."

12           Mr. Toomey mentioned the legal standard, and

13   we are here on the motion to dismiss.  We are here on an

14   motion to dismiss.  But we are here on an unusual sort

15   of framework because some of the allegations have been

16   attacked under the plausibility standard under Iqbal

17   like the substantially all.  There is no plausible

18   allegation in there supporting that.

19           But they are also -- the government has

20   attacked the factual underpinning of many of their

21   allegations, including the key one that is a virtual

22   certainty that volume, for example, demonstrates that

23   Wikimedia has standing or that if you are on one cable

24   you must be collecting all of that.  That's not true as

25   a matter of technology, and our expert pointed that out.

1           So, even if we are on one cable, that

2      doesn't mean that all communications on that cable are

3      subject to interception.  That's the takeaway.

4           But those kinds of factual disputes put the

5      factual burden on the plaintiffs to show, by a

6      preponderance of the evidence, and your Honor can see

7      that in United States ex rel. Vuyyuru versus Jadhav.

8      And I probably have the cite here, 555 F.3d 337 at page

9      337.  That's a Fourth Circuit case from 2009.

10          So, from the perspective of the legal

11     standard, yes, there is a little difference because it

12     was up on summary judgment at that time in front of

13     Clapper.  But up on summary judgment, the court find

14     there wasn't even a genuine issue of material fact to

15     take beyond summary judgment from Clapper.

16          In fact, there are cases that this argument

17     started out talking about Jewel versus NSA in the

18     Northern District of California.  Same result.

19          This is the Clapper case versus Amnesty

20     International both 702, this case and the Jewel case

21     involved 702, but upstream collection specifically.

22          THE COURT:  Clapper went on summary

23     judgment.  I take it in -- at the dismissal stage in

24     Clapper, there was an objection to the plaintiff's

25     standing.

1          ATTORNEY PATTON:  I believe -- I believe it

2     went to -- Mr. Capilano, who was here earlier was --

3     handled that case on behalf of United States.

4          THE COURT:  I'm sorry.  Say that again,

5     please, sir.

6          ATTORNEY PATTON:  I am afraid I was not on

7     that case.  I believe Mr. Jaffer was from ACLU.  But my

8     recollection of the procedural posture was that that

9     case went directly to merits briefing.  That's correct.

10    And so it was summary judgment brief.  And there was no

11    opportunity, like there is here, for your Honor to

12    dismiss this case without going forward to the merits

13    and whatever could happen at the merits stage.

14         THE COURT:  All right.

15         Thank you.

16         ATTORNEY PATTON:  Thank you.  I have much

17    more I could say, but there is a lot of information in

18    the briefs.

19         THE COURT:  You don't get the last word.

20    You are not the movant.

21         ATTORNEY TOOMEY:  I understand, your Honor.

22    I had hoped that we could say something about the

23    procedural posture of the case.

24         THE COURT:  All right.  Go ahead.  And then

25    I'll give you the last word, because you are the movant;

1    and, otherwise, it's interminable, and it's lunch time.

2                ATTORNEY TOOMEY:   I understand, your Honor.

3    The government just explained that it now views its case

4    as both a facial attack on the complaint and a factual

5    attack on the complaint.

6                And I want to explain and make very clear, I

7    hope, to the court why the government is trying to have

8    it both ways, and why that's inappropriate at this stage

9    of the case.

10               The government is trying to have the benefit

11   to prevail on a motion to dismiss, using evidence that

12   it's only entitled to the merits.  And there are three

13   reasons, if I can describe those for the court.

14               The first is that Fourth Circuit has made

15   very clear, including in a case the government just

16   cited to you that when the factual issue in dispute is

17   inextricably intertwined with the merits, it can only be

18   resolved on the merits under Rule 56.  And that's not

19   what the government is proposing to do here.

20               The fact of whether the government is

21   copying and reviewing the plaintiffs' communications,

22   obviously, is closely related, if not an essential

23   element of plaintiffs showing that the government is

24   unlawfully searching and seizing their communications.

25               It would be like a plaintiff suing over an

1    illegal house search, and the government saying, as a

2    jurisdictional matter, we want you to prove that your

3    house was searched and how it violated your privacy

4    under Rule 12(b)(1).

5            And the Fourth Circuit's decisions in

6    Kearns, in United States versus North Carolina, in

7    Vuyyuru, which is a case the government just cited, and

8    in Adams, all show to the contrary, that this factual

9    dispute can only be resolved on the merits.

