IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| WIKIMEDIA FOUNDATION, | ) |
| Plaintiff, | ) |
| v. | ) No. 1:15-cv-00662-TSE |
| NATIONAL SECURITY AGENCY, *et al.*, | ) |
| Defendants. | ) |

**SUR-REPLY IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Dated: March 22, 2019

JOSEPH H. HUNT
Assistant Attorney General

ANTHONY J. COPPOLINO
Deputy Branch Director

JAMES J. GILLIGAN
Special Litigation Counsel

RODNEY PATTON
Senior Trial Counsel

JULIA A. BERMAN
Senior Counsel

OLIVIA HUSSEY SCOTT
Trial Attorney

U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W., Room 11200
Washington, D.C. 20005
Phone: (202) 514-3358
Fax: (202) 616-8470
Email: james.gilligan@usdoj.gov

*Counsel for Defendants*

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................................... ii

I.  PLAINTIFF HAS NOT RAISED A TRIABLE ISSUE CONCERNING STANDING. ..............1

   A.  Plaintiff Lacks Admissible Evidence that the NSA Conducts Upstream Surveillance at any International Internet Link. ...........................................................................................1

   B.  Plaintiff Has No Admissible Evidence That the NSA "Most Likely" Copies and Scans All International Communications at Monitored Link(s). .........................................3

      1. The FISC's October 2011 statement concerning certain "about" acquisitions .....................4

      2. The PCLOB's remark concerning the goal of "comprehensiveness" ...................................7

      3. Expert speculation relabeled as "technical and practical necessities" ..................................8

      4. Mr. Bradner's testimony is inadmissible under *Daubert*. .................................................9

      5. Dr. Schulzrinne's testimony is admissible. .........................................................................11

   C.  Plaintiff's Standing Cannot Be Adjudicated Without Unjustifiable Risk of Harm to National Security. .........................................................................................................12

II.  PLAINTIFF'S ADDITIONAL INJURIES ARE NOT TRACEABLE TO UPSTREAM..13

III.  PLAINTIFF CANNOT ESTABLISH THIRD-PARTY STANDING..................................15

CONCLUSION.................................................................................................................. 15

# **TABLE OF AUTHORITIES**

**CASES**                                                                                                                       **PAGE(S)**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .................................................................................................. 6, 11

*Carter v. Burch*,
   34 F.3d 257 (4th Cir. 1994) ............................................................................................ 3

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ........................................................................................................ 3

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ................................................................................................ passim

*Daubert v. Merrell Pharm., Inc.*,
   509 U.S. 579 (1993) .............................................................................................. 6, 10, 11

*El-Masri v. Tenet*,
   437 F. Supp. 2d 530 (E.D. Va. 2006) ............................................................................ 12

*El-Masri v. United States*,
   479 F.3d 296 (4th Cir. 2007) .............................................................................. 2, 12, 13

*Fazaga v. FBI*,
   916 F.3d 1202 (9th Cir. 2019) ....................................................................................... 13

*Laird v. Tatum*,
   408 U.S. 1 (1972) ..................................................................................................... 13, 14

*Libertarian Party of Va. v. Judd*,
   718 F.3d 308 (4th Cir. 2013) .......................................................................................... 14

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ........................................................................................................ 15

*McHan v. Comm'r*,
   558 F.3d 326 (4th Cir. 2009) .......................................................................................... 3

*Miller v. Mandrin Homes, Ltd.*,
   305 F. App'x 976 (4th Cir. 2009) ............................................................................ 6, 11

*Nease v. Ford Motor Co.*,
   848 F.3d 219 (4th Cir. 2017) ........................................................................................... 6

*Nipper v. Snipes*,
   7 F.3d 415 (4th Cir. 1993) .............................................................................................. 3

*Obama v. Klayman*,
   800 F.3d 559 (D.C. Cir. 2015) ........................................................................................ 7

**PAGE(S)**

*Oglesby v. Gen. Motors Corp.*,
  190 F.3d 244 (4th Cir. 1999) ................................................................................................6

*[Redacted]*,
  2011 WL 10945618 (F.I.S.C. Oct. 3, 2011) ................................................................. 2, 3, 5

*Scinto v. Stansberry*,
  841 F.3d 219 (4th Cir. 2016) ................................................................................................6

*Sterling v. Tenet*,
  416 F.3d 338 (4th Cir. 2005) ..............................................................................................12

*United States v. McDonnell*,
  792 F.3d 478 (4th Cir. 2015), v*acated on other grounds,* 136 S. Ct. 2355 (2016) ...............6

*United States v. Mendoza*,
  464 U.S. 154 (1984) .............................................................................................................3

*Wikimedia Found. v. NSA*,
  335 F. Supp. 3d 772 (D. Md. 2018) ......................................................................... 2, 12, 13

*Wikimedia Found. v. NSA*,
  857 F.3d 193 (4th Cir. 2015) .......................................................................................... 1, 3

*Williams v. Illinois*,
  567 U.S. 50 (2012) ........................................................................................................ 2, 15

*Zellers v. Nextech N.E., LLC*,
  533 F. App'x 192 (4th Cir. 2013) ........................................................................................6

*Zeus Enter., Inc. v. Alphin Aircraft, Inc.*,
  190 F.3d 238 (4th Cir. 1999) ................................................................................................3

