1

```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF VIRGINIA
2                         ALEXANDRIA DIVISION

3   --------------------------------x
                                    :
4   WIKIMEDIA FOUNDATION, et al,    : Civil Action No
                                    :
5                     Plaintiffs,   :
                                    :
6            versus                 : 1:15-CV-662
                                    :
7   NATIONAL SECURITY AGENCY/       :
    CENTRAL SECURITY SERVICES, et al,:
8                                   :
                      Defendants.   : May 30, 2019
9   --------------------------------x

10           The above-entitled Remand Hearing was heard by
    the Honorable T.S. Ellis, III, United States District Judge.
11
                        A P P E A R A N C E S
12
    FOR THE PLAINTIFF:      PATRICK TOOMEY, ESQ.
13                          American Civil Liberties Union
                            Foundation
14                          125 Broad Street, 18th Floor
                            New York, NY 10004
15
                            ALEX ABDO, ESQ.
16                          ASMA PERACHA, ESQ.
                            Knight First Amendment Institute at
17                          Columbia University
                            475 Riverside Drive Street
18                          Suite 302
                            New York, NY 10115
19
    FOR THE DEFENDANTS:     OLIVIA H. SCOTT, DOJ
20                          RODNEY PATTON, DOJ
                            JAMES GILLIGAN, DOJ
21                          JULIA BERMAN, DOJ
                            U.S. Department of Justice
22                          Civil Division, Federal Programs Branch
                            1100 L. Street, N.W., Room 11200
23                          Washington, D.C. 20005

24

25
```

2

1   OFFICIAL COURT REPORTER:        MS. TONIA M. HARRIS, RPR
                                    United States District Court
2                                   Eastern District of Virginia
                                    401 Courthouse Square, Ninth Floor
3                                   Alexandria, VA 22314

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

**P R O C E E D I N G S**

1

2  (Court proceedings commenced at 2:42 p.m.)

3          THE DEPUTY CLERK:  The Court calls civil case

4  Wikimedia Foundation versus National Security Agency, et al.

5  Case No. 2015-CV-662.

6          May I have appearances, please.  First, for the

7  plaintiff.

8          THE COURT:  All right.  Who is here on behalf of

9  Wikimedia?

10          MR. TOOMEY:  I'm Patrick Toomey on behalf of

11  Wikimedia Foundation.

12          THE COURT:  All right.  Anybody with you today, Mr.

13  Toomey?

14          MR. TOOMEY:  Yes.  With me are Asma Peracha and Alex

15  Abdo from Knight First Amendment Institute.

16          THE COURT:  Well, the only defendant [sic] remaining

17  is Wikimedia.  I take it the remaining attorneys are here to

18  support you.

19          MR. TOOMEY:  That's correct, Your Honor.  Thank you.

20          THE COURT:  Good afternoon to all of you.

21          Now, who is here on behalf of the Government?

22          MS. SCOTT:  Yes, Your Honor.  I'm Olivia Hussey

23  Scott or Ms. Scott.  Scott is fine.  I'm here on behalf of the

24  Government defendants along with my co-counsel, Jim Gilligan,

25  Rodney Patton, and Julia Berman.

Wikimedia v. NSA

4

1              THE COURT:  And who will argue today on behalf of

2    the Government?

3              MS. SCOTT:  I will, Your Honor.

4              THE COURT:  Good afternoon to all of you.

5              All right.  This matter is here on remand.  I

6    granted in part, I granted a motion to dismiss on standing

7    grounds.  The Fourth Circuit affirmed in part and remanded in

8    part leaving only one defendant.  I'd forgotten how many there

9    were that are no longer here that I dismissed.  So we're

10   really here today to consider whether, on this summary

11   judgment record, because I allowed modest or partial discovery

12   on the issue of standing, some questions that were asked, were

13   not answered because the Government invoked the state secrets

14   privilege, and there is some argument about that that I will

15   hear today.  But I won't hear any state secrets today.  I

16   think that's clear.  Nothing classified has been submitted or

17   reviewed by the Court in connection with this.  Nothing has

18   been reviewed in camera or ex parte.

19             Let's begin, Ms. Scott, with you.  You're the

20   movant.  Put me in the picture, if you will, I think your task

21   today is to persuade the Court that the summary judgment

22   record, as it exists, discloses no disputed material issue of

23   fact on the existence or in your view, lack of existence of

24   injury in fact to the plaintiff.

25             Do I have that about right?

1          MS. SCOTT:  You do, Your Honor, yes.  That is the

2    first part of my argument and the Court also referenced the

3    state secrets privilege related part.

4          THE COURT:  All right.  Go ahead.  I'll hear from

5    you.  And if I remain standing it's for the comfort of my

6    back, no other purpose.

7          MS. SCOTT:  Okay.  Well, the plaintiff, as we said

8    in our papers, the plaintiff has no competent evidence in

9    support of two of the three key allegations that the Fourth

10   Circuit found would, if proven, support their standing.  And

11   without competent evidence of both of those two key facts,

12   this case must be dismissed.

13          And first, they have no proof sufficient for a

14   genuine issue of material fact that Upstream surveillance is

15   conducted on what they allege are international Internet

16   links.  They rely really on a single sentence from an 80-page

17   FISC opinion, and which is inadmissible for factual matters

18   and doesn't say what they claim it says.  I'll talk about that

19   in a little bit more.

20          Second, they also have no proof sufficient for a

21   genuine issue of material fact that, as a matter of

22   technological necessity, the NSA must be copying all or nearly

23   all communications transiting any monitored link.  And there

24   is no factual dispute here.  In fact, the undisputed evidence

25   shows the opposite of what plaintiffs were originally arguing

1   in this case.  Plaintiff's own expert admits that Upstream's

2   surveillance program could be operated in multiple ways.

3            THE COURT:  Before you continue, just enlighten us

4   all with what you mean by "Upstream surveillance."

5            MS. SCOTT:  Yes, Your Honor.  Upstream surveillance

6   is authorized under Section 702 of the Foreign Surveillance --

7   Foreign Intelligence Surveillance Act.

8            Under Section 702, there are two types of

9   surveillance.  Colloquially --

10           THE COURT:  I wanted to know what "Upstream

11  surveillance" means.

12           MS. SCOTT:  Yes, Your Honor.  So as technically --

13  well, Upstream surveillance is a colloquial term given to the

14  type of surveillance under Section 702 that is operated on the

15  Internet backbone, which are the major trunk lines between

16  providers that operate the Internet.

17           So Upstream surveillance involves the eventual

18  collection of communications from the Internet backbone.  And

19  it's distinct from another program that is also operated under

20  Section 702.

21           Now, here the reason there's no factual dispute

22  about how Upstream could, as a matter of technological

23  necessity operate, is because both experts agree that Upstream

24  surveillance could be operated either using a copy-all

25  approach, which is described in plaintiff's allegations.  That

1   approach is described in our briefs as a "copy all, then

2   scan."  And it involves essentially putting an optical

3   splitter or something akin to that, along the Internet

4   backbone and making a full copy of the entire stream of

5   communications.  As alleged by plaintiff.

6          The experts both agree it could be done that way or

7   it could be done via what's referred -- what I'll refer to

8   here as a "filter first architecture."  In the papers that's

9   called a filter, then copy and scan.

10          It's also called mirroring, as a technical matter,

11   that's the term you might see in Dr. Schulzrinne's

12   declaration.  As the experts both say, "filter first," that

13   type of an architecture could be implemented multiple ways.

14          So here there's no factual dispute as to the fact it

15   can be done multiple ways.  And neither expert, not

16   Mr. Bradner, the plaintiff's technical expert, or

17   Dr. Schulzrinne, our technical expert, neither one of them had

18   access to any classified information.  So these experts, to

19   the extent they agree that it could be done multiple ways,

20   they are talking about entirely unclassified information.

21          The only dispute here is about whether there is a

22   technical basis for Mr. Bradner's opinion or if his opinion

23   about how it's most likely done, that's what he offers an

24   opinion on, is actually straying outside of his expertise into

25   conjecture about matters within which he doesn't himself know,

1    which is the NSA's Court authorized surveillance practices.

2            Their priorities and practices, their resources,

3    capabilities, and numbers, nature and other things about

4    targets.

5            He speculates about all of those things and all of

6    those things, as Dr. Schulzrinne explains, are not technical

7    bases for his conclusion, they are his guesses, essentially

8    about what the NSA might choose in order to run Upstream

9    surveillance.

10           They make the argument that the choices that

11   Mr. Bradner thinks the NSA is making are most likely largely

12   based on incidental reports -- incidental remarks, I

13   apologize, found in a PCLOB report.  So the PCLOB is the

14   Privacy and Civil Liberties Oversight Board.  It's not the

15   NSA.  But plaintiffs, they did do a review and they did issue

16   a report.  And they said a few incidental remarks about how

17   NSA's Upstream program is designed or has the goal to be

18   comprehensive and reliable.

19           THE COURT:  Who are these people again?

20           MS. SCOTT:  The PCLOB.  I'm using a shortened

21   abbreviation, but PCLOB is Privacy and Civil Liberties

22   Oversight Board.

23           THE COURT:  All right.  Go on.

24           MS. SCOTT:  So plaintiff, however, has already used

25   these statements, these remarks about comprehensive and

1   reliable goals.  And in their, now dismissed, dragnet claim.

2   And the Fourth Circuit held that even accepting as true the

3   allegation about what the NSA is incentivized to do, that fact

4   without more doesn't establish a dragnet.

5          And that's still true here, these PCLOB statements

6   about the goals and what the NSA might be incentivized to do,

7   are not a basis for any technical conclusions about the

8   operation of Upstream.  And especially where, as

9   Dr. Schulzrinne explains, that this comprehensive goal could

10  be accomplished in a "copy all" or a "filter first"

11  architecture.

12         And there are many practical realities he explains

13  undercut the idea that it might be a copy-all.

14         Even if -- this is the second part of the argument

15  the Court referenced a few moments ago -- even if, however,

16  Plaintiff could raise a genuine issue of material fact as to

17  its standing, this case must be dismissed under the state

18  secrets doctrine because the entire aim of a trial on

19  standing, would be to prove the existence of a state secret

20  privileged fact.

