1

```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MARYLAND

-------------------------------x
                                :
WIKIMEDIA FOUNDATION, et al,    : Civil Action No.
                                :
                 Plaintiffs,    :
                                :
             versus             : 1:15-CV-662
                                :
NATIONAL SECURITY AGENCY/       :
CENTRAL SECURITY SERVICES, et al,:
                                :
                 Defendants.    : May 30, 2019
-------------------------------x
```

            The above-entitled Remand Hearing was heard by
the Honorable T.S. Ellis, III, United States District Judge at
the United States District Court Eastern District of Virginia
- Alexandria Division.

                    A P P E A R A N C E S

FOR THE PLAINTIFF:      PATRICK TOOMEY, ESQ.
                        American Civil Liberties Union
                        Foundation
                        125 Broad Street, 18th Floor
                        New York, NY 10004

                        ALEX ABDO, ESQ.
                        ASMA PERACHA, ESQ.
                        Knight First Amendment Institute at
                        Columbia University
                        475 Riverside Drive Street
                        Suite 302
                        New York, NY 10115

FOR THE DEFENDANTS:     OLIVIA H. SCOTT, DOJ
                        RODNEY PATTON, DOJ
                        JAMES GILLIGAN, DOJ
                        JULIA BERMAN, DOJ
                        U.S. Department of Justice
                        Civil Division, Federal Programs Branch
                        1100 L. Street, N.W., Room 11200
                        Washington, D.C. 20005

14:42:27

2

1    OFFICIAL COURT REPORTER:    MS. TONIA M. HARRIS, RPR
                                 United States District Court
2                                Eastern District of Virginia
                                 401 Courthouse Square, Ninth Floor
3                                Alexandria, VA 22314

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

─Wikimedia v. NSA─

3

| | |
|---|---|
| 14:42:02 | 1 |

**P R O C E E D I N G S**

14:42:05  2  (Court proceedings commenced at 2:42 p.m.)

14:42:05  3         THE DEPUTY CLERK:  The Court calls civil case

14:42:05  4  Wikimedia Foundation versus National Security Agency, et al.

14:42:08  5  Case No. 2015-CV-662.

14:42:10  6         May I have appearances, please.  First, for the

14:42:11  7  plaintiff.

14:42:13  8         THE COURT:  All right.  Who is here on behalf of

14:42:17  9  Wikimedia?

14:42:19  10         MR. TOOMEY:  I'm Patrick Toomey on behalf of

14:42:25  11  Wikimedia Foundation.

14:42:25  12         THE COURT:  All right.  Anybody with you today, Mr.

14:42:25  13  Toomey?

14:42:27  14         MR. TOOMEY:  Yes.  With me are Asma Peracha and Alex

14:42:32  15  Abdo from Knight First Amendment Institute.

14:42:34  16         THE COURT:  Well, the only defendant [sic] remaining

14:42:36  17  is Wikimedia.  I take it the remaining attorneys are here to

14:42:42  18  support you.

14:42:45  19         MR. TOOMEY:  That's correct, Your Honor.  Thank you.

14:42:46  20         THE COURT:  Good afternoon to all of you.

14:42:48  21         Now, who is here on behalf of the Government?

14:42:52  22         MS. SCOTT:  Yes, Your Honor.  I'm Olivia Hussey

14:42:55  23  Scott or Ms. Scott.  Scott is fine.  I'm here on behalf of the

14:42:59  24  Government defendants along with my co-counsel, Jim Gilligan,

14:43:03  25  Rodney Patton, and Julia Berman.

Wikimedia v. NSA

4

| 14:43:05 | 1 | THE COURT:  And who will argue today on behalf of |
| 14:43:07 | 2 | the Government? |
| 14:43:08 | 3 | MS. SCOTT:  I will, Your Honor. |
| 14:43:09 | 4 | THE COURT:  Good afternoon to all of you. |
| 14:43:14 | 5 | All right.  This matter is here on remand.  I |
| 14:43:20 | 6 | granted in part, I granted a motion to dismiss on standing |
| 14:43:27 | 7 | grounds.  The Fourth Circuit affirmed in part and remanded in |
| 14:43:35 | 8 | part leaving only one defendant.  I'd forgotten how many there |
| 14:43:40 | 9 | were that are no longer here that I dismissed.  So we're |
| 14:43:43 | 10 | really here today to consider whether, on this summary |
| 14:43:51 | 11 | judgment record, because I allowed modest or partial discovery |
| 14:43:56 | 12 | on the issue of standing, some questions that were asked, were |
| 14:44:03 | 13 | not answered because the Government invoked the state secrets |
| 14:44:09 | 14 | privilege, and there is some argument about that that I will |
| 14:44:18 | 15 | hear today.  But I won't hear any state secrets today.  I |
| 14:44:22 | 16 | think that's clear.  Nothing classified has been submitted or |
| 14:44:26 | 17 | reviewed by the Court in connection with this.  Nothing has |
| 14:44:30 | 18 | been reviewed in camera or ex parte. |
| 14:44:44 | 19 | Let's begin, Ms. Scott, with you.  You're the |
| 14:44:47 | 20 | movant.  Put me in the picture, if you will, I think your task |
| 14:44:54 | 21 | today is to persuade the Court that the summary judgment |
| 14:44:58 | 22 | record, as it exists, discloses no disputed material issue of |
| 14:45:03 | 23 | fact on the existence or in your view, lack of existence of |
| 14:45:12 | 24 | injury in fact to the plaintiff. |
| 14:45:16 | 25 | Do I have that about right? |

14:45:18  1          MS. SCOTT:  You do, Your Honor, yes.  That is the

14:45:20  2    first part of my argument and the Court also referenced the

14:45:24  3    state secrets privilege related part.

14:45:27  4          THE COURT:  All right.  Go ahead.  I'll hear from

14:45:29  5    you.  And if I remain standing it's for the comfort of my

14:45:32  6    back, no other purpose.

14:45:35  7          MS. SCOTT:  Okay.  Well, the plaintiff, as we said

14:45:38  8    in our papers, the plaintiff has no competent evidence in

14:45:39  9    support of two of the three key allegations that the Fourth

14:45:44  10   Circuit found would, if proven, support their standing.  And

14:45:48  11   without competent evidence of both of those two key facts,

14:45:52  12   this case must be dismissed.

14:45:54  13          And first, they have no proof sufficient for a

14:45:56  14   genuine issue of material fact that Upstream surveillance is

14:46:00  15   conducted on what they allege are international Internet

14:46:04  16   links.  They rely really on a single sentence from an 80-page

14:46:08  17   FISC opinion, and which is inadmissible for factual matters

14:46:12  18   and doesn't say what they claim it says.  I'll talk about that

14:46:16  19   in a little bit more.

14:46:17  20          Second, they also have no proof sufficient for a

14:46:20  21   genuine issue of material fact that, as a matter of

14:46:23  22   technological necessity, the NSA must be copying all or nearly

14:46:30  23   all communications transiting any monitored link.  And there

14:46:34  24   is no factual dispute here.  In fact, the undisputed evidence

14:46:38  25   shows the opposite of what plaintiffs were originally arguing

—Wikimedia v. NSA—

6

14:46:43  1   in this case.  Plaintiff's own expert admits that Upstream's

14:46:48  2   surveillance program could be operated in multiple ways.

14:46:54  3          THE COURT:  Before you continue, just enlighten us

14:46:56  4   all with what you mean by "Upstream surveillance."

14:47:01  5          MS. SCOTT:  Yes, Your Honor.  Upstream surveillance

14:47:04  6   is authorized under Section 702 of the Foreign Surveillance --

14:47:10  7   Foreign Intelligence Surveillance Act.

14:47:10  8          Under Section 702, there are two types of

14:47:13  9   surveillance.  Colloquially --

14:47:15  10         THE COURT:  I wanted to know what "Upstream

14:47:18  11  surveillance" means.

14:47:20  12         MS. SCOTT:  Yes, Your Honor.  So as technically --

14:47:23  13  well, Upstream surveillance is a colloquial term given to the

14:47:27  14  type of surveillance under Section 702 that is operated on the

14:47:31  15  Internet backbone, which are the major trunk lines between

14:47:36  16  providers that operate the Internet.

14:47:40  17         So Upstream surveillance involves the eventual

14:47:46  18  collection of communications from the Internet backbone.  And

14:47:49  19  it's distinct from another program that is also operated under

14:47:53  20  Section 702.

14:47:54  21         Now, here the reason there's no factual dispute

14:47:58  22  about how Upstream could, as a matter of technological

14:48:05  23  necessity operate, is because both experts agree that Upstream

14:48:10  24  surveillance could be operated either using a copy-all

14:48:13  25  approach, which is described in plaintiff's allegations.  That

14:48:17 1 approach is described in our briefs as a "copy all, then

14:48:22 2 scan." And it involves essentially putting an optical

14:48:26 3 splitter or something akin to that, along the Internet

14:48:29 4 backbone and making a full copy of the entire stream of

14:48:34 5 communications. As alleged by plaintiff.

14:48:37 6         The experts both agree it could be done that way or

14:48:42 7 it could be done via what's referred -- what I'll refer to

14:48:46 8 here as a "filter first architecture." In the papers that's

14:48:50 9 called a filter, then copy and scan.

14:48:52 10        It's also called mirroring, as a technical matter,

14:48:57 11 that's the term you might see in Dr. Schulzrinne's

14:48:59 12 declaration. As the experts both say, "filter first," that

14:49:03 13 type of an architecture could be implemented multiple ways.

14:49:08 14        So here there's no factual dispute as to the fact it

14:49:12 15 can be done multiple ways. And neither expert, not

14:49:16 16 Mr. Bradner, the plaintiff's technical expert, or

14:49:16 17 Dr. Schulzrinne, our technical expert, neither one of them had

14:49:21 18 access to any classified information. So these experts, to

14:49:25 19 the extent they agree that it could be done multiple ways,

14:49:29 20 they are talking about entirely unclassified information.

14:49:34 21        The only dispute here is about whether there is a

14:49:38 22 technical basis for Mr. Bradner's opinion or if his opinion

14:49:45 23 about how it's most likely done, that's what he offers an

14:49:48 24 opinion on, is actually straying outside of his expertise into

14:49:53 25 conjecture about matters within which he doesn't himself know,

Wikimedia v. NSA

8

14:49:58  1   which is the NSA's Court authorized surveillance practices.

14:50:03  2          Their priorities and practices, their resources,

14:50:06  3   capabilities, and numbers, nature and other things about

14:50:11  4   targets.

14:50:12  5          He speculates about all of those things and all of

14:50:16  6   those things, as Dr. Schulzrinne explains, are not technical

14:50:21  7   bases for his conclusion, they are his guesses, essentially

14:50:26  8   about what the NSA might choose in order to run Upstream

14:50:30  9   surveillance.

14:50:31  10         They make the argument that the choices that

14:50:35  11  Mr. Bradner thinks the NSA is making are most likely largely

14:50:41  12  based on incidental reports -- incidental remarks, I

14:50:47  13  apologize, found in a PCLOB report.  So the PCLOB is the

14:50:57  14  Privacy and Civil Liberties Oversight Board.  It's not the

14:51:01  15  NSA.  But plaintiffs, they did do a review and they did issue

14:51:04  16  a report.  And they said a few incidental remarks about how

14:51:10  17  NSA's Upstream program is designed or has the goal to be

14:51:15  18  comprehensive and reliable.

14:51:19  19         THE COURT:  Who are these people again?

14:51:22  20         MS. SCOTT:  The PCLOB.  I'm using a shortened

14:51:27  21  abbreviation, but PCLOB is Privacy and Civil Liberties

14:51:29  22  Oversight Board.

14:51:30  23         THE COURT:  All right.  Go on.

14:51:33  24         MS. SCOTT:  So plaintiff, however, has already used

14:51:35  25  these statements, these remarks about comprehensive and

—Wikimedia v. NSA—

9

14:51:40  1    reliable goals.  And in their, now dismissed, dragnet claim.

14:51:44  2    And the Fourth Circuit held that even accepting as true the

14:51:48  3    allegation about what the NSA is incentivized to do, that fact

14:51:52  4    without more doesn't establish a dragnet.

14:51:55  5            And that's still true here, these PCLOB statements

14:51:59  6    about the goals and what the NSA might be incentivized to do,

14:52:04  7    are not a basis for any technical conclusions about the

14:52:06  8    operation of Upstream.  And especially where, as

14:52:09  9    Dr. Schulzrinne explains, that this comprehensive goal could

14:52:13  10   be accomplished in a "copy all" or a "filter first"

14:52:16  11   architecture.

14:52:17  12           And there are many practical realities he explains

14:52:22  13   undercut the idea that it might be a copy-all.

14:52:24  14           Even if -- this is the second part of the argument

14:52:28  15   the Court referenced a few moments ago -- even if, however,

14:52:32  16   Plaintiff could raise a genuine issue of material fact as to

14:52:34  17   its standing, this case must be dismissed under the state

14:52:38  18   secrets doctrine because the entire aim of a trial on

14:52:41  19   standing, would be to prove the existence of a state secret

14:52:47  20   privileged fact.

14:52:48  21           Whether Wikimedia's communications are subject to

14:52:51  22   Upstream, it also -- a trial on standing would also involve

14:52:56  23   indirect facts that are protected by the state secrets

14:52:58  24   privilege, including what method Upstream actually employs and

14:53:03  25   where it is located in order to conduct its operations.