10           The second point is that the government

11   didn't present --

12           THE COURT:  It isn't a factual dispute.

13   It's a dispute about whether the allegations in the

14   complaint, the amended complaint, are sufficient to

15   raise a plausible inference that your clients'

16   communications were seized and copied.  That's what is

17   it at the threshold.

18           ATTORNEY TOOMEY:  We entirely agree with

19   that, your Honor.  And our --

20           THE COURT:  If we get into the facts and --

21   I think I -- you may be seated.

22           Let me ask the government.  You don't intend

23   to make it a factual determination, do you?

24           ATTORNEY TOOMEY:  There is a portion of the

25   motion to dismiss that we filed, and Mr. Toomey

1    mentioned that I just explained.

2             We explained this situation, what was

3    happening in our reply brief, as to what -- because they

4    not moved to strike, but indicated that it was improper

5    for us to add documents outside the pleadings, the two

6    expert declarations, for example.

7             But for the substantially all-allegation,

8    that is, clearly, unsupported by any well-pled

9    allegations in the complaint.  As your Honor mentioned,

10   it's an Iqbal plausibility determination.

11            When we get to the part of, they must -- the

12   NSA must be conducting surveillances, obviously, it's

13   speculation the say way as it was in Clapper versus

14   Amnesty.

15            But if your Honor needs to get to any

16   factual issue on that, you can also resolve that short

17   of a merits determination to decide jurisdictional

18   facts.

19            And I have heard the plaintiffs say, both in

20   their brief and here today, that the facts are

21   inextricably intertwined.  But I have not heard how it

22   is.  In every case you have to show standing, and in

23   every case --

24            THE COURT:  Standing is a jurisdictional --

25            ATTORNEY PATTON:  It's a jurisdictional

1    matter.

2              THE COURT:  Just a moment.  When I start,

3    you need to stop.

4              ATTORNEY PATTON:  Sorry.

5              THE COURT:  He gets us only one at a time

6    here, Mr. Rodriquez.

7              ATTORNEY PATTON:  Too much coffee this

8    morning.

9              THE COURT:  And it's a jurisdictional issue.

10   I have no power to decide the merits until I decide the

11   jurisdictional issue.

12             Only if I find standing, do I have the power

13   to adjudicate.  I am not a fan of mixing standing with

14   the merits, and going ahead.

15             I am surprised that the California suit,

16   once you get past the jurisdictional aspect then, of

17   course, you get discovery.  I would be surprised if

18   everybody doesn't have to get some kind of clearance to

19   look what discovery is sought.

20             And, so, I don't see this as a case

21   involving a factual dispute, do you?

22             ATTORNEY PATTON:  I don't believe so.

23             THE COURT:  This standing issue, I don't

24   have to resolve a factual dispute, do I?

25             ATTORNEY PATTON:  As the record exists right

1 now, your Honor, I don't see -- I think we can resolve

2 this case on --

3     THE COURT:  So, I don't have to look at your

4 declarations.

5     ATTORNEY PATTON:  If you can decide this

6 without the declarations, we are certainly --

7     THE COURT:  Well, if I have to use the

8 declarations to decide them, isn't that importing into

9 the standing?

10     Let me do this.  Mr. Johnson, I am going to

11 take a recess before I hear your case, so that we can

12 have lunch.

13     ATTORNEY JOHNSON:  Yes, sir.

14     THE COURT:  So we wouldn't begin your case

15 until 1:30 at the earliest.

16     ATTORNEY JOHNSON:  Yes, sir.

17     THE COURT:  Now, your client, I think, is in

18 the custody of the marshals.  If you need to see him,

19 you need to discuss that with the court security officer

20 and the marshals.

21     ATTORNEY JOHNSON:  Yes, sir, I will.  That

22 is what I am trying to do.  I appreciate that, your

23 Honor.

24     THE COURT:  Thank you, Mr. Johnson.

25     All right.  So, I want to be clear, do you

1    you believe -- is it the government's position that I

2    have to resolve factual disputes, other than inferences.

3    You are going to disagree about inferences.

4              But, do I have to get into the merits, facts

5    of this, that is seizing of actual things to decide the

6    case -- decide the standing issues.

7              ATTORNEY PATTON:  You do not need to --

8    that's our point is that, contrary to what the plaintiff

9    say, you do not need to get into the merits FISC facts

10   because the merit FISC facts are not inextricably

11   intertwined.

12             To the extent that at the end of all the

13   briefing you think that there are any jurisdictional

14   factual disputes, you are entitled, as a matter of law,

15   in determining your jurisdiction, to resolve those.