**STATUTES**

50 U.S.C. § 1803(a) ....................................................................................................................3

50 U.S.C. § 1806(f) ..................................................................................................................12

**RULES**

Fed. R. Evid. 401 .....................................................................................................................14

Fed. R. Evid. 702 ............................................................................................................. 5, 6, 14

Fed. R. Evid. 801 .......................................................................................................................2

Plaintiff remains without admissible, non-speculative evidence to establish two of the three "key facts" on which it has based its standing argument. *Wikimedia Found. v. NSA*, 857 F.3d 193, 210-11 (4th Cir. 2015). As proof that the NSA conducts Upstream surveillance at "international Internet links" transited by Wikimedia's communications, Plaintiff continues to rely on a statement in the FISC's October 2011 opinion, which is inadmissible hearsay. And as held by this Court, whether the NSA conducts Upstream surveillance at "international Internet links" is a state secret.

In the face of Defendants' evidence, Plaintiff has again renovated the third leg of its standing claim, this time arguing that the NSA must be copying and scanning its communications at supposedly monitored links, based on (i) the same, single sentence, within an 80-page FISC opinion, and (ii) a single statement in the PCLOB's 200-page Section 702 Report, neither of which supports the expansive conclusions to which Plaintiff would have this Court leap, and (iii) so-called "technical and practical necessities" of Upstream surveillance, which turn out to be more of the same speculation, lacking a basis in Internet technology, that Plaintiff's expert proffered before.

None of this evidence is admissible, and would be insufficient, in any case, to create a triable issue of actual or certainly impending injury that meets the standing threshold established by *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013). Even were it otherwise, the state secrets doctrine would still mandate judgment for Defendants, because Plaintiff's standing cannot be adjudicated without unacceptable risks of disclosure of state secrets. Plaintiff's arguments about "additional injuries," and third-party standing, lack merit. Summary judgment should be entered for Defendants.

## I. PLAINTIFF HAS NOT RAISED A TRIABLE ISSUE CONCERNING STANDING.

### A. Plaintiff Lacks Admissible Evidence that the NSA Conducts Upstream Surveillance at any International Internet Link.

Defendants have shown that a central tenet of Plaintiff's standing theory— whether the NSA conducts Upstream surveillance at one or more international Internet links—is both a classified state secret and a fact for which Plaintiff has proffered no admissible evidence. Defs.' Br.

at 21-22; Defs.' Reply at 4-6. In response, Plaintiff fires off a volley of arguments, but all miss their mark. *See* Pl.'s Sur-reply at 4-5. Plaintiff's arguments all derive from a single sentence in an 80-page, 2011 FISC opinion, which states that according to a (still classified) filing by the Government,

> [the] NSA will acquire a wholly domestic 'about' communication *if* the transaction containing the communication *is* routed through an international Internet link being monitored by NSA or is routed through a foreign server.

[*Redacted*], 2011 WL 10945618, at *15 (F.I.S.C. Oct. 3, 2011) (emphasis added).

As Defendants have already shown, however, statements of fact in the FISC's opinion are inadmissible hearsay. *See* Defs.' Reply at 5. Plaintiff argues otherwise, contending that the NSA adopted the statement, *see* Fed. R. Evid. 801(d), when its Rule 30(b)(6) witness testified the sentence was "accurate as of October 3, 2011." Bradner Decl., App. K ("Richards Depo.") 189; *see also* Pl.'s Sur-reply at 4. The statement says, in essence, that "something will occur (a communication will be acquired) if the NSA were doing something else (monitoring a certain link)." While that is the statement the NSA's witness adopted, Plaintiff seeks to offer her testimony to prove a fact to which she did not attest: that the NSA was and is in fact doing the "something else," that is, monitoring at least one international Internet link. *Id.* The witness, however, refused repeatedly to state whether the NSA actually monitors such links, based on the state secrets privilege. *See* Richards Depo. 180-89. Thus, the witness refused to adopt the cited sentence as a statement that the NSA actually monitors so-called "international Internet links," and for purposes of that proposition it remains hearsay. Moreover, this Court has upheld the Government's assertion of privilege over this fact, *Wikimedia Found. v. NSA*, 335 F. Supp. 3d 772, 786-90 (D. Md. 2018), thus removing evidence of this fact "from the proceedings entirely." *El-Masri v. United States*, 479 F.3d 296, 306 (4th Cir. 2007). As a result, the sentence is not admissible for the purpose Plaintiff seeks to use it.[1]

---

[1] Plaintiff also contends that Mr. Bradner may rely on this statement even though it is hearsay, Pl.'s Sur-reply at 5 n.3, but "if [Plaintiff] cannot muster any independent admissible evidence to prove the foundational facts that are essential to the relevance of the expert's testimony, then the expert's testimony cannot be given any weight by the trier of fact. *Williams v. Illinois*, 567 U.S. 50, 81 (2012).