21         Whether Wikimedia's communications are subject to

22  Upstream, it also -- a trial on standing would also involve

23  indirect facts that are protected by the state secrets

24  privilege, including what method Upstream actually employs and

25  where it is located in order to conduct its operations.

1          This Court's August 2018 ruling on the motion to

2     compel and Government's assertion of privilege in fact has

3     already held that information to be protected by the state

4     secret doctrine.

5          Finally, without proof of that copying and scan, the

6     additional arguments the plaintiff raises must fail.  And as

7     this Court is aware, *Clapper v. Amnesty International* is a

8     Supreme Court case that is very analogous to the circumstances

9     here.  And it directs that any alleged chill in readership or

10    protected measures taken, because of fears of surveillance,

11    without evidence of actual or certainly impending

12    surveillance, are insufficient as a matter of law.

13         So here, the additional claim -- the additional

14    claims of harm, must fail as a matter of law.  And in total,

15    plaintiff has offered no legally cognizable basis to proceed.

16         Fundamentally, there are three pieces of evidence at

17    the core of plaintiff's arguments.  The PCLOB report, which I

18    already discussed a bit, an October 2011 FISC opinion

19    specifically within that large opinion single sentence and

20    then declarations filed by their technical expert,

21    Mr. Bradner.

22         I'll talk about each of those three types of

23    evidence for each of the two key allegations next.

24         So first, their allegation that I'll refer to here

25    has kind led to or their second key allegation, that Upstream

Wikimedia v. NSA

1  occurs at so-called international Internet links.  That's what

2  they allege.

3        First, they rely on the single sentence from an

4  October 2011 FISC opinion.  But factual matters, in judicial

5  opinions, are inadmissible hearsay.  And that sentence is --

6  it doesn't say what plaintiffs allege it says.  So I'll start

7  with the second of those.  The sentence actually says, "The

8  Government readily concedes that the NSA will acquire a wholly

9  domestic 'about' communication if the transaction containing

10  the communication is routed through an international Internet

11  link being monitored by the NSA, or is routed through a

12  foreign server."

13        Now, this is not --

14        THE COURT:  You just read that.  But -- and I have

15  some understanding.

16        Would you read it, once again, it says:  The

17  Government readily concedes, what?

18        MS. SCOTT:  "The NSA will acquire a wholly domestic

19  about communication, if the transaction containing the

20  communication is routed through an international Internet

21  link, being monitored by the NSA, or is routed through a

22  foreign server."

23        Now --

24        THE COURT:  "Wholly domestic 'about' communication."

25        What does that mean?

1       MS. SCOTT:  Yes.  A wholly domestic communication is

2  a communication where both ends, the sender and the recipient,

3  are U.S. persons.  Are reasonably located in the United

4  States.

5       THE COURT:  All right.  Go on.

6       MS. SCOTT:  And "about" for the Court's -- the

7  second part of that thing is it's a wholly domestic about and

8  about is a communication type where a selector in the Upstream

9  process that falls after any filtering, the communication is

10  scanned for selectors.  And an about selector is one that's

11  not in the to/from, it's within the communication itself.

12       So that's what it means when it says a "wholly

13  domestic 'about'," it's that type of communication.

14       The sentence itself is not a statement of fact.

15  It's a hypothetical, an if-then hypothetical.  X happens if Y

16  and Z, but, you know, no X if not Y and -- or not Z.

17       Now, plaintiffs have tried to pull more from this

18  exact sentence than it could be pulled before.  Specifically,

19  in their motion to compel, they argued, and the Court

20  rejected, the argument that this sentence constituted an

21  official acknowledgment of monitoring international Internet

22  links.

23       The Court held that nothing in this statement

24  confirms that the NSA is monitoring multiple Internet links

25  and plaintiff's argument fails because although the Government

1  has declassified certain information about Upstream, the

2  Government has not yet released the precise information at

3  issue here.

4         The same thing is true now whether or not Upstream

5  occurs at any international Internet link is protected state

6  secrets privileged information.

7         It falls under the locations category that the Court

8  has already held as protected, but also the scope and scale

9  and the operational details, all from this Court's order last

10  August.

11         Now, I'd like to -- so the sentence doesn't actually

12  say what they claim it says.  It's a hypothetical within the

13  FISC opinion and it shouldn't be taken as a Statement of Fact.

14  But to the extent they are arguing it is a Statement of Fact,

15  it is inadmissible, because Statements of Fact that are in

16  judicial opinions are inadmissible hearsay.  And it does not

17  meet the public records exception for that hearsay rule,

18  because the FISC is an Article III court not part of the

19  executive branch and judicial investigations do not qualify

20  for that exception.

21         THE COURT:  What about the argument that it's an

22  admission of the party?

23         MS. SCOTT:  They do argue that it has been adopted

24  by the NSA, because in the NSA's 30(b)(6) deposition, where

25  the deponent was Ms. Rebecca Richards, she said that the

Wikimedia v. NSA

14

1    sentence was accurate as of October 2011, when the order was

2    issued.  That is not an adoption here, a plaintiff's

3    interpretation of the sentence.  The sentence was accurate.

4    That's what she said.  And to the extent that's what they're

5    arguing, that's as far as it goes, because in that same

6    deposition Ms. Richards said, when asked many different ways,

7    if the sentence meant what plaintiff's are claiming --

8    plaintiff claims it means, which is that Upstream occurs at

9    so-called international Internet links, every time that

10   question was asked, the witness said the privilege was

11   asserted actually by the NSA, and the witness was directed not

12   to answer and the witness in fact followed that instruction

13   because of the privilege.

14            And again --

15            THE COURT:  And that's reflected not in the FISC

16   opinion, but it would be reflected in the record, is that what

17   you're saying?

18            MS. SCOTT:  Correct.

19            THE COURT:  If we want to see that, where do we look

20   on this record?

21            MS. SCOTT:  Yes, the deposition of Rebecca Richards

22   is plaintiff's exhibit.  And I have the exhibit number, but I

23   don't have it -- hold on.  I can pull the exhibit number.

24            THE COURT:  Well, it's in that deposition.  You

25   don't have page numbers with you today?

Wikimedia v. NSA

15

1          MS. SCOTT:  I do, Your Honor.  If you'd like the

2    specific page numbers I do.

3          THE COURT:  And these would be page numbers in which

4    that specific question was asked and a negative answer was

5    given?  Is that what you're saying?

6          MS. SCOTT:  Yes.  And I can walk you through that if

7    you'd like.

8          The deposition of Ms. Rebecca Richards is

9    plaintiff's exhibit -- I apologize, Your Honor.  Oh, you know

10   what, it's in the Bradner attachment.

11         THE COURT:  It's in what?

12         MS. SCOTT:  It's attached to their expert's, their

13   technical expert's appendix.  And it's Appendix K.

14         So there we go.  So --

15         THE COURT:  You're being handed something by your

16   co-counsel.

17         MR. GILLIGAN:  Thank you, Your Honor.

18         MS. SCOTT:  Thank you.  So the transcript of the

19   deposition of Ms. Richards is Appendix K to the declaration of

20   Scott Bradner.  Mr. Bradner's declaration can be found at

21   Document 168- -- let me make sure I'll give you the exact --

22         Okay.  Ms. Richard's deposition transcript can be

23   found at Document 168-4, starting at page 105 in the record.

24         And then specifically within that deposition, she

25   was asked first:

Wikimedia v. NSA

1          "Is the sentence true?"

2          And she said:  "Yes, that sentence is accurate."

3          That can be found on page 160, lines 4 to 17.

4          Then she was asked:

5          "What do you understand the FISC --"

6          That's the Foreign Intelligence Surveillance Court.

7          "-- to mean in its use of the term 'international

8     Internet link' in that sentence?"

9          The counsel objected and asserted the state secrets

10    privilege, directed her not to answer.  And she said:

11         "I have an unclassified response, at least in part,

12    NSA.  So unlike the other words that you had me go through, in

13    terms of definitions that were Telecom providers, you know,

14    sort of --

15         (Court reporter interruption.)

16         MS. SCOTT:  I apologize.  I went too fast.  I

17    apologize.  Okay.

18         -- definitions that were Telecom provider, you know,

19    sort of generally what a teleco expert would be, NSA has an

20    understanding of this term that is specific to how Judge Bates

21    described it.  But it's classified to provide any further

22    information."

23         And then she did not provide any further information

24    in response to that question.

25         That's at page 160, lines 19 through 161.

Wikimedia v. NSA

1          (A pause in the proceedings.)

2          MS. SCOTT:  Sorry.  He's -- he was referring me to

3     page 189 in the brief.  That's actually what we cite in our

4     brief.  But I'm walking the Court through the fact that the

5     question was asked many different ways.

6          THE COURT:  Yes.  I want you to finish.

7          MS. SCOTT:  Yes, okay.  So then page 163 the Court

8     asked -- or sorry, the questioner asked.

9          "Is there anything you can tell us unclassified about

10    the nature of the..."

11         I'm sorry.  I skipped ahead, Your Honor.  Strike

12    that.  I'd like to go back a little.

13         Page 162.

14         "Is the NSA's understanding of the term different

15    from the general meaning of the term you described in response

16    to an earlier question as the link between two countries?"

17         "Objection, calls for the state secrets privilege."

18         She followed the instruction.

19         Later on that same page.

20         "Is your understanding that in using the term

21    "international Internet link" the FISC meant an Internet link

22    that terminates in a foreign country?"

23         "Objection."

24         Same objection.  Same instruction.  She followed the

25    instruction.

Wikimedia v. NSA

1              The next page of the deposition, 163.

2              "Is it your understanding that an international

3    Internet link is an Internet backbone circuit with one end in

4    the United States and the other end in a foreign country?"

5              Same objection, same instruction.  She followed the

6    instruction.

7              As you go through the transcript, Your Honor, you'll

8    see that this was asked in many different ways.