Wikimedia v. NSA

10

14:53:07  1        This Court's August 2018 ruling on the motion to

14:53:12  2   compel and Government's assertion of privilege in fact has

14:53:15  3   already held that information to be protected by the state

14:53:19  4   secret doctrine.

14:53:20  5        Finally, without proof of that copying and scan, the

14:53:25  6   additional arguments the plaintiff raises must fail.  And as

14:53:30  7   this Court is aware, *Clapper v. Amnesty International* is a

14:53:33  8   Supreme Court case that is very analogous to the circumstances

14:53:38  9   here.  And it directs that any alleged chill in readership or

14:53:42  10  protected measures taken, because of fears of surveillance,

14:53:45  11  without evidence of actual or certainly impending

14:53:49  12  surveillance, are insufficient as a matter of law.

14:53:52  13       So here, the additional claim -- the additional

14:53:55  14  claims of harm, must fail as a matter of law.  And in total,

14:54:01  15  plaintiff has offered no legally cognizable basis to proceed.

14:54:05  16       Fundamentally, there are three pieces of evidence at

14:54:09  17  the core of plaintiff's arguments.  The PCLOB report, which I

14:54:14  18  already discussed a bit, an October 2011 FISC opinion

14:54:19  19  specifically within that large opinion single sentence and

14:54:21  20  then declarations filed by their technical expert,

14:54:25  21  Mr. Bradner.

14:54:25  22       I'll talk about each of those three types of

14:54:28  23  evidence for each of the two key allegations next.

14:54:32  24       So first, their allegation that I'll refer to here

14:54:37  25  has kind led to or their second key allegation, that Upstream

—Wikimedia v. NSA—

11

14:54:40  1  occurs at so-called international Internet links.  That's what

14:54:45  2  they allege.

14:54:46  3         First, they rely on the single sentence from an

14:54:49  4  October 2011 FISC opinion.  But factual matters, in judicial

14:54:55  5  opinions, are inadmissible hearsay.  And that sentence is --

14:55:01  6  it doesn't say what plaintiffs allege it says.  So I'll start

14:55:05  7  with the second of those.  The sentence actually says, "The

14:55:08  8  Government readily concedes that the NSA will acquire a wholly

14:55:12  9  domestic 'about' communication if the transaction containing

14:55:16  10  the communication is routed through an international Internet

14:55:19  11  link being monitored by the NSA, or is routed through a

14:55:23  12  foreign server."

14:55:24  13         Now, this is not --

14:55:25  14         THE COURT:  You just read that.  But -- and I have

14:55:32  15  some understanding.

14:55:33  16         Would you read it, once again, it says:  The

14:55:38  17  Government readily concedes, what?

14:55:41  18         MS. SCOTT:  "The NSA will acquire a wholly domestic

14:55:46  19  about communication, if the transaction containing the

14:55:50  20  communication is routed through an international Internet

14:55:54  21  link, being monitored by the NSA, or is routed through a

14:55:58  22  foreign server."

14:55:59  23         Now --

14:56:00  24         THE COURT:  "Wholly domestic 'about' communication."

14:56:03  25         What does that mean?

—Wikimedia v. NSA—

12

| | | |
|---|---|---|
| 14:56:05 | 1 | MS. SCOTT:  Yes.  A wholly domestic communication is |
| 14:56:08 | 2 | a communication where both ends, the sender and the recipient, |
| 14:56:13 | 3 | are U.S. persons.  Are reasonably located in the United |
| 14:56:17 | 4 | States. |
| 14:56:17 | 5 | THE COURT:  All right.  Go on. |
| 14:56:19 | 6 | MS. SCOTT:  And "about" for the Court's -- the |
| 14:56:21 | 7 | second part of that thing is it's a wholly domestic about and |
| 14:56:26 | 8 | about is a communication type where a selector in the Upstream |
| 14:56:32 | 9 | process that falls after any filtering, the communication is |
| 14:56:38 | 10 | scanned for selectors.  And an about selector is one that's |
| 14:56:43 | 11 | not in the to/from, it's within the communication itself. |
| 14:56:49 | 12 | So that's what it means when it says a "wholly |
| 14:56:53 | 13 | domestic 'about'," it's that type of communication. |
| 14:56:55 | 14 | The sentence itself is not a statement of fact. |
| 14:57:01 | 15 | It's a hypothetical, an if-then hypothetical.  X happens if Y |
| 14:57:06 | 16 | and Z, but, you know, no X if not Y and -- or not Z. |
| 14:57:11 | 17 | Now, plaintiffs have tried to pull more from this |
| 14:57:17 | 18 | exact sentence than it could be pulled before.  Specifically, |
| 14:57:20 | 19 | in their motion to compel, they argued, and the Court |
| 14:57:26 | 20 | rejected, the argument that this sentence constituted an |
| 14:57:29 | 21 | official acknowledgment of monitoring international Internet |
| 14:57:33 | 22 | links. |
| 14:57:33 | 23 | The Court held that nothing in this statement |
| 14:57:37 | 24 | confirms that the NSA is monitoring multiple Internet links |
| 14:57:42 | 25 | and plaintiff's argument fails because although the Government |

—Wikimedia v. NSA—

13

14:57:45  1   has declassified certain information about Upstream, the

14:57:48  2   Government has not yet released the precise information at

14:57:51  3   issue here.

14:57:52  4        The same thing is true now whether or not Upstream

14:57:59  5   occurs at any international Internet link is protected state

14:58:03  6   secrets privileged information.

14:58:04  7        It falls under the locations category that the Court

14:58:08  8   has already held as protected, but also the scope and scale

14:58:11  9   and the operational details, all from this Court's order last

14:58:16  10  August.

14:58:16  11        Now, I'd like to -- so the sentence doesn't actually

14:58:21  12  say what they claim it says.  It's a hypothetical within the

14:58:25  13  FISC opinion and it shouldn't be taken as a Statement of Fact.

14:58:28  14  But to the extent they are arguing it is a Statement of Fact,

14:58:33  15  it is inadmissible, because Statements of Fact that are in

14:58:37  16  judicial opinions are inadmissible hearsay.  And it does not

14:58:41  17  meet the public records exception for that hearsay rule,

14:58:44  18  because the FISC is an Article III court not part of the

14:58:48  19  executive branch and judicial investigations do not qualify

14:58:52  20  for that exception.

14:58:52  21        THE COURT:  What about the argument that it's an

14:58:55  22  admission of the party?

14:58:58  23        MS. SCOTT:  They do argue that it has been adopted

14:59:01  24  by the NSA, because in the NSA's 30(b)(6) deposition, where

14:59:05  25  the deponent was Ms. Rebecca Richards, she said that the

—Wikimedia v. NSA—

14

14:59:09  1  sentence was accurate as of October 2011, when the order was

14:59:13  2  issued.  That is not an adoption here, a plaintiff's

14:59:18  3  interpretation of the sentence.  The sentence was accurate.

14:59:22  4  That's what she said.  And to the extent that's what they're

14:59:26  5  arguing, that's as far as it goes, because in that same

14:59:30  6  deposition Ms. Richards said, when asked many different ways,

14:59:35  7  if the sentence meant what plaintiff's are claiming --

14:59:39  8  plaintiff claims it means, which is that Upstream occurs at

14:59:43  9  so-called international Internet links, every time that

14:59:45  10  question was asked, the witness said the privilege was

14:59:49  11  asserted actually by the NSA, and the witness was directed not

14:59:53  12  to answer and the witness in fact followed that instruction

14:59:56  13  because of the privilege.

14:59:58  14         And again --

14:59:59  15         THE COURT:  And that's reflected not in the FISC

15:00:03  16  opinion, but it would be reflected in the record, is that what

15:00:06  17  you're saying?

15:00:09  18         MS. SCOTT:  Correct.

15:00:10  19         THE COURT:  If we want to see that, where do we look

15:00:13  20  on this record?

15:00:14  21         MS. SCOTT:  Yes, the deposition of Rebecca Richards

15:00:16  22  is plaintiff's exhibit.  And I have the exhibit number, but I

15:00:23  23  don't have it -- hold on.  I can pull the exhibit number.

15:00:32  24         THE COURT:  Well, it's in that deposition.  You

15:00:34  25  don't have page numbers with you today?

─Wikimedia v. NSA─

15

| | | |
|---|---|---|
| 15:00:37 | 1 | MS. SCOTT:  I do, Your Honor.  If you'd like the |
| 15:00:40 | 2 | specific page numbers I do. |
| 15:00:41 | 3 | THE COURT:  And these would be page numbers in which |
| 15:00:44 | 4 | that specific question was asked and a negative answer was |
| 15:00:47 | 5 | given?  Is that what you're saying? |
| 15:00:51 | 6 | MS. SCOTT:  Yes.  And I can walk you through that if |
| 15:00:54 | 7 | you'd like. |
| 15:00:55 | 8 | The deposition of Ms. Rebecca Richards is |
| 15:00:58 | 9 | plaintiff's exhibit -- I apologize, Your Honor.  Oh, you know |
| 15:01:06 | 10 | what, it's in the Bradner attachment. |
| 15:01:08 | 11 | THE COURT:  It's in what? |
| 15:01:10 | 12 | MS. SCOTT:  It's attached to their expert's, their |
| 15:01:13 | 13 | technical expert's appendix.  And it's Appendix K. |
| 15:01:20 | 14 | So there we go.  So -- |
| 15:01:27 | 15 | THE COURT:  You're being handed something by your |
| 15:01:30 | 16 | co-counsel. |
| 15:01:35 | 17 | MR. GILLIGAN:  Thank you, Your Honor. |
| 15:01:36 | 18 | MS. SCOTT:  Thank you.  So the transcript of the |
| 15:01:36 | 19 | deposition of Ms. Richards is Appendix K to the declaration of |
| 15:01:41 | 20 | Scott Bradner.  Mr. Bradner's declaration can be found at |
| 15:01:47 | 21 | Document 168- -- let me make sure I'll give you the exact -- |
| 15:01:54 | 22 | Okay.  Ms. Richard's deposition transcript can be |
| 15:01:57 | 23 | found at Document 168-4, starting at page 105 in the record. |
| 15:02:04 | 24 | And then specifically within that deposition, she |
| 15:02:08 | 25 | was asked first: |

Wikimedia v. NSA

16

15:02:11  1          "Is the sentence true?"

15:02:13  2          And she said:  "Yes, that sentence is accurate."

15:02:17  3          That can be found on page 160, lines 4 to 17.

15:02:20  4          Then she was asked:

15:02:22  5          "What do you understand the FISC --"

15:02:24  6          That's the Foreign Intelligence Surveillance Court.

15:02:28  7          "-- to mean in its use of the term 'international

15:02:31  8   Internet link' in that sentence?"

15:02:33  9          The counsel objected and asserted the state secrets

15:02:36  10  privilege, directed her not to answer.  And she said:

15:02:39  11         "I have an unclassified response, at least in part,

15:02:44  12  NSA.  So unlike the other words that you had me go through, in

15:02:47  13  terms of definitions that were Telecom providers, you know,

15:03:03  14  sort of --

15:03:03  15         (Court reporter interruption.)

15:03:03  16         MS. SCOTT:  I apologize.  I went too fast.  I

15:03:03  17  apologize.  Okay.

15:03:03  18         -- definitions that were Telecom provider, you know,

15:03:03  19  sort of generally what a Teleco expert would be, NSA has an

15:03:08  20  understanding of this term that is specific to how Judge Bates

15:03:12  21  described it.  But it's classified to provide any further

15:03:15  22  information."

15:03:17  23         And then she did not provide any further information

15:03:19  24  in response to that question.

15:03:21  25         That's at page 160, lines 19 through 161.

—Wikimedia v. NSA—

17

15:03:31   1              (A pause in the proceedings.)

15:03:33   2              MS. SCOTT:  Sorry.  He's -- he was referring me to

15:03:36   3   page 189 in the brief.  That's actually what we cite in our

15:03:40   4   brief.  But I'm walking the Court through the fact that the

15:03:43   5   question was asked many different ways.

15:03:46   6              THE COURT:  Yes.  I want you to finish.

15:03:47   7              MS. SCOTT:  Yes, okay.  So then page 163 the Court

15:03:51   8   asked -- or sorry, the questioner asked.

15:03:55   9              "Is there anything you can tell us unclassified about

15:03:58  10   the nature of the..."

15:03:59  11              I'm sorry.  I skipped ahead, Your Honor.  Strike

15:04:01  12   that.  I'd like to go back a little.

15:04:03  13              Page 162.

15:04:05  14              "Is the NSA's understanding of the term different

15:04:07  15   from the general meaning of the term you described in response

15:04:10  16   to an earlier question as the link between two countries?"

15:04:14  17              "Objection, calls for the state secrets privilege."

15:04:16  18              She followed the instruction.

15:04:18  19              Later on that same page.

15:04:20  20              "Is your understanding that in using the term

15:04:22  21   "international Internet link" the FISC meant an Internet link

15:04:25  22   that terminates in a foreign country?"

15:04:27  23              "Objection."

15:04:28  24              Same objection.  Same instruction.  She followed the

15:04:32  25   instruction.