16             THE COURT:  All right.  A last question for

17   you.  Other than producing an e-mail of the plaintiffs

18   that they can show was trapped, and copied, and whatever

19   by the NSA, is there any other way to get standing?

20             ATTORNEY PATTON:  Certainly, if there is an

21   official acknowledgement by the United States in a

22   criminal case, if they said, we took this information

23   from you, from the upstream process, then I can envision

24   that.

25             THE COURT:  But, in this context, you can't

1    think of any?

2              ATTORNEY PATTON:  I can't think of any --

3              THE COURT:  Other than what the --

4              ATTORNEY PATTON:  -- right here, but I will

5    say that the Supreme Court -- this same argument was

6    made to the Supreme Court.  And the response to the

7    Supreme Court was, just because you don't have standing,

8    and you can't think of anybody who does, there is no

9    reason to find standing in this case.

10             THE COURT:  Yes, I think that's clear.  But

11   no judge could decide this without thinking about that.

12   And you would not, I think, argument on behalf of the

13   government that just because you all keep things secret

14   that the constitutionality of it can't be, at some

15   point, examined and judicially determined.

16             ATTORNEY PATTON:  Well, two points, your

17   Honor.  The constitutionality of this program is, at

18   least, once a year examined by the Foreign Intelligence

19   Surveillance Court that has --

20             THE COURT:  That's the question I asked.

21   That's the point I raised at the outset.  Where are the

22   opinions and the -- from the FISC court?  And the answer

23   to that was, well, they only decide the minimization

24   efforts and so forth.

25             ATTORNEY PATTON:  They decide -- they have

1    to decide whether the process that's in place, the

2    minimization procedures and targeting procedures, are

3    reasonably designed to comply both with the statute,

4    Section 702, and with the Fourth Amendment, with full

5    knowledge of how, from the NSA and from the National

6    Security Division, Department of Justice, how this

7    program works, not something that we --

8              THE COURT:  The only thing missing from that

9    equation is anybody arguing that it's unconstitutional.

10             ATTORNEY PATTON:  Well, your Honor, as you

11   know, the USA Freedom Act was enacted just a few months

12   ago, and there are issues that are coming from that

13   about designing particular parties to argue those --

14             THE COURT:  Yes.

15             ATTORNEY PATTON:  -- those kinds of --

16             THE COURT:  Yes.

17             ATTORNEY PATTON:  -- those kinds of things.

18             But the second point is, who can make these

19   arguments.  In criminal case, the ACLU is making these

20   very arguments and has made them on behalf of Mr.

21   Dratel's clients that -- that upstream collection is

22   unconstitutional, that it violates the Fourth Amendment

23   at the very least.

24             So, whether these particular plaintiffs are

25   able to demonstrate to the court's satisfaction they

1    have standing or not, these issues are being addressed

2    by article three judges.

3              THE COURT:  Thank you.

4              ATTORNEY PATTON:  Thank you, your Honor.

5              THE COURT:  Obviously, this is an issue of

6    some complexity and importance.  I think the arguments

7    today have been helpful, and I thank counsel for that.

8              The purpose of oral argument is two-fold.

9    One is to focus matters sharply, and I think this has

10   focused it reasonably sharply on issues.  And the other

11   is to expose my ignorance so you could fill the empty

12   bottle, as it were, and you all have done that in your

13   briefs and now in oral argument, and I thank you.

14             Again, I thank counsel for your cooperation,

15   particularly, for your agreement to have your argument

16   here rather than at Greenbelt.

17             Court stands in recess.

18             (Court recessed at 1:03 p.m.)

19                      ---

20

21

22

23

24

25

```
 1                    CERTIFICATE OF REPORTER

 2

 3              I, MICHAEL A. RODRIQUEZ, an Official Court

 4     Reporter for the United States District Court, in the

 5     Eastern District of Virginia, Alexandria Division, do

 6     hereby certify that I reported by machine shorthand, in

 7     my official capacity, the proceedings had and evidence

 8     adduced upon the motion hearing in the case of WIKIMEDIA

 9     FOUNDATION, et al vs. NSA/CSS.

10              I further certify that I was authorized and

11     did report by stenotype the proceedings and evidence in

12     said motion hearing, and that the foregoing pages,

13     numbered 1 to 52, inclusive, constitute the official

14     transcript of said proceedings as taken from my machine

15     shorthand notes.

16

17              IN WITNESS WHEREOF, I have hereto subscribed

18     my name this  1st   day of _____October_____ , 2015.

19

20

                              _____/S/_____
21                            Michael A. Rodriquez, RPR/CM/RMR
                                   Official Court Reporter
22

23

24

25
```