2

Plaintiff's remaining arguments fare no better. First, the Government is not collaterally "estopped from denying" the facts in the opinion, as Plaintiff urges, *see* Pl.'s Sur-reply at 5, for the simple reason that such nonmutual offensive collateral estoppel does not apply against the United States. *See United States v. Mendoza*, 464 U.S. 154, 162-63 (1984).[2] Second, Plaintiff cannot rely on the public records exception to the hearsay rule because that exception applies only to executive branch investigations, *Nipper v. Snipes*, 7 F.3d 415, 417 (4th Cir. 1993); *see also Zeus Enter., Inc. v. Alphin Aircraft, Inc.*, 190 F.3d 238, 242 (4th Cir. 1999); *Carter v. Burch*, 34 F.3d 257, 265 (4th Cir. 1994), whereas the FISC is an Article III court, 50 U.S.C. § 1803(a).

Without evidence that the NSA conducts Upstream collection on at least one international Internet link, Plaintiff cannot establish one of the three "key" facts necessary to show it has standing, *see Wikimedia*, 857 F.3d at 210-11, and judgment must be entered for the Government on that basis alone. *Celotex Corp. v. Cattret*, 477 U.S. 317, 323 (1986).

### B. Plaintiff Has No Admissible Evidence That the NSA "Most Likely" Copies and Scans All International Communications at Monitored Link(s).

Plaintiff has also presented no admissible evidence to support the third tenet of its standing claim, notwithstanding that it has again reformulated the theory on which it bases the allegation.

After abandoning its position that the NSA, as a matter of technological necessity, "must be" copying and scanning all communications crossing a (hypothetically) monitored link, including Wikimedia's, *see Wikimedia*, 857 F.3d at 210-11, Plaintiff retreated to the position, advanced by Mr. Bradner, that the NSA "most likely" copies and scans all communications crossing a monitored link, rather than filtering out low-interest communications before they can be copied or scanned. Defs.' Reply at 7. As Dr. Schulzrinne showed, none of Mr. Bradner's conclusions has a non-speculative basis in his field of expertise, Internet technology, and are based instead on speculation about NSA

---

[2] Even if the doctrine applied here, Plaintiff cannot satisfy its elements, such as the requirement that the prior decision be a final judgment, *McHan v. Comm'r*, 558 F.3d 326, 331 (4th Cir. 2009), which the FISC opinion quite clearly is not. *See* [*Redacted*], 2011 WL 10945618, at *29-30.

surveillance practices, capabilities, and its Upstream surveillance targets.  As such, they are inadmissible under *Daubert v. Merrell Pharms., Inc.*, 509 U.S. 579 (1993).  *See id.* at 7-14.

Plaintiff now overhauls the third pillar of its standing theory again, arguing that (i) the same FISC statement discussed above; (ii) a single remark made in the PCLOB Section 702 Report; and (iii) so-called "technical and practical necessities" of Upstream collection, each independently supports a conclusion that the NSA is copying and scanning Wikimedia's communications at supposedly monitored links.  Pl.'s Sur-reply at 5.

These arguments rest, however, on Mr. Bradner's own unsupported reading of the FISC's statement, untenable inferences he draws from the PCLOB's remark, and the same speculation about how the NSA conducts its business as before, simply relabeled now as "technical and practical necessities."  As Dr. Schulzrinne explains, none of these grounds has a basis in specialized knowledge of Internet technology or engineering.  *See* (Third) Declaration of Dr. Henning Schulzrinne, Defs.' Exh. 16 (filed herewith) ("3rd Schulzrinne Decl.") ¶¶ 9-64.

**1. The FISC's October 2011 statement concerning certain "about" acquisitions**

In his reply declaration, Mr. Bradner concludes that the use of traffic-mirroring techniques during Upstream collection, as described by Dr. Schulzrinne, would be inconsistent with the FISC's October 2011 statement concerning the acquisition of wholly domestic "about" communications, quoted *supra*, at 2.  *See* Pl.'s Sur-reply at 5-6 (citing Bradner Reply Decl. ¶¶ 35-45).  He does not dispute Dr. Schulzrinne's explanation that the use of such traffic-mirroring techniques would be entirely consistent with the collection of *some* wholly domestic "about" communications.  3rd Schulzrinne Decl. ¶¶ 10, 18 (citing Bradner Reply Decl. ¶¶ 36, 111).  Rather, Mr. Bradner asserts that because whitelists or blacklists would likely filter out at least some wholly domestic communications containing targeted selectors, the collection of only *some* of these communications "would not be consistent with the FISC's statement that *all* 'about' communications 'will' be acquired."  Bradner Reply Decl. ¶ 42 (emphasis added); *see* 3rd Schulzrinne Decl. ¶ 11.

4

Notably, this is not an argument that Plaintiff and its expert advanced before, *see* 3rd Schulzrinne Decl. ¶ 10, and it is unsupported by what the FISC actually said. The FISC did not say that "all" wholly domestic about communications crossing a monitored international Internet link will be acquired by the NSA. It said that "a wholly domestic 'about' communication" will be acquired if it crosses such a link. [*Redacted*], 2011 WL 10945618, at *15. Mr. Bradner arrives at the conclusion that whitelisting and blacklisting would be inconsistent with the FISC's statement by imputing to the FISC a term, "all," that the FISC did not use. *See* 3rd Schulzrinne Decl. ¶ 12.