9              And then on pages 188 and 189, they get to the end

10   of the -- the back and forth, and the question was asked

11   again.

12             She said, "would you like me to restate the

13   unclassified response?"

14             "I think you already did answer the sentence as

15   written is true as of October 3, 2011."

16             And she says, "Yes, the sentence is accurate as of

17   October 3, 2011."

18             So again, she has said the sentence is accurate, but

19   then she refused to answer any further specific questions

20   about the sentence's meaning, the FISC's understanding of what

21   the sentence meant, and what the Government understood the

22   sentence to mean.

23             The witness, as we said in our brief, the witness

24   repeatedly refused to state whether the NSA actually monitors

25   such links based on the state secrets privilege.

1          And the page reference that we put in the brief is

2     actually the broader one.  180 to 189.

3          So she has specifically -- so the deposition

4     transcript makes clear that although the sentence is accurate,

5     and accurate as of October 3, 2011, that's still true, as I

6     stand here now, as of that date.  I can tell you that.  But

7     anything further about this sentence and the hypothetical that

8     it presents is classified state secrets privileged

9     information.

10          THE COURT:  Why isn't that sentence enough to carry

11     the plaintiff's where they want to go?

12          MS. SCOTT:  Because the sentence does not -- as a

13     hypothetical, the sentence doesn't actually say that the NSA

14     is monitoring any international Internet links.  It says that

15     the NSA will acquire a certain type of communication if the

16     transaction containing the communication is routed through an

17     international Internet link.  The second part of that is being

18     monitored by the NSA.  So it doesn't say whether or not that

19     is true.

20          And the plaintiff specifically moves to compel that

21     information.  And the Court's order in August of 2018 upheld

22     that that sentence, and specifically in the motion to compel

23     argument, they were arguing that the sentence was the

24     Government's acknowledgment of multiple links because there's

25     a -- oh, I apologize, Your Honor.  Specifically, in the motion

1    to compel argument, they were arguing that -- they were

2    arguing that they wanted to compel specific information about

3    documents defining key terms.  That the Government and the

4    FISC have used to describe the operation of Upstream

5    surveillance to the public.  And they gave an example, which

6    is specifically this sentence.  And they said because the

7    term, "international Internet link" describes the point at

8    which the NSA is monitoring communications on the Internet

9    backbone, they've asked us, you know, they propounded an

10   interrogatory saying give us your understanding of that term.

11           And the Court held that that term was protected.

12   The understanding of that term and what it means that the

13   further state secrets privilege information was protected.

14   It's protected both as a location, where is Upstream operated.

15   Is it on international Internet links or some other part of

16   the Internet backbone or not.

17           The intelligence community has publicly acknowledged

18   that the NSA is monitoring at least one circuit carrying

19   international Internet communications, but that that does not

20   mean that the Upstream is operated as the so-called

21   international Internet links.

22           The breadth of the Internet backbone that is

23   carrying international Internet communications is much larger

24   than just these international Internet links that they have

25   alleged.

Wikimedia v. NSA

1    So this sentence, you know, this sixth sentence does

2    not -- fundamentally, it does not say what they want it to

3    say.  And also, to the extent it is a Statement of Fact, in a

4    judicial opinion, it is inadmissible hearsay, and should be

5    kept out.  And Ms. Richards, in fact, did not adopt their

6    interpretation of the sentence.

7    Admissibility matters here.  Plaintiff argues in

8    their papers that admissibility doesn't really matter because

9    their expert can consider hearsay information.  But the

10   Supreme Court has made clear that experts cannot rely as a

11   foundational part of their opinion on inadmissible matters.

12   Specifically, in *Williams v. Illinois*, the Supreme

13   Court said, "If plaintiff cannot muster any independent

14   admissible evidence to prove the foundational facts that are

15   essential to the relevance of the expert's testimony, then the

16   expert's testimony cannot be given any weight by the trier of

17   fact."

18   Plaintiff also cites the PCLOB report that I

19   mentioned a few moments ago.  For support for this part of

20   their allegation, that Upstream occurs on so-called

21   international Internet links, but the PCLOB report says only

22   that Upstream is on circuits facilitating the flow of

23   communications between communications service providers.

24   And that is not necessarily these international

25   Internet links.  So the PCLOB does not support this allegation

1   of theirs.

2           The third core piece of evidence that they cite, are

3   the declarations by Mr. Bradner, plaintiff's Internet

4   technology expert.

5           All of Mr. Bradner's testimony concluding that the

6   NSA monitors these so-called international Internet links

7   comes from his speculation about vague statements in

8   Government decisions.  In Government documents, I mean.

9   They're not based on his expertise and so they're not

10  admissible under Rule 702 or *Daubert*.

11          The NSA's intelligence mission is not a matter

12  within his field of expertise.  He testifies in his

13  declarations that he thinks it's logical and unsurprising if

14  the NSA were to be monitoring at least one international

15  Internet link, but you know the fact that the NSA -- the fact

16  that everyone thinks the NSA is on a particular link, or a

17  particular point, might even be a reason that the NSA would

18  choose not to be at that particular point.

19          Mr. Bradner, at bottom, really, Mr. Bradner may know

20  the technical reasons why someone might want to be at a

21  particular place on the Internet backbone to get a certain

22  type of communication, but he does not know the foreign

23  intelligence reasons or concerns that are at play, or the

24  resource and capability issues that might be relevant to the

25  NSA's decision making.

1          Now, even if it were admissible, his declarations on

2   this conjecture were admissible, they would be legally

3   insufficient as a matter of law to support their standing,

4   because *Amnesty International* directs that such speculation

5   cannot support standing as a matter of law.

6          THE COURT:  What is it that directs that?

7          MS. SCOTT:  Amnesty -- I'm sorry, *Clapper v.*

8   *Amnesty International*.  Which I refer to --

9          THE COURT:  The Supreme Court's case.

10         MS. SCOTT:  Yes, exactly the Supreme Court's case.

11         THE COURT:  It's better to refer to it as the

12  *Clapper* decision.

13         MS. SCOTT:  I will do so from now on in this

14  argument, Your Honor.  Sometimes we refer to it by the

15  non-Government party to make it a littler clearer, because

16  there's multiple cases with the *Clapper* name, but I'll say

17  *Clapper.*

18         THE COURT:  All right.

19         MS. SCOTT:  So you know the FISC opinion, the PCLOB

20  report, nor Mr. Bradner's declarations show or provide

21  sufficient evidence to create a genuine issue of material fact

22  here that the NSA is monitoring with Upstream surveillance

23  international Internet links.  And without unclassified

24  evidence showing this, this allegation, like two of the

25  three-legged stool or the second key allegation, cannot be

1  sustained and their case must be dismissed on that point

2  alone.

3          The third key -- the third key allegation, is that

4  Upstream must be, or now they're arguing, most likely is done

5  via a copy-all infrastructure.  And they based this on, again,

6  these three types of evidence.  The first one is the PCLOB

7  report.  Again, I have already mentioned that the PCLOB have

8  some incidental remarks about the NSA's goals being to do

9  comprehensive and reliable collection.

10         But as I said, the Fourth Circuit has already held

11  that statements about what the NSA is incentivized to do in

12  the PCLOB, cannot be a basis for any technical conclusions

13  about the actual operation of Upstream.

14         That's in line with another D.C. circuit case

15  holding in *Obama v. Klayman* that rejects the district court's

16  inference of standing based on the Government's efforts to

17  create a comprehensive phone record metadata database.  And

18  specifically there, Judge Williams pointed out that there are

19  various competing interests that may constrain the

20  Government's pursuit of effective surveillance.  And it is

21  possible that these factors have operated to hamper the

22  breadth of the NSA's collection, including, you know, these

23  can be legal, technical, budget funding, other types of

24  collateral concerns Judge Williams pointed to.

25         And that makes sense because the plaintiff and

1    Mr. Bradner are really guessing about the meaning of these

2    qualitative and aspirational terms and whether the NSA

3    achieved their goals.

4           As Dr. Schulzrinne, his declarations point out,

5    there are many practical realities and tradeoffs that cut

6    against those goals.  And Mr. Bradner doesn't disagree with

7    that.  He just disregards it.

8           But the PCLOB, plaintiff's evidence, the PCLOB

9    supports Dr. Schulzrinne view.  Specifically at page 120.  It

10   says that, "Whereas PRISM collection..."

11          That's the other type of Section 702 surveillance.

12          "Whereas PRISM collection, as the comparatively

13   simple process, the Upstream process is more complex depending

14   upon the use of collection devices with technological

15   limitations that significantly affect the scope of

16   collection."

17          Dr. Schulzrinne also points out that the filter

18   first architecture -- which by the way can be implemented in a

19   variety of ways that Dr. Schulzrinne explains -- can achieve

20   this comprehensive level of collection that the PCLOB says is

21   the NSA's goal.

22          And finally, on this point, I will say that even if

23   in 2014 when this PCLOB report came out, even if Upstream

24   collection was as comprehensive as Mr. Bradner thinks it was,

25   which again, there's no support to make that conclusion, one

1    way or the other.  That's not necessarily true now.

2           The Internet has grown a lot.  There's increased

3    incentive to filter communications since 2014.  And the PCLOB

4    report itself talked about how at the time the NSA couldn't

5    stop what the court -- what we talked about a moment ago,

6    which is the "abouts" type of communications collection --

7    without harming the main focus of the program, which is the

8    to/from collection.

9           So the PCLOB says, "They can't stop abouts without

10   harming the to/from collection."  But plaintiff's evidence,

11   specifically exhibit -- their Exhibit 45, is NSA's statement,

12   public statement, about stopping abouts collection.  And that

13   happened in early 2017.  Page 2 to 3 of that exhibit says that

14   nothing has changed from the PCLOB statement, but nonetheless,

15   the NSA has decided to stop abouts.

16          So although we can't specifically say what has

17   changed, the evidence that even plaintiff puts forward shows

18   that something has changed.

19          Now, they also put forward the same FISC opinion,

20   the same sentence within the FISC opinion, for this leg 3 or

21   third allegation that Upstream must be or most likely is done

22   via a copy-all architecture.