—Tonia M. Harris OCR-USDC/EDVA 703-646-1438—

EASTERN DISTRICT OF VIRGINIA

—Wikimedia v. NSA—

18

| | | |
|---|---|---|
| 15:04:32 | 1 | The next page of the deposition, 163. |
| 15:04:35 | 2 | "Is it your understanding that an international |
| 15:04:38 | 3 | Internet link is an Internet backbone circuit with one end in |
| 15:04:41 | 4 | the United States and the other end in a foreign country?" |
| 15:04:44 | 5 | Same objection, same instruction.  She followed the |
| 15:04:47 | 6 | instruction. |
| 15:04:48 | 7 | As you go through the transcript, Your Honor, you'll |
| 15:04:52 | 8 | see that this was asked in many different ways. |
| 15:04:57 | 9 | And then on pages 188 and 189, they get to the end |
| 15:05:02 | 10 | of the -- the back and forth, and the question was asked |
| 15:05:08 | 11 | again. |
| 15:05:08 | 12 | She said, "would you like me to restate the |
| 15:05:11 | 13 | unclassified response?" |
| 15:05:12 | 14 | "I think you already did answer the sentence as |
| 15:05:14 | 15 | written is true as of October 3, 2011." |
| 15:05:18 | 16 | And she says, "Yes, the sentence is accurate as of |
| 15:05:22 | 17 | October 3, 2011." |
| 15:05:24 | 18 | So again, she has said the sentence is accurate, but |
| 15:05:28 | 19 | then she refused to answer any further specific questions |
| 15:05:32 | 20 | about the sentence's meaning, the FISC's understanding of what |
| 15:05:36 | 21 | the sentence meant, and what the Government understood the |
| 15:05:42 | 22 | sentence to mean. |
| 15:05:47 | 23 | The witness, as we said in our brief, the witness |
| 15:05:50 | 24 | repeatedly refused to state whether the NSA actually monitors |
| 15:05:55 | 25 | such links based on the state secrets privilege. |

—Wikimedia v. NSA—

19

15:05:59  1        And the page reference that we put in the brief is

15:06:02  2   actually the broader one.  180 to 189.

15:06:08  3        So she has specifically -- so the deposition

15:06:18  4   transcript makes clear that although the sentence is accurate,

15:06:22  5   and accurate as of October 3, 2011, that's still true, as I

15:06:28  6   stand here now, as of that date.  I can tell you that.  But

15:06:32  7   anything further about this sentence and the hypothetical that

15:06:36  8   it presents is classified state secrets privileged

15:06:40  9   information.

15:06:40  10        THE COURT:  Why isn't that sentence enough to carry

15:06:44  11   the plaintiff's where they want to go?

15:06:49  12        MS. SCOTT:  Because the sentence does not -- as a

15:06:51  13   hypothetical, the sentence doesn't actually say that the NSA

15:06:54  14   is monitoring any international Internet links.  It says that

15:06:59  15   the NSA will acquire a certain type of communication if the

15:07:03  16   transaction containing the communication is routed through an

15:07:06  17   international Internet link.  The second part of that is being

15:07:09  18   monitored by the NSA.  So it doesn't say whether or not that

15:07:13  19   is true.

15:07:19  20        And the plaintiff specifically moves to compel that

15:07:24  21   information.  And the Court's order in August of 2018 upheld

15:07:27  22   that that sentence, and specifically in the motion to compel

15:07:32  23   argument, they were arguing that the sentence was the

15:07:34  24   Government's acknowledgment of multiple links because there's

15:07:39  25   a -- oh, I apologize, Your Honor.  Specifically, in the motion

Wikimedia v. NSA

20

15:07:53  1   to compel argument, they were arguing that -- they were

15:07:57  2   arguing that they wanted to compel specific information about

15:08:00  3   documents defining key terms.  That the Government and the

15:08:04  4   FISC have used to describe the operation of Upstream

15:08:08  5   surveillance to the public.  And they gave an example, which

15:08:11  6   is specifically this sentence.  And they said because the

15:08:14  7   term, "international Internet link" describes the point at

15:08:18  8   which the NSA is monitoring communications on the Internet

15:08:19  9   backbone, they've asked us, you know, they propounded an

15:08:23  10  interrogatory saying give us your understanding of that term.

15:08:27  11        And the Court held that that term was protected.

15:08:33  12  The understanding of that term and what it means that the

15:08:35  13  further state secrets privilege information was protected.

15:08:39  14  It's protected both as a location, where is Upstream operated.

15:08:44  15  Is it on international Internet links or some other part of

15:08:49  16  the Internet backbone or not.

15:08:51  17        The intelligence community has publicly acknowledged

15:08:54  18  that the NSA is monitoring at least one circuit carrying

15:08:46  19  international Internet communications, but that that does not

15:09:02  20  mean that the Upstream is operated as the so-called

15:09:08  21  international Internet links.

15:09:10  22        The breadth of the Internet backbone that is

15:09:15  23  carrying international Internet communications is much larger

15:09:19  24  than just these international Internet links that they have

15:09:24  25  alleged.

15:09:25   1          So this sentence, you know, this sixth sentence does

15:09:35   2   not -- fundamentally, it does not say what they want it to

15:09:39   3   say.  And also, to the extent it is a Statement of Fact, in a

15:09:42   4   judicial opinion, it is inadmissible hearsay, and should be

15:09:46   5   kept out.  And Ms. Richards, in fact, did not adopt their

15:09:50   6   interpretation of the sentence.

15:09:52   7          Admissibility matters here.  Plaintiff argues in

15:09:56   8   their papers that admissibility doesn't really matter because

15:10:00   9   their expert can consider hearsay information.  But the

15:10:04  10   Supreme Court has made clear that experts cannot rely as a

15:10:10  11   foundational part of their opinion on inadmissible matters.

15:10:15  12          Specifically, in *Williams v. Illinois*, the Supreme

15:10:18  13   Court said, "If plaintiff cannot muster any independent

15:10:22  14   admissible evidence to prove the foundational facts that are

15:10:25  15   essential to the relevance of the expert's testimony, then the

15:10:28  16   expert's testimony cannot be given any weight by the trier of

15:10:32  17   fact."

15:10:32  18          Plaintiff also cites the PCLOB report that I

15:10:39  19   mentioned a few moments ago.  For support for this part of

15:10:42  20   their allegation, that Upstream occurs on so-called

15:08:46  21   international Internet links, but the PCLOB report says only

15:10:51  22   that Upstream is on circuits facilitating the flow of

15:10:55  23   communications between communications service providers.

15:10:58  24          And that is not necessarily these international

15:11:04  25   Internet links.  So the PCLOB does not support this allegation

—Wikimedia v. NSA—

22

| | | |
|---|---|---|
| 15:11:10 | 1 | of theirs. |
| 15:11:10 | 2 | The third core piece of evidence that they cite, are |
| 15:11:12 | 3 | the declarations by Mr. Bradner, plaintiff's Internet |
| 15:11:17 | 4 | technology expert. |
| 15:11:17 | 5 | All of Mr. Bradner's testimony concluding that the |
| 15:11:20 | 6 | NSA monitors these so-called international Internet links |
| 15:11:24 | 7 | comes from his speculation about vague statements in |
| 15:11:27 | 8 | Government decisions.  In Government documents, I mean. |
| 15:11:30 | 9 | They're not based on his expertise and so they're not |
| 15:11:33 | 10 | admissible under Rule 702 or *Daubert*. |
| 15:11:37 | 11 | The NSA's intelligence mission is not a matter |
| 15:11:41 | 12 | within his field of expertise.  He testifies in his |
| 15:11:45 | 13 | declarations that he thinks it's logical and unsurprising if |
| 15:11:49 | 14 | the NSA were to be monitoring at least one international |
| 15:11:53 | 15 | Internet link, but you know the fact that the NSA -- the fact |
| 15:11:57 | 16 | that everyone thinks the NSA is on a particular link, or a |
| 15:12:01 | 17 | particular point, might even be a reason that the NSA would |
| 15:12:05 | 18 | choose not to be at that particular point. |
| 15:12:07 | 19 | Mr. Bradner, at bottom, really, Mr. Bradner may know |
| 15:12:12 | 20 | the technical reasons why someone might want to be at a |
| 15:12:16 | 21 | particular place on the Internet backbone to get a certain |
| 15:12:19 | 22 | type of communication, but he does not know the foreign |
| 15:12:24 | 23 | intelligence reasons or concerns that are at play, or the |
| 15:12:28 | 24 | resource and capability issues that might be relevant to the |
| 15:12:32 | 25 | NSA's decision making. |

—Wikimedia v. NSA—

23

15:12:34  1          Now, even if it were admissible, his declarations on

15:12:40  2     this conjecture were admissible, they would be legally

15:12:44  3     insufficient as a matter of law to support their standing,

15:12:48  4     because *Amnesty International* directs that such speculation

15:12:53  5     cannot support standing as a matter of law.

15:12:57  6          THE COURT:  What is it that directs that?

15:13:00  7          MS. SCOTT:  Amnesty -- I'm sorry, *Clapper v.*

15:13:02  8     *Amnesty International*.  Which I refer to --

15:13:03  9          THE COURT:  The Supreme Court's case.

15:13:05  10         MS. SCOTT:  Yes, exactly the Supreme Court's case.

15:13:07  11         THE COURT:  It's better to refer to it as the

15:13:09  12    *Clapper* decision.

15:13:11  13         MS. SCOTT:  I will do so from now on in this

15:13:14  14    argument, Your Honor.  Sometimes we refer to it by the

15:13:17  15    non-Government party to make it a littler clearer, because

15:13:19  16    there's multiple cases with the *Clapper* name, but I'll say

15:13:22  17    *Clapper.*

15:13:24  18         THE COURT:  All right.

15:13:25  19         MS. SCOTT:  So you know the FISC opinion, the PCLOB

15:13:32  20    report, nor Mr. Bradner's declarations show or provide

15:13:35  21    sufficient evidence to create a genuine issue of material fact

15:13:38  22    here that the NSA is monitoring with Upstream surveillance

15:13:42  23    international Internet links.  And without unclassified

15:13:45  24    evidence showing this, this allegation, like two of the

15:13:49  25    three-legged stool or the second key allegation, cannot be

—Wikimedia v. NSA—

24

15:13:52  1  sustained and their case must be dismissed on that point

15:13:56  2  alone.

15:13:56  3          The third key -- the third key allegation, is that

15:14:03  4  Upstream must be, or now they're arguing, most likely is done

15:14:09  5  via a copy-all infrastructure.  And they based this on, again,

15:14:17  6  these three types of evidence.  The first one is the PCLOB

15:14:23  7  report.  Again, I have already mentioned that the PCLOB have

15:14:24  8  some incidental remarks about the NSA's goals being to do

15:14:29  9  comprehensive and reliable collection.

15:14:31  10         But as I said, the Fourth Circuit has already held

15:14:34  11  that statements about what the NSA is incentivized to do in

15:14:37  12  the PCLOB, cannot be a basis for any technical conclusions

15:14:41  13  about the actual operation of Upstream.

15:14:44  14         That's in line with another D.C. circuit case

15:14:47  15  holding in *Obama v. Klayman* that rejects the district court's

15:14:53  16  inference of standing based on the Government's efforts to

15:14:56  17  create a comprehensive phone record metadata database.  And

15:15:03  18  specifically there, Judge Williams pointed out that there are

15:15:06  19  various competing interests that may constrain the

15:15:09  20  Government's pursuit of effective surveillance.  And it is

15:15:12  21  possible that these factors have operated to hamper the

15:15:16  22  breadth of the NSA's collection, including, you know, these

15:15:21  23  can be legal, technical, budget funding, other types of

15:15:25  24  collateral concerns Judge Williams pointed to.

15:15:28  25         And that makes sense because the plaintiff and

Wikimedia v. NSA

25

15:15:32  1   Mr. Bradner are really guessing about the meaning of these

15:15:35  2   qualitative and aspirational terms and whether the NSA

15:15:39  3   achieved their goals.

15:15:41  4        As Dr. Schulzrinne, his declarations point out,

15:15:47  5   there are many practical realities and tradeoffs that cut

15:15:50  6   against those goals.  And Mr. Bradner doesn't disagree with

15:15:54  7   that.  He just disregards it.

15:15:56  8        But the PCLOB, plaintiff's evidence, the PCLOB

15:16:00  9   supports Dr. Schulzrinne view.  Specifically at page 120.  It

15:16:05  10  says that, "Whereas PRISM collection..."

15:16:07  11       That's the other type of Section 702 surveillance.

15:16:10  12       "Whereas PRISM collection, as the comparatively

15:16:14  13  simple process, the Upstream process is more complex depending

15:16:18  14  upon the use of collection devices with technological

15:16:22  15  limitations that significantly affect the scope of

15:16:24  16  collection."

15:16:25  17       Dr. Schulzrinne also points out that the filter

15:16:30  18  first architecture -- which by the way can be implemented in a

15:16:35  19  variety of ways that Dr. Schulzrinne explains -- can achieve

15:16:40  20  this comprehensive level of collection that the PCLOB says is

15:16:46  21  the NSA's goal.

15:16:48  22       And finally, on this point, I will say that even if

15:16:52  23  in 2014 when this PCLOB report came out, even if Upstream

15:16:57  24  collection was as comprehensive as Mr. Bradner thinks it was,

15:17:01  25  which again, there's no support to make that conclusion, one

—Wikimedia v. NSA—

26

15:17:06   1   way or the other.  That's not necessarily true now.

15:17:09   2        The Internet has grown a lot.  There's increased

15:17:13   3   incentive to filter communications since 2014.  And the PCLOB

15:17:21   4   report itself talked about how at the time the NSA couldn't

15:17:21   5   stop what the court -- what we talked about a moment ago,

15:17:26   6   which is the "abouts" type of communications collection --

15:17:28   7   without harming the main focus of the program, which is the

15:17:33   8   to/from collection.