Mr. Bradner also disregards context. The statement appears in a discussion of the NSA's inability to prevent the acquisition of certain wholly domestic communications, and its suggestion that these acquisitions resulted from a "failure" of its "technical means." When the FISC made the statement seized on by Mr. Bradner, it was explaining why it rejected the NSA's argument—because the acquisitions would occur as the result of the normal operation of the NSA's equipment, rather than a malfunction. [*Redacted*], 2011 WL 10945618, at *15. It gave no indication it was making a statement about the scope of those acquisitions. Indeed, Mr. Bradner's interpretation of the FISC's statement is undermined by an earlier reference to the same phenomenon (the NSA's inability to prevent the acquisition of at least some wholly domestic communications). [*Redacted*], 2011 WL 10945618, at *11 n.34. There the FISC observed that the "NSA *may* acquire wholly domestic communications," *id.* (emphasis added), and not that it "will" acquire "all" of them. That statement is at odds with the meaning that Mr. Bradner seeks to impute to the FISC's later remark.[3]

Mr. Bradner's interpretation of the FISC's statement is not only unsupported, his testimony on this matter is inadmissible under Rule 702, for three reasons. First, his reading of the FISC's

---

[3] Plaintiff suggests that in the earlier passage the FISC was referring to a "slightly different phenomenon" than in the later passage cited by Mr. Bradner. Pl.'s Sur-reply at 6. But both dealt with the same technical issue, the NSA's inability to prevent the acquisition of wholly domestic communications. And although the FISC used the term "wholly domestic communication" in the first passage, and "wholly domestic 'about' communication" in the second, that is of no technical significance for reasons Dr. Schulzrinne explains. 3rd Schulzrinne Decl. ¶ 15 & n.1.

5

statement is not based on his specialized knowledge of Internet technology. *See* Bradner Reply Decl. ¶¶ 38-42; 3rd Schulzrinne Decl. ¶ 12; *Nease v. Ford Motor Co.*, 848 F.3d 219, 231 (4th Cir. 2017); *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999). Second, because this Court is as capable as Mr. Bradner of reading the FISC's statement and determining for itself whether the FISC meant "all," even though it did not say "all," Mr. Bradner's testimony is not helpful to the Court as trier of fact. Fed. R. Evid. 702(a); *Scinto v. Stansberry*, 841 F.3d 219, 230 (4th Cir. 2016); *United States v. McDonnell*, 792 F.3d 478, 500 (4th Cir. 2015), *vacated on other grounds*, 136 S. Ct. 2355 (2016).

Third, without reason to conclude that the FISC meant that "all" wholly domestic "about" communications would be acquired, Mr. Bradner "ha[s] no factual basis by which to reach [his] conclusion" that whitelisting or blacklisting at a link would be inconsistent with the FISC's statement. *Oglesby*, 190 F.3d at 250. It is therefore inadmissible. *Id.* At best, Mr. Bradner's reading of the FISC's 2011 statement is based on speculation as to its meaning (and continued accuracy[4]), which is equally disqualifying. *Zellers v. Nextech N.E., LLC*, 533 F. App'x 192, 197 (4th Cir. 2013).

Even if admissible, speculation regarding the meaning (and currency) of the FISC's 2011 statement is far from an "independent" basis on which Plaintiff's standing can be supported, and amounts at most to a scintilla of evidence concerning the manner in which Upstream surveillance might be conducted. In both respects, it fails to create a triable issue of fact on the standing question. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *Daubert*, 509 U.S. at 596; *Miller v. Mandrin Homes, Ltd.*, 305 F. App'x 976, 979-80 (4th Cir. 2009). *See also Amnesty Int'l*, 568 U.S. at 410-14, 420 ("mere conjecture about possible government action" cannot establish standing).

---

[4] Even if (i) the FISC meant that the NSA would acquire "all" wholly domestic about communications crossing an international Internet link theoretically monitored by the NSA in 2011, and (ii) that meant the NSA would not have been using traffic-mirroring techniques at that time, it cannot be taken for granted that the situation has remained the same. As Dr. Schulzrinne observes, the enormous growth in Internet traffic since 2011 would provide an incentive to adopt whitelisting and blacklisting techniques, in order to reduce the technical fand logistical challenges, and costs, of processing large volumes of communications. *See* 3d Schulzrinne Decl. ¶ 17.

6

### 2. The PCLOB's remark concerning the goal of "comprehensiveness"

As before, Plaintiff also invokes the PCLOB's remark describing the goal of Upstream collection as "comprehensively acquir[ing] communications … sent to or from [the NSA's] targets." PCLOB Section 702 Report at 10, 123; *see also* Pl.'s Sur-reply at 6-7. The NSA "could not be comprehensive," say Plaintiff and Mr. Bradner, if it were using whitelisting and blacklisting techniques such as described by Dr. Schulzrinne. *Id.* at 6; *see* Bradner Reply Decl. ¶¶ 46-54. With all due respect, to proffer an abstract and barely remarked goal of comprehensiveness as an "independent" basis for reaching elaborate, real-world conclusions about the highly technical details of so complex an undertaking as NSA Upstream collection, is to traffic in the absurd.