23          And at first, as I've already said, judicial

24   opinions, the statements of fact within judicial opinions, are

25   not admissible for the same reasons I've already given the

1    Court, this sentence is not admissible.

2          But second, just as before, the sentence does not

3    actually support their copy-all contention or conclusion.  You

4    know reading it again, the sentence says, "The NSA will

5    acquire a wholly domestic 'about' communication, if the

6    transaction containing the communication is routed through an

7    international Internet link being monitored by the NSA."

8          Plaintiff argues that this sentence must mean the

9    NSA is not using IP filtering.

10          THE COURT:  Is not using what?

11          MS. SCOTT:  An IP filter.

12          THE COURT:  All right.

13          MS. SCOTT:  That's an Internet protocol filter.

14    It's a specific type of filtering.  Because if they used an IP

15    filter, it would eliminate the wholly domestic transaction

16    before copying.  And the NSA would never collect the

17    transaction between U.S. IP addresses.  And they make that

18    argument in their first brief.

19          Dr. Schulzrinne points out that that's actually not

20    technically correct, because passing all transactions through

21    an IP filter to eliminate wholly domestic transactions could

22    still result in the theoretical acquisition of a wholly

23    domestic communication as described in the FISC hypothetical.

24          And then, Mr. Bradner does not respond to that

25    technical correction.

1     Their remaining textual argument about this sentence

2  is that the "will acquire" language there, must mean will

3  acquire all.  Now the word "all," is not in the sentence.  It

4  says "will acquire a."  And so it plainly doesn't say that.

5  And it's also still, it's a hypothetical.  So it's not a

6  statement of fact.  I've already said that.

7     But moreover, reading the word "all," the way they

8  do for this argument, into this sentence, ignores the context

9  within which that sentence appears in the FISC opinion.

10  Specifically, the FISC in this part of its opinion is

11  discussing the NSA's technical means.  It's not discussing the

12  scope or scale of collection.  And it's talking about the

13  NSA's technical inability to prevent the acquisition of wholly

14  domestic communications under certain circumstances.  And the

15  FISC finding is the acquisitions occur by normal operation and

16  not as a result of a technical failure or malfunction of

17  equipment.

18     So reading "all," the word "all" into this sentence,

19  converts it from a hypothetical about the technical operation

20  into a hypothetical about the scope or scale of collection,

21  which is not -- it doesn't contextually fit within what the

22  FISC is actually saying.

23     Moreover, Mr. B's interpretation ignores that the

24  FISC, in an earlier section, specifically at page 36 of this

25  exhibit, Plaintiff's Exhibit 16, note 34.  There, the FISC is

1   discussing the same phenomenon.  This inability to prevent the

2   acquisition of some wholly domestic communications, and there

3   the FISC observes that the NSA may acquire wholly domestic

4   communications, not that it will acquire all of them.

5          You know, this interpretation of Mr. Bradner is a

6   good example of him straying beyond his expertise to interpret

7   a judicial opinion in one way or the other.  And the Court

8   does not need his assistance in order to interpret a judicial

9   opinion.

10          Finally, same as what we talked about a moment ago

11  with the PCLOB, even if -- even if Upstream operated, as

12  plaintiff's allege, which again we say there is not proof

13  sufficient for a genuine issue of material fact to support

14  their allegations.  But even if it operated at the level that

15  they claim it did in 2011, there's no evidence that operations

16  today are the same as they were in 2011.

17          Just as before, when I mentioned, there's been an

18  enormous growth of the Internet, additional incentives to

19  filter, and the Government is no longer, since early 2017,

20  getting abouts collection, which does impact the scope of

21  collection.

22          Now, the third category of evidence that they rely

23  on for this argument that Upstream must be or most likely is

24  done via copy all, are the declarations filed by their

25  technical expert, Mr. Bradner.  As I've already said, he

1    admits that it can be technically possible to use either a

2    copy all or a filtering, one of the many ways of filtering

3    process, in order to operate Upstream collection.

4            From there, as I've said, he strays beyond his

5    experience into matters of court authorized surveillance and

6    foreign intelligence questions.

7            I can provide the Court with some examples of this

8    straying.  Specifically, he claims that copy first is more

9    likely than the filter first, because the NSA is unlikely to

10   share sensitive information about its targets and/or filtering

11   criteria within an assisting provider.

12           This is guessing about the NSA's willingness to

13   share classified information with a provider.  It's not a

14   technical basis for a conclusion.  Plus it's an iffy premise.

15   The NSA already shares sensitive information with the provider

16   in some instances.  The PCLOB report the plaintiff attaches

17   evidence, identifies that this happens, for example, with

18   selectors like e-mail addresses.

19           Mr. Bradner also claims, as an example, that copy

20   first is more likely, because it requires no placement of an

21   NSA operated device into the heart of a provider's network.

22   But as Dr. Schulzrinne's points out, neither would the filter

23   first architecture that he's proposing, the filtering method

24   that he said is technically available as an alternative, would

25   be low risk.

1          Specifically, it is operated, the filter first

2    architecture that Dr. Schulzrinne proposes, is operated within

3    the provider's own routers and switches.

4          So to back up for a moment, the routers and switches

5    are the points where, as the light streams or the electronic

6    data is moving through the Internet backbone, the normal

7    operation of the router or the switch is to receive that

8    transmission, decode it, and examine the header information to

9    decide where to send it onto next, along the Internet

10   backbone.  Or if it's going to come off the backbone into a

11   more -- a -- as it travels closer to the user, the end

12   destination.

13         So as part of their normal operations, these routers

14   and switches decode the information, look at the IP address

15   header, the header information, and then they send it on to

16   their next destination.

17         As part of the providers' normal operation,

18   Dr. Schulzrinne explains, the providers do filtering

19   themselves.  And this filtering is called mirroring also,

20   where they do it for their own network security, for their own

21   network maintenance reasons, they also do it to try and stop

22   denial of service attacks or other malicious attacks on their

23   system.  So what's done in that process is the router, when it

24   decodes the information and looks at the IP -- the header

25   information, it then compares that header information against

1    what's called an "access control lists."  Those access control

2    lists are loaded with information.  Should this, you know,

3    that describes is something to be whitelisted or blacklisted,

4    or filtered as the provider wants it to be.  And if it's a

5    communication that has been whitelisted, meaning the provider

6    wants to look at this type of communication or the

7    communication itself for some reason, for its own business

8    purposes, it would mirror the communication or make a copy

9    before it goes on its way.

10           Now, this process is happening at -- in nanoseconds.

11   So faster than I can even say the "c" in copy, it's done.  And

12   it's moving at an extremely rapid pace.

13           The blacklist version of this filtering, is where

14   the access control list is loaded with a don't give me an

15   instruction, don't give me any information -- any

16   communications that meet these qualities.

17           So this mirroring or filtering process is already

18   running in the provider's own network.  And Dr. Schulzrinne

19   explains that the mirroring process could be utilized by

20   providing the provider the information they need, they can

21   load and access control lists and utilize either whitelisting

22   or blacklisting.  And again, he is -- he is describing this as

23   a technical alternative, not -- he doesn't have access to

24   classified information so he's not saying how it's actually

25   run.  He's saying it's a possibility.

1          Through blacklisting it or whitelisting, they can

2     either block a communication or send it through to an NSA

3     operated device.  They can also use a combination filtering so

4     they could blacklist all types of communications or all

5     communications from a certain IP address, and then only

6     whitelist the ones that are of specific interest as a

7     combination approach.

8          So this -- what Dr. Schulzrinne is saying is that

9     Mr. Bradner is wrong, that filter first would be riskier

10    because it would require placing a device in the heart of the

11    provider's network that is NSA operated.  But that's actually

12    not the case, because as Dr. Schulzrinne proposes it, the

13    provider would use -- the provider would use its own system as

14    it operates in the ordinary course of business.

15          THE COURT:  Well, we've spent a good deal of time

16    here talking about various expert's speculation, speculations

17    as to what might be done, because, as you would remind me,

18    what's actually done is subject to the state secrets

19    privilege.  Tell me then, what is the standard that you think

20    the Court must apply to find standard?  Must I be persuaded by

21    a preponderance of the evidence that is not disputed that

22    there is injury in fact?

23          MS. SCOTT:  The standard that this Court should

24    apply for standing in this case is the standard -- the same

25    standard that was articulated in the *Clapper v. Amnesty*

1   *International* case.  The evidence showing injury would have to

2   be showing actual or certainly impending injury.

3           As the Court in *Clapper* --

4           THE COURT:  Would I have to know what's actually

5   done?

6           MS. SCOTT:  Well, Your Honor, as we've said our

7   position is that they have not proven, using the unclassified

8   evidence, that there is a genuine issue of material fact about

9   whether or not they have standing.  They have not shown that

10  they have standing because they cannot show either actual or

11  certainly impending injury.  They can't, in fact, show that

12  their communications are --

13          THE COURT:  Well, isn't the only way to show that,

14  to breach the state secrets privilege, and find out what's

15  actually done?

16          MS. SCOTT:  Your Honor, from here, correct.  That is

17  the second part of my argument.  So because they cannot show a

18  genuine issue of material fact on standing, we think the Court

19  should dismiss on that basis, but the Court also should

20  dismiss, because from this point, even if they could show with

21  unclassified evidence a genuine issue of material fact, at

22  this point, the case would have to be dismissed under the

23  state secrets privilege doctrine.  Because, you can't hold a

24  trial on the question of standing where the very question of

25  standing, the outcome of that, is a protected state secrets

1   privileged fact.

2           This case in that way is exactly, at this point,

3   like *El-Masri*, where the Fourth Circuit found that for

4   purposes of the analysis, the central facts, or the very

5   subject matter of an action, are the facts that are essential

6   for the claim to proceed or for the -- to prosecuting the

7   action or defending it.

8           At this point we now know that for them to attempt

9   to prove standing, as they would propose, now we should have a

10  trial on standing, that such a trial can't happen because the

11  whole object would be to prove whether Wikimedia

12  communications are subject to Upstream.  And the Court, this

13  Court has already held in August 2018 that such a fact is

14  protected by the state secrets privilege.