15:17:35   9        So the PCLOB says, "They can't stop abouts without

15:17:39  10   harming the to/from collection."  But plaintiff's evidence,

15:17:43  11   specifically exhibit -- their Exhibit 45, is NSA's statement,

15:17:48  12   public statement, about stopping abouts collection.  And that

15:17:52  13   happened in early 2017.  Page 2 to 3 of that exhibit says that

15:17:58  14   nothing has changed from the PCLOB statement, but nonetheless,

15:18:04  15   the NSA has decided to stop abouts.

15:18:05  16        So although we can't specifically say what has

15:18:08  17   changed, the evidence that even plaintiff puts forward shows

15:18:12  18   that something has changed.

15:18:15  19        Now, they also put forward the same FISC opinion,

15:18:19  20   the same sentence within the FISC opinion, for this leg 3 or

15:18:24  21   third allegation that Upstream must be or most likely is done

15:18:27  22   via a copy-all architecture.

15:18:31  23        And at first, as I've already said, judicial

15:18:34  24   opinions, the statements of fact within judicial opinions, are

15:18:37  25   not admissible for the same reasons I've already given the

Wikimedia v. NSA

27

15:18:40  1    Court, this sentence is not admissible.

15:18:42  2         But second, just as before, the sentence does not

15:18:46  3    actually support their copy-all contention or conclusion.  You

15:18:52  4    know reading it again, the sentence says, "The NSA will

15:18:55  5    acquire a wholly domestic 'about' communication, if the

15:19:00  6    transaction containing the communication is routed through an

15:19:04  7    international Internet link being monitored by the NSA."

15:19:09  8         Plaintiff argues that this sentence must mean the

15:19:12  9    NSA is not using IP filtering.

15:19:15  10        THE COURT:  Is not using what?

15:19:17  11        MS. SCOTT:  An IP filter.

15:19:19  12        THE COURT:  All right.

15:19:21  13        MS. SCOTT:  That's an Internet protocol filter.

15:19:25  14   It's a specific type of filtering.  Because if they used an IP

15:19:29  15   filter, it would eliminate the wholly domestic transaction

15:19:33  16   before copying.  And the NSA would never collect the

15:19:37  17   transaction between U.S. IP addresses.  And they make that

15:19:40  18   argument in their first brief.

15:19:43  19        Dr. Schulzrinne points out that that's actually not

15:19:44  20   technically correct, because passing all transactions through

15:19:47  21   an IP filter to eliminate wholly domestic transactions could

15:19:51  22   still result in the theoretical acquisition of a wholly

15:19:56  23   domestic communication as described in the FISC hypothetical.

15:19:59  24        And then, Mr. Bradner does not respond to that

15:20:02  25   technical correction.

Wikimedia v. NSA

15:20:05  1          Their remaining textual argument about this sentence
15:20:10  2   is that the "will acquire" language there, must mean will
15:20:14  3   acquire all.  Now the word "all," is not in the sentence.  It
15:20:20  4   says "will acquire a."  And so it plainly doesn't say that.
15:20:24  5   And it's also still, it's a hypothetical.  So it's not a
15:20:28  6   statement of fact.  I've already said that.
15:20:30  7          But moreover, reading the word "all," the way they
15:20:34  8   do for this argument, into this sentence, ignores the context
15:20:38  9   within which that sentence appears in the FISC opinion.
15:20:42  10  Specifically, the FISC in this part of its opinion is
15:20:45  11  discussing the NSA's technical means.  It's not discussing the
15:20:49  12  scope or scale of collection.  And it's talking about the
15:20:54  13  NSA's technical inability to prevent the acquisition of wholly
15:20:59  14  domestic communications under certain circumstances.  And the
15:21:03  15  FISC finding is the acquisitions occur by normal operation and
15:21:08  16  not as a result of a technical failure or malfunction of
15:21:12  17  equipment.
15:21:12  18          So reading "all," the word "all" into this sentence,
15:21:16  19  converts it from a hypothetical about the technical operation
15:21:21  20  into a hypothetical about the scope or scale of collection,
15:21:26  21  which is not -- it doesn't contextually fit within what the
15:21:31  22  FISC is actually saying.
15:21:32  23          Moreover, Mr. B's interpretation ignores that the
15:21:37  24  FISC, in an earlier section, specifically at page 36 of this
15:21:41  25  exhibit, Plaintiff's Exhibit 16, note 34.  There, the FISC is

Wikimedia v. NSA

29

15:21:49  1   discussing the same phenomenon.  This inability to prevent the

15:21:54  2   acquisition of some wholly domestic communications, and there

15:21:58  3   the FISC observes that the NSA may acquire wholly domestic

15:22:01  4   communications, not that it will acquire all of them.

15:22:05  5         You know, this interpretation of Mr. Bradner is a

15:22:09  6   good example of him straying beyond his expertise to interpret

15:22:15  7   a judicial opinion in one way or the other.  And the Court

15:22:18  8   does not need his assistance in order to interpret a judicial

15:22:21  9   opinion.

15:22:24  10        Finally, same as what we talked about a moment ago

15:22:29  11  with the PCLOB, even if -- even if Upstream operated, as

15:22:36  12  plaintiff's allege, which again we say there is not proof

15:22:44  13  sufficient for a genuine issue of material fact to support

15:22:47  14  their allegations.  But even if it operated at the level that

15:22:54  15  they claim it did in 2011, there's no evidence that operations

15:22:56  16  today are the same as they were in 2011.

15:22:58  17        Just as before, when I mentioned, there's been an

15:23:00  18  enormous growth of the Internet, additional incentives to

15:23:05  19  filter, and the Government is no longer, since early 2017,

15:23:09  20  getting abouts collection, which does impact the scope of

15:23:13  21  collection.

15:23:14  22        Now, the third category of evidence that they rely

15:23:17  23  on for this argument that Upstream must be or most likely is

15:23:21  24  done via copy all, are the declarations filed by their

15:23:27  25  technical expert, Mr. Bradner.  As I've already said, he

Wikimedia v. NSA

30

15:23:33   1   admits that it can be technically possible to use either a

15:23:35   2   copy all or a filtering, one of the many ways of filtering

15:23:39   3   process, in order to operate Upstream collection.

15:23:43   4         From there, as I've said, he strays beyond his

15:23:46   5   experience into matters of court authorized surveillance and

15:23:49   6   foreign intelligence questions.

15:23:52   7         I can provide the Court with some examples of this

15:23:55   8   straying.  Specifically, he claims that copy first is more

15:24:00   9   likely than the filter first, because the NSA is unlikely to

15:24:05   10  share sensitive information about its targets and/or filtering

15:24:09   11  criteria within an assisting provider.

15:24:12   12        This is guessing about the NSA's willingness to

15:24:15   13  share classified information with a provider.  It's not a

15:24:18   14  technical basis for a conclusion.  Plus it's an iffy premise.

15:24:23   15  The NSA already shares sensitive information with the provider

15:24:26   16  in some instances.  The PCLOB report the plaintiff attaches

15:24:33   17  evidence, identifies that this happens, for example, with

15:24:34   18  selectors like e-mail addresses.

15:24:37   19        Mr. Bradner also claims, as an example, that copy

15:24:40   20  first is more likely, because it requires no placement of an

15:24:45   21  NSA operated device into the heart of a provider's network.

15:24:50   22  But as Dr. Schulzrinne's points out, neither would the filter

15:24:54   23  first architecture that he's proposing, the filtering method

15:24:59   24  that he said is technically available as an alternative, would

15:25:03   25  be low risk.

Wikimedia v. NSA

31

15:25:04  1          Specifically, it is operated, the filter first

15:25:09  2  architecture that Dr. Schulzrinne proposes, is operated within

15:25:13  3  the provider's own routers and switches.

15:25:18  4          So to back up for a moment, the routers and switches

15:25:24  5  are the points where, as the light streams or the electronic

15:25:28  6  data is moving through the Internet backbone, the normal

15:25:32  7  operation of the router or the switch is to receive that

15:25:35  8  transmission, decode it, and examine the header information to

15:25:39  9  decide where to send it onto next, along the Internet

15:25:43  10  backbone.  Or if it's going to come off the backbone into a

15:25:47  11  more -- a -- as it travels closer to the user, the end

15:25:52  12  destination.

15:25:53  13          So as part of their normal operations, these routers

15:25:57  14  and switches decode the information, look at the IP address

15:26:00  15  header, the header information, and then they send it on to

15:26:04  16  their next destination.

15:26:05  17          As part of the providers' normal operation,

15:26:08  18  Dr. Schulzrinne explains, the providers do filtering

15:26:13  19  themselves.  And this filtering is called mirroring also,

15:26:18  20  where they do it for their own network security, for their own

15:26:22  21  network maintenance reasons, they also do it to try and stop

15:26:25  22  denial of service attacks or other malicious attacks on their

15:26:30  23  system.  So what's done in that process is the router, when it

15:26:34  24  decodes the information and looks at the IP -- the header

15:26:37  25  information, it then compares that header information against

—Wikimedia v. NSA—

32

15:26:40  1  what's called an "access control lists."  Those access control

15:26:45  2  lists are loaded with information.  Should this, you know,

15:26:51  3  that describes is something to be whitelisted or blacklisted,

15:26:54  4  or filtered as the provider wants it to be.  And if it's a

15:26:59  5  communication that has been whitelisted, meaning the provider

15:27:02  6  wants to look at this type of communication or the

15:27:05  7  communication itself for some reason, for its own business

15:27:09  8  purposes, it would mirror the communication or make a copy

15:27:13  9  before it goes on its way.

15:27:14  10         Now, this process is happening at -- in nanoseconds.

15:27:19  11  So faster than I can even say the "c" in copy, it's done.  And

15:27:23  12  it's moving at an extremely rapid pace.

15:27:28  13         The blacklist version of this filtering, is where

15:27:30  14  the access control list is loaded with a don't give me an

15:27:37  15  instruction, don't give me any information -- any

15:27:37  16  communications that meet these qualities.

15:27:39  17         So this mirroring or filtering process is already

15:27:43  18  running in the provider's own network.  And Dr. Schulzrinne

15:27:47  19  explains that the mirroring process could be utilized by

15:27:52  20  providing the provider the information they need, they can

15:27:56  21  load and access control lists and utilize either whitelisting

15:27:59  22  or blacklisting.  And again, he is -- he is describing this as

15:28:04  23  a technical alternative, not -- he doesn't have access to

15:28:09  24  classified information so he's not saying how it's actually

15:28:12  25  run.  He's saying it's a possibility.

—Wikimedia v. NSA—

33

15:28:14  1          Through blacklisting it or whitelisting, they can

15:28:17  2   either block a communication or send it through to an NSA

15:28:22  3   operated device.  They can also use a combination filtering so

15:28:26  4   they could blacklist all types of communications or all

15:28:30  5   communications from a certain IP address, and then only

15:28:34  6   whitelist the ones that are of specific interest as a

15:28:38  7   combination approach.

15:28:39  8          So this -- what Dr. Schulzrinne is saying is that

15:28:44  9   Mr. Bradner is wrong, that filter first would be riskier

15:28:48  10  because it would require placing a device in the heart of the

15:28:51  11  provider's network that is NSA operated.  But that's actually

15:28:54  12  not the case, because as Dr. Schulzrinne proposes it, the

15:28:58  13  provider would use -- the provider would use its own system as

15:29:03  14  it operates in the ordinary course of business.

15:29:06  15         THE COURT:  Well, we've spent a good deal of time

15:29:09  16  here talking about various expert's speculation, speculations

15:29:15  17  as to what might be done, because, as you would remind me,

15:29:23  18  what's actually done is subject to the state secrets

15:29:29  19  privilege.  Tell me then, what is the standard that you think

15:29:40  20  the Court must apply to find standard?  Must I be persuaded by

15:29:48  21  a preponderance of the evidence that is not disputed that

15:29:49  22  there is injury in fact?

15:29:53  23         MS. SCOTT:  The standard that this Court should

15:29:55  24  apply for standing in this case is the standard -- the same

15:30:00  25  standard that was articulated in the *Clapper v. Amnesty*

—Wikimedia v. NSA—

34

15:30:04  1   *International* case.  The evidence showing injury would have to

15:30:08  2   be showing actual or certainly impending injury.

15:30:15  3              As the Court in *Clapper* --

15:30:18  4              THE COURT:  Would I have to know what's actually

15:30:20  5   done?

15:30:21  6              MS. SCOTT:  Well, Your Honor, as we've said our

15:30:24  7   position is that they have not proven, using the unclassified

15:30:28  8   evidence, that there is a genuine issue of material fact about

15:30:35  9   whether or not they have standing.  They have not shown that

15:30:38  10  they have standing because they cannot show either actual or

15:30:41  11  certainly impending injury.  They can't, in fact, show that

15:30:45  12  their communications are --

15:30:46  13             THE COURT:  Well, isn't the only way to show that,

15:30:49  14  to breach the state secrets privilege, and find out what's

15:30:53  15  actually done?

15:30:55  16             MS. SCOTT:  Your Honor, from here, correct.  That is

15:30:57  17  the second part of my argument.  So because they cannot show a

15:31:03  18  genuine issue of material fact on standing, we think the Court

15:31:08  19  should dismiss on that basis, but the Court also should

15:31:12  20  dismiss, because from this point, even if they could show with

15:31:17  21  unclassified evidence a genuine issue of material fact, at

15:31:20  22  this point, the case would have to be dismissed under the

15:31:24  23  state secrets privilege doctrine.  Because, you can't hold a

15:31:28  24  trial on the question of standing where the very question of

15:31:32  25  standing, the outcome of that, is a protected state secrets

—Wikimedia v. NSA—

35

15:31:37  1   privileged fact.