Plaintiff and Mr. Bradner assume, simply because the PCLOB said that Upstream's goal is comprehensiveness, that the NSA has in fact achieved that level of collection. Pl.'s Sur-reply at 6; Bradner Reply Decl. ¶ 48. But Dr. Schulzrinne has already explained that one cannot simply assume away the many technical, logistical, and financial hurdles, and competing mission priorities, that would stand in the way of constructing, deploying, and maintaining the kind of "comprehensive" collection systems envisioned by Mr. Bradner. 2d Schulzrinne Decl. ¶ 73; *see also id.* ¶¶ 20-21 (describing technical and logistical challenges of implementing Mr. Bradner's copy-all-then-scan approach). Mr. Bradner does not dispute these practical realities; he just disregards them. *See* 3rd Schulzrinne Decl. ¶ 22. He remarks that using whitelists and blacklists would be "incompatible" with the aspirational goal of completeness, Bradner Reply Decl. ¶ 51; *see also* Pl.'s Sur-reply at 6, but they would be entirely compatible with reducing the formidable technical and logistical burdens and costs of processing large volumes of communications traffic. 3rd Schulzrinne Decl. ¶ 23.

This is not to claim "that the PCLOB did not actually mean '"comprehensive,"' Pl.'s Sur-reply at 7, it is merely asking Plaintiff and its expert to acknowledge the difference between wishes and horses. *Obama v. Klayman*, 800 F.3d 559, 567, 569 (D.C. Cir. 2015); *see also* 3rd Schulzrinne Decl. ¶ 25. Whether or not the NSA has the wherewithal to overcome the obstacles to achieving a

7

"comprehensive" level of Upstream acquisition, the assumption that it has done so simply because the PCLOB said that it would like to has no foundation in the real world of Internet technology. *Id.*[5] Lacking a basis in his field of expertise, the conclusions that Mr. Bradner attempts to draw from the PCLOB's remark are inadmissible, and create no triable issue regarding standing.

### 3. Expert speculation relabeled as "technical and practical necessities"

Plaintiff points only lastly to so-called "technical and practical necessities" of Upstream collection as a third basis for its claim of copying and scanning. Pl.'s Sur-reply at 5, 7-8. According to Plaintiff and Mr. Bradner, these "technical and practical necessities . . . make clear" that the NSA is copying and scanning Wikimedia communications at supposedly monitored links, and render it "implausible" that the NSA employs traffic-mirroring techniques. *Id.* at 7, 8.

But Mr. Bradner's discussion of these "technical and practical necessities" simply warms over the same one-course meal of speculation he served up before, concerning the NSA's practices and priorities, capabilities and resources, and its targets—all classified matters about which Mr. Bradner has no specialized knowledge or information. *See generally* 3rd Schulzrinne Decl. ¶¶ 26-58. He still purports to draw conclusions about the technical operation of Upstream surveillance based on assumptions, not information, about such matters as the extent of the NSA's willingness to share information about its filtering with assisting carriers, *see id.* ¶ 55, its interest in wholesale versus targeted examination of HTTPS communications, *see id.* ¶¶ 50-51, the mobility of its targets, *see id.* ¶¶ 33-35, and the resources at its disposal, *see id.* ¶¶ 20-26, 51, 54. As Dr. Schulzrinne demonstrated before and does so again now, the conclusions Mr. Bradner attempts to draw on the basis of his unsupported assumptions still lack a basis in Internet technology and engineering.

Plaintiff's scattershot responses lead nowhere. To observe that communications must be copied and reassembled before being scanned, Pl.'s Sur-reply at 7-8, merely raises, but does not

---

[5] Plaintiff's arguments that whitelisting and 'about' collection would have required the NSA "to perform … impossible task[s]," Pl.'s Sur-reply at 7, both depend on, and also collapse with, this untenable assumption, as Dr. Schulzrinne explains. 3rd Schulzrinne Decl. ¶¶ 47-49.

8

answer, the question at hand: whether the NSA copies and scans all communications at a given link, or (using traffic-mirroring techniques) only those of potential intelligence interest. Mr. Bradner's assertion that the NSA would have to "strive[ ]" to eliminate Wikimedia's communications to avoid interacting with them, *see id.* at 8, is both unexplained, and met by Dr. Schulzrinne's observation that the traffic-mirroring techniques he describes represent means of avoiding interaction with Wikimedia's communications, "whether by design or effect." 2d Schulzrinne Decl. ¶¶ 3, 76.

Plaintiff relatedly asserts that traffic-mirroring techniques would not "guarantee," in Mr. Bradner's words, the elimination of all Wikimedia communications from those copied and scanned during Upstream collection. Pl.'s Sur-reply at 8; Bradner Reply Decl. ¶ 57. But this, too, is reheated fare. *See* Defs.' Reply at 13-14. The premise of the argument remains hypothetical scenarios, posited by Mr. Bradner, in which Wikimedia communications would be copied and scanned, but each of which could only come to pass, as Dr. Schulzrinne explains, if a series of speculative conditions were met. 3rd Schulzrinne Decl. ¶¶ 60-64. At best, the scenarios hypothesized by Mr. Bradner present speculative possibilities of interaction with Wikimedia's communications, and are insufficient, as a matter of law, to support Plaintiff's standing. *See Amnesty Int'l*, 568 U.S. at 410-14.

### 4. Mr. Bradner's testimony is inadmissible under *Daubert*.

For all the reasons stated above, Mr. Bradner's speculation and conjecture about the FISC's meaning in its October 2011 opinion, the "comprehensiveness" of Upstream collection, and classified matters concerning NSA surveillance practices, capabilities, and targets, still lack a foundation in specialized knowledge or information about Internet technology and engineering. His conclusions are therefore inadmissible under the principles of *Daubert*. *See* Defs.' Reply at 7-8, 16.