15          A trial on standing would also indirectly bear on

16  other state secrets privileged questions, as we've now seen

17  made plain through the briefing, whether or not the NSA uses a

18  copy all or a filter first or some version of the filter first

19  architecture.  That's protected state secrets information

20  because it's operational details.  Whether or not Upstream is

21  operated at one or more of these so-called international

22  Internet links, that's also state secrets privileged

23  information.  It's locations of Upstream.

24          So just like in *El-Masri* where the plaintiff argued,

25  well this CIA rendition program has been publicly acknowledged

1  and so we can go forward, the privilege is undermined.  No,

2  this is just like *El-Masri* where the operational details are

3  what is protected by the privilege here.

4         And because you would have to get into those

5  protected pieces of information in order to have a trial on

6  standing, this case can proceed no further.

7         THE COURT:  All right.  Anything further?  You'll

8  have an opportunity to respond, but it's -- you've argued for

9  quite a while now, and I think we have a pretty good idea of

10  your position.  Is there anything you want to say before I

11  give Mr. Toomey an opportunity?

12         MS. SCOTT:  I will take the Court's guidance, and

13  knowing I will come back and have another opportunity, I will

14  defer at this time.

15         THE COURT:  All right.  Mr. Toomey.

16         MR. TOOMEY:  Thank you, Your Honor.  And may it

17  please the Court.

18         For all the bluster in the Government's briefs

19  there's no question that Wikimedia has put forward more than

20  enough evidence to support its standing and defeat summary

21  judgment.

22         I want to touch on Wikimedia's showing first before

23  addressing why this case can and should proceed in light of

24  the procedures that Congress made mandatory in FISA.

25         Wikimedia evidence supports each of its three key

1    allegations.  First, Wikimedia's trillions of communications

2    across every international Internet link in and out of the

3    United States.

4           Second, the NSA is monitoring at least one of these

5    international links.

6           And third, the NSA cannot conduct Upstream

7    surveillance as it has been described in the Government's own

8    documents without copying and reviewing some of Wikimedia's

9    communications on these links.  Wikimedia's expert, Scott

10   Bradner, explains in great detail why these public documents

11   support his conclusions.  But the basic idea is not

12   complicated.  The NSA's systematic surveillance of Internet

13   traffic invariably touches some of Wikimedia's ubiquitous

14   communications.  The Government's expert, Henning Schulzrinne,

15   disagrees with some of Bradner's points.  But notably, he does

16   not disagree with Bradner's key conclusion:  That the NSA is

17   in fact copying and reviewing some of Wikimedia's

18   communications.

19          THE COURT:  Where does it show that he doesn't

20   disagree with that?

21          MR. TOOMEY:  He never contests Mr. Bradner's

22   conclusion that there is a virtual certainty that the NSA is

23   copying, reviewing some of Wikimedia's communications.

24          At no point --

25          THE COURT:  Does it say that or is that an inference

Wikimedia v. NSA

38

1  you draw from his declaration?

2          MR. TOOMEY:  He never disputes it.  He never

3  addresses - -

4          THE COURT:  I'm sorry, answer my question.

5          Does he say that or is it an inference you're

6  drawing?

7          MR. TOOMEY:  He does not say, "I don't dispute this

8  finding."  He says --

9          THE COURT:  All right.  Well, that's what I wanted

10  to be clear about because if he did say that, I'd want you to

11  point it to me.

12          MR. TOOMEY:  Understood, Your Honor.

13          THE COURT:  That doesn't mean that your argument

14  that he effectively admits that for the reasons that you

15  state.  It doesn't dispose of that argument, but it puts it in

16  the proper light.

17          MR. TOOMEY:  That's right.  And of course, the Court

18  is assessing, at this stage of the case, whether plaintiffs

19  have put forward enough evidence to establish a genuine

20  dispute of material fact.  So I do want to emphasize that the

21  Court isn't deciding, at this stage of the case, whether

22  Mr. Bradner or Mr. Schulzrinne is correct in any of the

23  statements that they made, but whether there is a genuine

24  dispute as to whether Wikimedia has put forward evidence that

25  would support its showing that there is a substantial

Wikimedia v. NSA

39

1  likelihood that its communications are being intercepted.

2        THE COURT:  What evidence, other than what's

3  reflected in your expert's declaration, have you put forward

4  on standing?

5        MR. TOOMEY:  We point to the documents that are

6  discussed in our briefs.  Some of which have already been

7  disclosed today.  The FISC opinion, the Government's

8  submissions to the FISA court, the report by the Privacy and

9  Civil Liberties Oversight Board, the Government's responses to

10  our discovery requests, the testimony of the NSA's witness at

11  its 30(b)(6) deposition, and a host of documents, many of them

12  are cited in the appendix to Mr. Bradner's opinion.

13        THE COURT:  All right.  If I were to proceed to hear

14  this case on the standing issue, which in effect is the merits

15  issue, if I were to proceed to hear the case on the standing

16  issue, wouldn't we have to get into the state secrets

17  privilege that the Government asserts?  That is, the material

18  as to which the state secrets privilege has been asserted.

19        MR. TOOMEY:  FISA procedures here provide the Court

20  --

21        THE COURT:  I mean can I get a yes or a no and then

22  you can go on and explain it?

23        If I go ahead and litigate standing, won't I have to

24  consider matters as to which the Government has asserted the

25  state secrets privilege?

1         MR. TOOMEY:  You might, Your Honor.  If the Court

2    were to use FISA's procedures --

3         THE COURT:  Whose procedures?

4         MR. TOOMEY:  The procedures in the Foreign

5    Intelligence Surveillance Act, Your Honor.  In Section 1806(f)

6    of the statute.

7         THE COURT:  All right.  Go on.

8         MR. TOOMEY:  Congress laid out a set of procedures

9    governing discovery of material related to FISA surveillance.

10         THE COURT:  Is that related at all to CIPA?

11         MR. TOOMEY:  It is a different statute.

12         THE COURT:  I know it's a different statute, but I

13    mean, obviously, that material is classified and CIPA purports

14    to govern all use of classified information in litigation.

15         MR. TOOMEY:  My understanding, Your Honor, is that

16    CIPA governs in criminal proceedings.

17         THE COURT:  You're correct.

18         MR. TOOMEY:  But FISA --

19         THE COURT:  But civil --

20         MR. TOOMEY:  The FISA statute applies in both

21    criminal and civil proceedings, as Congress made clear when it

22    enacted FISA.

23         THE COURT:  That's correct.  Go on.

24         MR. TOOMEY:  So in our view, and I want to put this

25    in practical terms, Your Honor, that the way for the Court to

1   proceed, is Wikimedia has adduced evidence showing that the

2   NSA is copying and reviewing some of its trillions of

3   communications, consistent with the Court's prior ruling on

4   the state secrets issue last August, this showing is

5   sufficient to trigger FISA's in camera review procedures to

6   permit the Court to consider classified evidence in ex parte

7   fashion that addresses this standing issue.

8          And the -- the Court should use those procedures to

9   review additional evidence that will make this case far

10  simpler.  The procedures require the Government to present

11  actual evidence about the surveillance at issue, rather than

12  their outside expert's increasingly elaborate theories about

13  what the NSA might be doing.

14         The Court can require the NSA to state directly

15  whether it has attempted to filter out every single one of

16  Wikimedia's communications, as Schulzrinne theorizes, and if

17  so, the Court can ask for evidence that the NSA has actually

18  succeeded in those efforts to completely avoid Wikimedia's

19  communications.

20         And the Court should conduct that in camera review

21  with the help of its own expert or special master.  As I

22  believe the Court indicated it has done in other technically

23  complex cases.

24         THE COURT:  I indicated what?

25         MR. TOOMEY:  In a prior status conference that I

Wikimedia v. NSA

42

1  believe the Court said in a patent case it had --

2          THE COURT:  Yes, I had --

3          MR. TOOMEY:  -- invited its own expert to help --

4          THE COURT:  Let me be clear about that, because I

5  don't think I was -- I may have been complete, but I don't

6  think I was.  I'm at the point now where I reminisce a lot.

7  At my age, you'll do the same.  Looking forward is not

8  productive.

9          Many years ago, I participated, I was on the

10  judicial conference committee of both the umbrella committee

11  for the federal rules and also the appellate rules committee,

12  and others, and I participated in considering the rule of

13  evidence that allows appointment of independent experts.  I

14  was opposed to that rule, which I may not have disclosed

15  earlier.  I was opposed to it, because I felt, in my

16  experience, that if the Court appoints an independent expert,

17  the fact finder, typically a jury, check out whatever the

18  Court-appointed expert says is going to rule.  That's human

19  nature.  And I didn't think that was a good way to proceed.

20          It reminded me of the old patent cases.  I've been

21  around so long that I can remember, in the '60s and '70s when

22  most patent cases where two experts swearing at each other and

23  a jury deciding which expert they like without any idea what

24  the patent was about or the boundaries of the monopoly

25  branding.

1          So I wasn't in favor of it.  I lost that argument

2    and I won't surprise you to tell you that I've lost a lot of

3    arguments in the past 50-plus years.

4          I lost that argument.  And I said, in losing it,

5    yes, I can see there might be some cases where I would use an

6    independent expert.  I think I posited the safety of drinking

7    water in a community or something like that.  But by and large

8    I wasn't really moved by it.  Well, along comes a patent case

9    and this patent case involves 20 or 25 transistor circuitry

10   patents.  Very good lawyers on both sides.  Very good experts

11   on both sides from MIT, Duke, Princeton, other places who were

12   very, very good, and I became concerned, for good reason, that

13   they would blow things past me.  So I said:  Let's have an

14   independent expert.  There were 20-some patents, and so I

15   divided -- I took each patent one at a time.  There were five

16   groups of patents and I took the first group of four or five,

17   and the way the thing presented -- oh, the experts had to pick

18   the third expert, they had to agree on it.