15:31:38  2          This case in that way is exactly, at this point,

15:31:42  3   like *El-Masri*, where the Fourth Circuit found that for

15:31:47  4   purposes of the analysis, the central facts, or the very

15:31:50  5   subject matter of an action, are the facts that are essential

15:31:54  6   for the claim to proceed or for the -- to prosecuting the

15:31:58  7   action or defending it.

15:32:00  8          At this point we now know that for them to attempt

15:32:06  9   to prove standing, as they would propose, now we should have a

15:32:10  10  trial on standing, that such a trial can't happen because the

15:32:14  11  whole object would be to prove whether Wikimedia

15:32:18  12  communications are subject to Upstream.  And the Court, this

15:32:21  13  Court has already held in August 2018 that such a fact is

15:32:26  14  protected by the state secrets privilege.

15:32:29  15         A trial on standing would also indirectly bear on

15:32:33  16  other state secrets privileged questions, as we've now seen

15:32:38  17  made plain through the briefing, whether or not the NSA uses a

15:32:42  18  copy all or a filter first or some version of the filter first

15:32:47  19  architecture.  That's protected state secrets information

15:32:52  20  because it's operational details.  Whether or not Upstream is

15:32:57  21  operated at one or more of these so-called international

15:32:59  22  Internet links, that's also state secrets privileged

15:33:02  23  information.  It's locations of Upstream.

15:33:04  24         So just like in *El-Masri* where the plaintiff argued,

15:33:10  25  well this CIA rendition program has been publicly acknowledged

─────Wikimedia v. NSA─────

36

15:33:15  1   and so we can go forward, the privilege is undermined.  No,

15:33:19  2   this is just like *El-Masri* where the operational details are

15:33:23  3   what is protected by the privilege here.

15:33:25  4          And because you would have to get into those

15:33:30  5   protected pieces of information in order to have a trial on

15:33:34  6   standing, this case can proceed no further.

15:33:38  7          THE COURT:  All right.  Anything further?  You'll

15:33:40  8   have an opportunity to respond, but it's -- you've argued for

15:33:44  9   quite a while now, and I think we have a pretty good idea of

15:33:48  10  your position.  Is there anything you want to say before I

15:33:51  11  give Mr. Toomey an opportunity?

15:33:53  12         MS. SCOTT:  I will take the Court's guidance, and

15:33:56  13  knowing I will come back and have another opportunity, I will

15:34:01  14  defer at this time.

15:34:01  15         THE COURT:  All right.  Mr. Toomey.

15:34:04  16         MR. TOOMEY:  Thank you, Your Honor.  And may it

15:34:06  17  please the Court.

15:34:07  18         For all the bluster in the Government's briefs

15:34:10  19  there's no question that Wikimedia has put forward more than

15:34:14  20  enough evidence to support its standing and defeat summary

15:34:18  21  judgment.

15:34:18  22         I want to touch on Wikimedia's showing first before

15:34:21  23  addressing why this case can and should proceed in light of

15:34:23  24  the procedures that Congress made mandatory in FISA.

15:34:27  25         Wikimedia evidence supports each of its three key

37

15:34:30  1    allegations.  First, Wikimedia's trillions of communications

15:34:35  2    across every international Internet link in and out of the

15:34:39  3    United States.

15:34:40  4         Second, the NSA is monitoring at least one of these

15:34:45  5    international links.

15:34:45  6         And third, the NSA cannot conduct Upstream

15:34:48  7    surveillance as it has been described in the Government's own

15:34:50  8    documents without copying and reviewing some of Wikimedia's

15:34:54  9    communications on these links.  Wikimedia's expert, Scott

15:34:58 10    Bradner, explains in great detail why these public documents

15:35:03 11    support his conclusions.  But the basic idea is not

15:35:06 12    complicated.  The NSA's systematic surveillance of Internet

15:35:09 13    traffic invariably touches some of Wikimedia's ubiquitous

15:35:14 14    communications.  The Government's expert, Henning Schulzrinne,

15:35:18 15    disagrees with some of Bradner's points.  But notably, he does

15:35:21 16    not disagree with Bradner's key conclusion:  That the NSA is

15:35:26 17    in fact copying and reviewing some of Wikimedia's

15:35:28 18    communications.

15:35:29 19         THE COURT:  Where does it show that he doesn't

15:35:31 20    disagree with that?

15:35:34 21         MR. TOOMEY:  He never contests Mr. Bradner's

15:35:36 22    conclusion that there is a virtual certainty that the NSA is

15:35:39 23    copying, reviewing some of Wikimedia's communications.

15:35:42 24         At no point --

15:35:43 25         THE COURT:  Does it say that or is that an inference

Wikimedia v. NSA

38

15:35:45  1   you draw from his declaration?

15:35:48  2          MR. TOOMEY:  He never disputes it.  He never

15:35:50  3   addresses - -

15:35:50  4          THE COURT:  I'm sorry, answer my question.

15:35:52  5          Does he say that or is it an inference you're

15:35:54  6   drawing?

15:35:55  7          MR. TOOMEY:  He does not say, "I don't dispute this

15:35:58  8   finding."  He says --

15:35:59  9          THE COURT:  All right.  Well, that's what I wanted

15:36:01  10  to be clear about because if he did say that, I'd want you to

15:36:07  11  point it to me.

15:36:07  12         MR. TOOMEY:  Understood, Your Honor.

15:36:07  13         THE COURT:  That doesn't mean that your argument

15:36:07  14  that he effectively admits that for the reasons that you

15:36:12  15  state.  It doesn't dispose of that argument, but it puts it in

15:36:17  16  the proper light.

15:36:20  17         MR. TOOMEY:  That's right.  And of course, the Court

15:36:21  18  is assessing, at this stage of the case, whether plaintiffs

15:36:23  19  have put forward enough evidence to establish a genuine

15:36:26  20  dispute of material fact.  So I do want to emphasize that the

15:36:30  21  Court isn't deciding, at this stage of the case, whether

15:36:33  22  Mr. Bradner or Mr. Schulzrinne is correct in any of the

15:36:38  23  statements that they made, but whether there is a genuine

15:36:41  24  dispute as to whether Wikimedia has put forward evidence that

15:36:44  25  would support its showing that there is a substantial

Wikimedia v. NSA

39

15:36:47  1  likelihood that its communications are being intercepted.

15:36:50  2          THE COURT:  What evidence, other than what's

15:36:53  3  reflected in your expert's declaration, have you put forward

15:36:57  4  on standing?

15:37:00  5          MR. TOOMEY:  We point to the documents that are

15:37:02  6  discussed in our briefs.  Some of which have already been

15:37:05  7  disclosed today.  The FISC opinion, the Government's

15:37:09  8  submissions to the FISA court, the report by the Privacy and

15:37:12  9  Civil Liberties Oversight Board, the Government's responses to

15:37:15  10  our discovery requests, the testimony of the NSA's witness at

15:37:18  11  its 30(b)(6) deposition, and a host of documents, many of them

15:37:23  12  are cited in the appendix to Mr. Bradner's opinion.

15:37:28  13          THE COURT:  All right.  If I were to proceed to hear

15:37:31  14  this case on the standing issue, which in effect is the merits

15:37:38  15  issue, if I were to proceed to hear the case on the standing

15:37:44  16  issue, wouldn't we have to get into the state secrets

15:37:54  17  privilege that the Government asserts?  That is, the material

15:37:57  18  as to which the state secrets privilege has been asserted.

15:38:03  19          MR. TOOMEY:  FISA procedures here provide the Court

15:38:03  20  --

15:38:05  21          THE COURT:  I mean can I get a yes or a no and then

15:38:07  22  you can go on and explain it?

15:38:09  23          If I go ahead and litigate standing, won't I have to

15:38:12  24  consider matters as to which the Government has asserted the

15:38:17  25  state secrets privilege?

Wikimedia v. NSA

40

| | | |
|---|---|---|
| 15:38:20 | 1 | MR. TOOMEY:  You might, Your Honor.  If the Court |
| 15:38:22 | 2 | were to use FISA's procedures -- |
| 15:38:24 | 3 | THE COURT:  Whose procedures? |
| 15:38:26 | 4 | MR. TOOMEY:  The procedures in the Foreign |
| 15:38:32 | 5 | Intelligence Surveillance Act, Your Honor.  In Section 1806(f) |
| 15:38:33 | 6 | of the statute. |
| 15:38:34 | 7 | THE COURT:  All right.  Go on. |
| 15:38:35 | 8 | MR. TOOMEY:  Congress laid out a set of procedures |
| 15:38:37 | 9 | governing discovery of material related to FISA surveillance. |
| 15:38:42 | 10 | THE COURT:  Is that related at all to CIPA? |
| 15:38:47 | 11 | MR. TOOMEY:  It is a different statute. |
| 15:38:48 | 12 | THE COURT:  I know it's a different statute, but I |
| 15:38:50 | 13 | mean, obviously, that material is classified and CIPA purports |
| 15:38:55 | 14 | to govern all use of classified information in litigation. |
| 15:39:00 | 15 | MR. TOOMEY:  My understanding, Your Honor, is that |
| 15:39:02 | 16 | CIPA governs in criminal proceedings. |
| 15:39:02 | 17 | THE COURT:  You're correct. |
| 15:39:05 | 18 | MR. TOOMEY:  But FISA -- |
| 15:39:05 | 19 | THE COURT:  But civil -- |
| 15:39:08 | 20 | MR. TOOMEY:  The FISA statute applies in both |
| 15:39:08 | 21 | criminal and civil proceedings, as Congress made clear when it |
| 15:39:12 | 22 | enacted FISA. |
| 15:39:13 | 23 | THE COURT:  That's correct.  Go on. |
| 15:39:16 | 24 | MR. TOOMEY:  So in our view, and I want to put this |
| 15:39:18 | 25 | in practical terms, Your Honor, that the way for the Court to |

─────Wikimedia v. NSA─────

41

15:39:22  1   proceed, is Wikimedia has adduced evidence showing that the

15:39:27  2   NSA is copying and reviewing some of its trillions of

15:39:30  3   communications, consistent with the Court's prior ruling on

15:39:33  4   the state secrets issue last August, this showing is

15:39:36  5   sufficient to trigger FISA's in camera review procedures to

15:39:42  6   permit the Court to consider classified evidence in ex parte

15:39:44  7   fashion that addresses this standing issue.

15:39:47  8            And the -- the Court should use those procedures to

15:39:50  9   review additional evidence that will make this case far

15:39:53  10  simpler.  The procedures require the Government to present

15:39:56  11  actual evidence about the surveillance at issue, rather than

15:40:00  12  their outside expert's increasingly elaborate theories about

15:40:04  13  what the NSA might be doing.

15:40:06  14           The Court can require the NSA to state directly

15:40:10  15  whether it has attempted to filter out every single one of

15:40:15  16  Wikimedia's communications, as Schulzrinne theorizes, and if

15:40:18  17  so, the Court can ask for evidence that the NSA has actually

15:40:21  18  succeeded in those efforts to completely avoid Wikimedia's

15:40:24  19  communications.

15:40:25  20           And the Court should conduct that in camera review

15:40:30  21  with the help of its own expert or special master.  As I

15:40:32  22  believe the Court indicated it has done in other technically

15:40:37  23  complex cases.

15:40:37  24           THE COURT:  I indicated what?

15:40:39  25           MR. TOOMEY:  In a prior status conference that I

—Wikimedia v. NSA—

42

| | |
|---|---|
| 15:40:41 | 1 |

believe the Court said in a patent case it had --

15:40:45  2      THE COURT:  Yes, I had --

15:40:47  3      MR. TOOMEY:  -- invited its own expert to help --

15:40:48  4      THE COURT:  Let me be clear about that, because I

15:40:52  5  don't think I was -- I may have been complete, but I don't

15:40:55  6  think I was.  I'm at the point now where I reminisce a lot.

15:41:02  7  At my age, you'll do the same.  Looking forward is not

15:41:05  8  productive.

15:41:07  9      Many years ago, I participated, I was on the

15:41:14  10  judicial conference committee of both the umbrella committee

15:41:19  11  for the federal rules and also the appellate rules committee,

15:41:25  12  and others, and I participated in considering the rule of

15:41:30  13  evidence that allows appointment of independent experts.  I

15:41:34  14  was opposed to that rule, which I may not have disclosed

15:41:39  15  earlier.  I was opposed to it, because I felt, in my

15:41:45  16  experience, that if the Court appoints an independent expert,

15:41:50  17  the fact finder, typically a jury, check out whatever the

15:41:57  18  Court-appointed expert says is going to rule.  That's human

15:42:00  19  nature.  And I didn't think that was a good way to proceed.

15:42:04  20      It reminded me of the old patent cases.  I've been

15:42:09  21  around so long that I can remember, in the '60s and '70s when

15:42:12  22  most patent cases where two experts swearing at each other and

15:42:17  23  a jury deciding which expert they like without any idea what

15:42:21  24  the patent was about or the boundaries of the monopoly

15:42:27  25  branding.

Wikimedia v. NSA

43

15:42:27  1        So I wasn't in favor of it.  I lost that argument

15:42:31  2   and I won't surprise you to tell you that I've lost a lot of

15:42:35  3   arguments in the past 50-plus years.