Plaintiff responds that Mr. Bradner's opinions are based on his technical expertise and experience in matters of Internet technology, and that Defendants "cherry-pick" and "ignore the vast majority of the evidence that [he] relies on" to support his conclusions. Pl.'s Sur-reply at 9. But that is not the case. Dr. Schulzrinne has systematically reviewed the reasons given by Mr. Bradner in

9

support of his conclusions, and explains, one by one, why each of them lacks a non-speculative basis in Internet technology and engineering. 3rd Schulzrinne Decl. ¶¶ 9-64; 2d Schulzrinne Decl. ¶¶ 14-87. Plaintiff identifies no reasons or items of evidence that Dr. Schulzrinne overlooked.

Plaintiff notes that experts are allowed to provide opinions and make reasoned inferences, even in the absence of direct knowledge, if they flow from a sufficient factual basis. Pl.'s Sur-reply at 10; *id.* at 11 (citing *Daubert*, 509 U.S. at 592). But the latitude given to experts to offer opinions "is premised on an assumption that [an] expert's opinion will have a reliable basis in the knowledge and experience of [the expert's] discipline." *Daubert*, 509 U.S. at 592. That is not the case here.

For example, Plaintiff argues it is reasonable of Mr. Bradner to suppose that the NSA would be reluctant to disclose filtering criteria to assisting carriers, and that it would be interested in collecting both encrypted and web (HTTP and/or HTTPS) communications. Pl.'s Sur-reply at 10. But Plaintiff misses the point. Even taking for granted, momentarily, that these assumptions are reasonable to make, it is thoroughly speculative to suppose that the NSA is so reluctant to share its filtering criteria that it would (assuming it could) undertake the daunting technical and logistical burdens and costs of implementing Mr. Bradner's copy-all-then-scan approach. *See* 2d Schulzrinne Decl. ¶¶ 18-21. Even assuming the NSA acquired encrypted communications via Upstream collection, Mr. Bradner can only guess whether these include HTTPS communications, and whether the NSA copies and scans all HTTPS communications (including Wikimedia's), rather than blacklisting high-volume but perhaps low-interest websites, like Wikimedia's, or whitelisting only those websites, webmail services, and chatrooms of intelligence interest. *See* 3rd Schulzrinne Decl. ¶¶ 50-51. The answers to these questions all turn on choices made by the NSA that Mr. Bradner cannot know and can only guess at, and so any answers he arrives at necessarily have no basis in the "knowledge and experience of his discipline." *Daubert*, 509 U.S. at 592.

Plaintiff argues that the Court should treat the lack of foundation for Mr. Bradner's opinions as a matter going to their weight, not their admissibility. Pl.'s Sur-reply at 11. Even if that were the

10

case, Mr. Bradner's conclusions are so overrun at their foundation with speculation, concerning classified matters about which he has no information, first-hand or not, that his testimony could constitute at most a scintilla of evidence that the NSA possibly could be copying and scanning Wikimedia communications.  On both scores, it falls short of what is required for Plaintiff to carry its burden of demonstrating its standing.  *Liberty Lobby*, 477 U.S. at 251-52; *Daubert*, 509 U.S. at 596; *Miller*, 305 F. App'x at 979-80.  *See also Amnesty Int'l*, 568 U.S. at 410-14.[6]

### 5. Dr. Schulzrinne's testimony is admissible.

Plaintiff attempts to launch a tit-for-tat attack on the admissibility of Dr. Schulzrinne's testimony, Pl.'s Sur-reply at 12, but unlike Mr. Bradner, Dr. Schulzrinne restricts himself to matters about which he can offer testimony that is both relevant and reliable, as *Daubert* requires.  His first declaration addresses, and refutes, what was once Plaintiff's marquee allegation—that the NSA, as a matter of technological necessity, must be copying and scanning all communications crossing a monitored link.  Defs.' Br. at 23-28.  His testimony is based on facts, not speculation, concerning available traffic-mirroring techniques that are undisputed by Mr. Bradner.  *See* 2d Schulzrinne Decl. ¶ 11.  His additional declarations examine the bases of Mr. Bradner's opinions, and reveal them as lacking foundation in Internet technology.  In doing so he limits his observations to matters within his own realm of expertise, and avoids speculation about how the NSA conducts its business.  Thus, his testimony both is relevant to whether Mr. Bradner's opinions should be admitted in support of Plaintiff's standing, and is reliably based.[7]  His testimony is patently admissible under *Daubert*.

---

[6] Plaintiff accuses Defendants of "distort[ing]" the legal standards for standing, Pl.'s Sur-reply at 2-3, while itself ignoring the controlling Supreme Court and Circuit precedent, cited by Defendants, under which it must prove "actual" or "certainly impending" injury to obtain prospective relief, not just a "substantial risk" of harm, Defs.' Reply at 3-4.

[7] Plaintiff attempts to justify the exclusion of Dr. Schulzrinne's testimony on the ground that he does not also offer opinions on whether Wikimedia's communications are actually copied and scanned, and whether the NSA actually uses traffic-mirroring techniques.  Pl.'s Sur-reply at 12. Dr. Schulzrinne's refusal to speculate about matters about which neither he nor Mr. Bradner has specialized knowledge, *see* 3rd Schulzrinne Decl. ¶ 7; 2d Schulzrinne Decl. ¶ 3, is a virtue, not a vice.