19          All right.  So that's how we proceeded.  And I heard

20   one expert, and then I heard the other expert, and then I

21   heard the Court-appointed expert.  After three patents -- I

22   decided the case after each patent.  I decided that patent.

23   After three or four, I don't remember which now, it's been 30

24   years or so, and I decided it, the parties settled the other

25   20.  And in the course of that, it turned out -- maybe there

1   were five that I did.  But it turned out that I found

2   persuasive the party's experts, one or the other, over the

3   independent expert.  I never picked the independent expert.

4   Not because I was biased against an independent expert, but

5   because I concluded that the other was right.

6          So I guess my view is, I'm not a fan of that rule

7   appointing an independent expert, because I don't farm out

8   decisions, even if they're technically difficult.  But, I take

9   your point that I could do that, the rule permits it and I

10  might.  I don't cross that bridge until I come to it.  But I

11  don't want you assuming that I have some great interest and

12  affection in that.  If I can do the problem myself, I'll do

13  it.

14         MR. TOOMEY:  Understood, Your Honor.  I think one --

15         THE COURT:  After all, if I can't do it myself, how

16  am I going to judge the validity or the -- the merits of what

17  an independent expert says.  I'd end up doing what I've always

18  suspected a jury does in those cases, whatever the independent

19  expert says must be true.  Not so.

20         MR. TOOMEY:  I think one additional consideration in

21  this circumstance, and of course it's up to the Court to

22  decide when the time comes, would be that some of these

23  submissions might be in camera submissions.  So the Court

24  would be hearing only from the Government.  And potentially on

25  quite complex technical questions.  And in that posture, it

1   might be useful for the Court to have --

2            THE COURT:  Yes, I take that point.  Go on.  That's

3   a valid point.  I'll consider that if it comes to that.

4            MR. TOOMEY:  Absolutely.

5            THE COURT:  When we -- if we get to that bridge, I

6   will have to decide and I'll take what you've just said into

7   account.  That's a valid point.

8            MR. TOOMEY:  Thank you.

9            So the Government claims that allowing this case to

10  go any further could reveal sensitive information.  But

11  Congress anticipated those claims.  FISA's procedures address

12  the Government's concerns by protecting sensitive evidence

13  while explicitly authorizing court review.  These procedures

14  are mandatory and the Court should use them just as it has

15  used them in other FISA cases.  Especially here where the

16  Government has made extensive public disclosures about the

17  scope and operation of Upstream surveillance and where

18  Wikimedia's trillions of communication can be found on every

19  international link.  This would not reveal sensitive

20  information.

21           Using FISA's procedures here would only confirm what

22  the public record already shows.  A ruling that Wikimedia has

23  standing would confirm only that there is a substantial risk

24  that one of Wikimedia's trillions of communications will be

25  copied and reviewed in the course of Upstream surveillance.

1  Despite the Government's claims the Court need not make any

2  public finding that Wikimedia is or was subject to Upstream

3  surveillance.

4          THE COURT:  Say that again.

5          MR. TOOMEY:  The Court need not make any public

6  finding that Wikimedia is or was subject to the surveillance.

7  The standing threshold is that Wikimedia must show a

8  substantial likelihood.

9          THE COURT:  Well, but -- when we get to the merits,

10  I have to answer that.

11          MR. TOOMEY:  No, I don't believe you do, Your Honor,

12  because Wikimedia is seeking prospective relief, and in order

13  to establish standing for prospective relief it has to show a

14  substantial likelihood that its communications will be

15  intercepted.

16          THE COURT:  So that's really what Wikipedia [sic]

17  has as its first choice.  Wikimedia, I mean.  All right.  Go

18  on.

19          If this were not a matter subject to state secrets,

20  I'd suggest what an ideal circumstance in which the parties

21  should get together and reach a reasonable solution.  But it

22  isn't, because of that factor.  Go on, sir.

23          MR. TOOMEY:  Understood.

24          So as a result a ruling that Wikimedia has standing

25  would not reveal anything more than what the existing record

Wikimedia v. NSA

1   shows, which is that the NSA is systematically monitoring

2   Internet traffic, including web activity of the kind Wikimedia

3   engages in on a massive scale.  Most obviously no target,

4   terrorist, or spy would learn that his or her communications

5   were or were not being surveilled.

6           Because Wikimedia communicates with hundreds of

7   millions of individuals scattered around the world and because

8   Internet communications take ever-shifting paths, a ruling

9   that Wikimedia simply has standing would reveal no new

10  information about the scope, location, or targets of the

11  surveillance.

12          THE COURT:  And let's assume that we went down that

13  road and that I agreed with everything you did, what is the

14  remedy that you-all seek in this case?

15          MR. TOOMEY:  We're seeking an injunction that -- and

16  a declaratory judgment that the surveillance at issue here,

17  Upstream surveillance, the searching of Internet traffic, in

18  and of out of the United States, violates the Fourth

19  Amendment.

20          THE COURT:  So you would want to stop it.

21          MR. TOOMEY:  That's correct, Your Honor.

22          THE COURT:  All right.  Go on.

23          MR. TOOMEY:  Finally, even if the Court believes

24  that some secrecy might be compromised by allowing the case to

25  go forward, that is only because Congress struck a balance in

1    FISA between secrecy and between the judicial review necessary

2    to ensure that NSA surveillance complies with the law.

3           So it's not the Court's province to remake the

4    balance that Congress decided on when it enacted FISA and when

5    it provided procedures for the Court to review information,

6    sensitive information in camera.

7           The Government's argument that FISA's procedures

8    don't apply here is -- are belied by the text, the structure,

9    and the legislative history of FISA.

10          THE COURT:  Sounds like your brief.

11          MR. TOOMEY:  We certainly made some of those

12   arguments in our brief, Your Honor.

13          But I do want to point out one way in which the

14   Government's arguments interact here, because if the

15   Government could assert the state secrets privilege over

16   whether a party is aggrieved under FISA, which is what it

17   contends here, then no civil case could go forward without the

18   Government's permission.

19          The remedies that Congress created to impose

20   accountability through the civil remedies in FISA would be

21   illusory.  The Government could block any party's, any

22   plaintiff's effort to challenge the lawfulness of

23   surveillance, by claiming that whether or not that party is

24   aggrieved is itself a state secret.  It could cut off every

25   case at that juncture.

1           And because of that, the Government's state secrets

2    claim is incompatible with the FISA statute.  The Government

3    has argued that Wikimedia must prove it's aggrieved to invoke

4    FISA's procedures.  But in the next bracket says that the

5    state secrets privilege prevents Wikimedia from proving it is

6    aggrieved under the statute.  And those arguments would turn

7    FISA's civil remedies into a nullity.  No one would be able to

8    avail themselves of those remedies without the Government's

9    permission.

10           I want to turn now back to Wikimedia's evidence on

11   the summary judgment question.  First, I want to emphasize

12   that the Government distorts the summary judgment standard.

13   The Government repeatedly suggests that Wikimedia must prove

14   the copying and review of its communications to a perfect

15   certainty at this stage, but that's a false premise.  No other

16   plaintiff would be required to prove its claim to a certainty

17   at summary judgment.  And that's not the standard that applies

18   here.

19           THE COURT:  I don't recall that she argued that.  My

20   recollection is that she argued that there's not evidence

21   sufficient to establish a material issue of disputed fact.

22           Am I correct, Ms. Scott?

23           MS. SCOTT:  Yes, Your Honor.  That is what I argued.

24           THE COURT:  So there's no point in knocking that

25   straw man down.  That's not an argument they make.

1        MR. TOOMEY:  Your Honor, the Government's

2   description of what weight or what implication their expert's

3   declaration has, suggests that Wikimedia can't prove its

4   standing unless it has disproven the hypothetical that

5   Dr. Schulzrinne puts forward.

6        Their argument is --

7        THE COURT:  No, their argument is that that argument

8   that your expert has put forth is speculative, speculation,

9   and that that's not enough.

10        MR. TOOMEY:  Respectfully, Your Honor, their expert

11   goes beyond that and their arguments go beyond that.

12        THE COURT:  Their expert does.  That's how she

13   characterized what your expert says.  It's speculation.

14        MR. TOOMEY:  They have certainly argued that our

15   expert is speculating, Your Honor.  And we disagree with that.

16   I want to emphasize that Scott Bradner begins with the

17   Government's own official disclosures and he interprets those

18   documents --

19        THE COURT:  Well, let's come to those.  Now, let's

20   go directly to those.  There were three of those that

21   Ms. Scott mentioned.  Why don't you treat each of those.

22        MR. TOOMEY:  Of course, Your Honor.

23        So the first document is the -- is the FISC opinion,

24   and there, I believe, the Government touched on both the

25   question of whether the surveillance -- there's evidence that

1   surveillance occurs at international Internet links and then

2   we returned to that -- that same FISC opinion, related to

3   whether the Government is in fact filtering out Wikimedia's

4   communications.

5            On the question of whether the surveillance occurs

6   at international Internet links, the Government today hasn't

7   disputed that the statement in the FISC opinion is accurate,

8   and its own witness at the 30(b)(6) deposition, at two

9   different places, on page 160 and on page 189, agreed that

10  that statement in the FISC opinion was accurate as of October

11  2011.

12           The questioning that occurred -- that the Government

13  read through here, involved questions about going beyond what

14  the statement on the FISC -- in the FISC opinion meant.  But,

15  there's no -- there's no genuine dispute that what the FISC

16  said in its opinion is accurate.  And that the -- the accuracy

17  of that statement was adopted, at least as of the date of that

18  opinion.

19           And that should resolve the question whether there's

20  evidence about whether the surveillance occurs at, at least

21  one international Internet link.  If the FISC opinion having

22  been adopted is competent evidence of where the surveillance

23  occurs, the Government has not put forward any evidence to the

24  contrary.  And that FISC opinion and Government's witness

25  provides sufficient evidence to support plaintiff's showing on

Wikimedia v. NSA

52

1   that fact.

2        We have also discussed the PCLOB report, and, I

3   think, the main focus of the Government's argument has been on

4   the PCLOB's description of Upstream surveillance as being

5   comprehensive.  And I have three points that I want to make

6   sure the Court understands.