15:42:39  4        I lost that argument.  And I said, in losing it,

15:42:45  5   yes, I can see there might be some cases where I would use an

15:42:49  6   independent expert.  I think I posited the safety of drinking

15:42:54  7   water in a community or something like that.  But by and large

15:42:57  8   I wasn't really moved by it.  Well, along comes a patent case

15:43:03  9   and this patent case involves 20 or 25 transistor circuitry

15:43:10 10   patents.  Very good lawyers on both sides.  Very good experts

15:43:14 11   on both sides from MIT, Duke, Princeton, other places who were

15:43:24 12   very, very good, and I became concerned, for good reason, that

15:43:29 13   they would blow things past me.  So I said:  Let's have an

15:43:36 14   independent expert.  There were 20-some patents, and so I

15:43:42 15   divided -- I took each patent one at a time.  There were five

15:43:45 16   groups of patents and I took the first group of four or five,

15:43:49 17   and the way the thing presented -- oh, the experts had to pick

15:43:53 18   the third expert, they had to agree on it.

15:43:58 19        All right.  So that's how we proceeded.  And I heard

15:44:02 20   one expert, and then I heard the other expert, and then I

15:44:06 21   heard the Court-appointed expert.  After three patents -- I

15:44:09 22   decided the case after each patent.  I decided that patent.

15:44:16 23   After three or four, I don't remember which now, it's been 30

15:44:20 24   years or so, and I decided it, the parties settled the other

15:44:26 25   20.  And in the course of that, it turned out -- maybe there

Wikimedia v. NSA

44

15:44:34  1    were five that I did.  But it turned out that I found

15:44:38  2    persuasive the party's experts, one or the other, over the

15:44:43  3    independent expert.  I never picked the independent expert.

15:44:47  4    Not because I was biased against an independent expert, but

15:44:52  5    because I concluded that the other was right.

15:44:54  6         So I guess my view is, I'm not a fan of that rule

15:45:01  7    appointing an independent expert, because I don't farm out

15:45:05  8    decisions, even if they're technically difficult.  But, I take

15:45:13  9    your point that I could do that, the rule permits it and I

15:45:15  10   might.  I don't cross that bridge until I come to it.  But I

15:45:19  11   don't want you assuming that I have some great interest and

15:45:24  12   affection in that.  If I can do the problem myself, I'll do

15:45:28  13   it.

15:45:29  14        MR. TOOMEY:  Understood, Your Honor.  I think one --

15:45:31  15        THE COURT:  After all, if I can't do it myself, how

15:45:34  16   am I going to judge the validity or the -- the merits of what

15:45:39  17   an independent expert says.  I'd end up doing what I've always

15:45:43  18   suspected a jury does in those cases, whatever the independent

15:45:48  19   expert says must be true.  Not so.

15:45:51  20        MR. TOOMEY:  I think one additional consideration in

15:45:52  21   this circumstance, and of course it's up to the Court to

15:45:54  22   decide when the time comes, would be that some of these

15:46:01  23   submissions might be in camera submissions.  So the Court

15:46:04  24   would be hearing only from the Government.  And potentially on

15:46:10  25   quite complex technical questions.  And in that posture, it

Wikimedia v. NSA

45

| | | |
|---|---|---|
| 15:46:14 | 1 | might be useful for the Court to have -- |
| 15:46:15 | 2 | THE COURT:  Yes, I take that point.  Go on.  That's |
| 15:46:18 | 3 | a valid point.  I'll consider that if it comes to that. |
| 15:46:22 | 4 | MR. TOOMEY:  Absolutely. |
| 15:46:23 | 5 | THE COURT:  When we -- if we get to that bridge, I |
| 15:46:26 | 6 | will have to decide and I'll take what you've just said into |
| 15:46:29 | 7 | account.  That's a valid point. |
| 15:46:31 | 8 | MR. TOOMEY:  Thank you. |
| 15:46:32 | 9 | So the Government claims that allowing this case to |
| 15:46:35 | 10 | go any further could reveal sensitive information.  But |
| 15:46:40 | 11 | Congress anticipated those claims.  FISA's procedures address |
| 15:46:44 | 12 | the Government's concerns by protecting sensitive evidence |
| 15:46:47 | 13 | while explicitly authorizing court review.  These procedures |
| 15:46:51 | 14 | are mandatory and the Court should use them just as it has |
| 15:46:54 | 15 | used them in other FISA cases.  Especially here where the |
| 15:46:56 | 16 | Government has made extensive public disclosures about the |
| 15:47:00 | 17 | scope and operation of Upstream surveillance and where |
| 15:47:04 | 18 | Wikimedia's trillions of communication can be found on every |
| 15:47:06 | 19 | international link.  This would not reveal sensitive |
| 15:47:09 | 20 | information. |
| 15:47:09 | 21 | Using FISA's procedures here would only confirm what |
| 15:47:14 | 22 | the public record already shows.  A ruling that Wikimedia has |
| 15:47:17 | 23 | standing would confirm only that there is a substantial risk |
| 15:47:20 | 24 | that one of Wikimedia's trillions of communications will be |
| 15:47:23 | 25 | copied and reviewed in the course of Upstream surveillance. |

—Wikimedia v. NSA—

46

15:47:28  1   Despite the Government's claims the Court need not make any

15:47:31  2   public finding that Wikimedia is or was subject to Upstream

15:47:35  3   surveillance.

15:47:35  4          THE COURT:  Say that again.

15:47:37  5          MR. TOOMEY:  The Court need not make any public

15:47:40  6   finding that Wikimedia is or was subject to the surveillance.

15:47:43  7   The standing threshold is that Wikimedia must show a

15:47:47  8   substantial likelihood.

15:47:49  9          THE COURT:  Well, but -- when we get to the merits,

15:47:52  10  I have to answer that.

15:47:54  11         MR. TOOMEY:  No, I don't believe you do, Your Honor,

15:47:56  12  because Wikimedia is seeking prospective relief, and in order

15:48:00  13  to establish standing for prospective relief it has to show a

15:48:06  14  substantial likelihood that its communications will be

15:48:08  15  intercepted.

15:48:09  16         THE COURT:  So that's really what Wikipedia [sic]

15:48:11  17  has as its first choice.  Wikimedia, I mean.  All right.  Go

15:48:19  18  on.

15:48:20  19         If this were not a matter subject to state secrets,

15:48:25  20  I'd suggest what an ideal circumstance in which the parties

15:48:29  21  should get together and reach a reasonable solution.  But it

15:48:36  22  isn't, because of that factor.  Go on, sir.

15:48:40  23         MR. TOOMEY:  Understood.

15:48:40  24         So as a result a ruling that Wikimedia has standing

15:48:43  25  would not reveal anything more than what the existing record

─Wikimedia v. NSA─

47

15:48:47   1   shows, which is that the NSA is systematically monitoring

15:48:49   2   Internet traffic, including web activity of the kind Wikimedia

15:48:52   3   engages in on a massive scale.  Most obviously no target,

15:48:58   4   terrorist, or spy would learn that his or her communications

15:49:03   5   were or were not being surveilled.

15:49:03   6          Because Wikimedia communicates with hundreds of

15:49:07   7   millions of individuals scattered around the world and because

15:49:10   8   Internet communications take ever-shifting paths, a ruling

15:49:14   9   that Wikimedia simply has standing would reveal no new

15:49:16   10  information about the scope, location, or targets of the

15:49:20   11  surveillance.

15:49:20   12         THE COURT:  And let's assume that we went down that

15:49:23   13  road and that I agreed with everything you did, what is the

15:49:26   14  remedy that you-all seek in this case?

15:49:30   15         MR. TOOMEY:  We're seeking an injunction that -- and

15:49:33   16  a declaratory judgment that the surveillance at issue here,

15:49:38   17  Upstream surveillance, the searching of Internet traffic, in

15:49:40   18  and of out of the United States, violates the Fourth

15:49:43   19  Amendment.

15:49:43   20         THE COURT:  So you would want to stop it.

15:49:45   21         MR. TOOMEY:  That's correct, Your Honor.

15:49:47   22         THE COURT:  All right.  Go on.

15:49:48   23         MR. TOOMEY:  Finally, even if the Court believes

15:49:50   24  that some secrecy might be compromised by allowing the case to

15:49:55   25  go forward, that is only because Congress struck a balance in

48

15:49:58  1   FISA between secrecy and between the judicial review necessary

15:50:00  2   to ensure that NSA surveillance complies with the law.

15:50:03  3            So it's not the Court's province to remake the

15:50:08  4   balance that Congress decided on when it enacted FISA and when

15:50:12  5   it provided procedures for the Court to review information,

15:50:15  6   sensitive information in camera.

15:50:18  7            The Government's argument that FISA's procedures

15:50:24  8   don't apply here is -- are belied by the text, the structure,

15:50:29  9   and the legislative history of FISA.

15:50:32  10            THE COURT:  Sounds like your brief.

15:50:37  11            MR. TOOMEY:  We certainly made some of those

15:50:39  12   arguments in our brief, Your Honor.

15:50:40  13            But I do want to point out one way in which the

15:50:43  14   Government's arguments interact here, because if the

15:50:46  15   Government could assert the state secrets privilege over

15:50:49  16   whether a party is aggrieved under FISA, which is what it

15:50:55  17   contends here, then no civil case could go forward without the

15:50:57  18   Government's permission.

15:50:58  19            The remedies that Congress created to impose

15:51:01  20   accountability through the civil remedies in FISA would be

15:51:07  21   illusory.  The Government could block any party's, any

15:51:10  22   plaintiff's effort to challenge the lawfulness of

15:51:12  23   surveillance, by claiming that whether or not that party is

15:51:17  24   aggrieved is itself a state secret.  It could cut off every

15:51:21  25   case at that juncture.

─Wikimedia v. NSA─

49

15:51:23   1        And because of that, the Government's state secrets

15:51:26   2   claim is incompatible with the FISA statute.  The Government

15:51:31   3   has argued that Wikimedia must prove it's aggrieved to invoke

15:51:34   4   FISA's procedures.  But in the next bracket says that the

15:51:37   5   state secrets privilege prevents Wikimedia from proving it is

15:51:41   6   aggrieved under the statute.  And those arguments would turn

15:51:45   7   FISA's civil remedies into a nullity.  No one would be able to

15:51:49   8   avail themselves of those remedies without the Government's

15:51:52   9   permission.

15:51:53  10        I want to turn now back to Wikimedia's evidence on

15:51:57  11   the summary judgment question.  First, I want to emphasize

15:52:03  12   that the Government distorts the summary judgment standard.

15:52:05  13   The Government repeatedly suggests that Wikimedia must prove

15:52:08  14   the copying and review of its communications to a perfect

15:52:13  15   certainty at this stage, but that's a false premise.  No other

15:52:16  16   plaintiff would be required to prove its claim to a certainty

15:52:20  17   at summary judgment.  And that's not the standard that applies

15:52:24  18   here.

15:52:24  19        THE COURT:  I don't recall that she argued that.  My

15:52:26  20   recollection is that she argued that there's not evidence

15:52:31  21   sufficient to establish a material issue of disputed fact.

15:52:34  22        Am I correct, Ms. Scott?

15:52:37  23        MS. SCOTT:  Yes, Your Honor.  That is what I argued.

15:52:39  24        THE COURT:  So there's no point in knocking that

15:52:40  25   straw man down.  That's not an argument they make.

Wikimedia v. NSA

50

15:52:45   1          MR. TOOMEY:  Your Honor, the Government's

15:52:46   2    description of what weight or what implication their expert's

15:52:53   3    declaration has, suggests that Wikimedia can't prove its

15:52:57   4    standing unless it has disproven the hypothetical that

15:53:00   5    Dr. Schulzrinne puts forward.

15:53:03   6          Their argument is --

15:53:05   7          THE COURT:  No, their argument is that that argument

15:53:07   8    that your expert has put forth is speculative, speculation,

15:53:14   9    and that that's not enough.

15:53:19  10          MR. TOOMEY:  Respectfully, Your Honor, their expert

15:53:21  11    goes beyond that and their arguments go beyond that.

15:53:24  12          THE COURT:  Their expert does.  That's how she

15:53:28  13    characterized what your expert says.  It's speculation.

15:53:33  14          MR. TOOMEY:  They have certainly argued that our

15:53:36  15    expert is speculating, Your Honor.  And we disagree with that.

15:53:40  16    I want to emphasize that Scott Bradner begins with the

15:53:43  17    Government's own official disclosures and he interprets those

15:53:47  18    documents --

15:53:47  19          THE COURT:  Well, let's come to those.  Now, let's

15:53:50  20    go directly to those.  There were three of those that

15:53:53  21    Ms. Scott mentioned.  Why don't you treat each of those.

15:53:57  22          MR. TOOMEY:  Of course, Your Honor.

15:53:58  23          So the first document is the -- is the FISC opinion,

15:54:02  24    and there, I believe, the Government touched on both the

15:54:06  25    question of whether the surveillance -- there's evidence that

Wikimedia v. NSA

51

15:54:10  1  surveillance occurs at international Internet links and then

15:54:12  2  we returned to that -- that same FISC opinion, related to

15:54:17  3  whether the Government is in fact filtering out Wikimedia's

15:54:21  4  communications.

15:54:22  5       On the question of whether the surveillance occurs

15:54:25  6  at international Internet links, the Government today hasn't

15:54:28  7  disputed that the statement in the FISC opinion is accurate,

15:54:31  8  and its own witness at the 30(b)(6) deposition, at two

15:54:35  9  different places, on page 160 and on page 189, agreed that

15:54:40  10  that statement in the FISC opinion was accurate as of October

15:54:43  11  2011.