### C. Plaintiff's Standing Cannot Be Adjudicated Without Risk to National Security.

This Court has held that the state secrets privilege protects seven categories of classified information implicated by Plaintiff's claims, including the central fact of whether Wikimedia's communications have been subject to Upstream collection processes. *Wikimedia*, 335 F. Supp. 3d at 788–89. Defendants have shown why, given the risks of disclosure inherent in further proceedings, precedent requires dismissal of Plaintiff's claims. Defs.' Br. at 28–30; Defs.' Reply at 17–22. Plaintiff now proposes two ways forward, Pl.'s Sur-reply at 14–15, but both ignore the law of this Circuit; the prior decision of this Court; and the reality that "the very question on which [Plaintiff's standing] turns is itself a state secret." *El-Masri v. Tenet*, 437 F. Supp. 2d 530, 538 (E.D. Va. 2006).

First, Plaintiff urges the Court to adjudicate its standing based on public evidence, arguing that "no harm" can come of doing so. Pl.'s Sur-reply at 14. But Defendants' reply enumerates multiple examples of privileged facts that would be at risk in any such proceedings, *see* Defs.' Reply at 19–20, and demonstrates that to hold a trial on Plaintiff's standing would force Defendants to choose between proffering privileged evidence, or remaining silent and thereby either confirming privileged facts by implication (if the allegations were true) or allowing the Court to proceed in error (if the allegations were false), *see id.* 19–21. Plaintiff's sur-reply offers no response.

Because of the risks inherent in further litigation, and the privileged nature of the ultimate fact to be adjudicated, the law of this Circuit provides that this case cannot proceed. *Sterling v. Tenet*, 416 F.3d 338, 348 (4th Cir. 2005). Plaintiff argues that Defendants have not shown that "the very subject-matter of this case is a state secret," or that the privilege deprives Defendants of "a valid defense." Pl.'s Sur-reply at 15. But that is beside the point. Setting aside whether Plaintiff correctly states the out-of-circuit precedent on which it relies, *see id.*, the law of this Circuit bars proceeding based on public evidence as Plaintiff would have this Court do. *El-Masri*, 479 F.3d at 311.

Plaintiff's second proposal, that its standing should be determined using the procedures of 50 U.S.C. § 1806(f), *see* Pl.'s Sur-reply at 14, fares no better. The Court already has ruled that this

12

provision has no application here, because it does not apply "where, as here, a plaintiff has not yet established that it has been the subject of electronic surveillance." *Wikimedia*, 335 F. Supp. 3d at 780.[8] Moreover, use of § 1806(f) to adjudicate Plaintiff's standing necessarily would result in the disclosure, at least by implication, of a privileged fact, *i.e.* whether Plaintiff's communications were subject to surveillance. Supreme Court precedent "expressly foreclose[s]" such a result. *El-Masri*, 479 F.3d at 311; *see also Amnesty, Int'l*, 568 U.S. at 412 n.4.

## II. PLAINTIFF'S ADDITIONAL INJURIES ARE NOT TRACEABLE TO UPSTREAM

As Defendants have shown, in the absence of evidence that Plaintiff's communications have actually been subjected to Upstream collection activities, the "additional injuries" it claims to have suffered cannot be traced, as a matter of law, to challenged NSA surveillance, but only to Plaintiff's subjective and speculative fears of surveillance, as held in *Amnesty International*, 568 U.S. at 415-18 & n.7, and *Laird v. Tatum*, 408 U.S. 1, 10-16 (1972). *See* Defs.' Reply at 22, 27-28.

Plaintiff nevertheless insists on arguing that a supposed loss of readership and protective measures it has taken are injuries traceable "to the NSA's own extensive disclosures" about Upstream surveillance, and provide an independent legal basis for standing. Pl.'s Sur-reply, at 12-13. Plaintiff is wrong both factually and as a matter of law. As evidence of "the NSA's own extensive disclosures," Plaintiff identifies only two, the PCLOB Section 702 Report and a public statement by the Office of the Director of National Intelligence. *See* Pl.'s Sur-reply at 12 (citing ECF No. 168-7 ("Paulson Decl.") ¶¶ 40-41, 49-53); Pl.'s Exhs. 15, 17. Neither of these documents says anything to suggest that Wikimedia's communications have been subject to Upstream collection. Other than those two documents, Ms. Paulson points only to "disclosures in the press," including inadmissible

---

[8] *Fazaga v. FBI*, 916 F.3d 1202 (9th Cir. 2019) is not to the contrary. There, the court stated that allegations of aggrieved-person status must be "proven" before § 1806(f) may be invoked. *See id.* at 1216, 1253 & n.52. Consistent with the statute's terms, the court further directed that § 1806(f)'s procedures should be utilized only "for a determination of whether the alleged [electronic] surveillance was unlawful," *id.* at 1211; *see also id.* at 1234, 1236, 1251, and not to determine whether a plaintiff has been a subject of surveillance in the first place. Thus, *Fazaga's* displacement analysis—which is incorrect—does not assist Plaintiff here.