7        First, the PCLOB reports discussion of

8   comprehensiveness was not an abstract, hypothetical, or

9   aspirational discussion.  I urge the Court to look very

10  closely at the PCLOB report in -- especially that discussion

11  in it, because it makes clear that what the PCLOB was

12  discussing was a very technical description of how Upstream

13  surveillance operates and the technical consequences of the

14  Government's objective of comprehensively collecting

15  communications to and from its targets.  In light of the

16  technical constraints that the NSA faces due to the technology

17  it uses to implement Upstream surveillance.

18       The Government tries to characterize the PCLOB's

19  reference to comprehensiveness as a passing remark, but the

20  PCLOB actually makes that observation at two separate points

21  in the report, including in the executive summary on page 10.

22  So that description is the linchpin of the PCLOB's explanation

23  about why the Government was unable to eliminate about

24  surveillance at that point in time.

25       And I also want to emphasize that the type -- the

Wikimedia v. NSA

53

1  type of comprehensiveness that is being discussed there and

2  that Bradner explains in his opinions is comprehensiveness not

3  in some generalized sense, but on a particular circuit.

4          The question is whether the NSA is employing any

5  filters to eliminate communications, let alone the types of

6  filters that would completely avoid Wikimedia's

7  communications.

8          And on that point, the PCLOB report is quite clear,

9  on page 122, that the NSA utilizes and that there exist

10  devices that are capable of examining all the contents passing

11  through collection devices.

12          And that description in the PCLOB report is

13  consistent with other documents that Bradner points to,

14  including public disclosures in court filings by the British

15  intelligence agencies.  And what those documents show is that

16  the British intelligence agency, GCHQ, which is one of the

17  U.S. Government's closest intelligence partners, engages in an

18  analogous form of surveillance that involves copying all the

19  communications on a circuit in order to review them for

20  selectors.

21          And the reasons that the GCHQ describes in those

22  documents are what it calls:  reasons of technical and

23  practical necessity.  And those reasons parallel the reasons

24  that Bradner himself describes in his declarations.  They

25  include the fact that targets may move from one communications

1   method to another communications method, that targets are

2   distributed around the globe, and that their communications

3   travel different -- unpredictable paths across the Internet.

4         And those technical and practical necessities

5   validate Bradner's description of how and why Upstream

6   surveillance is conducted in the way that he says.

7         Schulzrinne himself acknowledges the feasibility of

8   conducting a surveillance in the way that Bradner describes.

9   He acknowledges that the Government may in fact use a splitter

10  to copy and review all the communications.  So neither the

11  PCLOB report, nor Schulzrinne himself demonstrate that the

12  method that Bradner describes is infeasible.

13        Now, on this -- on this question of whether the NSA

14  employs a secret filter to eliminate Wikimedia's

15  communications entirely.  We have also pointed to the FISC

16  opinions description of how wholly domestic about

17  communications are intercepted at international Internet

18  links.  And a FISC opinion says that those types of

19  communications will be intercepted at international Internet

20  links.  And Scott Bradner explains why that statement would

21  only be true if the Government were not employing filters at

22  those collection points.

23        The statement -- the statement that the NSA will

24  acquire means that the Government is not employing either the

25  types of filters that would eliminate wholly domestic

1    communications or the types of filters that Schulzrinne

2    hypothesizes.

3            And Bradner points to the plain language of that

4    statement in the FISC's own opinion.  And the FISC opinion is

5    another document that I hope the Court looks closely at,

6    because it is clear from that discussion that the FISC was not

7    addressing an abstract hypothetical in the way the Government

8    has suggested today or in its papers.  The FISC was conducting

9    an extensive investigation into how Upstream surveillance was

10   in fact conducted, because it learned that for years the NSA

11   had misrepresented to the Court how that surveillance actually

12   occurred and the implications that it had for the collection

13   of Americans domestic communications.

14           The FISC was -- was closely examining the technical

15   methods that the NSA used to screen out communications, and it

16   made statements in reference to the NSA's own submissions.  So

17   there was a very good reason for the FISC to be precise and

18   the length and the other sections of its opinion make very

19   clear that it was engaged in a technical discussion of how

20   NSA's surveillance actually occurs.

21           Between these documents and -- between these

22   documents and Bradner's opinion, there's no question that

23   Wikimedia has put forward evidence supporting its view that at

24   least some of its communications are being intercepted.

25           Dr. Schulzrinne puts forward a hypothetical about in

1    his view how the NSA could conduct surveillance without --

2    without interacting with any of Wikimedia's communication, but

3    he doesn't cite a single document that supports his Wikimedia

4    avoidance theory.  He does not cite a single document showing

5    that the NSA is taking any of the steps he theorizes about.

6              And in fact, he is a vehicle for the Government to

7    put forward the notion that the NSA is employing a secret

8    Wikimedia filter without the Government ever being accountable

9    for the truth of those theories, even in an ex parte

10   submission to the Court.

11             The Government uses Schulzrinne to put forward a

12   bald hypothetical, one that has no basis in any document in

13   the record.  And then, it argues that Wikimedia has to have --

14   would have to have classified information to disprove that

15   hypothetical.  That tactic is not a reason to find Bradner's

16   opinions inadmissible, and it's not a reason to grant summary

17   judgment for the Government.

18             Bradner has put forward his view not simply that it

19   is most likely that the NSA is copying and reviewing some of

20   Wikimedia's communications, but that it is a virtual

21   certainty, given the technical descriptions of NSA

22   surveillance and the fact that Wikimedia engages in so many

23   communications with so many people around the world.

24             I want to focus on any questions the Court has if --

25   if that would be helpful, but unless the Court has -- has

1   anything further, I do want to emphasize that three factors in

2   this case make it unlike any of the cases that the Government

3   cites in its papers.  And some of those factors involve

4   actions by the other branches of Government.

5          So the first factor is the Government's own

6   disclosures here.  The Government made a deliberate decision

7   to provide this information public.  It reviewed the FISC

8   opinion in detail and declassified the FISC opinion.

9          It engaged with the Privacy and Civil Liberties

10  Oversight Board in its investigation into Section 702.  It

11  reviewed the report that the Privacy and Civil Liberties

12  Oversight Board produced for both accuracy and classified

13  information.  And it has provided a wealth of information to

14  the public for purposes of transparency and accountability

15  about how Upstream surveillance operates.

16         The second fact is that Congress made a decision in

17  FISA to provide a mechanism that balance the interest in

18  secrecy and accountability.  Unlike the state secrets cases

19  that the government points to, including *El-Masri*, Congress

20  provided a mechanism for Courts, like this one, to review

21  classified information in order to hear cases, to hear civil

22  challenges that took on the lawfulness of FISA surveillance.

23         And so that mechanism, which was a judgment by

24  Congress, is available here.  And in fact Congress made --

25  made it mandatory in cases challenging FISA's surveillance.

1           And third, plaintiff Wikimedia and its showing are

2     exceptional, because of the size, breadth, and distribution of

3     its communications.  Wikimedia engages in so many

4     communications of the kind -- of web communications of the

5     kind the Government has said it's collecting that it can make

6     a showing that few other plaintiffs could.

7           And together with the Government's own unclassified

8     public disclosures, Wikimedia has provided more than enough

9     evidence to show that its communications are substantially

10    likely to be copied and reviewed in the course of the

11    surveillance.

12           THE COURT:  All right.  Thank you.

13           MR. TOOMEY:  Thank you, Your Honor.

14           THE COURT:  Thank you, Mr. Toomey.  All right,

15    Ms. Scott.

16           MS. SCOTT:  Yes, Your Honor.

17           THE COURT:  You have the burden of persuasion, so

18    you get the last word.

19           MS. SCOTT:  Yes, Your Honor.

20           So counsel has just said that there are three

21    factors that make this case different.  And the first one that

22    he said is that the Government decided to release information.

23    And so that factor, in making that argument, he forgot to tell

24    the Court that the Court has already ruled that the privilege

25    applies here to the specific information that are operational

—Wikimedia v. NSA—

59

1   details, locations of Upstream surveillance, and the subjects

2   and/or targets.  There are other things that the privilege

3   covers, but those are the key things that it covers that are

4   being addressed in their argument.

5        And this case is *El-Masri* because of that where

6   there had been a general release of information, but not a

7   release of the information that was specifically necessary to

8   litigate that case.

9        As this Court held and the Fourth Circuit affirmed,

10  the case could not go forward in that circumstance and this

11  case is just like that and it cannot go forward.

12       The second factor, the 1806(f) can apply.  Again,

13  counsel forgot to tell the Court that this Court has already

14  looked specifically at the 1806(f) issue and this Court has

15  already found that 1806(f) does not apply here.  Specifically,

16  the August 2018 decision that this Court issued said:  That

17  1806(f) procedures do not apply.  I'm going to read directly

18  from the Court's opinion if you don't mind.  I didn't want to

19  get it wrong, that's why the pause.

20       "A determination that surveillance was lawfully

21  authorized and conducted, cannot occur unless a determination

22  has previously been made that the surveillance at issue did in

23  fact occur.  Put differently, it is impossible to determine

24  the lawfulness of surveillance if no surveillance has actually

25  occurred.  Thus the text of 1806(f) points persuasively to the

1    conclusion that Congress intended 1806(f) procedures to apply

2    only after it became clear from the factual record that the

3    movant was the subject of electronic surveillance.

4            Now, here, just like in August of 2018, when the

5    Court made that analysis and issued -- when this Court issued

6    this opinion, plaintiff has failed to prove, on the factual

7    record, that 1806(f) procedures apply.  And this Court should

8    not revisit that decision here now.  Specifically, they have

9    to prove, as I'll remind the Court you've already decided,

10   that they have -- they qualify as an aggrieved person.  And

11   without that aggrieved personhood or aggrieved person status,

12   they cannot get access to those procedures.  And the aggrieved

13   person status, in order to prove that, they have got to --

14   they have got to prove the definition of aggrieved person

15   under 50 U.S.C. 1801, which is the FISA definition for

16   aggrieved person.  "Is a person who is subject to electronic

17   surveillance."