15:54:44  12       The questioning that occurred -- that the Government

15:54:48  13  read through here, involved questions about going beyond what

15:54:53  14  the statement on the FISC -- in the FISC opinion meant.  But,

15:54:58  15  there's no -- there's no genuine dispute that what the FISC

15:55:03  16  said in its opinion is accurate.  And that the -- the accuracy

15:55:07  17  of that statement was adopted, at least as of the date of that

15:55:10  18  opinion.

15:55:11  19       And that should resolve the question whether there's

15:55:15  20  evidence about whether the surveillance occurs at, at least

15:55:18  21  one international Internet link.  If the FISC opinion having

15:55:24  22  been adopted is competent evidence of where the surveillance

15:55:26  23  occurs, the Government has not put forward any evidence to the

15:55:29  24  contrary.  And that FISC opinion and Government's witness

15:55:37  25  provides sufficient evidence to support plaintiff's showing on

—Wikimedia v. NSA—

52

15:55:40    1   that fact.

15:55:42    2          We have also discussed the PCLOB report, and, I

15:55:52    3   think, the main focus of the Government's argument has been on

15:55:54    4   the PCLOB's description of Upstream surveillance as being

15:56:00    5   comprehensive.  And I have three points that I want to make

15:56:03    6   sure the Court understands.

15:56:04    7          First, the PCLOB reports discussion of

15:56:08    8   comprehensiveness was not an abstract, hypothetical, or

15:56:12    9   aspirational discussion.  I urge the Court to look very

15:56:16   10   closely at the PCLOB report in -- especially that discussion

15:56:21   11   in it, because it makes clear that what the PCLOB was

15:56:24   12   discussing was a very technical description of how Upstream

15:56:27   13   surveillance operates and the technical consequences of the

15:56:30   14   Government's objective of comprehensively collecting

15:56:34   15   communications to and from its targets.  In light of the

15:56:38   16   technical constraints that the NSA faces due to the technology

15:56:43   17   it uses to implement Upstream surveillance.

15:56:45   18          The Government tries to characterize the PCLOB's

15:56:48   19   reference to comprehensiveness as a passing remark, but the

15:56:53   20   PCLOB actually makes that observation at two separate points

15:56:55   21   in the report, including in the executive summary on page 10.

15:57:01   22   So that description is the linchpin of the PCLOB's explanation

15:57:05   23   about why the Government was unable to eliminate about

15:57:09   24   surveillance at that point in time.

15:57:11   25          And I also want to emphasize that the type -- the

Wikimedia v. NSA

53

15:57:16  1   type of comprehensiveness that is being discussed there and

15:57:20  2   that Bradner explains in his opinions is comprehensiveness not

15:57:28  3   in some generalized sense, but on a particular circuit.

15:57:31  4          The question is whether the NSA is employing any

15:57:35  5   filters to eliminate communications, let alone the types of

15:57:40  6   filters that would completely avoid Wikimedia's

15:57:45  7   communications.

15:57:46  8          And on that point, the PCLOB report is quite clear,

15:57:53  9   on page 122, that the NSA utilizes and that there exist

15:57:55  10  devices that are capable of examining all the contents passing

15:58:01  11  through collection devices.

15:58:03  12         And that description in the PCLOB report is

15:58:07  13  consistent with other documents that Bradner points to,

15:58:13  14  including public disclosures in court filings by the British

15:58:19  15  intelligence agencies.  And what those documents show is that

15:58:22  16  the British intelligence agency, GCHQ, which is one of the

15:58:27  17  U.S. Government's closest intelligence partners, engages in an

15:58:31  18  analogous form of surveillance that involves copying all the

15:58:35  19  communications on a circuit in order to review them for

15:58:38  20  selectors.

15:58:38  21         And the reasons that the GCHQ describes in those

15:58:43  22  documents are what it calls:  reasons of technical and

15:58:48  23  practical necessity.  And those reasons parallel the reasons

15:58:52  24  that Bradner himself describes in his declarations.  They

15:58:57  25  include the fact that targets may move from one communications

—Wikimedia v. NSA—

54

15:59:02    1   method to another communications method, that targets are

15:59:05    2   distributed around the globe, and that their communications

15:59:08    3   travel different -- unpredictable paths across the Internet.

15:59:12    4        And those technical and practical necessities

15:59:16    5   validate Bradner's description of how and why Upstream

15:59:21    6   surveillance is conducted in the way that he says.

15:59:23    7        Schulzrinne himself acknowledges the feasibility of

15:59:30    8   conducting a surveillance in the way that Bradner describes.

15:59:31    9   He acknowledges that the Government may in fact use a splitter

15:59:35   10   to copy and review all the communications.  So neither the

15:59:39   11   PCLOB report, nor Schulzrinne himself demonstrate that the

15:59:45   12   method that Bradner describes is infeasible.

15:59:48   13        Now, on this -- on this question of whether the NSA

15:59:54   14   employs a secret filter to eliminate Wikimedia's

16:00:04   15   communications entirely.  We have also pointed to the FISC

16:00:07   16   opinions description of how wholly domestic about

16:00:11   17   communications are intercepted at international Internet

16:00:14   18   links.  And a FISC opinion says that those types of

16:00:18   19   communications will be intercepted at international Internet

16:00:22   20   links.  And Scott Bradner explains why that statement would

16:00:26   21   only be true if the Government were not employing filters at

16:00:31   22   those collection points.

16:00:33   23        The statement -- the statement that the NSA will

16:00:36   24   acquire means that the Government is not employing either the

16:00:41   25   types of filters that would eliminate wholly domestic

16:00:46  1  communications or the types of filters that Schulzrinne

16:00:48  2  hypothesizes.

16:00:50  3          And Bradner points to the plain language of that

16:00:57  4  statement in the FISC's own opinion.  And the FISC opinion is

16:01:01  5  another document that I hope the Court looks closely at,

16:01:04  6  because it is clear from that discussion that the FISC was not

16:01:08  7  addressing an abstract hypothetical in the way the Government

16:01:12  8  has suggested today or in its papers.  The FISC was conducting

16:01:17  9  an extensive investigation into how Upstream surveillance was

16:01:21  10  in fact conducted, because it learned that for years the NSA

16:01:26  11  had misrepresented to the Court how that surveillance actually

16:01:31  12  occurred and the implications that it had for the collection

16:01:35  13  of Americans domestic communications.

16:01:38  14          The FISC was -- was closely examining the technical

16:01:43  15  methods that the NSA used to screen out communications, and it

16:01:47  16  made statements in reference to the NSA's own submissions.  So

16:01:51  17  there was a very good reason for the FISC to be precise and

16:01:55  18  the length and the other sections of its opinion make very

16:01:58  19  clear that it was engaged in a technical discussion of how

16:02:02  20  NSA's surveillance actually occurs.

16:02:07  21          Between these documents and -- between these

16:02:11  22  documents and Bradner's opinion, there's no question that

16:02:15  23  Wikimedia has put forward evidence supporting its view that at

16:02:19  24  least some of its communications are being intercepted.

16:02:23  25          Dr. Schulzrinne puts forward a hypothetical about in

Wikimedia v. NSA

56

16:02:26   1  his view how the NSA could conduct surveillance without --

16:02:31   2  without interacting with any of Wikimedia's communication, but

16:02:34   3  he doesn't cite a single document that supports his Wikimedia

16:02:40   4  avoidance theory.  He does not cite a single document showing

16:02:43   5  that the NSA is taking any of the steps he theorizes about.

16:02:47   6        And in fact, he is a vehicle for the Government to

16:02:52   7  put forward the notion that the NSA is employing a secret

16:02:56   8  Wikimedia filter without the Government ever being accountable

16:02:59   9  for the truth of those theories, even in an ex parte

16:03:04  10  submission to the Court.

16:03:05  11        The Government uses Schulzrinne to put forward a

16:03:08  12  bald hypothetical, one that has no basis in any document in

16:03:12  13  the record.  And then, it argues that Wikimedia has to have --

16:03:16  14  would have to have classified information to disprove that

16:03:21  15  hypothetical.  That tactic is not a reason to find Bradner's

16:03:24  16  opinions inadmissible, and it's not a reason to grant summary

16:03:30  17  judgment for the Government.

16:03:31  18        Bradner has put forward his view not simply that it

16:03:34  19  is most likely that the NSA is copying and reviewing some of

16:03:37  20  Wikimedia's communications, but that it is a virtual

16:03:40  21  certainty, given the technical descriptions of NSA

16:03:44  22  surveillance and the fact that Wikimedia engages in so many

16:03:48  23  communications with so many people around the world.

16:03:51  24        I want to focus on any questions the Court has if --

16:03:56  25  if that would be helpful, but unless the Court has -- has

─Wikimedia v. NSA─

57

16:04:01  1   anything further, I do want to emphasize that three factors in

16:04:05  2   this case make it unlike any of the cases that the Government

16:04:10  3   cites in its papers.  And some of those factors involve

16:04:14  4   actions by the other branches of Government.

16:04:16  5        So the first factor is the Government's own

16:04:20  6   disclosures here.  The Government made a deliberate decision

16:04:24  7   to provide this information public.  It reviewed the FISC

16:04:28  8   opinion in detail and declassified the FISC opinion.

16:04:32  9        It engaged with the Privacy and Civil Liberties

16:04:35  10  Oversight Board in its investigation into Section 702.  It

16:04:40  11  reviewed the report that the Privacy and Civil Liberties

16:04:43  12  Oversight Board produced for both accuracy and classified

16:04:48  13  information.  And it has provided a wealth of information to

16:04:52  14  the public for purposes of transparency and accountability

16:04:56  15  about how Upstream surveillance operates.

16:04:59  16       The second fact is that Congress made a decision in

16:05:04  17  FISA to provide a mechanism that balance the interest in

16:05:09  18  secrecy and accountability.  Unlike the state secrets cases

16:05:12  19  that the government points to, including *El-Masri*, Congress

16:05:16  20  provided a mechanism for Courts, like this one, to review

16:05:21  21  classified information in order to hear cases, to hear civil

16:05:25  22  challenges that took on the lawfulness of FISA surveillance.

16:05:31  23       And so that mechanism, which was a judgment by

16:05:34  24  Congress, is available here.  And in fact Congress made --

16:05:38  25  made it mandatory in cases challenging FISA's surveillance.

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

Wikimedia v. NSA

58

16:05:42  1          And third, plaintiff Wikimedia and its showing are

16:05:47  2   exceptional, because of the size, breadth, and distribution of

16:05:51  3   its communications.  Wikimedia engages in so many

16:05:56  4   communications of the kind -- of web communications of the

16:05:58  5   kind the Government has said it's collecting that it can make

16:06:02  6   a showing that few other plaintiffs could.

16:06:05  7          And together with the Government's own unclassified

16:06:08  8   public disclosures, Wikimedia has provided more than enough

16:06:12  9   evidence to show that its communications are substantially

16:06:15  10  likely to be copied and reviewed in the course of the

16:06:18  11  surveillance.

16:06:19  12          THE COURT:  All right.  Thank you.

16:06:20  13          MR. TOOMEY:  Thank you, Your Honor.

16:06:20  14          THE COURT:  Thank you, Mr. Toomey.  All right,

16:06:22  15  Ms. Scott.

16:06:23  16          MS. SCOTT:  Yes, Your Honor.

16:06:28  17          THE COURT:  You have the burden of persuasion, so

16:06:31  18  you get the last word.

16:06:33  19          MS. SCOTT:  Yes, Your Honor.

16:06:35  20          So counsel has just said that there are three

16:06:38  21  factors that make this case different.  And the first one that

16:06:44  22  he said is that the Government decided to release information.

16:06:48  23  And so that factor, in making that argument, he forgot to tell

16:06:55  24  the Court that the Court has already ruled that the privilege

16:06:57  25  applies here to the specific information that are operational

—Wikimedia v. NSA—

59

16:07:03  1  details, locations of Upstream surveillance, and the subjects

16:07:07  2  and/or targets.  There are other things that the privilege

16:07:10  3  covers, but those are the key things that it covers that are

16:07:14  4  being addressed in their argument.

16:07:16  5         And this case is *El-Masri* because of that where

16:07:21  6  there had been a general release of information, but not a

16:07:24  7  release of the information that was specifically necessary to

16:07:29  8  litigate that case.

16:07:29  9         As this Court held and the Fourth Circuit affirmed,

16:07:32  10  the case could not go forward in that circumstance and this

16:07:34  11  case is just like that and it cannot go forward.

16:07:39  12         The second factor, the 1806(f) can apply.  Again,

16:07:43  13  counsel forgot to tell the Court that this Court has already

16:07:45  14  looked specifically at the 1806(f) issue and this Court has

16:07:50  15  already found that 1806(f) does not apply here.  Specifically,

16:07:55  16  the August 2018 decision that this Court issued said:  That

16:08:01  17  1806(f) procedures do not apply.  I'm going to read directly

16:08:10  18  from the Court's opinion if you don't mind.  I didn't want to

16:08:14  19  get it wrong, that's why the pause.