13

press reports, and the so-called "NSA slides," which Defendants have already addressed. *See* Defs.' Reply at 23-24. Under *Amnesty International* and *Laird,* these materials cannot establish the necessary causal link between Plaintiff's "additional injuries" and Upstream collection, where proof that Wikimedia's communications have been subject to Upstream collection processes is lacking.[9]

For similar reasons, Plaintiff's legal argument also fails. Plaintiff cites *Libertarian Party of Va. v. Judd,* 718 F.3d 308, 315-16 (4th Cir. 2013), a decision discussing the doctrine of concurrent causation, to argue that "traceability is satisfied if defendant's conduct is 'at least part responsible for [plaintiff's injury].'" Pl's Sur-reply, at 12-13. But this doctrine is not applicable where, as here, controlling authority of the Supreme Court, *Amnesty International* and *Laird,* hold that absent actual surveillance of a plaintiff, "costly and burdensome measures" it may take "to protect the confidentiality of [its] communications" are not traceable to the Government's conduct, but are instead attributable solely to the plaintiff's own subjective fears of surveillance. *Amnesty Int'l*, 568 U.S. at 415-17; *Laird*, 408 U.S. at 10-14.

Finally, Plaintiff's lackluster defense of Dr. Penney's unreliable and irrelevant analysis is unavailing. *See* Pl.'s Sur-reply at 13. As Dr. Salzberg explains in his first and second declarations, Dr. Penney's conclusions are based on a deeply flawed model that lacks a reliable foundation in statistical analysis and produced spurious results. *See generally* ECF 178-3 ("Salzberg Decl."); Second Declaration of Dr. Alan Salzberg, Defs.' Exh. 17 (filed herewith) ("2d Salzberg Decl."). As such, Dr. Penney's conclusions do not "rest on a reliable foundation" as required by Fed. R. Evid. 702, and should be excluded on that basis alone. *See* Defs.' Reply at 24-26. Dr. Penney's opinions should also be excluded because they are irrelevant, Fed. R. Evid. 401, 702, because (1) he admits he only

---

[9] Plaintiff argues that the so-called "NSA slides" are admissible, even though unauthenticated, because their publication, and the reaction of "community members" to them, are what motivated Wikimedia to adopt its "protective measures." Pl.'s Sur-reply at 13 & n.9. But under *Amnesty International* and *Laird,* absent actual surveillance of Wikimedia's communications, its motivation to take "protective measures" is just another word for its own subjective and speculative fears of surveillance, not evidence that its "additional injuries" are traceable to the NSA's actions.

measures the effects of public awareness of "media coverage of NSA surveillance," not of Upstream's actual operation, 2d Penney Decl., ¶ 26(e); and (2) he admits he did not analyze any data after August 2014, *id.* ¶¶ 33-34, which means his conclusions have no bearing on whether any ongoing chill remains today that could be traced to the operation of Upstream.[10]

### III.  PLAINTIFF CANNOT ESTABLISH THIRD-PARTY STANDING.

Plaintiff cannot establish the three elements of third-party standing.  *See* Defs.' Reply at 29.  First, as before, Plaintiff has not shown that it has suffered an Article III injury in fact, and so the third-party standing inquiry ends there.  *See id.*  Second, while Plaintiff now proffers testimony asserting a "close relationship" between Wikimedia and all of its (largely unidentified) users, Pl.'s Sur-reply at 13-14, it still has not presented evidence of injury to the specific subgroups of users it seeks to represent (*see* Pl.'s Opp. at 27-28) that can be traced to actual rather than feared surveillance.  Plaintiff cannot sue to vindicate the supposed rights of persons who are not themselves "among the injured."  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 563 (1992); *see also* Defs.' Reply at 29.  And, finally, Plaintiff has not demonstrated that these groups of users have the kinds of privacy interests that have been recognized as a "genuine obstacle" to filing their own suits.  *See id.* at 30.

### CONCLUSION

Summary judgment should be entered in favor of the Defendants.

Dated:  March 22, 2019

                                                                               Respectfully submitted,

                                                                               JOSEPH H. HUNT
                                                                               Assistant Attorney General

---

[10] Dr. Penney attempts to plaster over his failure to analyze page view data after August 2014 by reference to other studies whose underlying facts and data he neither reviews nor analyzes.  2d Penney Decl., ¶¶ 34(a)-(g); *see also* Penney Decl., ¶¶ 15-20.  Those studies, and Dr. Penney's opinion that they support his findings, should be excluded on hearsay grounds.  Experts may not "act as mere conduits" for hearsay.  *Williams*, 567 U.S. at 80; *United States v. Tran Trong Cuong*, 18 F.3d 1132, 1143 (4th Cir. 1994); *United States v. Grey Bear*, 883 F.2d 1382, 1392-93 (8th Cir. 1989).

15

ANTHONY J. COPPOLINO
Deputy Branch Director


 */s/ James J. Gilligan*
JAMES J. GILLIGAN
Special Litigation Counsel

RODNEY PATTON
Senior Trial Counsel

JULIA A. BERMAN
Senior Counsel

OLIVIA HUSSEY SCOTT
Trial Attorney

U.S. Department of Justice Civil Division,
Federal Programs Branch
1100 L Street, N.W., Room 11200
Washington, D.C. 20005
Phone: (202) 514-3358
Fax: (202) 616-8470
Email:james.gilligan@usdoj.gov

*Counsel for Defendants*