18           And the "electronic surveillance" term that's

19   defined under 1801(f).  There are four categories, but all of

20   them require a factual showing of acquisition.

21           Now, that hasn't been briefed at this stage here,

22   because it is not the same as the standing question.

23   Specifically, neither of the two architectures that are being

24   discussed as the available technical architectures, neither

25   one of them, deal with this question of acquisition.  That is

1  after any filtering stage and it has to do with ingestion into

2  the Government databases.

3      Now, as I said, we haven't briefed specifically what

4  would an aggrieved person, what would that proof require,

5  because the Court has already held that 1806(f) procedures

6  cannot be used here.  They haven't proven they're an aggrieved

7  person.  That's the first thing.  But also, it would be

8  inappropriate because the statute is aimed, the entire thrust

9  of that statute is aimed at using those procedures to

10  determine the lawfulness of the surveillance, not whether or

11  not surveillance occurred, which is the standing question.

12      Or that they were subject to surveillance, which is

13  the standing question.  So I forgot to tell the Court that it

14  had already ruled and that is directly on point, and Your

15  Honor should not revisit that decision.

16      THE COURT:  Do you need a moment to consult?

17      MS. SCOTT:  I would appreciate a moment just to make

18  sure I understand the point.

19      MR. GILLIGAN:  Thank you, Your Honor.

20      (A pause in the proceedings.)

21      MS. SCOTT:  So the final third -- the third point --

22  he's actually transitioning perfectly to my third point.  The

23  third point that they said makes this case different than any

24  other case is that Wikimedia's communications is so

25  ubiquitous, so ubiquitous, a finding on standing could not

1    harm national security because it wouldn't reveal anything

2    because their communications are everywhere.  That's the

3    argument they've made.

4           They've made that before.  And again, he forgot to

5    tell you that in the August 2018 decision, that this Court

6    issued, you already addressed that argument.  I'll read from

7    your opinion again.

8           "Plaintiff contends that, contrary to surveillance

9    of a particular individual with limited communications,

10   plaintiff's communications are so ubiquitous that to reveal

11   surveillance of its communications would not provide

12   information regarding the structure of the Upstream

13   surveillance program or its specific targets.

14          "Although this proposition may appear to have some

15   force, courts consistently recognized that judicial intuition

16   about this proposition, about -- I apologize, about a

17   proposition such as this, is no substitute for documented

18   risks and threats posed by the potential disclosure of

19   national security."

20          There the Court quotes *Al Haramain*, a Ninth Circuit

21   decision.

22          "The defendants have thoroughly documented those

23   risks in the classified declaration here explaining that to

24   reveal the fact of surveillance of an organization such as

25   plaintiff, even considering plaintiff's voluminous online

1  communications, would provide insight into the structure and

2  operations of Upstream surveillance -- of the Upstream

3  surveillance program.  And in so doing undermine the

4  effectiveness of this intelligence method."

5          Now, that is the case and the Court has already held

6  as such.  It is also -- that holding is also directly in line

7  with the Supreme Court's instruction and analysis of the issue

8  from the *Clapper v. Amnesty International* decision in Footnote

9  4, where it had been suggested in oral argument that the

10  Government could help resolve the issue of standing by

11  disclosing to the Court, perhaps through an in camera

12  proceeding, whether it is intercepting respondent's

13  communications, and what targeting or minimization procedures

14  it is using.

15          Now, this was not specific to 1806(f), but

16  generally, the Supreme Court said, this type -- said that the

17  suggestion was puzzling to do an ex parte review like this,

18  because as an initial matter it's respondent's burden.  Here,

19  it's plaintiff's burden to prove their standing by pointing to

20  specific facts, not the Government's burden to disprove

21  standing by revealing details of its surveillance priorities.

22          And then the Court continued to discuss how doing

23  such a thing would harm national security by exposing those

24  state secrets privilege types of information to the Court ex

25  parte, and then potentially in its decision later.

1          Now, the fact that plaintiff's communications are

2    ubiquitous doesn't change that, as this Court has already

3    held.

4          Now I'd also like to correct another statement that

5    they started with and returned to a few times, which is, they

6    said Dr. Schulzrinne opines about a filter first or put

7    forward a bald hypothetical, I believe is what they said, as

8    to what might be happening.  And I'd like to correct that,

9    because Dr. Schulzrinne specifically does not opine on what is

10   more likely here.  He doesn't do what Mr. Bradner does, which

11   is speculate about what the NSA may or may not be doing here.

12   He doesn't know.  He hasn't been given access to any

13   classified information, just like Mr. Bradner has no access to

14   classified information.  And Dr. Schulzrinne cannot say,

15   cannot say how it's mostly done or how it is done, because he

16   doesn't know what the NSA's surveillance practices and

17   priorities and things of -- in this foreign intelligence

18   realm, how they would make decisions because of those things.

19         What he does, is he says, it could be done via a

20   copy all.  It could also technically be done via the filter

21   first mechanism that has many permutations, as he describes:

22   whitelisting, blacklisting, combination.

23         He doesn't offer an opinion about how it's done

24   because he doesn't know, but he provides us an answer to a

25   very important question:  Were they originally correct in

Wikimedia v. NSA

65

1   arguing to the Fourth Circuit, to this Court and the Fourth

2   Circuit, that the technical rules of the Internet require that

3   it be done via a copy-all infrastructure.  The answer, and now

4   bright blinking lights, is now totally clear because every

5   expert agrees, it can be done multiple ways.

6           Now, fundamentally this idea that it must be done

7   because of the rules of the Internet only one way, that was

8   plaintiff's argument around or attempted argument around the

9   state secrets privilege.  If something can only be done one

10  way, then it can't be a secret, essentially, is what they

11  would argue.  Now, we're not conceding that that's the case.

12  You know, maybe it could be done one way and it could still be

13  a secret.  But what we have proven here is that factually

14  they're wrong.  It could be done multiple ways and how it's

15  done or how it's more likely done, that is a question that the

16  Court cannot step into.  And the state secrets doctrine

17  mandates that this Court say they fail to prove their

18  allegation -- sorry, the state secrets privilege doctrine

19  doesn't say -- doesn't mandate that they fail to prove their

20  allegations, but they did.  They failed to show a genuine

21  issue in material fact on their allegations, but the state

22  secrets doctrine now demands that it be dismissed, because the

23  central fact they want to litigate, in order to prove

24  standing, is protected by the privilege.

25          Now --

1          THE COURT:  Anything else?

2          MS. SCOTT:  Yes, Your Honor.  With a few more

3  moments of the Court's indulgence, I would like to explain

4  that plaintiffs are wrong when they say that the standard the

5  Court should apply is the substantial risk standard.

6          Now, in their briefs, they cite for that standard, a

7  Susan B. Anthony List Supreme Court decision.

8          And I've said, in my opening argument, that *Amnesty*

9  *International*, the *Clapper v. Amnesty International* decision,

10  is controlling here.  And so the correct standard is actual or

11  certainly impending injury.

12          They think it's substantial risk, but the line of

13  cases that Susan B. Anthony addresses, all show -- all face

14  circumstances where there has been actual action by the

15  Government that can be connected with the plaintiff.  So

16  that's a known commodity.

17          And then, they look to the future injury for that

18  standard.

19          That is, as the *Clapper* decision held in Footnote 5,

20  that was the wrong standard to apply in *Clapper,* and it's the

21  wrong standard to apply here, because plaintiffs have no proof

22  of actual Government action connected to them specifically.

23          Moreover, the case they cite for the substantial

24  risk standard, it cites back to *Clapper* and it says,

25  specifically that:  The *Amnesty International* plaintiff's

1   theory of standing, in unifying the two decisions, that

2   case -- plaintiff's theory of standing, was substantially

3   undermined by their failure to offer any evidence that their

4   communications had been monitored under the challenged

5   statute.

6          So, you know, Susan B. Anthony is not doing anything

7   to disturb the answer that *Clapper* provided, which is that

8   actual action is required and the substantial risks standard

9   is inappropriate.  But even more, Footnote 5 in *Clapper* says:

10  Even if the substantial risks standard were applied, in that

11  case, plaintiff's would still fail to meet it because of the

12  chain of attenuated circumstances.

13         Here, all of this speculation is just such a chain.

14  And this Court should reject that application of the errant --

15  of the errant standard.

16         THE COURT:  All right.  Thank you, Ms. Scott.

17         All right.  The Court will take the matter under

18  advisement.  The parties may wish to request a transcript of

19  their arguments from the reporter, presumably your budgets can

20  afford that.  I think it might be helpful for the Court to

21  have that.  And I'll take the matter under advisement and

22  consider it.

23         I think the case involves a substantial challenge,

24  let's say, on both sides.  And I want to consider it carefully

25  the arguments you've made today and in your briefs.  And I

Wikimedia v. NSA

68

1    also -- you submitted a good deal of paper in support of it

2    and I want to review that as well.

3            As usual, the arguments you've made both here and in

4    previous stages of this case have been very helpful and I

5    thank you for it.  Court stands in recess.

6

7            **(Proceedings adjourned at 4:22 p.m.)**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EASTERN DISTRICT OF VIRGINIA

1                    CERTIFICATE OF REPORTER

2

3            I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the Remand

7    Hearing in the case of the **WIKIMEDIA FOUNDATION versus**

8    **NATIONAL SECURITY AGENCY**/**CENTRAL SECURITY SERVICES, et al,**

9    Civil Action No. 1:15-CV-662, in said court on the 30th day

10   of May, 2019.

11           I further certify that the foregoing 69 pages

12   constitute the official transcript of said proceedings, as

13   taken from my machine shorthand notes, my computer realtime

14   display, together with the backup tape recording of said

15   proceedings to the best of my ability.

16           In witness whereof, I have hereto subscribed my

17   name, this June 7, 2019.

18

19

20

21                          _Tonia M Harris_

22                          _____

23                          Tonia M. Harris, RPR
                            Official Court Reporter

24

25