16:08:15  20         "A determination that surveillance was lawfully

16:08:18  21  authorized and conducted, cannot occur unless a determination

16:08:21  22  has previously been made that the surveillance at issue did in

16:08:25  23  fact occur.  Put differently, it is impossible to determine

16:08:30  24  the lawfulness of surveillance if no surveillance has actually

16:08:34  25  occurred.  Thus the text of 1806(f) points persuasively to the

─Wikimedia v. NSA─

60

16:08:40  1   conclusion that Congress intended 1806(f) procedures to apply

16:08:44  2   only after it became clear from the factual record that the

16:08:48  3   movant was the subject of electronic surveillance.

16:08:51  4          Now, here, just like in August of 2018, when the

16:08:56  5   Court made that analysis and issued -- when this Court issued

16:08:59  6   this opinion, plaintiff has failed to prove, on the factual

16:09:04  7   record, that 1806(f) procedures apply.  And this Court should

16:09:09  8   not revisit that decision here now.  Specifically, they have

16:09:17  9   to prove, as I'll remind the Court you've already decided,

16:09:21 10   that they have -- they qualify as an aggrieved person.  And

16:09:25 11   without that aggrieved personhood or aggrieved person status,

16:09:32 12   they cannot get access to those procedures.  And the aggrieved

16:09:37 13   person status, in order to prove that, they have got to --

16:09:44 14   they have got to prove the definition of aggrieved person

16:09:48 15   under 50 U.S.C. 1801, which is the FISA definition for

16:09:53 16   aggrieved person.  "Is a person who is subject to electronic

16:09:57 17   surveillance."

16:09:58 18          And the "electronic surveillance" term that's

16:10:01 19   defined under 1801(f).  There are four categories, but all of

16:10:06 20   them require a factual showing of acquisition.

16:10:09 21          Now, that hasn't been briefed at this stage here,

16:10:13 22   because it is not the same as the standing question.

16:10:18 23   Specifically, neither of the two architectures that are being

16:10:24 24   discussed as the available technical architectures, neither

16:10:28 25   one of them, deal with this question of acquisition.  That is

———Wikimedia v. NSA———

61

16:10:33  1    after any filtering stage and it has to do with ingestion into

16:10:39  2    the Government databases.

16:10:41  3         Now, as I said, we haven't briefed specifically what

16:10:45  4    would an aggrieved person, what would that proof require,

16:10:49  5    because the Court has already held that 1806(f) procedures

16:10:53  6    cannot be used here.  They haven't proven they're an aggrieved

16:10:57  7    person.  That's the first thing.  But also, it would be

16:10:59  8    inappropriate because the statute is aimed, the entire thrust

16:11:04  9    of that statute is aimed at using those procedures to

16:11:07  10   determine the lawfulness of the surveillance, not whether or

16:11:10  11   not surveillance occurred, which is the standing question.

16:11:13  12        Or that they were subject to surveillance, which is

16:11:17  13   the standing question.  So I forgot to tell the Court that it

16:11:24  14   had already ruled and that is directly on point, and Your

16:11:26  15   Honor should not revisit that decision.

16:11:35  16        THE COURT:  Do you need a moment to consult?

16:11:38  17        MS. SCOTT:  I would appreciate a moment just to make

16:11:42  18   sure I understand the point.

16:11:47  19        MR. GILLIGAN:  Thank you, Your Honor.

16:11:47  20        (A pause in the proceedings.)

16:11:48  21        MS. SCOTT:  So the final third -- the third point --

16:11:50  22   he's actually transitioning perfectly to my third point.  The

16:11:55  23   third point that they said makes this case different than any

16:12:00  24   other case is that Wikimedia's communications is so

16:12:02  25   ubiquitous, so ubiquitous, a finding on standing could not

—Wikimedia v. NSA—

62

16:12:07  1   harm national security because it wouldn't reveal anything

16:12:12  2   because their communications are everywhere.  That's the

16:12:15  3   argument they've made.

16:12:15  4        They've made that before.  And again, he forgot to

16:12:17  5   tell you that in the August 2018 decision, that this Court

16:12:21  6   issued, you already addressed that argument.  I'll read from

16:12:24  7   your opinion again.

16:12:25  8        "Plaintiff contends that, contrary to surveillance

16:12:28  9   of a particular individual with limited communications,

16:12:31  10  plaintiff's communications are so ubiquitous that to reveal

16:12:36  11  surveillance of its communications would not provide

16:12:39  12  information regarding the structure of the Upstream

16:12:41  13  surveillance program or its specific targets.

16:12:44  14        "Although this proposition may appear to have some

16:12:48  15  force, courts consistently recognized that judicial intuition

16:12:54  16  about this proposition, about -- I apologize, about a

16:12:58  17  proposition such as this, is no substitute for documented

16:13:06  18  risks and threats posed by the potential disclosure of

16:13:12  19  national security."

16:13:14  20        There the Court quotes *Al Haramain*, a Ninth Circuit

16:13:14  21  decision.

16:13:18  22        "The defendants have thoroughly documented those

16:13:19  23  risks in the classified declaration here explaining that to

16:13:23  24  reveal the fact of surveillance of an organization such as

16:13:27  25  plaintiff, even considering plaintiff's voluminous online

—Wikimedia v. NSA—

63

communications, would provide insight into the structure and operations of Upstream surveillance -- of the Upstream surveillance program.  And in so doing undermine the effectiveness of this intelligence method."

Now, that is the case and the Court has already held as such.  It is also -- that holding is also directly in line with the Supreme Court's instruction and analysis of the issue from the *Clapper v. Amnesty International* decision in Footnote 4, where it had been suggested in oral argument that the Government could help resolve the issue of standing by disclosing to the Court, perhaps through an in camera proceeding, whether it is intercepting respondent's communications, and what targeting or minimization procedures it is using.

Now, this was not specific to 1806(f), but generally, the Supreme Court said, this type -- said that the suggestion was puzzling to do an ex parte review like this, because as an initial matter it's respondent's burden.  Here, it's plaintiff's burden to prove their standing by pointing to specific facts, not the Government's burden to disprove standing by revealing details of its surveillance priorities.

And then the Court continued to discuss how doing such a thing would harm national security by exposing those state secrets privilege types of information to the Court ex parte, and then potentially in its decision later.

Wikimedia v. NSA

64

16:15:11  1        Now, the fact that plaintiff's communications are

16:15:18  2   ubiquitous doesn't change that, as this Court has already

16:15:22  3   held.

16:15:22  4        Now I'd also like to correct another statement that

16:15:27  5   they started with and returned to a few times, which is, they

16:15:31  6   said Dr. Schulzrinne opines about a filter first or put

16:15:37  7   forward a bald hypothetical, I believe is what they said, as

16:15:42  8   to what might be happening.  And I'd like to correct that,

16:15:47  9   because Dr. Schulzrinne specifically does not opine on what is

16:15:52  10  more likely here.  He doesn't do what Mr. Bradner does, which

16:15:57  11  is speculate about what the NSA may or may not be doing here.

16:16:01  12  He doesn't know.  He hasn't been given access to any

16:16:05  13  classified information, just like Mr. Bradner has no access to

16:16:08  14  classified information.  And Dr. Schulzrinne cannot say,

16:16:14  15  cannot say how it's mostly done or how it is done, because he

16:16:17  16  doesn't know what the NSA's surveillance practices and

16:16:21  17  priorities and things of -- in this foreign intelligence

16:16:25  18  realm, how they would make decisions because of those things.

16:16:28  19        What he does, is he says, it could be done via a

16:16:34  20  copy all.  It could also technically be done via the filter

16:16:40  21  first mechanism that has many permutations, as he describes:

16:16:46  22  whitelisting, blacklisting, combination.

16:16:47  23        He doesn't offer an opinion about how it's done

16:16:51  24  because he doesn't know, but he provides us an answer to a

16:16:55  25  very important question:  Were they originally correct in

16:16:57  1   arguing to the Fourth Circuit, to this Court and the Fourth

16:17:01  2   Circuit, that the technical rules of the Internet require that

16:17:05  3   it be done via a copy-all infrastructure.  The answer, and now

16:17:11  4   bright blinking lights, is now totally clear because every

16:17:15  5   expert agrees, it can be done multiple ways.

16:17:19  6        Now, fundamentally this idea that it must be done

16:17:22  7   because of the rules of the Internet only one way, that was

16:17:29  8   plaintiff's argument around or attempted argument around the

16:17:34  9   state secrets privilege.  If something can only be done one

16:17:36  10  way, then it can't be a secret, essentially, is what they

16:17:41  11  would argue.  Now, we're not conceding that that's the case.

16:17:44  12  You know, maybe it could be done one way and it could still be

16:17:47  13  a secret.  But what we have proven here is that factually

16:17:51  14  they're wrong.  It could be done multiple ways and how it's

16:17:55  15  done or how it's more likely done, that is a question that the

16:17:59  16  Court cannot step into.  And the state secrets doctrine

16:18:04  17  mandates that this Court say they fail to prove their

16:18:08  18  allegation -- sorry, the state secrets privilege doctrine

16:18:11  19  doesn't say -- doesn't mandate that they fail to prove their

16:18:14  20  allegations, but they did.  They failed to show a genuine

16:18:16  21  issue in material fact on their allegations, but the state

16:18:19  22  secrets doctrine now demands that it be dismissed, because the

16:18:23  23  central fact they want to litigate, in order to prove

16:18:26  24  standing, is protected by the privilege.

16:18:28  25        Now --

Wikimedia v. NSA

66

16:18:28  1            THE COURT:  Anything else?

16:18:31  2            MS. SCOTT:  Yes, Your Honor.  With a few more

16:18:33  3  moments of the Court's indulgence, I would like to explain

16:18:37  4  that plaintiffs are wrong when they say that the standard the

16:18:41  5  Court should apply is the substantial risk standard.

16:18:44  6            Now, in their briefs, they cite for that standard, a

16:18:49  7  Susan B. Anthony List Supreme Court decision.

16:18:53  8            And I've said, in my opening argument, that *Amnesty*

16:18:57  9  *International*, the *Clapper v. Amnesty International* decision,

16:19:00  10  is controlling here.  And so the correct standard is actual or

16:19:04  11  certainly impending injury.

16:19:05  12           They think it's substantial risk, but the line of

16:19:08  13  cases that Susan B. Anthony addresses, all show -- all face

16:19:14  14  circumstances where there has been actual action by the

16:19:18  15  Government that can be connected with the plaintiff.  So

16:19:21  16  that's a known commodity.

16:19:24  17           And then, they look to the future injury for that

16:19:26  18  standard.

16:19:26  19           That is, as the *Clapper* decision held in Footnote 5,

16:19:32  20  that was the wrong standard to apply in *Clapper,* and it's the

16:19:37  21  wrong standard to apply here, because plaintiffs have no proof

16:19:41  22  of actual Government action connected to them specifically.

16:19:46  23           Moreover, the case they cite for the substantial

16:19:49  24  risk standard, it cites back to *Clapper* and it says,

16:19:54  25  specifically that:  The *Amnesty International* plaintiff's

─Wikimedia v. NSA─

67

16:19:59  1   theory of standing, in unifying the two decisions, that

16:20:02  2   case -- plaintiff's theory of standing, was substantially

16:20:06  3   undermined by their failure to offer any evidence that their

16:20:10  4   communications had been monitored under the challenged

16:20:13  5   statute.

16:20:13  6         So, you know, Susan B. Anthony is not doing anything

16:20:18  7   to disturb the answer that *Clapper* provided, which is that

16:20:22  8   actual action is required and the substantial risks standard

16:20:26  9   is inappropriate.  But even more, Footnote 5 in *Clapper* says:

16:20:32  10  Even if the substantial risks standard were applied, in that

16:20:36  11  case, plaintiff's would still fail to meet it because of the

16:20:40  12  chain of attenuated circumstances.

16:20:42  13        Here, all of this speculation is just such a chain.

16:20:46  14  And this Court should reject that application of the errant --

16:20:53  15  of the errant standard.

16:20:56  16        THE COURT:  All right.  Thank you, Ms. Scott.

16:20:59  17        All right.  The Court will take the matter under

16:21:02  18  advisement.  The parties may wish to request a transcript of

16:21:06  19  their arguments from the reporter, presumably your budgets can

16:21:14  20  afford that.  I think it might be helpful for the Court to

16:21:19  21  have that.  And I'll take the matter under advisement and

16:21:23  22  consider it.

16:21:26  23        I think the case involves a substantial challenge,

16:21:34  24  let's say, on both sides.  And I want to consider it carefully

16:21:43  25  the arguments you've made today and in your briefs.  And I

68

16:21:47  1  also -- you submitted a good deal of paper in support of it

16:21:52  2  and I want to review that as well.

16:21:54  3       As usual, the arguments you've made both here and in

16:21:59  4  previous stages of this case have been very helpful and I

16:22:06  5  thank you for it.  Court stands in recess.

16:22:08  6

16:22:24  7            **(Proceedings adjourned at 4:22 p.m.)**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3          I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the Remand

7    Hearing in the case of the **WIKIMEDIA FOUNDATION versus**

8    **NATIONAL SECURITY AGENCY**/**CENTRAL SECURITY SERVICES, et al,**

9    Civil Action No. 1:15-CV-662, in said court on the 30th day

10   of May, 2019.

11         I further certify that the foregoing 69 pages

12   constitute the official transcript of said proceedings, as

13   taken from my machine shorthand notes, my computer realtime

14   display, together with the backup tape recording of said

15   proceedings to the best of my ability.

16         In witness whereof, I have hereto subscribed my

17   name, this May 12, 2020.

18

19

20

21                        _Tonia M Harris_

22                        _____

23                        Tonia M. Harris, RPR
                          Official Court Reporter

24

25

                                                              69